# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

BARN LIGHT ELECTRIC COMPANY,
L.L.C., a Florida limited liability company,

Plaintiff,

v.

BARNLIGHT ORIGINALS, INC.,
a Nevada corporation; and
HI-LITE MANUFACTURING
COMPANY, INC.; a Nevada corporation,
JEFFREY L. OHAI, an individual
California resident,

Defendants.

CASE NO. 8:14-CV-1955-T-35AEP

## EXPERT REPORT OF JEFFERY A. STEC, Ph.D.

### I.    INTRODUCTION

I was retained by counsel on behalf of Barn Light Electric Company, L.L.C. ("Barn Light Electric")[1] in litigation against Barnlight Originals, Inc., Hi-Lite Manufacturing Company, Inc., and Jeffrey L. Ohai ("Barnlight Originals") where Barnlight Originals has been accused of trademark infringement and unfair competition by Barn Light Electric.[2]  In particular, Barn Light Electric alleges that Barnlight Originals infringe the Barn Light Electric marks[3] in the sale of its lighting fixture products.  In

---

[1] See Exhibit 1 for my curriculum vitae.  See Exhibit 2 for my testimony experience and published works.
[2] See Third Amended Complaint, May 27, 2015, p. 1.
[3] The Barn Light Electric marks are "Barn Light Electric," "Barn Light Electric Company," Barn Light Electric Co.," "Home of 'the Original Barn Light,'" and "The Original."  (See Third Amended Complaint, May 27, 2015, p. 10).

 CRA Charles River Associates

Confidential – Attorneys'
Eyes Only

1

addition, Barn Light Electric alleges that Barnlight Originals has systematically copied numerous aspects of Barn Light Electric's website and design.[4]

In the context of this litigation, I was asked to determine whether Barnlight Originals' use of the Barn Light Electric marks and its use of the design elements from the Barn Light Electric website have caused a likelihood of confusion as to the source of Barnlight Originals lighting fixture products. In other words, I have been asked to investigate whether Barnlight Originals has caused a likelihood of confusion in the marketplace by its allegedly infringing use of Barn Light Electric marks and website design elements. To address this question, I conducted a survey asking customers and potential customers of lighting fixture products whether they associated the Barnlight Originals' "The Authentic Warehouse Shade Gooseneck" lighting fixture, as it is presented on Barnlight Originals' website with the same company or a different company as the Barn Light Electric's "The Original™ Warehouse Gooseneck" light as it is presented on Barn Light Electrics website. This report describes my research methodology for conducting the survey, my research findings, and the conclusions based on these findings.

This report is based upon information currently known to me and analyses completed to date. Accordingly, I reserve the right to rely upon additional information that becomes available to me after the date of this report and to amend or modify this report to reflect such information or further research or analyses I may perform. I have attached exhibits to this report that support my opinions. My firm is currently compensated for the time my staff and I spend on this engagement plus out-of-pocket expenses. My hourly rate is $525 per hour. CRA's compensation does not depend in any way on the outcome of this litigation.

## II.        QUALIFICATIONS

I am a Vice President with Charles River Associates ("CRA"), an international economic consulting firm focused on advising clients and counsel in the areas of complex

---

[4] In particular, Barn Light Electric alleges that Barnlight Originals "copied every material aspect of Barn



litigation and intellectual property matters in the context of economics, strategy, valuation, licensing, and litigation support services.[5]

I have served as a consultant to a wide variety of clients on matters involving economic, financial, and statistical analysis and modeling for the purpose of interpreting and projecting data and evaluating the impact of business decisions, transactions, consumers' perceptions, and economic events. I have also served as an expert witness or consultant in a wide range of litigation matters, including intellectual property, antitrust, financial, and commercial litigation. In addition, I have served as an expert witness or consulted with clients on survey research and survey methodological issues, including designing and conducting surveys for clients, evaluating the survey work done by others, and researching and recommending best practices.

