# EXHIBIT "A"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 8-14-CV-1955-T-35AEP

BARN LIGHT ELECTRIC COMPANY, LLC,

Plaintiff,

v.

BARNLIGHT ORIGINALS, INC., HI-LITE
MANUFACTURING COMPANY, INC.,
JEFFREY L. OHAI,

Defendants

_____

**DECLARATION OF DR. ELI SEGGEV**

October 16, 2015

I was asked by counsel for the defendants—BARNLIGHT ORIGINALS, INC and HI-LITE MANUFACTURING COMPANY, INC.—to review and comment on the report[1] submitted on behalf of the plaintiff—BARN LIGHT ELECTRIC COMPANY, LLC.

In preparation for my review I have considered Dr. Stec's Report (the Stec Report) as well as the documents and websites footnoted in this Declaration.

My qualifications are summarized in Exhibits 1 and 2. Exhibit 1 presents my CV; Exhibit 2 lists my experience as an expert witness in cases covering a variety of topics involving consumer surveys and reliance upon consumer behavior theory in all its manifestations. I am being compensated at the rate of $500 per hour.

_____
[1] Expert Report of Jeffrey A. Stec, Ph.D. (September 18, 2015)

My review of the Stec Report leads me to conclude that its findings have no bearing on the central issue of this lawsuit because of a key aspect of the methodology used in the study.

Dr. Stec's stated objective was to identify and measure likelihood of confusion with regard to the two companies' *trademarks* and the extent to which certain *website design elements* are likely to confuse consumers making them believe that the junior mark represents the same source as the senior mark or sources that are related by means of sponsorship or approval.

However, the stimuli he used with respondents and the phrasing of the questions he designed to obtain response to those stimuli are not in line with his own stated objective. At best, both question phrasing and the stimuli to which he exposed respondents would be adequate and appropriate if the objective of the study were to uncover likelihood of confusion between the two products' design and appearance. But that is not the stated purpose of Dr. Stec's study.

In describing his perception of the task assigned to him by counsel for the plaintiff, he says:

> "In the context of this litigation, I was asked to determine whether Barnlight Originals' use of Barn Light Electric marks and its use of design elements from the Barn Light Electric website have caused a likelihood of confusion as to the source of Barnlight Originals lighting fixture products. In other words, I have been asked to investigate whether Barnlight Originals has caused a likelihood of confusion in the marketplace by its allegedly infringing use of Barn Light Electric marks and website elements. To address this question, I conducted a survey asking customers and potential customers of lighting fixture products whether they associate the Barnlight Originals' "The Authentic Warehouse Shade Gooseneck" light fixture, as it is presented on Barnlight Originals' website with the same company or a different company as the Barn Light Electric's "The Original™ Warehouse Gooseneck" light as it is presented on Barn Light Electrics [sic] website. "

While Dr. Stec accurately identifies the objectives of the client's assignment as the *marks* themselves and *website design elements*, when it comes to describing what he has done, he clearly states that the focus of the survey he designed is on the *light fixture* rather than the trademark or the website.

His approach is patently evident when examining the phrasing of the questions he asked respondents in order to determine whether or not there is evidence of likelihood of confusion.

Likelihood of confusion is typically measured in a two-questions series designed to uncover respondents' perception of the relationship between two entities: equivalency, i.e., same source, in the first question or affiliation, association, connection, sponsorship or

2

permission in the second, follow-up question, for those who do not find equivalency in the first question.

Dr. Stec phrased those questions as follows:

> "Do you believe this web page shows lighting fixtures that are put out by the same company that puts out the lighting fixtures[2] that you saw in the first web page or do you believe this web page shows lighting fixtures that are put out by a different company than the one that puts out the lighting fixtures that you saw in the first web page?"

> "Do you believe that the company that puts out these lighting fixtures that are shown on this web page is sponsored or approved to do so by the same company that puts out the lighting fixtures you saw on the first page or do you believe that the company that puts out these lighting fixtures that are shown on this web page is not sponsored or approved to do so by the same company that puts out the lighting fixtures you saw in the first web page?"