Prior to joining CRA, I was a senior research associate at the Ohio State University Center for Survey Research. In that role, I designed numerous telephone, internet, and mail surveys for various clients. My responsibilities included everything from sample and questionnaire design to data collection methods and statistical analyses of survey data.

I also have written and presented papers and presentations dealing with various damages-related and survey research topics and survey methodological issues. These presentations have included the meetings of the American Statistical Association, the American Association of Public Opinion Research ("AAPOR"), the Midwest Association of Public Opinion Research, and the Chicago Bar Association, among others. Some of these papers were published in the American Statistical Association's *Proceedings of the Section on Survey Research Methods* and *Proceedings of the Section on Government Statistics and Section on Social Statistics*.

In addition, I have also served on the Sage Publications' Editorial Board as an advisory board member for the compilation of the Encyclopedia of Survey Research

---

Light Electric's product page." (See Third Amended Complaint, May 27, 2015, pp. 15-17).
[5] See Exhibit 1 for my curriculum vitae. See Exhibit 2 for my testimony experience.



Methods.  I have acted as a referee in the review of a number of articles for publication in survey research journals.  I have also served on various AAPOR-based task force committees convened to address, discuss, and put forth recommendations on various survey-related issues and on the Intellectual Property Owners Association's Damages and Injunctions Committee.

I received Ph.D. and Master's degrees in Economics from the Ohio State University.  I received Bachelor of Arts degrees in Philosophy and Psychology from Cornell University and in Economics with a Math Minor from the University of Illinois-Chicago.  I am a member of various professional organizations including the American Economic Association, the American Association for Public Opinion Research, and the Licensing Executives Society, among others.

## III.    BACKGROUND INFORMATION

### A. Barn Light Electric Company, LLC

Founded in 2008, Barn Light Electric is a Florida limited liability company with its principal place of business in the Middle District of Florida.[6]  Barn Light Electric designs, manufactures and sells light fixtures and other vintage-inspired goods.[7]  Many of these products fall under the company's "BARN LIGHT ELECTRIC CO." family of trademarks, which includes "THE ORIGINAL" mark that is used to identify certain warehouse light fixtures.[8]

### B. Barnlight Originals, Inc. et al.,

Barnlight Originals is a corporation that is organized under the laws of Nevada with its principle place of business in Nevada.[9]  The company is a retailer that offers light fixtures that are suitable for commercial and residential use.[10]  These products are

---

[6] See Third Amended Complaint, May 27, 2015, p. 5.
[7] See Third Amended Complaint, May 27, 2015, pp. 1-2.
[8] See Third Amended Complaint, May 27, 2015, p. 2.
[9] See Defendants' Answer to Plaintiff's Third Amended Complaint, September 8, 2015, p. 4.
[10] https://www.barnlightoriginals.com/page/about-us.



manufactured by Hi-Lite Mfg. Co.,[11] a corporation organized and existing under the laws of Nevada, with its principal place of business in California.[12]

## IV.      SURVEY METHODOLOGY

To determine whether customers and potential customers confuse the lighting fixture presented on the Barnlight Originals website with coming from or being affiliated with Barn Light Electric, I constructed a sampling design and survey questionnaire that were used to collect the survey data. I identified the target population for this study as U.S. residents that are customers and potential customers of lighting fixtures. To reach this target population, I conducted a double-blind internet survey asking a series of questions to collect the survey data.[13]

### A. Sample Design

The appropriate target population for measuring likelihood of confusion in this case is customers and potential customers of Barnlight Originals lighting fixtures. It is my understanding that Barn Light Electric and Barnlight Originals sell their lighting fixtures across the U.S. using the Internet.[14] Therefore the appropriate target population for a likelihood of confusion survey is U.S. customers and potential customers of lighting fixtures.[15] The sample design was chosen to approximate the U.S. population.[16] A probability (random) sample was selected for this study. That sample, selected from the