The correct phrasing of those questions should have pointed to the existence of relationships *between the two companies* rather than between their products. If Dr. Stec wanted to explore product design features he should have conducted instead a trade dress study. A trade dress study, either as a "stand-alone" or in conjunction with a secondary meaning study, calls for a completely different methodology. Dr. Stec is an expert in trade dress research, as can be seen in this description on his company's website.[3]

Dr. Stec focused respondents' attention exclusively on the lighting fixtures by means of question phrasing and the inherently large size of the fixture pictorial relative to the web pages he used as stimuli.[4]

As a result, what we have here is a lighting fixture that pops out of the picture, anyway, plus the question phrasing itself that directs—or, conditions—all the respondents where to look for an answer to the question that had just been put to them.

The unwarranted emphasis on the pictorial on the web page works exceedingly well not only because the researcher has conditioned respondents but also from what we know from other areas of consumer behavior research. The research that informs us about readers' eyes movement on a page tells us that, generally, they move in a Southeasterly direction from the top left corner of the page.

Recent research,[5] using web pages as the medium, have shown that when they come upon a page, people—starting from the top left corner—browse using a pattern best described as the letter F. The natural position of the pictorials used by Dr. Stec reinforced the results he obtained. However, as I pointed out earlier, those results turn out to be inconsistent with the purpose of Dr. Stec's study as stated by him.

---

[2] See Exhibit 3 for a sample of the actual stimuli used by Dr. Stec in his study.
[3] http://www.crai.com/engagement/survey-research-supporting-claims-trade-dress-infringement
[4] The fixture in the first stimulus page respondents saw, which is duplicated in Exhibit 3 of this Declaration, occupies 13 percent of the total area of the page and is the single most prominent element on the page.
[5] https://blog.kissmetrics.com/eye-tracking-studies/

Having placed the emphasis he did on the light fixture itself, it should not come as a surprise that significant proportions of people believe that two or more gooseneck barn lights come from a single source.

There are hundreds of gooseneck barn light product offerings like those depicted in the stimuli Dr. Stec presented to respondents in his study that are made by a large number of manufacturers, all exhibiting extraordinary degrees of similarity among them. That is why finding single source attribution is not a research revelation; it is merely an accurate portrayal of market reality.

Dr. Stec has proven the self-evident. In my opinion, that disqualifies his research as an aid for the finder of fact. The Stec Report fails to address the *word mark* trademark infringement issue. Instead, contrary to the stated purpose of the study, Dr. Stec's research addresses a single-source attribution issue based on the physical similarity between two gooseneck barn lights manufactured by two companies.

_____

        Eli Seggev

# EXHIBIT 1

## DR. SEGGEV'S RESUME

**Expert Witness Experience**

| | | |
|---|---|---|
| Expert testimony on trademark infringement matters | Designing, conducting, analyzing and testifying about the results of survey research in Intellectual Property and Consumer Behavior, including: likelihood of confusion, trade dress, dilution, secondary meaning, genericness, misleading advertising, etc. | 2003 to present |

**Business Experience**

| | | |
|---|---|---|
| Founder & Director | TYDACOMM Ltd. (Nigeria) | 2013 to present |
| Business strategy and marketing consulting | Developing business plans, strategic directions, marketing plans and funding strategies for a variety of clients, including: Fortune 500 company, technology startups, and various consumer product and real estate ventures. Advising telecoms entering Sub-Saharan African markets. | 2005 to present |
| Consultant | Synovate (Market Research), New York, NY | 1999 - 2002 |
| Founder and CEO | Marketing Strategy & Planning, Inc. (MS&P) New York, NY | 1985 - 1999 |
| Founder and CEO | Marketing Systems, Inc., New York, NY | 1980 - 1984 |
| Various marketing research and consulting positions | Audits & Surveys, Inc.; Benton & Bowles Advertising; Decisions Center; Seggev Consulting | 1973 - 1980 |