---

[11] See Third Amended Complaint, May 27, 2015, p. 13.
[12] See Third Amended Complaint, May 27, 2015, p. 5.
[13] A double-blind survey is one where neither the respondents nor the data collection organization conducting the survey were aware of the purposes of the research. A double-blind survey design prevents both parties from discerning an anticipated or preferred pattern of responses. (See Diamond, Shari Seidman. Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition.* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council. p. 419).
[14] See http://www.barnlightelectric.com/ and https://www.barnlightoriginals.com/. As such, an Internet study in which respondents see the web pages that they might encounter as they shop for lighting fixtures would well represent the marketplace in which Barn Light Electric and Barnlight Originals operate.
[15] Specifically, the target population is U.S. customers and potential customers of lighting fixtures, 18 years old or older whose immediate household members are not employed in the market research, advertising, or the lighting fixture industry.
[16] Using demographic information from the survey, Research Now sent invitations to participate in the survey to a sample that approximated the general U.S population.



Confidential – Attorneys' Eyes Only

5

research panel of respondents, was provided by Research Now,[17] a leading data collection and survey research firm.[18]

A set of screening questions was used to select the appropriate respondents.[19] Sample members were qualified to participate in the research study if they indicated that:

- They were viewing the survey questionnaire on a device with a sufficient screen size in order to see the website pictures in the survey;[20]
- They were 18 years old or older;
- In the last 12 months, they personally had shopped for/purchased lighting fixtures and/or, in the next 12 months, they planned to shop for/purchase lighting fixtures; and,
- No one in their immediate households worked in the market research, advertising, or the lighting fixture industries.

Internet interviews were completed and the data was collected by Research Now at my direction and supervision.  That data collection process occurred from September 13, 2015 through September 16, 2015.  In all, 500 surveys were completed.

### B.  Survey Questionnaire

Once sample members were qualified to participate in the research study, each respondent was randomly assigned to one of two groups – a treatment group[21] or a

---

[17] The research panel used was the E-Rewards U.S. panel, which is comprised of approximately 4.5 million panel members.  Twelve thousand invitations were sent to panel members.  Of those 12,000 panel members, 3,790 panel members responded.  Of those 3,790 respondents, 3,217 did not qualify for the survey, 73 respondents did not complete the survey, and 500 respondents completed the survey.  Based on these dispositions, 15.1% of the respondents qualified to take the survey.  ((3,790-3,217)/3,790).  Using this qualification rate to determine how many non-respondents were likely to qualify for the study, the estimated response rate is 38.0% (500/((12,000-3,790)*15.1%+73)).  The completion rate was 87.3% (500/(500+73)).

[18] http://www.researchnow.com/en-US/AboutUs/Our%20Parent%20Company.aspx.

[19] See Exhibit 7 for the screener questionnaire.  A pilot test was conducted using a random sample of potential respondents.  The pilot test indicated that there were no data collection procedures or questionnaire design issues to address.  Therefore, the surveys completed as part of the pilot test were incorporated into the overall sample.

[20] This was done to ensure that respondents would have a large enough screen to see the web pages they were shown as part of the survey.



Confidential – Attorneys'
Eyes Only

6

control group.[22]  For the treatment group, the Barnlight Originals web page for its Authentic Warehouse Shade Gooseneck was used.  For the control group, the Barnlight Originals web page for its Authentic Warehouse Shade Gooseneck was used, but the accused trademarks and design elements were removed and replaced with non-accused words and design elements.  This was done so that the control group stimulus would share as many characteristics with the treatment group stimulus as possible, with the key exception of the characteristics whose influence are being assessed.[23]   Assignment to one of these two groups determined the questionnaire that was administered to the respondent.