**Academic Experience**

| | | |
|---|---|---|
| Associate Professor of Marketing | Pace University, New York, NY | 1982 – 1992 |
| Associate Professor of Marketing | Baruch College, New York, NY | 1975 – 1982 |
| Associate Professor of Marketing | Long Island University, NY | 1970 – 1975 |
| Visiting Lecturer in Marketing | Tel Aviv University, Israel | 1971 – 1972 |
| Assistant Professor of Marketing | Syracuse University, Syracuse, NY | 1969 – 1970 |

**Education**

| | | |
|---|---|---|
| Ph.D. | Syracuse University, Syracuse, NY | 1969 |
| MBA | University of Michigan, Ann Arbor, MI | 1965 |

B.A. (Social Sciences)                    The Hebrew University, Jerusalem, Israel          1963

**Publications**

- "Values Added from Internet Research," *ESOMAR Net Effects Worldwide Internet Conference,* (2001) [with C. Eichman, A. Mezzasalma and G. Licastro]
- "Marketing Research – the Marketing Strategy Engine," *The Institute of International Research Conference: Customer Marketing for Newly Deregulated Industries*, (1998)
- "The Pickax, The Shovel, The Bulldozer and the Head Lamp," *Working Paper*, (1998)
- "Fusing Attitudinal and Behavioral Data in Data Mining," *Working Paper*, (1998)
- Gaining Competitive Advantage Through Customer-Focused Marketing," *Idaho and Montana Banker Association Annual Convention*, (1997)
- "A Role in Flux," *Marketing Management*, (1995)
- "Getting the Most Out of Your Customer Satisfaction Measurement," *Consumer Banking Digest*, (1993)
- "Advertising Effectiveness Measurement for Contribution-Based Compensation," *Journal of Advertising Research*, (1992)
- "Testing the Strategic Fit of Financial Services Advertising, *Advertising Research Foundations Key Issues Workshop*, (1983)
- "Testing Persuasion by Strategic Positioning," *Journal of Advertising Research*, (1982)
- "Brand Assortment and Consumer Brand Choice," *Journal of Marketing*, (1970)

**Awards**

American Marketing Association Dissertation Award for best doctoral dissertations (1969)

**EXHIBIT 2**

DR. SEGGEV'S EXPERT WITNESS EXPERIENCE
[Past Four Years]

Heidi Langan et al. v. Johnson & Johnson Consumer Companies. Inc.—U.S. District Court District of Connecticut (2015)
        Class Action—Deceptive Labeling—Report and Deposition

Ortega et al. v. Natural Balance, Inc. et al.—U.S. District Court Central District of California (2014).
        Class Action—Deceptive Advertising—Report and Rebuttal

Action Direct Marketing, Inc. v. METX, LLC et al.—U.S. District Court Western District of Texas Waco Division (2014)
        Likelihood of Confusion—Report

Carol Leebove, Wanda Santa, et al. V. Maybelline LLC (2013)—U.S. District Court Southern District of New York (2013)
        Class Action—Advertising Claim Research—Deposition

Baroness Small Estates Inc. v. BJ's Restaurant Inc.—U.S. District Court Central District of California Santa Ana (2012)
        Likelihood of Confusion—Rebuttal Report

Timelines v. Facebook—U.S. District Court Northern District of Illinois Eastern Division (2012)
        Likelihood of Confusion and Rebuttal of Genericness Survey—Deposition

Weruva International, Inc. v. Pets Global, Inc.—U.S. District Court Massachusetts (2012)
        Misleading advertising on cat food labeling—Report

## EXHIBIT 3

### SELECTED STIMULI USED IN THE STEC REPORT



**Figure 1 Test Cell Stimulus—Plaintiff's Mark**

8



**Figure 2 Test Cell Stimulus—Defendant's Mark**



**Figure 3 Control Cell Stimulus--Altered Defendant's Webpage**