For respondents in the treatment group, respondents were first shown the Barn Light Electric web page used to sell The Original™ Warehouse Gooseneck Light as follows:[24]

Take as much time as you need to view this web page as if you were seeing it as you consider purchasing light fixtures.  For the purposes of upcoming questions, this web page will be referred to as the first web page that you saw.  Once you have thoroughly reviewed this web page, please continue:

---

[21] In an experimental design paradigm, the treatment group is the respondents that are exposed to the Barnlight Originals web page.
[22] The control group is the respondents that are exposed to the Modified Barnlight Originals web page.
[23] Diamond, Shari Seidman, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence, Second Edition,* Federal Judicial Center 2000, p.258.
[24] See Exhibit 8 for the treatment questionnaire.  See Exhibit 10 for screen shots of the survey.





Next, respondents were shown one of three different web pages randomly ordered.[25]  For the treatment cohort, one of the web pages shown to them was the Barnlight Originals web page for "The Authentic Warehouse Shade Gooseneck" as it appears online.[26]

---

[25] The order of the web pages was randomly determined to avoid possible order effects.
[26] http://www.barnlightoriginals.com/goosenecks/barn-sign-goosenecks/the-authentic-warehouse-shade-gooseneck.



Confidential – Attorneys'
Eyes Only

8



# THE AUTHENTIC WAREHOUSE SHADE GOOSENECK



Respondents were also shown two other web pages. One web page presented the "Oldage LED Gooseneck Barn Semi-Flush Mount" light fixture by Cocoweb sold through the wayfair.com website.[27]

---

[27] http://www.wayfair.com/Oldage-LED-Gooseneck-Barn-Semi-Flush-Mount-LBL-OAG12-CCOW1022.html.





The other web page presented the "1 Light Barn Style Outdoor Shade" sold through the Capital Lighting Fixture Company website.[28]

---

[28] http://www.capitallightingfixture.com/product/1-light-barn-style-outdoor-shade/.





For respondents in the treatment group, they were asked the following questions after each presentation of the web pages described above:

**Q1.**  Do you believe this web page shows lighting fixtures that are put out by the **same company** that puts out the lighting fixtures that you saw in the first web page **<u>or</u>** do you believe this web page shows lighting fixtures that are put out by a **different company** than the one that puts out the lighting fixtures that you saw in the first web page?

> <1> These lighting fixtures are put out by the **same company** that puts out the lighting fixtures I saw in the first web page
> <2> These lighting fixtures are put out by a **different company** than the one that puts out the lighting fixtures I saw in the first web page
> <3> Don't Know

The word order of this question was varied to avoid possible order effects. Specifically, whether respondents saw the "same company" phrase first or the "different company" phrase first was randomly determined.



Charles River Associates

Confidential – Attorneys'
Eyes Only

11

For those respondents that answered, "same company," they were asked the following question:

**Q2.**   What specifically makes you believe this web page shows lighting fixtures that are put out by the same company that puts out the lighting fixtures you saw in the first web page?  **Please be as specific as possible.**

> <1> **SPECIFY**
> <2> **DON'T KNOW**

For those respondents that indicated "different company" or "don't know" in Q1, they were asked:

**Q3.**  Do you believe that the company that puts out these lighting fixtures that are shown on this web page **is** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page **or** do you believe that the company that puts out these lighting fixtures that are shown on this web page **is not** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page?

> <1> The company that puts out these lighting fixtures **is** sponsored or
>       approved to do so by the same company that puts out the lighting
>       fixtures you saw in the first web page
> <2> The company that puts out these lighting fixtures **is not** sponsored or
>       approved to do so by the same company that puts out the lighting
>       fixtures you saw in the first web page
> <3> Don't Know

The word order of this question was also varied to avoid possible order effects. Specifically, whether respondents saw the "**is** sponsored or approved to do so by the same company" phrase first or the "**is not** sponsored or approved to do so by the same company" phrase first was randomly determined.

For those respondents that answered, "**is** sponsored or approved to do so by the same company," they were asked the following question:



**Q4.**     What specifically makes you believe this web page shows lighting fixtures that are sponsored or approved by the same company that puts out the lighting fixtures you saw in the first web page? **Please be as specific as possible.**

> <1> **SPECIFY**
> <2> **DON'T KNOW**

For those respondents that answered, "**is not** sponsored or approved to do so by the same company" to Q3 as well as the respondents that answered Q4, they were shown the next web page, the order of which was randomly determined and then asked the same block of questions about that web page.  This was done until respondents were shown each of the three web pages described above and asked the corresponding questions.

For respondents in the control group, they were asked the same questions about each of the web pages they were shown.[29]  However, control group respondents were not shown the Barnlight Originals web page as it appears online.  Instead, they were shown a modified version of the web page, which had removed from it the "Barnlight Originals" company name,[30] the light fixture that was part of the Barnlight Originals logo, the "Authentic Warehouse Shade Gooseneck" product name,[31] the product specification box,[32] and the picture of the product.[33]

---

[29] See Exhibit 9 for the control questionnaire.  See Exhibit 10 for screen shots of the survey.
[30] The "Barnlight Originals" name was replaced with the name, "Only Lights."
[31] The "Authentic Warehouse Shade Gooseneck" product name was replaced by the "Warehouse Shade" product name.
[32] The Barnlight Originals product specification box was removed and replaced with a product specification box that did not have drop down menus or product specification bubbles.
[33] The picture of the Barnlight Originals Authentic Warehouse Shade Gooseneck light fixture was removed and replaced with the picture of another light fixture.

 **Charles River Associates**

Confidential – Attorneys'
Eyes Only

13



The design of this survey is sometimes referred to as a product array survey.[34]
First, respondents are shown the senior user's web page that contains the relevant
product. Next, respondents are shown a rotation of other web pages with other lighting
products, including the web page containing the allegedly infringing trademarks and
design elements. Series of questions are used to determine respondents' beliefs about
whether or not there are relationships between the senior user's product, as it appears on
its website and the products in the "array" as they appear on their respective websites.

In addition, a control was used to address the research question while attempting
to remove pre-existing beliefs, guesses, and other background noise that respondents may
bring to the survey. To the extent that respondents to this survey brought pre-existing

---

[34] Lalonde, Anne Gilson, *Gilson on Trademarks,* Volume 3, Matthew Bender & Company, Inc., pp.
§8.03[3][b][i][B][II] and §8.03[3][f]. See also *Squirtco v. Seven-Up Co.* 628 F.2d 1086, 1089 n.4, 1091
(8th Cir. 1980). This type of study is particularly appropriate in this case because both Barn Light Electric
and Barnlight Originals marketplace is the Internet. Moreover, a potential customer shopping for lighting



beliefs, guesses, or other background noise that inappropriately shaped their responses, the use of a control group directly addresses and accounts for this issue.[35]

## V.    SURVEY RESULTS

Data from 500 completed interviews was used to produce sample statistics.  In addition, because the sampling design was based on a probability sample from the panel that was used, well-accepted statistical principles were used to generate confidence intervals for the relevant sample statistics that could then be generalized to the panel. These confidence intervals were created to establish a range in which the true population statistics for the panel were likely to fall with a high level of confidence.

### A.  Survey Data[36]

Of the 500 completed interviews, 249 respondents were assigned to the treatment group and 251 were assigned to the control group.

Examining the survey data, respondents from the treatment group and control group answered the survey questions regarding the Barnlight Originals web page as follows:

**Q1.**  Do you believe this web page shows lighting fixtures that are put out by the **same company** that puts out the lighting fixtures that you saw in the first web page **<u>or</u>** do you believe this web page shows lighting fixtures that are put out by a **different company** than the one that puts out the lighting fixtures that you saw in the first web page?

---

fixtures on the Internet would potentially encounter multiple lighting fixtures websites and compare the products from those websites in the course of his/her Internet shopping.
[35] See Diamond, Shari Seidman.  Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition*.  Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, pp. 397-401.
[36] See Exhibit 11 for the survey data.

 **CRA** Charles River Associates

Confidential – Attorneys'
Eyes Only

15

**Table 1: Respondents Shown the Barnlight Originals Web Page (Treatment Group)[37]**

|  | Number of Respondents | Percentage[38] |
|---|---|---|
| These lighting fixtures are put out by the **same company** that puts out the lighting fixtures I saw in the first web page | 134 | 53.8% |
| These lighting fixtures are put out by a **different company** than the one that puts out the lighting fixtures I saw in the first web page | 86 | 34.5% |
| **Don't Know** | 29 | 11.6% |
| **Total** | 249 | 100.0% |

**Table 2: Respondents Shown the Modified Barnlight Originals Web Page (Control Group)[39]**

|  | Number of Respondents | Percentage[40] |
|---|---|---|
| These lighting fixtures are put out by the **same company** that puts out the lighting fixtures I saw in the first web page | 48 | 19.1% |
| These lighting fixtures are put out by a **different company** than the one that puts out the lighting fixtures I saw in the first web page | 157 | 62.5% |
| **Don't Know** | 46 | 18.3% |
| **Total** | 251 | 100.0% |

---

[37] See Exhibit 5.1.

[38] The sampling error for this sample statistic can be calculated as

$$SamplingError = \sqrt{\frac{p*(1-p)}{n}} * z_{\alpha/2}$$ where $p$ is the percentage of interest, $n$ is the total sample size

and $z_{\alpha/2}$ is the (1-α/2)th percentile of the standard normal distribution where α is the significance level or

the likelihood of committing a Type I error (rejecting the null hypothesis when it is true). For example, for a 5% significance level (two-tailed), the sampling error for $p = 0.538$ derived from a sample of size 249 is 6.2%.

[39] See Exhibit 5.1.

[40] The sampling error for this sample statistic can be calculated as specified in the above footnote. For a 5% significance level (two-tailed), the sampling error for $p = 0.191$ for a sample of size 251 is 4.9%.



**Q2.** What specifically makes you believe this web page shows lighting fixtures that are put out by the same company that puts out the lighting fixtures you saw in the first web page? **Please be as specific as possible.**

**Table 3: Respondents Shown the Barnlight Originals Web Page (Treatment Group)[41]**

| | | Number of Respondents | Percentage |
|---|---|---|---|
| **Product** | **Style/Finishes** | 12 | 9.6% |
| | **Design/Hardware** | 33 | 26.4% |
| **Company** | **Logo** | 7 | 5.6% |
| | **Pricing** | 12 | 9.6% |
| | **Name** | 44 | 35.2% |
| **Web Page** | **Description** | 11 | 8.8% |
| | **Layout** | 40 | 32.0% |
| **Other** | | 5 | 4.0% |
| **Mention of "same," "similar" or "identical"** | | 75 | 60.0% |
| **Total Respondents** | | 125 | 100.0% |

---

[41] See Exhibit 6.0. Based on my review of the respondents' open-ended answers, numerous responses suggest evidence of likelihood of confusion based on the respondents' open-ended answers regarding the similarity of the tested trademarks and design elements. For example, as Table 3 indicates, numerous responses indicate that respondents thought the Barnlight Originals lighting fixture was put out by Barn Light Electric because of the accused trademarks and design elements that were tested in the survey.



**Table 4: Respondents Shown the Modified Barnlight Originals Web Page (Control Group)[42]**

| | | Number of Respondents | Percentage |
|---|---|---|---|
| Product | Style/Finishes | 13 | 30.2% |
| | Design/Hardware | 12 | 27.9% |
| Company | Logo | 1 | 2.3% |
| | Pricing | 0 | 0.0% |
| | Name | 3 | 7.0% |
| Web Page | Description | 6 | 14.0% |
| | Layout | 6 | 14.0% |
| Other | | 13 | 30.2% |
| Mention of "same," "similar" or "identical" | | 27 | 62.8% |
| Total Respondents | | 43 | 100.0% |

**Q3.** Do you believe that the company that puts out these lighting fixtures that are shown on this web page **is** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page <u>or</u> do you believe that the company that puts out these lighting fixtures that are shown on this web page **is not** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page?

---

[42] See Exhibit 6.0.



Confidential – Attorneys' Eyes Only

**Table 5: Respondents Shown the Barnlight Originals Web Page (Treatment Group)[43]**

|  | Number of Respondents | Percentage[44] |
|---|---|---|
| The company that puts out these lighting fixtures **is** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page | 17 | 14.8% |
| The company that puts out these lighting fixtures **is not** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page | 54 | 47.0% |
| **Don't Know** | 44 | 38.3% |
| **Total** | 115 | 100.0% |

**Table 6: Respondents Shown the Modified Barnlight Originals Web Page (Control Group)[45]**

|  | Number of Respondents | Percentage[46] |
|---|---|---|
| The company that puts out these lighting fixtures **is** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page | 25 | 12.3% |
| The company that puts out these lighting fixtures **is not** sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page | 97 | 47.8% |
| **Don't Know** | 81 | 39.9% |
| **Total** | 203 | 100.0% |

---

[43] See Exhibit 5.1.
[44] For a 5% significance level (two-tailed), the sampling error for this sample statistic can be calculated as specified in the above footnote. The sampling error for $p = 0.148$ for a sample of size 115 is 6.5%.
[45] See Exhibit 5.1.
[46] For a 5% significance level (two-tailed), the sampling error for this sample statistic can be calculated as specified in the above footnote. The sampling error for $p = 0.123$ for a sample of size 203 is 4.5%.



**Q4.**  What specifically makes you believe this web page shows lighting fixtures that are sponsored or approved by the same company that puts out the lighting fixtures you saw in the first web page?  **Please be as specific as possible.**

**Table 7: Respondents Shown the Barnlight Originals Web Page (Treatment Group)[47]**

| | | Number of Respondents | Percentage |
|---|---|---|---|
| **Product** | **Style/Finishes** | 1 | 8.3% |
| | **Design/Hardware** | 2 | 16.7% |
| **Company** | **Logo** | 0 | 0.0% |
| | **Pricing** | 2 | 16.7% |
| | **Name** | 3 | 25.0% |
| **Web Page** | **Description** | 0 | 0.0% |
| | **Layout** | 2 | 16.7% |
| **Other** | | 3 | 25.0% |
| **Mention of "same," "similar" or "identical"** | | 8 | 66.7% |
| **Total Respondents** | | 12 | 100.0% |

---

[47] See Exhibit 6.1.



**Table 8: Respondents Shown the Modified Barnlight Originals Web Page**
**(Control Group)[48]**

|          |                | Number of Respondents | Percentage |
|----------|----------------|:---------------------:|:----------:|
| Product  | Style/Finishes | 5                     | 21.7%      |
|          | Design/Hardware| 6                     | 26.1%      |
| Company  | Logo           | 0                     | 0.0%       |
|          | Pricing        | 1                     | 4.3%       |
|          | Name           | 0                     | 0.0%       |
| Web Page | Description    | 1                     | 4.3%       |
|          | Layout         | 4                     | 17.4%      |
| Other    |                | 11                    | 47.8%      |
| Mention of "same," "similar" or "identical" | | 15      | 65.2%      |
| Total Respondents |       | 23                    | 100.0%     |

## VI.      ANALYSES

### A.  Examination of Source Confusion

When respondents from the treatment group were presented with the Barnlight Originals web page, 53.8% of those respondents believed that the lighting fixtures displayed there were put out by Barn Light Electric.[49]  However, as discussed above, it is important to remove pre-existing beliefs, guesses, and other background noise that respondents may bring to the survey.[50]  Therefore, the control questionnaire was administered to a randomly selected sample to gauge the percentage of respondents believed the control stimulus, the modified Barnlight Originals web page, as presenting lighting fixtures put out by Barn Light Electric.  When respondents from the control group were presented with the modified Barnlight Originals web page, 19.1% of those

---

[48] See Exhibit 6.1.
[49] See Exhibit 5.1.  The sampling error is 6.2%.
[50] See Diamond, Shari Seidman.  Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition*.  Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, pp. 397-401.



respondents associated the modified Barnlight Originals web page with Barn Light Electric.[51]  The difference between the percentage of treatment group respondents that indicated the Barnlight Originals web page presented fixtures that were put out by Barn Light Electric and the percentage of control group respondents that indicated the modified Barnlight Originals web page presented fixtures that were put out by Barn Light Electric is the measure of what percentage of light fixture customers (and potential customers) exhibit a likelihood of confusion (source) based on the similarity of the tested trademarks and design elements.  In this case, that percentage is 34.7% after controlling for pre-existing beliefs, guesses, and other background noise.[52]

### B.  Examination of Source and Affiliation Confusion

When respondents from the treatment group were presented with the Barnlight Originals web page, 60.6% of those respondents associated (source or affiliation) that web page with Barn Light Electric.[53]  However, as discussed above, it is important to remove pre-existing beliefs, guesses, and other background noise that respondents may bring to the survey.[54]  When respondents from the control group were presented with the modified Barnlight Originals web page, 29.1% of those respondents associated the modified Barnlight Originals web page with Barn Light Electric.[55]  The difference between the percentage of treatment group respondents that associated the Barnlight Originals web page with Barn Light Electric and the percentage of control group respondents that associated the modified Barnlight Originals web page with Barn Light Electric is the measure of what percentage of light fixture customers (and potential customers) exhibit a likelihood of confusion (source or affiliation) based on the similarity

---

[51] See Exhibit 5.1.  The sampling error is 4.9%.
[52] 53.8% − 19.1% = 34.7%.  See Exhibit 5.1.  The sampling error is 7.9%.
[53] See Exhibit 5.0.  The sampling error is 6.1%.
[54] See Diamond, Shari Seidman.  Reference Guide on Survey Research, *Reference Manual on Scientific Evidence, Third Edition.*  Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, pp. 397-401.
[55] See Exhibit 5.0.  The sampling error is 5.6%.



of the tested trademarks and design elements.  In this case, that percentage is 31.5% after controlling for pre-existing beliefs, guesses, and other background noise.[56]

## VII.    CONCLUSIONS

Based on the results from this double-blind, dual frame, randomized design probability survey, I found that:

- The results of the survey indicate that 53.8% of the survey respondents believed that the Barnlight Originals lighting fixtures displayed on its web page were put out by Barnlight Electric.[57]

- Controlling for pre-existing beliefs, guesses, and other background noise, 34.7% of the respondents believed that the lighting fixtures from the Barnlight Originals web page were put out by Barn Light Electric.[58]

- The results of the survey indicate that 60.6% of the survey respondents believed that the Barnlight Originals lighting fixtures displayed on its web page were put out by Barnlight Electric or were sponsored by or affiliated with Barn Light Electric.[59]

- Controlling for pre-existing beliefs, guesses, and other background noise, 31.5% of the respondents believed that the lighting fixtures from the Barnlight Originals were put out by or were sponsored by or affiliated with Barn Light Electric.[60]

---

[56] 60.6% – 29.1% = 31.5%.  See Exhibit 5.0.  The sampling error is 8.3%.
[57] See Exhibit 5.1.
[58] See Exhibit 5.1.  53.8% – 19.1% = 34.7%.
[59] See Exhibit 5.0.
[60] See Exhibit 5.0.



Confidential – Attorneys'
Eyes Only

Respectfully submitted:

Jeffery A. Stec, Ph.D.

Vice President

Charles River Associates

September 18, 2015

