BARN LIGHT ELECTRIC COMPANY, LLC,
a Florida limited liability company,

      Plaintiff,

v.

BARNLIGHT ORIGINALS, INC., a
a Nevada corporation; HI-
LITE MANUFACTURING
COMPANY, INC., a
California corporation; and
JEFFREY L. OHAI, an
individual California
Resident,

      Defendants.

_____/

BARNLIGHT ORIGINALS, INC., a
a Nevada corporation; and HI-LITE
MANUFACTURING COMPANY,
INC., a California corporation,

      Counterclaim Plaintiffs,

v.

BARN LIGHT ELECTRIC COMPANY, LLC,
a Florida limited liability company,

      Counterclaim Defendants,

and

BRYAN AND DONNA SCOTT, individual
Florida Residents,

      Third-Party Defendants.

_____/

**JOINT FINAL PRETRIAL STATEMENT**

Pursuant to Paragraph III of the November 28, 2016 Amended Case Management and Scheduling Order in this matter (Dkt. 370) and Local Rule 3.06(c), Plaintiff and Counterclaim Defendant, Barn Light Electric Company, LLC ("Barn Light Electric"), Third Party Defendants Bryan Scott and Donna Scott ("The Scotts") (collectively, "Plaintiffs"), Defendants and Counterclaim Plaintiffs Hi-Lite Manufacturing Company, Inc., ("Hi-Lite"), Barnlight Originals, LLC ("Barnlight Originals") and Jeffrey L. Ohai ("Ohai") (collectively, "Defendants"), by and though their respective undersigned counsel, respectfully submit this Joint Final Pretrial Statement. A jury trial in the above matter is scheduled to commence during the trial term beginning May 1, 2017.

## 1. **BASIS OF FEDERAL JURISDICTION**

Plaintiff believes that this Court has subject matter jurisdiction pursuant to: 28 U.S.C. §§ 1331, 1338 (a) and (b), and 15 U.S.C. § 1121 because Barn Light Electric's trademark infringement and unfair competition claims arise under the Lanham Act, 15 U.S.C. § 1051 et seq. This Court has supplemental jurisdiction over the Florida law claims under 28 U.S.C. §§ 1367 and 1338(b). Jurisdiction is not disputed.

Defendants believe this Court has jurisdiction under 28 U.S.C. § 1331 for a federal question arising under the laws of the United States, which include violation of the Lanham Act, violation of the Copyright Act, and 28 U.S.C. § 1338(a) for a claim arising under an Act of Congress relating to copyrights and trademarks. Joinder of Third-party Defendants Bryan and Donna Scott is proper pursuant to Fed. R. Civ. P. 20. Jurisdiction is not disputed.

## 2. **CONCISE STATEMENT OF THE NATURE OF THE ACTION**

Hi-Lite and Jeffrey Ohai, using an unlawful mash-up of Barn Light Electric's trademarks and a domain name registered in bad faith, opened a retail website in direct competition with Barn Light Electric.  The result of Defendants' conduct was a constant stream of consumer confusion.  To stop such consumer confusion and protect its intellectual property rights, Barn Light Electric sued Defendants.  Specifically, Barn Light Electric sued Defendants for infringement of federally registered trademarks, false designation of origin pursuant to §43(a) of the Lanham Act, common law unfair competition, common law trademark infringement and unfair competition, and cybersquatting pursuant to 35 U.S.C. §1125(d).  Additionally, Barn Light Electric sued Defendants for cancellation of the BLO marks wrongfully registered by Defendants.

At this point, Counterclaimants' remaining counterclaims allege copyright infringement of three of Hi-Lite's product catalogs, and trademark infringement regarding alleged use of the mark BARNLIGHT ORIGINALS.  Counterclaimants also allege copyright infringement by Bryan and Donna Scott, the owners of Barn Light Electric.

In Plaintiffs' pending Motion for Partial Summary Judgment (Dkt. 167), Barn Light Electric establishes that Hi-Lite granted it a nonexclusive, irrevocable implied license to use Hi-Lite works.  Further, the doctrine of promissory estoppel prohibits Hi-Lite from claiming copyright infringement.  Barn Light Electric also contends that Counterclaimant's claims of copyright infringement are barred under the doctrines of fair use, independent creation and because Counterclaimants' copyright infringement claims exceed the scope of protection afforded to the catalogs registered under the Copyright Act.

b.    Defendants' Concise Statement

This is an action by Defendants/Counterclaim-Plaintiffs against Counterclaim-Defendant Barn Light Electric for (Count I) Infringement of a Federally Registered Trademark pursuant to 15 U.S.C. § 1114 et al.; (Count II) Common Law Trademark Infringement; (Count III) Unfair Competition (Trademark Infringement) pursuant to § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and Florida common law; (Count VI) Infringement of U.S. Copyright Registration No. VA 0001931982 pursuant to 17 U.S.C. § 501; (Count VII) Infringement of U.S. Copyright Registration No. VA 0001931193 pursuant to 17 U.S.C. § 501; (Count VIII) Infringement of U.S. Copyright Registration No. VA 0001931001 pursuant to 17 U.S.C. § 501.

This is also an action by Defendants/Counterclaim-Plaintiffs against Third-party Defendants Bryan Scott and Donna Scott for (Count X) Contributory Infringement of a Federally Registered Trademark; (Count XI) Vicarious Infringement of a Federally Registered Trademark; (Count XII) Contributory Infringement of U.S. Copyright Registration No. VA 0001931982; (Count XIII) Contributory Infringement of U.S. Copyright Registration No. VA 0001931193; (Count XIV) Contributory Infringement of U.S. Copyright Registration No. VA 0001931001; (Count XV) Vicarious Infringement of U.S. Copyright Registration No. VA 0001931982; (Count XVI) Vicarious Infringement of U.S. Copyright Registration No. VA 0001931193; (Count XVII) Vicarious Infringement of U.S. Copyright Registration No. VA 0001931001.

## 3.    GENERAL STATEMENT OF EACH PARTY'S CASE

<u>Plaintiffs' General Statement of Each Parties' Case</u>

Since its inception, Barn Light Electric has been a pioneer in the manufacture, distribution and sale in interstate commerce of high-quality, vintage-inspired lighting and other home products. Like many successful businesses, Barn Light Electric had somewhat meager beginnings. Barn Light Electric has its origins in a barn behind founder Mr. Scott's home. In that barn, Mr. Scott dedicated years to avidly hand-restoring and rebuilding beautiful, American-crafted light fixtures. Eventually, that experience inspired Mr. Scott to coin the term BARN LIGHT and adopt the trademark: BARN LIGHT ELECTRIC.

Many of the lights Mr. Scott restored—commonly known in the lighting industry as "RLM Lights"—were used in warehouses, factories and other structures dating from the 1930s to the 1950s. He especially enjoyed restoring such light fixtures because of the highquality craftsmanship that went into their manufacture. Together, Mr. and Mrs. Scott would search antique stores, attend estate sales, and even search abandoned buildings looking for vintage light fixtures to restore. After restoring them, Mr. Scott sold many of the light fixtures and kept others for his personal use.

Eventually, Mr. Scott's experience and passion for restoring antique light fixtures led him to start designing and hand-crafting new light fixtures. In doing so, he researched and implemented techniques and materials from a bygone era, when light fixtures were made to last for generations. Mr. Scott used highest-quality, commercial grade materials in Barn Light Electric's light fixtures. Eventually, the demand for Barn Light Electric's light fixtures swelled to the point where it constituted a sustainable business that required full time

attention. Accordingly, in 2008, the Scotts left their professional careers to manage Barn Light Electric full time.

The aesthetic beauty and craftsmanship associated with Barn Light Electric's current products is self-evident, as illustrated below in Figure 1 (Barn Light Electric's Ivanhoe® Sky Chief Warehouse porcelain pendant light); and Figure 2 (Ivanhoe® Seaside Radial Wave Reflector porcelain pendant light).



**FIGURE 1**      **FIGURE 2**

Barn Light Electric has experienced stunning growth and success from its earliest days. Such growth and success were especially remarkable considering it was during one of the darkest recessionary periods in United States history and in a competitive, hard-hit industry. Barn Light Electric's success is not simply a matter of the craftsmanship, creativity and hard work, much of its success is a direct result of Barn Light Electric's brilliant marketing to its consumers. Barn Light Electric has invested millions of dollars and countless hours engaging, inspiring, educating and charming its customers.

Barn Light Electric created and is always improving on its website, www.barnlightelectric.com. A few minutes spent there reveals a great deal about Barn Light Electric and the exceptional quality of its products. It also beckons users to stroll through countless design ideas that incorporate Barn Light Electric's products. Barn Light Electric also invests time in marketing its products through a plethora of social networking websites. These include, for example, Instagram, Pinterest, www.houzz.com and Facebook. At such sites, Barn Light Electric inspires consumers with new ways to incorporate Barn Light Electric's products into their homes. Barn Light Electric also uses such websites to educate consumers who may have questions about specific projects.

These efforts have led to a substantial following on Barn Light Electric's social media sites. Barn Light Electric enjoys a following in the thousands and innumerable "likes." Such followers and "likes" are authentic. Barn Light Electric has never paid for fake followers or surreptitiously inflated its "likes." Over the years, Barn Light Electric's all-American success story has garnered significant amounts of national media attention in virtually every form of modern media, including television, radio, print and Internet.

Barn Light Electric's unique products, marketing investments, and nationwide media have led to a wellspring of goodwill in the BARNLIGHT ELECTRIC trademarks. Since at least 2008, Barn Light Electric has continuously used in commerce the marks BARN LIGHT ELECTRIC, BARN LIGHT ELECTRIC COMPANY, BARN LIGHT ELECTRIC CO., HOME OF "THE ORIGINAL BARN LIGHT." Barn Light Electric has also long used the mark THE ORIGINAL in connection with certain light fixtures. Together, the marks identified herein are referred to as "the BARN LIGHT ELECTRIC marks" to identify the

source and quality of its goods and services.  By virtue of years of extensively using and promoting the BARN LIGHT ELECTRIC marks, Barn Light Electric has established enormous goodwill in these marks. The BARN LIGHT ELECTRIC marks are well-known and uniquely associated with Barn Light Electric in the minds of consumers throughout the United States.  Accordingly, the BARN LIGHT ELECTRIC marks are entitled to common law trademark protection.

In addition to its exclusive common law rights in the BARN LIGHT ELECTRIC marks developed through many years of use and promotion, Barn Light Electric owns U.S. Trademark Reg. No. 3,748,277 on the principal register for the mark depicted in Figure 3 and covering the online marketing and sale of "a variety of goods, namely, lights, lighting fixtures and ceiling fans."

 **FIGURE 3**

Barn Light Electric also owns U.S. Trademark Reg. No. 4,722,667 on the principal register for the mark BARN LIGHT ELECTRIC, covering "non-illuminated ceiling fans and non-illuminated ceiling fan kits comprised of ceiling fans, wiring and mounting brackets." A true and correct copy of the '667 registration is provided as Exhibit 3.  Barn Light Electric also owns U.S. Trademark Reg. No. 3,723,964 on the supplemental register for the mark BARN LIGHT ELECTRIC COMPANY, covering the online marketing and sale of "a variety of oods, namely, lights, lighting fixtures and ceiling fans." In a matter of months, the

BARN LIGHT ELECTRIC COMPANY mark will be eligible for transfer to the principal register based on being listed on the supplemental register for five (5) years. At that time, Barn Light Electric's marks will also be eligible to become incontestable.

The BARN LIGHT ELECTRIC marks, when used in connection with Barn Light Electric's products and services, are distinctive and, through Barn Light Electric's extensive sales, advertising and promotional efforts, have acquired secondary meaning. 54. As a result of Barn Light Electric's activities, the BARN LIGHT ELECTRIC marks have become valuable assets of Barn Light Electric, represent enormous goodwill of the company, and identify and distinguish Barn Light Electric's goods and services from those of others.

For years, Barn Light Electric purchased various components for its light fixtures from Hi-Lite. Barn Light Electric purchased from Hi-Lite, as opposed to some other source, specifically because Hi-Lite manufactured its components in the United States. Over the course of their relationship, Barn Light Electric also began specifying and purchasing light fixtures from Hi-Lite. Eventually, Barn Light Electric was purchasing well over one million dollars in components and light fixtures from Hi-Lite. Upon information and belief, this made Barn Light Electric one of Hi-Lite's top buyers. Hi-Lite, however, wanted more. Defendant Ohai repeatedly demanded that Barn Light Electric: (i) sell *only* Hi-Lite products on Barn Light Electric's own website, except for those Barn Light Electric light fixtures that Hi-Lite was not equipped to manufacture, i.e., porcelain enamel products; (ii) stop purchasing parts from other manufacturers; (iii) stop manufacturing parts at Barn Light Electric (the original manufacturing site); and (iv) stop selling a lower cost line of light fixtures that it sold to customers that could not afford the high-end fixtures (comprised

primarily of Barn Light Electric's products).  Defendant Ohai coupled his unreasonable demands with intimidation and the threat that Hi-Lite would stop selling products to Barn Light Electric altogether.  Mr. Scott rejected Defendant Ohai's demands for exclusivity.

On information and belief, as a result of Mr. Scott's refusal to sell exclusively Hi-Lite products, Defendant Ohai devised a scheme to sell Hi-Lite light fixtures by trading off of the goodwill that Barn Light Electric had established in the BARN LIGHT ELECTRIC marks.  On September 11, 2012, Defendant Ohai, registered the domain name www.barnlightoriginals.com.  Defendant Ohai subsequently concealed his identity as the registrant of the BLO domain name.  Within about two months, Defendant Ohai had formed BLO.  Under Defendant Ohai's direction and control, BLO created and exploits www.barnlightoriginals.com as a fully operative and interactive commercial storefront to sell Hi-Lite light fixtures. BLO sells products manufactured by Hi-Lite and ships to consumers nationwide, including consumers residing in this judicial district.

Defendants, under the direction and control of Defendant Ohai, promote and sell Hi-Lite lighting fixtures using the marks BARNLIGHT ORIGINALS and BARNLIGHT ORIGINALS INC., as well as the website at www.barnlightoriginals.com.   At the time Defendants began operating their online retail operation, Defendants knew of Barn Light Electric's exclusive rights to the BARN LIGHT ELECTRIC marks, including, *inter alia*, Barn Light Electric's use of the HOME OF "THE ORIGINAL BARN LIGHT" mark.  Defendants selected the BARNLIGHT ORIGINALS marks with the intent of causing consumer confusion, and thereby enabling Defendants to profit from the goodwill Barn Light Electric had established in the BARN LIGHT ELECTRIC marks.   To make matters worse,

Defendants also adopted specific product trademarks that are confusingly similar to those used by Barn Light Electric.

Defendants' infringement of Barn Light Electric's trademark THE ORIGINAL is particularly transparent. Defendants seized on THE AUTHENTIC, which has exactly the same meaning and connation as THE ORIGINAL. They did so in connection with a light fixture that is essentially identical in all material respects to the light fixture sold by Barn Light Electric as THE ORIGINAL. Ironically, Defendants' use of THE AUTHENTIC highlights the Defendants' utter *lack* of authenticity.

Defendants have systematically copied numerous aspects of Barn Light Electric's website and its design. Just like Barn Light Electric's website, Defendants home page contains a logo in the upper left corner with the words "BARN LIGHT" prominently displayed against a rustic background. Both logos also include a picture of a vintage-inspired light fixture. Further, just as with Barn Light Electric's home page, Defendants placed a rotating carousel of multiple photographs of vintage-inspired lighting and light fixtures immediately below the logo. Further still, Defendants have placed a graphical text box with the words "Free Shipping" immediately to the right of the logo. Defendants went so far as to copy the *copyright notice*, as shown below. The copying by Defendants is particularly manifest in connection with the web pages directed to specific products. Defendants copied every material aspect of Barn Light Electric's product page. From Barn Light Electric's product name to the photographs and carousel placement to Barn Light Electric's unique colored informational buttons found on each product, and which identify qualities of the lighting fixture (e.g., wet/dry rating; origin of product; certifications, etc.).

Defendants are further systematically stalking and supplanting Barn Light Electric's posts on various websites, including www.houzz.com. Additionally, upon information and belief, Defendants have improperly and falsely inflated their followers and "likes" on one or more social media websites. Each of these actions is intended to confuse and mislead consumers about the source, quality and origin of BLO's products. Based on the foregoing, Defendants have traded on and damaged the goodwill associated with the BARN LIGHT ELECTRIC marks.

Based on its unlawful use of the mark BARNLIGHT ORIGINALS INC., BLO applied for and received two trademark registrations. Again, BLO resorted to mimicking Barn Light Electric's business activities by filing two applications that mimic the Barn Light Electric registrations. BLO's U.S. Reg. No. 4,464,241 is for the standard character mark BARNLIGHT ORIGINALS INC., and includes a disclaimer of the word "BARN LIGHT" and "INC." The '241 mark was registered on the supplemental register on January 7, 2014. BLO's U.S. Reg. No. 4,489,514 is for the BLO logo as shown below.



Both the '241 registration and the '514 registration by BLO are directed to trademarks that are confusingly similar to and in the same classes as the BARN LIGHT ELECTRIC marks. The net effect of Defendants' willful trademark infringement and unfair competition is actual harm and potential future harm to consumers and Barn Light Electric. Barn Light Electric has documented numerous instances of actual confusion. For example,

Barn Light Electric has received multiple communications from customers expressing confusion in connection with BLO products, as well as communications complaining about Defendants' website and products marketed and sold by Defendants. In at least one instance, an extensive purchase order having all BLO part numbers was submitted to Barn Light Electric.

Barn Light Electric prays for a Judgment for Damages, Cancellation of Defendants' marks, Permanent Injunctive Relief and Declaratory Relief.

      b.     <u>Defendants' General Statement of Each Parties' Case</u>

### **Hi-Lite's Copyright Infringement Claims**

Hi-Lite Manufacturing Company, Inc. ("Hi-Lite") has manufactured, advertised, and sold a wide variety of decorative lighting fixtures since 1958. Today Hi-Lite is run by Ms. Dorothy Ohai and her son Jeffrey Ohai. Hi-Lite sells its lighting fixtures through authorized distributors. These authorized distributors are given access to Hi-Lite's product catalogs. These catalogs include extensive collections of materials associated with Hi-Lite's lighting fixtures, including photographs, artwork, and line drawings. All of these materials are protected by copyright. The three registered copyrights at issue in this case include: Hi-Lite's U.S. Copyright Registration Nos. VA 1-931-982; VA 1-931-193; and VA 1-931-001. These registrations cover the materials found in Hi-Lite's 203, 205 and 208 product catalogs.

In 2008, Barn Light Electric Company, LLC, which is owned and operated by Bryan and Donna Scott, contacted Hi-Lite to inquire about becoming an authorized distributor of Hi-Lite products. The parties agreed that Barn Light Electric would be permitted to advertise and sell Hi-Lite products via Barn Light Electric's catalogs and website. Hi-Lite's

copyrighted catalogs were provided to Barn Light Electric to assist it in selling Hi-Lite's products. Barn Light Electric, therefore, had a limited license to use Hi-Lite's product catalogs to sell genuine Hi-Lite fixtures. Barn Light Electric was also given a substantial discount on its orders from Hi-Lite in exchange for not selling any fixtures from competing lighting manufacturers.

During the course of the business relationship between the two companies, Hi-Lite began to suspect that Barn Light Electric was selling competitive lighting fixtures and not honoring its commitment to Hi-Lite. Hi-Lite then asked a colleague, William Sanders, to order certain Hi-Lite products from Barn Light Electric's website. Mr. Sanders went to the Barn Light Electric website and ordered Hi-Lite lighting fixtures advertised under Hi-Lite's product codes – the H-15116 and H-15116G. The advertisement also depicted a photograph of Hi-Lite's lighting fixture.

After Mr. Sanders placed his order with Barn Light Electric, he received an order confirmation verifying his purchase of Hi-Lite's H-15116 and H-15116G products. When Mr. Sanders subsequently received the shipment from Barn Light Electric, he forwarded the boxes to Hi-Lite. David McAdam, an employee at Hi-Lite, opened the boxes and photographed their contents. The product bore Barn Light Electric's logo and was, in fact, manufactured by Barn Light Electric, not Hi-Lite.

Based on its understanding that Barn Light Electric was advertising Hi-Lite products and shipping Barn Light Electric products in their place, Hi-Lite terminated its business relationship. As part of the termination, Hi-Lite expressly revoked any license permitting Barn Light Electric to use Hi-Lite's copyrighted photographs and line drawings. To this day,

however, Barn Light Electric has ignored Hi-Lite's revocation of the license and continues to use Hi-Lite's copyrighted photographs and line drawings in its advertising to sell Barn Light Electric products.

Thus, Hi-Lite contends that during the business relationship between the parties, Barn Light Electric committed copyright infringement by exceeding the scope of its license to use Hi-Lite's copyrighted works. It did so by using Hi-Lite's copyrighted works to sell products originating from a manufacturer other than Hi-Lite. Barn Light Electric also used Hi-Lite's copyrighted works to reverse engineer the physical lighting fixtures of Hi-Lite. Barn Light Electric accomplished this reverse engineering with the assistance of Bay Area Innovations. Thus, Barn Light Electric was using Hi-Lite's photography to sell replicas of Hi-Lite products that were, in fact, manufactured by Barn Light Electric. The documents produced in this case, as well as the testimony of former Barn Light Electric employees, indicate that Barn Light Electric undertook a systematic effort to secretly reverse engineer Hi-Lite's products so it could fulfill orders for Hi-Lite products with its own knock-off fixtures. Hi-Lite further contends that any use of its copyrighted works by Barn Light Electric, and works substantially similar thereto, after the revocation of the license constitutes copyright infringement. The copyrighted materials that Barn Light Electric copies are detailed in the Second Amended Counterclaim [Dkt. 60] and are further depicted below.

| Examples of Materials Copied from Hi-Lite's Catalogs |
| --- |

## Examples of Materials Copied from Hi-Lite's Catalogs



## Examples of Materials Copied from Hi-Lite's Catalogs



| Examples of Materials Copied from Hi-Lite's Catalogs | |
|---|---|
|  | |

Hi-Lite also maintains that Bryan and Donna Scott, as the owners of Barn Light Electric, are liable for contributory and vicarious copyright infringement due to their knowledge of, control over, and having profited from, Barn Light Electric's acts of copyright infringement.

### Barnlight Originals' Trademark Infringement Claims

Discouraged by the Scotts' and Barn Light Electric's willfully deceptive business practices, and seeking a reliable online distributor for Hi-Lite's products, Mr. Jeffrey Ohai decided to go into business for himself, founding Barnlight Originals, Inc. ("Barnlight Originals"). Barnlight Originals is an online retail distributor of Hi-Lite products. In 2014, Barnlight Originals obtained U.S. Trademark Registration Nos. 4,464,241 for the word mark BARNLIGHT ORIGINALS INC. and 4,489,514 for the following logo:



.

Upon learning of Mr. Ohai's formation of Barnlight Originals, Barn Light Electric added the page www.barnlightelectric.com/barn-light-originals.html (the "Infringing Website") to its e-commerce website. On this page, the phrase "Barn Light Originals" was prominently displayed in association with the offering for sale of a variety of products made by Barn Light Electric. Barnlight Originals contends that Barn Light Electric's creation of the Infringing Website, and its use of the term "Barn Light Originals" on the Infringing Website, constitutes trademark infringement. As a result of the infringing link, consumers looking for Barnlight Originals, Inc. were presented with the following Google search result:



**Barn Light Originals**™ | Authentic RLM Lighting by ...
www.barnlightelectric.com/barn-light-originals.html ▾
Shop our **original** barn lighting for quality warehouse shade pendants, goosenecks, and wall sconce lighting. Made in America, these custom **barnlights** last a ...

Bryan and Donna Scott, as the owners of Barn Light Electric, are liable for contributory and vicarious trademark infringement due to their knowledge of, control over, and having profited from, Barn Light Electric's acts of copyright infringement.

### Defenses to Barn Light Electric's Claims

Barn Light Electric alleges that Barnlight Originals' use of the BARNLIGHT ORIGINALS mark constitutes trademark infringement and unfair competition pursuant to the Lanham Act. Barnlight Originals contends these claims fail because (1) "Barn Light" is a generic term for a type of lighting fixture, and therefore Barn Light Electric is merely a descriptive mark capable of limited, if any, protection; and (2) Barn Light Electric's claims fail under the equitable doctrine of unclean hands.

18

Barn Light Electric also alleges that Barnlight Originals has engaged in cybersquatting by registering the domain name www.barnlightoriginals.com. Barnlight Originals contends that Barn Light Electric has failed to demonstrate that Barnlight Originals registered its domain name in "bad faith."

4. **LIST OF ALL EXHIBITS AND LOCAL RULE 5.04 SUBSTITUTES TO BE OFFERED AT TRIAL**

Plaintiffs' Trial Exhibit List is attached hereto as **Exhibit A**.

Defendants' Trial Exhibit List is attached hereto as **Exhibit B**.

5. **LIST OF WITNESSES WHO MAY BE CALLED AT TRIAL**

Plaintiffs' Witness List is attached hereto as **Exhibit C**.

Defendants' Witness List is attached hereto as **Exhibit D**.

6. **LIST OF ALL EXPERT WITNESSES AND STATEMENT OF RELEVANT SUBJECT MATTER AND RELATED TESTIMONY**

a. <u>Plaintiffs' Expert Witnesses</u>

Michael Karaban
1900 Sunset Harbour Dr., #1008
Miami Beach, FL 33139
c/o Counsel for Barn Light Electric
John Plumpe
Principal - Intellectual Property
Charles River Associates
One South Wacker Dr., Suite 3400
Chicago, IL 60606
c/o Counsel for Barn Light Electric

Jeffrey Stec, PhD
Vice President
Charles River Associates
One South Wacker Dr., Suite 3400
Chicago, IL 60606
c/o Counsel for Barn Light Electric

b.   <u>Defendants' Expert Witnesses</u>

Eli Seggev, Ph.D.
c/o Counsel for Defendants

Stanley Stephenson, Ph.D.
c/o Counsel for Defendants


**7.   <u>STATEMENT OF THE PARTIES' CLAIMS TO MONEY DAMAGES</u>**

a.   <u>Plaintiffs' Statement of Damages</u>[1]

i.   Plaintiffs seek the disgorgement of all of Defendant Barnlight Originals' profits, and that this amount be trebled pursuant to 15 U.S.C. § 1117(a). Plaintiff's expert Mr. John Plumpe calculates that Defendant Barnlight Originals reported revenues through June 2015 to be $623,317.00.

ii.   Plaintiffs seek the disgorgement of all of Defendant Hi-Lite's profits for sales to or through Barnlight Originals, and that this amount be trebled pursuant to 15 U.S.C. § 1117(a). Plaintiff's expert Mr. John Plumpe calculates that Defendant Hi-Lite's reported revenues for sales to Barnlight Originals through June 2015 to be $340,028.00.

iii.   Plaintiffs seek the disgorgement of all of Defendant Jeffrey L. Ohai's profits realized in connection with violations of 15 U.S.C. § 1117(a).

iv.   Plaintiffs also seek an award sufficient to cover the expense of undertaking a future corrective advertising marketing campaign to correct at least misimpressions caused as a result of Defendants trademark infringement and other unlawful conduct.

v.   Plaintiffs seek statutory damages under 15 U.S.C. § 1117(d) in the amount of $100,000 for each and every domain name registered by Defendants in violation of 15 U.S.C. § 1117(d).

---

[1] Plaintiff Barn Light Electric reserves the right to amend this section of the Joint Final Pretrial Statement prior to trial given Defendants' failure to provide financial information during discovery and the upcoming depositions of Hi-Lite Manufacturing, Barnlight Originals, and Jeffrey L. Powell regarding financial matters and profits of Defendants.

      vi.     Plaintiffs also seek reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1117.

      vii.     Prejudgment and post-judgment interest in connection with each of the money damages awarded hereunder.

      viii.     All other monetary relief that is determined by the Court to be just and proper.

      ix.     Counterclaimants' alleged damages have no basis in fact or law, and thus should not be granted by this Court.

    b.    <u>Defendants' Statement of Damages</u>

**<u>Defendant Hi-Lite Manufacturing Company, Inc.'s Copyright Infringement Claims</u>**

- Defendant Hi-Lite Manufacturing Company, Inc. seeks a disgorgement of all of Plaintiff Barn Light Electric Company, LLC's profits pursuant to 17 U.S.C. §504 for its acts of copyright infringement. Defendant's expert Dr. Stanley P. Stephenson calculates that Plaintiff's revenues related to this claim amount to approximately $62,407,579 (through July 2015). Dr. Stephenson has alternatively calculated Plaintiff's specific revenues related to this claim amount to approximately $2,631,754 (through July 2015).

- Defendant Hi-Lite Manufacturing Company, Inc. contends that Defendant Bryan and Donna Scott are contributorily and vicariously liable for the infringing activities of Plaintiff Barn Light Electric Company, LLC and therefore seeks the disgorgement of all of the profits realized by Bryan and Donna Scott. Defendant further seeks to hold Bryan and Donna Scott personally liable for any damage award.

- Defendant Hi-Lite Manufacturing Company, Inc. seeks recovery of reasonable attorney's fees and costs pursuant to 15 U.S.C. §505.

- Pre-judgment and post-judgment interest in connection with each of the money damages awarded hereunder.

- All other monetary relief that is determined by the Court to be just and proper.

- Defendants reserve the right to amend this section of the Joint Final Pretrial Statement following the further Fed. R. Civ. P. 30(b)(6) depositions of Barnlight Orignals, Inc. and Hi-Lite Manufacturing Co., Inc.

**Defendant Barnlight Originals, Inc.'s Trademark Infringement Claims**

- Defendant Barnlight Originals, Inc. seeks a disgorgement of all of Plaintiff's profits related to its infringement of Defendant's trademarks under the Lanham Act and Florida Common Law. Defendant further requests that any amount awarded be trebled pursuant to 15 U.S.C. §1117(a) and 15 U.S.C. §1117(b). Defendant's expert Dr. Stanley P. Stephenson calculates that Plaintiff's revenues amount to approximately $62,407,579 (through July 2015). Dr. Stephenson has also calculated Plaintiff's specific revenues related to this claim amount to approximately $1,977,443 (through July 2015) and that Defendant is entitled to treble damages on this claim.

- Defendant Barnlight Originals, Inc. contends that Defendant Bryan and Donna Scott are contributorily and vicariously liable for the infringing activities of Plaintiff Barn Light Electric Company, LLC and therefore seeks the disgorgement of all of the profits realized by Bryan and Donna Scott. Defendant further seeks to hold Bryan and Donna Scott personally liable for any damage award.

- Defendant Barnlight Originals, Inc. also seeks recovery of reasonable attorney's fees and costs pursuant to 15 U.S.C. §1117.

- Defendant Barnlight Originals, Inc. also seeks pre-judgment and post-judgment interest in connection with each of the money damages awarded hereunder.

- All other monetary relief that is determined by the Court to be just and proper.

- Defendants reserve the right to amend this section of the Joint Final Pretrial Statement following the further Fed. R. Civ. P. 30(b)(6) depositions of Barnlight Originals, Inc. and Hi-Lite Manufacturing Co., Inc.

**Plaintiff's Claims to Damages**

- Plaintiff's alleged damages have no basis in fact or law, and thus should not be granted by the Court.

8. **LIST OF DEPOSITIONS TO BE OFFERED IN EVIDENCE**

The parties' joint deposition designations, objections and counter-designations, as well as disputed deposition excerpts are attached hereto as **Exhibit E**.

9. **CONCISE STATEMENT OF FACTS WHICH ARE ADMITTED AND REQUIRE NO PROOF AT TRIAL**

SECTION A: NONCOPYRIGHT-RELATED STATEMENTS OF ADMITTED FACTS[2]

Parties' Summary Judgment Stipulation of Agreed Material Facts [Dkt. 206]

1. Hi-Lite does not sell products retail (or to end users), but rather, sells to various distributors (or accounts).

Defendants' Admissions Based on Their Responses to Plaintiff's 1st RFAs

2. The Relationship was terminated on September 4, 2012.

3. The Relationship was terminated by Hi-Lite.

4. Individuals associated with Hi-Lite visited the website www.barnlightelectric.com after September 4, 2012.

---

[2] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

5.      Barn Light Electric was not the only seller of Hi-Lite Products during the Relationship.

6.      There is no written agreement between Hi-Lite and Barn Light Electric concerning the use by Barn Light Electric of any trademark.

7.      The "handshake agreement," as defined in the Second Amended Counterclaims, was not memorialized in a written agreement.

8.      There was no written agreement between Hi-Lite and Barn Light Electric requiring Barn Light Electric to sell only Hi-Lite Products.

9.      There was no written agreement between Hi-Lite and Barn Light Electric prohibiting Barn Light Electric from selling third party manufacturer's light fixtures.

10.     Jeffrey Ohai was aware of Barn Light Electric at the time he registered the domain name www.barnlightoriginals.com.

11.     Jeffrey Ohai was aware of Barn Light Electric's use of the domain name www.barnlightelectric.com at the time he registered www.barnlightoriginals.com.

12.     BLO did not use the term "Barnlight Originals Inc." in interstate commerce before November 12, 2013.

13.     BLO does not own a federal or state trademark registration for the term "Barnlight Originals".

14.     Defendants did not use the following logo in interstate commerce before November 12, 2013:



15.     BLO sells Hi-Lite Products.

16.     BLO offers for sale light fixtures over the Internet.

17.     BLO markets light fixtures over the Internet.

18.     BLO markets light fixtures on the website www.houzz.com.

19.     BLO markets light fixtures on www.facebook.com.

20.     Hi-Lite has purchased from at least one Internet search provider keyword advertisements for the terms "BARN LIGHT ELECTRIC."

21.     BLO had no trademark or intellectual property rights in the terms "BARNLIGHT ORIGINALS" at the time it registered the domain name www.barnlightoriginals.com.

22.     BLO registered the domain name www.barnlightoriginals.com for commercial gain.

23.     Prior to registration of the domain name www.barnlightoriginals.com, the Defendants had not used the term "Barnlight Originals" in connection with the bona fide offering of any goods or services.

24.     BLO has purchased from at least one Internet search provider keyword advertisements for the terms "BARN LIGHT ELECTRIC.

25.     Donna Scott visited Hi-Lite in June 2009.

26.     Donna Scott visited Hi-Lite on only one occasion.

27.     Bryan Scott visited Hi-Lite in June 2009.

28.     Bryan Scott visited Hi-Lite in June 2010.

29.     BLO has no formal trademark watch service for the BARNLIGHT ORIGINALS marks.

30.     Hi-Lite has never engaged a formal trademark watch service to monitor third-party use of any part numbers.

31.     Hi-Lite is aware of warehouse shades promoted by Baselite Corp.

32.     Jeffrey Ohai has visited www.baselite.com.

33.     Hi-Lite is aware of RLM design reflectors sold by Bock Company, LLC.

Defendants' Admissions Based on Their Responses to Plaintiff's 2nd RFAs

34.     Hi-Lite has been contacted by customers of Classic Light Design with complaints relating to Trey Solms' failure to fulfill orders placed with Classic Light Design for Hi-Lite products.

35.     Some products manufactured by Hi-Lite are sold by Barnlight Originals.

36.     BLO products are not sold through Hi-Lite.

37.     BLO does not manufacture products.

38.     Barn Light Electric is a former distributor of Hi-Lite and Barnlight Originals is a current distributor of Hi-Lite.

39.     Certain sales made by Barnlight Originals are shipped directly to the consumer by Hi-Lite.

40.     Barnlight Originals does not customarily ship products directly to customers.

41.     Some products sold by Barnlight Originals are stored in Hi-Lite facilities.

42.     Some products sold by Barnlight Originals are shipped with documentation bearing a Hi-Lite trademark.

43.     Jeffrey Ohai is the owner of Barnlight Originals.

44.     Hi-Lite and Barnlight Originals have the same physical address.

45.     The Light Choice Inc. is a Hi-Lite distributor.

46.     Defendant Ohai signed all agreements with Bold Array, LLC authorizing the design and development of the Barnlight Originals Website.

47.     Defendant Ohai approved the final design of the Barnlight Originals logo.

48.     Barnlight Originals sold products manufactured by Hi-Lite.

49.     Hi-Lite profits from sales of Hi-Lite products sold by Barnlight Originals.

50.     Hi-Lite profited from Hi-Lite products sold by Barnlight Originals.

51.     Hi-Lite profited from Hi-Lite products sold by Barn Light Electric.

52.     Hi-Lite sold in excess of $1,000,000.00 of products by or through BLE.

53.     Hi-Lite was aware of Barn Light Electric using Hi-Lite product photographs to sell Hi-Lite products.

54.     Barn Light Electric on certain occasions objected to the time in which it took to fulfill orders.

55.     Barnlight Originals purchased "barn light electric" as an advertising key word.

<u>Defendants' Admissions Based on Their Responses to Plaintiff's 3rd RFAs</u>

56.     Hi-Lite distributors other than Barn Light Electric have received or currently receive 1-5% discounts.

57.     Hi-Lite's sales revenue did not decrease following the termination of Hi-Lite's relationship with Barn Light Electric.

58.     Barnlight Originals sells products that are not manufactured by Hi-Lite.

59.     Hi-Lite and Barnlight Originals' offices are located in the same Building.

<u>SECTION B: COPYRIGHT-RELATED STATEMENTS OF ADMITTED FACTS</u>[3]

<u>Parties' Summary Judgment Stipulation of Agreed Material Facts [Dkt. 206]</u>

1.     Hi-Lite gave Barn Light Electric a license to use its copyrighted photographs during the course of the business relationship to sell Hi-Lite products.

2.     Barn Light Electric had access to Hi-Lite's Catalog 203, Catalog 205, and Catalog 208.

<u>Defendants' Admissions Based on Their Responses to Plaintiff's 1st RFAs</u>

3.     There is no written agreement between Hi-Lite and Barn Light Electric regarding use of Hi-Lite's photographs.

4.     Photographs in Catalog 203 were taken by multiple photographers.

5.     Photographs in Catalog 205 were taken by multiple photographers.

6.     Photographs in Catalog 208 were taken by multiple photographers.

7.     Photographs in Catalog 203 were published in different calendar years.

8.     Photographs in Catalog 205 were published in different calendar years.

9.     Photographs in Catalog 208 were published in different calendar years.

---

[3] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

10.    During the Relationship, Hi-Lite transferred to Barn Light Electric at least one photograph in Catalog 203 without any written limitation regarding Barn Light Electric's use of that photograph.

11.    During the Relationship, Hi-Lite transferred to Barn Light Electric at least one photograph in Catalog 205 without any written limitation regarding Barn Light Electric's use of that photograph.

12.    During the Relationship, Hi-Lite transferred to Barn Light Electric at least one photograph in Catalog 208 without any written limitation regarding Barn Light Electric's use of that photograph.

13.    Hi-Lite's distributors are licensed to use Hi-Lite photographs to sell Hi-Lite products.

14.    Hi-Lite's distributors are licensed to use Hi-Lite photographs to sell Hi-Lite products.

15.    Hi-Lite licenses its copyrighted photographs to its distributors for use in selling Hi-Lite products.

16.    Hi-Lite's distributors are licensed to use Hi-Lite photographs to sell Hi-Lite products and that some of the digital photographs lacked a watermark or formal copyright notice.

17.    Hi-Lite's distributors are licensed to use Hi-Lite photographs to sell Hi-Lite products, and no formal written licensing agreement exists between Hi-Lite and Barn Light Electric.

18.    Hi-Lite's distributors are licensed to use Hi-Lite photographs to sell Hi-Lite products but this agreement is not always reflected in a formal written agreement.

19.    From 2008 through 2012, Hi-Lite was aware the Hi-Lite product photographs were being used on the Barn Light Electric website to sell Hi-Lite products.

20.    Hi-Lite licensed Barn Light Electric to use Hi-Lite's line drawings, installation sheets, descriptive artwork, product codes, part numbers, color codes, and color charts to be used in the sale of Hi-Lite products.

Defendants' SACC

21.    Counterclaim-Plaintiff Hi-Lite is a corporation organized and existing under the laws of the State of California with its principal place of business in California.

22.     Counterclaim-Defendant Barn Light Electric is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in the Middle District of Florida.

23.     Third-party Defendant Bryan Scott is a managing member and registered agent of Barn Light Electric and, upon information and belief, is domiciled in this district.

24.     Third-party Defendant Donna Scott is a managing member of Barn Light Electric and, upon information and belief, is domiciled in this district.

25.     In 2008, the Scotts requested to open an account with Hi-Lite to resell Hi-Lite products as a distributor.

## 10.     CONCISE STATEMENT OF AGREED APPLICABLE PRINCIPLES OF LAW

### SECTION A: NONCOPYRIGHT-RELATED AGREED PRINICIPLES OF LAW

1.      A registration on the Principal Register can become "incontestable" if its owner files with the Patent and Trademark Office an affidavit or declaration of incontestability under Section 15 of the Lanham Act, 15 U.S.C. § 1065. An affidavit or declaration of incontestability requires the registrant to swear under oath that: 1. There has been no final decision to the registrant's claim of ownership of the registered trademark for the goods and services covered by the registration or to the registrant's right to register its trademark or to maintain the registration of its trademark; 2. There is no ongoing proceeding involving the registrant's rights to its trademark; and, 3. The trademark has been in continuous use for the five-year period immediately preceding the execution of the affidavit or declaration.

2.      Upon the filing (and not the acceptance) of the affidavit or declaration of incontestability, Section 33 of the Lanham Act, *id.* § 1115(b), provides that the registration is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." An incontestable registration can still be cancelled on certain grounds, and the registration's "conclusive" evidentiary significance is subject to certain affirmative defenses, as to both of which the defendant bears the burden of proof.

3.      Outside of the Eleventh Circuit, there is a pronounced split of authority on the issue of whether a registration that has not yet become incontestable shifts the burden of *proof*, or merely the burden of *production*, to a defendant challenging the registered mark's validity. *Compare Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009) (shift in burden of proof),

*Aktieselskabet AF 21. November 21 v. Fame Jean, Inc.*, 525 F.3d 8, 14 (D.C. Cir. 2008) (same), *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 514 (6th Cir. 2007) (same), *Colt Defense, LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007) (same), *and Aluminum Fabricating Co. v. Season-All Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958) (same) *with OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 342 (4th Cir. 2009) (shift in burden of production) *and Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007) (same). Under the majority rule, there is no need to distinguish between the evidentiary effect of a registration that has become "incontestable" under Sections 15 and 33 of the Lanham Act, 15 U.S.C. §§ 1065, 1115: Both types of registrations shift the burden of proof on the issue of trademark validity from the Plaintiff to the Defendant. In contrast, a registration on the Supplemental Register has no evidentiary effect. *See, e.g., ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1288 (Fed. Cir. 2010) (applying Third Circuit law).

4.      Nationwide constructive priority is provided for by Section 7(c) of the Lanham Act, 15 U.S.C. § 1057(c) (2006). *See generally Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010); *John R. Thompson Co. v. Holloway*, 366 F.2d 108, 115 (5th Cir. 1966).

Infringement - General Introductory Charge

5.      The statutory basis for the federal tort of the infringement of a registered trademark is Section 32(1) of the Lanham Act, 15 U.S.C. § 1114 (2006), which provides that:

Any person who shall, without the consent of the registrant

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Types and Strength of Trademarks

6.      A finding that a registered trademark is generic means that the mark cannot be protected *as* a trademark, *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992), and a jury finding that a registered trademark is

generic therefore should not evaluate whether the plaintiff has proven valid rights to the claimed trademark independent of the registration. *See Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980) ("A generic term can *never* become a trademark, [and] if a registered mark *at any time* becomes generic with respect to a particular article, the Lanham Act provides for the cancellation of that mark's registration." (footnote omitted) (citation omitted).

7.      A registered trademark that has achieved incontestable status under 15 U.S.C. § 1065 cannot be challenged on the grounds that it is descriptive and lacks secondary meaning. *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224, 105 S. Ct. 658, 83, 582 L. Ed. 2d (1985); *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1209 (11th Cir. 1999); *Soweco*, 617 F.2d at 1184-85. Nevertheless, even though the registration covering a trademark may have achieved incontestable status, there are still a variety of defenses that may be made as to incontestability. *See* 15 U.S.C. § 1115(b).

Monetary Relief

8.      The statutory basis for monetary relief is Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), which provides that: When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office,… shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

Award of the Plaintiff's Actual Damages

9.      To be entitled to the legal remedy of an award of actual damages, the Plaintiff must demonstrate that it suffered actual monetary losses. *Babbit Elecs., Inc. v. DynaScan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994). ("[T]he Plaintiff must prove both lost sales and that the loss was caused by the Defendant's actions."). Actual damages are not "speculative" if they are supported by a preponderance of the evidence. *See, e.g., Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (affirming award of actual damages supported by unrebutted expert testimony).

10.     The Eleventh Circuit will not allow liquidated damages in addition to actual damages if it represents a "double recovery." *Ramada Inns*, 804 F.2d at 1566. Under

appropriate circumstances, however, the Eleventh Circuit will allow for both trademark and liquidated damages in the same case. *Id*. at 1566. (liquidated damages and actual damages upheld even though they were "calculated in almost the same manner" because each damage calculation was meant to "compensate for separate wrongs.") Likewise, in a franchise "hold over" case, infringement damages as well as expenditures necessary to establish a new franchisee are recoverable. *Id*.

Punitive Damages

11.     Section 35 of the Lanham Act does not authorize awards of punitive damages, and, indeed, it provides that any monetary relief made under it be compensation and not a penalty. 15 U.S.C. § 1117(a) (2006). Nevertheless, the Lanham Act does not preempt awards of punitive damages under state law. *See generally* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:96 (4th ed.) (citing state law cases).

Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions With Respect to Defenses to Trademark Infringement

Nominative and Descriptive Fair Use

12.     Nominative fair use is a defense to a claim of trademark infringement. Under this defense, a defendant may use plaintiff's trademark to refer to plaintiff's goods, but defendant may not use plaintiff's trademark to refer to defendant's own goods. Defendant's use of the trademark was not infringing if defendant proves by a preponderance of the evidence that its use of plaintiff's trademark meets the following elements: 1. plaintiff's trademark is the only name, term, or symbol reasonably available to describe defendant's goods; 2. defendant does not attempt to capitalize on consumer confusion or to appropriate the prestige of plaintiff's trademark; and 3. defendant's use of plaintiff's trademark does not identify plaintiff as the source of defendant's goods. *See Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270,1277 (11th Cir. 2006), citing *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Abandonment

13.     Abandonment of a trademark is a defense to a claim of infringement. To prove abandonment, a defendant must prove by a preponderance of the evidence the following: 1. plaintiff discontinued the bona fide use of plaintiff's trademark, and did so with the intent to not resume its use in the reasonably foreseeable future. If plaintiff has not used the trademark for three consecutive years, it is presumed that plaintiff did not intend to resume use of the trademark, but plaintiff can rebut that presumption by producing evidence that it intended to resume use; or 2. plaintiff acted or failed to act, and as a result plaintiff's trademark no longer identifies the source of plaintiff's goods and has become a generic term for the associated goods.

14.     The statutory basis for the defense of abandonment is Section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b) (2006). A finding that a trademark has been abandoned means that the Plaintiff no longer has valid rights as of the date of abandonment. Nevertheless, because the Plaintiff may have acquired new rights to its trademark by resuming the use of its trademark after the initial abandonment took place, a jury finding that a registration is subject to cancellation on this ground is not dispositive of the Plaintiff's rights, and the jury therefore evaluate whether the Plaintiff has proven valid rights to the claimed trademark independent of the registration. The Plaintiff's resumption of a trademark's use after abandonment will not allow the Plaintiff to claim valid rights that date back to its original use; rather, the new rights will date only from the resumed use. *See generally AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1549-50 (11th Cir. 1986).

Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions With Respect to Cancellation of a Federal Trademark Registration

15.     A registration on the Principal Register that is less than five years old may be cancelled on any ground or grounds that would have prevented the registration's issuance in the first place, which are set forth in Sections 1, 2, and 14 of the Lanham Act. *See* 15 U.S.C. §§ 1051, 1052, 1064 (2006) and *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984). Immediately upon the registration's fifth anniversary of issuance, however, it may be cancelled only on the limited grounds set forth in Section 14(3) of the Lanham Act, regardless of whether the plaintiff has filed a declaration or affidavit of incontestability for its registration. 15 U.S.C. § 1064(3). *See Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 n.5 (Fed. Cir. 1990); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 761 n.6 (C.C.P.A. 1981).

Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions With Respect to the Anti-Cybersquatting Consumer Protection Act

16.     "[C]ourts characterize likelihood of confusion as an issue of fact" *4 McCarthy on Trademarks and Unfair Competition*, § 23:67 (4th ed.), citing *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1564 (11th Cir. 1991); *see also 4 McCarthy on Trademarks and Unfair Competition*, § 23:75 (4th ed.), citing *Am. Bank of Merritt Island v. First Am. Bank & Trust*, 455 So. 2d 443, 447 (Fla. 5th DCA 1984) ("The weight of authority is that likelihood of confusion is a question of fact and in arriving at a conclusion all relevant factors should be considered in an overall perspective.") (quoting 74 Am.Jur.2d 780, Trademarks and Tradenames § 119 (1974)).

17.     "The first factor [of the seven-factor balancing test for likelihood of confusion] assesses the strength of the plaintiff's marks." *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem,*

*Knights of Malta, The Ecumenical Order*, No. 14–14251, 25 Fla. L. Weekly Fed. C 1704, 2015 WL 6000633 (11th Cir. Oct. 15, 2015)*, citing John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir. 1983). "'The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives.'" *Id.*, *quoting Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). "We have described this factor as the 'second most important factor' [only after actual confusion] in the seven-factor balancing test for confusion.'" *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010).

18.     "[E]xtensive sales … and advertising do not necessarily establish secondary meaning." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1540, n.40 (11th Cir. 1986).

## SECTION B: COPYRIGHT-RELATED AGREED PRINCIPLES OF LAW

### Copyright Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions

1.      Compliance with "the applicable statutory formalities" is a requirement for validity. *See Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999).

2.      "[N]o action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with [the Copyright Act]. 17 U.S.C. § 411(a); *see also Montgomery v. Noga*, 1168 F.3d 1281, 1288 (11th Cir. 1999) (for works created after 1977, copyright automatically inheres in original works of authorship, but "[i]n order to bring an action for copyright infringement… the author must first register the copyright.") (citing *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1488 & n.4 (11th Cir. 1990)); *see also Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996).

3.      "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c).

4.      When the Plaintiff does not have a registration for the work that is the subject of the copyright infringement claim (an earlier created work, or preexisting work), but has a registration for a derivative or collective work (a later created work) that references or identifies the preexisting work, the effective registration doctrine permits a plaintiff to advance an infringement suit if: (a) the Plaintiff owns both the preexisting work and the later created work; and, (b) the certificate of registration for the later created work identifies the preexisting work. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1229-31 (11th Cir. 2008).

5.      Copyright in a work protected under this title vests initially in the author or authors of the work.  17 U.S.C. § 201(a); *see also Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S. Ct. 2166, 2170, 104 L. Ed. 2d, 811 (1989).

6.      17 U.S.C. § 101; 17 U.S.C. § 201(b) provides"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

7.      To the extent that claimant relies on circumstantial evidence as to access or similarity, the presumption of copying created is rebuttable. If the alleged infringer can prove independent creation or prior common source, even if the two works appear to be copies, the claimant cannot recover for copyright infringement.  *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir. 1982); *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1248 (11th Cir. 1999); *Corwin v. Walt Disney World Co.,* 475 F.3d 1239, 1253 (11th Cir. 2007) ("Striking similarity exists where the proof of similarity in appearance is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.").

8.      The Eleventh Circuit's general test for substantial similarity is the "lay observer" or "ordinary observer" test, and it applies to works that can be seen or heard. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 n.5 (11th Cir. 2008); *Bateman v. Mnemonics Inc.,* 37 U.S.P.Q.2d 1225 (11th Cir. 1995), *vacated in part, reversed in part and remanded,* 38 U.S.P.Q.2d 1225 (11th Cir. 1996); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982).

9.      The Copyright Act requires an exclusive license to be in writing and signed by the owner of the rights conveyed. *See* 17 U.S.C. §§ 101 (defining "transfer of copyright ownership") & 204(a). However, non-exclusive licenses are exempt from the writing requirement and may be granted orally or implied from conduct. *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) (citing *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997)). The alleged infringer has the burden of establishing this defense. *See Latimer* 601 F.3d at 1235.

10.     Upon finding by a preponderance of the evidence that a Defendant has infringed Plaintiff's copyright, the jury determines whether the Plaintiff can recover damages. *See Donald Frederick Evans & Assocs., Inc. Cont'l Homes, Inc.*, 785 F.2d 897, 903 (11th Circ. 1986) (establishing a prima facie copyright infringement claim requires proof by a preponderance of the evidence). A prevailing Plaintiff is entitled to recover his actual damages plus the Defendant's profits or statutory damages. *See* 17 U.S.C. § 504 (a & b) (actual damages and profits); *id.* § 504(c) (statutory

damages); *Jordan v. Time, Inc.*, 111 F.3d 102, 104 (11th Cir. 1997). Though a Plaintiff may elect between these two forms of recovery before the jury is instructed, the statute allows a Plaintiff to elect statutory damages (at any time before a final judgment is rendered.) 17 U.S.C. § 504(c); *Jordan*, 111 F.3d at 104.

11.     Such a claim for actual damages may include a retroactive license fee measured by what the Plaintiff would have earned by licensing the infringing use to the Defendant. *See e.g., Montgomery*, 168 F.3d at 1295-96 (affirming jury award of actual damages based on retroactive license fee).

12.     Under 17 U.S.C. § 504(c), a Plaintiff may obtain statutory damages in lieu of actual damages and profits. Even though the statute suggests that statutory damages are awarded by the court, the Seventh Amendment requires that the determination, including the amount of such award, be made by the jury. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353, 118 S. Ct. 1279, 1287, 140 L. Ed. 2d. 438, 353 (1998).

13.     In seeking statutory damages, the willfulness of defendant's conduct may be considered. *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 850 (11th Cir. 1990) (difficulty or impossibility of providing actual damages, attitude and conduct of parties, willfulness of defendant's conduct, deterrence of future infringement). *See also MCA Television LTD v. Feltner*, 89 F.3d 766, 768 (11th Cir. 1996) (stating that "'[i]t seems clean that as here used "willfully" means with knowledge that the defendant's conduct constitutes copyright infringement'" (quoting 3 Nimmer on Copyright (199), § 14.04[B], 14-58-60)); 17 U.S.C. § 504(c)(2) (If infringer proves it was not aware and had no reason to believe that its acts constituted an infringement of copyright, the award may be reduced to not less than $200.)

14.     An implied nonexclusive license may be granted orally or implied through conduct. *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).

15.     Implied nonexclusive licenses are exempt from the writing requirement of the Copyright Act and may arise by operation of law. *See* 17 U.S.C. § 204(a).

16.     While "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate[,] [t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c). *See also Pegasus Imaging Corp. v. Allscripts Healthcare Sols., Inc.*, 2009 Copr. L. Dec. P 29875, 2010 WL 497720, at *9 (M.D. Fla. Feb. 9, 2010) ("Importantly, because the registration was made more than five years after first publication of the work, Pegasus does not benefit from a presumption of validity of the copyright registration."); *Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4005454, at *3

(S.D. Fla. Sept. 8, 2011) ("If the registration is made more than five years after first publication, then there is no presumption of validity.").

17.     The Copyright Act defines "publication," in relevant part, as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication." 17 U.S.C. § 101.

18.     The Court's focus is not on the subjective intent of the parties, but on an objective inquiry into the facts that manifest intent. *See I.A.E, Inc. v. Shaver*, 74 F.3d 768, 776 (5th Cir. 1996); *see also Karlson v. Red Door Homes, LLC.*, 18 F.Supp.3d 1301, 1307 (N.D. Alabama 2014) aff'd Case No. 14-12371 (11th Cir. May 7, 2015) (holding the copyright holder's "subjective intent is irrelevant.").

19.      "[U]nder federal law, a nonexclusive license may be granted orally, or may even be implied from conduct. . . . When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license...." *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir.1997) (quoting 3 MELVILLE B. NIMMER & DAVID NIMMER (NIMMER) ON COPYRIGHT § 10.03[A], at 10-40, 10-41 (1997)).

20.     Eleventh Circuit precedent precludes an extension of copyright protection to cover objects depicted in photographs. *Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (holding copyrights do not cover the appearance of an object depicted in a copyrighted photograph).

21.     When a supplementary registration is completed, the Copyright Office will assign it a new registration number. 37 C.F.R. § 201.5(d).

22.     The information contained in a supplementary registration augments but does not supersede that contained in the basic registration. 37 C.F.R. § 201.5(d); 17 U.S.C. § 408(d).

**11.     CONCISE STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

SECTION A: STATEMENTS OF FACTS THAT PLAINTIFFS BELIEVE WERE
            ADMITTED TO DURING DISCOVERY, AND THUS DO NOT REQUIRE
            PROOF AT TRIAL, WHICH DEFENDANTS NOW DISPUTE[4]

    i.   NONCOPYRIGHT-RELATED STATEMENTS[5]

---

[4] Defendants object to Plaintiff's characterization to the extent it ignores Defendants' objections to a particular discovery request .

1.      Hi-Lite was founded in 1959.

2.      Barn Light Electric sells products to consumers over the Internet.

Defendants' Admissions Based on Their Responses to Plaintiff's 1st RFAs

3.      BLO is a direct competitor of Barn Light Electric.

4.      Defendants have not performed a formal consumer survey to determine if BLO's mark "Barnlight Originals" has acquired secondary meaning.

5.      The Hi-Lite Products BLO offers for sale in connection with the BARNLIGHT ORIGINALS mark are similar in appearance to the products Barn Light Electric offers under the BARN LIGHT ELECTRIC marks.

6.      BLO is aware of at least one instance in which a consumer believed BLO was the source of a product(s) purchased from Barnlight Originals.

7.      The domain name www.barnlightoriginals.com did not consist of the legal name commonly used to identify Jeffrey Ohai.

8.      Trey Solms informed Hi-Lite that sales by Classic Light Design were negatively affected following the launch of the Barnlight Originals Website.

9.      Some photographs were delivered to Barn Light Electric by Hi-Lite on compact disc without copyright notice.

10.     Counterclaim-Plaintiff Barnlight Originals is a corporation organized and existing under the laws of the State of Nevada with its principle place of business in Nevada.

Defendants' Admissions Based on Their Responses to Plaintiff's 2nd RFAs

11.     Classic Light Design was a distributor of Hi-Lite products.

12.     Classic Light Design LLC is a distributor of products manufactured by Hi-Lite.

13.     Michael Schultz operates a website having the URL: http://www.thelightchoice.com.

---

5 Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

14.     Jeffrey Ohai provided direction and final approval for design of the BARNLIGHT ORIGINALS marks.  David McAdam provided feedback on the design of the BARNLIGHT ORIGINALS marks.  Bold Array, an internet design company, helped translate Jeffrey Ohai's design concepts into the final BARNLIGHT ORIGINALS mark

15.     Marketing, advertising, and promotional activities that Barnlight Originals has conducted, is conducting and/or plans to conduct within the United States in connection with the BARNLIGHT ORIGINALS mark includes: Google advertisements via www.google.com and email blasts via www.marketersmedia.com; and Google advertisements for the period of November 11, 2013 - March 11, 2014 and email blast via www.marketersmedia.com on or around December 17, 2013.

16.     Barnlight Originals' actual and intended consumers are people who visit the website www.barnlightoriginals.com.

17.     With respect to each product that is promoted, sold, or distributed under the BARNLIGHT ORIGINALS marks, the trade channel in which such have been sold or are now being offered for sale is the website www.barnlightoriginals.com.

18.     Hi-Lite Manufacturing Company, Inc., Go Home, and ATG are manufacturers of products sold under the BARNLIGHT ORIGINALS marks.

Plaintiff's Third Amended Complaint's [Dkt. 107] Undisputed, Factual Allegations

19.     For years, Barn Light Electric purchased certain light fixture components and light fixtures from Hi-Lite.  Barn Light Electric's annual purchases from Hi-Lite eventually reached well over one million dollars, making Barn Light Electric one of Hi-Lite's largest purchasers.

20.     Defendant Jeffrey Ohai registered the domain name www.barnlightoriginals.com.

21.     This Court has subject matter jurisdiction pursuant to: 28 U.S.C. §§ 1331, 1338 (a) and (b), and 15 U.S.C. § 1121 because Barn Light Electric's trademark infringement and unfair competition claims arise under the Lanham Act, 15 U.S.C. §§ 1051 et seq.

22.     This Court has supplemental jurisdiction over the Florida law claims under 28 U.S.C. §§ 1367 and 1338(b).

23.     Venue is proper pursuant to 28 U.S.C. § 1391(c) because Barn Light Electric resides in this Judicial District.

24.     Plaintiff Barn Light Electric is a limited liability company organized and existing under the laws of Florida with its principal place of business in the Middle District of Florida.

25.     For years, Barn Light Electric purchased various components for its light fixtures from Hi-Lite.

26.     Over the course of their relationship, Barn Light Electric also began specifying and purchasing light fixtures from Hi-Lite.

27.     Barn Light Electric was purchasing over one million dollars in light fixtures and replacement components from Hi-Lite, making Barn Light Electric one of Hi-Lite's top buyer.

28.     On September 11, 2012, Defendant Ohai, registered the domain name www.barnlightoriginals.com.  Exhibit 5.

29.     The domain name was registered via a proxy.

30.     BLO was formed to sell Hi-Lite light fixtures.

31.     BLO sells products manufactured by Hi-Lite.

32.     Hi-Lite sells lighting fixtures via BLO.

33.     BLO owns U.S. Trademark Registration No. 4,464,241.  BLO's U.S. Reg. No. 4,464,241 is for the standard character mark BARNLIGHT ORIGINALS INC., and includes a disclaimer of the word "BARN LIGHT" and "INC."  The '241 mark was registered on the supplemental register on January 7, 2014.

34.     BLO's U.S. Reg. No. 4,489,514 is for the BLO logo as shown in Figure 9, below.



FIGURE 9

### ii. COPYRIGHT-RELATED STATEMENTS[6]

Parties' Summary Judgment Stipulation of Agreed Material Facts [Dkt. 206]

1.     The Second Amended Complaint [Dkt. 60] provides pictures and descriptions for twelve lighting fixtures.

2.     Exhibits J, K, L, M, N, and O of Jeffrey Ohai's declaration each include a photograph of a Hi-Lite product.

3.     Barn Light Electric had access to the Hi-Lite photographs depicted in Exhibits J, K, L, M, N and O of Jeffrey Ohai's declaration.

Defendants' Admissions Based on Their Responses to Plaintiff's 2nd Set of Interrogatories

4.     The photographs depicted in Hi-Lite Catalogs No. 203, 205, and 208 were taken by Mr. Dimitri Newman of 1839 Blake Ave. #6, Los Angeles, CA 90039 and Mr. Reynolds Ohai, II, deceased. The photographs taken by Mr. Newman were assigned to Hi-Lite on April 4, 2013.

## SECTION B: NONCOPYRIGHT-RELATED STATEMENTS OF DISPUTED FACTS[7]

1.     Whether Hi-Lite benefited directly from Barnlight Originals' trademark infringement, unfair competition, and cybersquatting.

2.     Whether Hi-Lite and Barnlight Originals commingled their financials and engaged in a joint venture.

3.     Whether Hi-Lite is the true party in interest behind Barnlight Originals' infringing activities, and directly profits from Barnlight Originals' infringing activities.

4.     Whether Barn Light Electric's goods and services description for U.S. Trademark Registration No. 3,748,277 refers to "an internet website particularly specializing in the marketing of the sale of goods of others."

5.     Whether Barn Light Electric uses the term Barnlight Originals as an advertising keyword.

---

[6] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

[7] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

6.      Whether any confusion between Barn Light Electric and Barnlight Originals is attributable to factors other than the similarity of the marks.

7.      Although Barn Light Electric was one of Hi-Lite's largest purchasers, on September 4, 2012, Defendant Ohai terminated the relationship and Hi-Lite abruptly stopped selling light fixtures and components to Barn Light Electric.

8.      BLO is a corporation organized and existing under the laws of Nevada with a principle place of business in Nevada.  BLO is subject to this Court's jurisdiction and receives revenue from Florida residents.  BLO is subject to this Court's jurisdiction at least by: maintaining a fully-interactive, commercial web store (www.barnlightoriginals.com) that promotes, sells and offers for sale products under the infringing mark BARNLIGHT ORIGINALS to consumers in this judicial district; engaging in unlawful business transactions with consumers in this judicial district; shipping products under the infringing trademarks to consumers in this judicial district; engaging in other acts of unfair competition described herein that harm local consumers and Barn Light Electric in this judicial district; and receiving revenue from Florida residents.

9.      Hi-Lite has a principle place of business in California and is subject to this Court's jurisdiction.  Hi-Lite is subject to this Court's jurisdiction at least by: maintaining numerous Florida sales representatives that promote and sell Hi-Lite products throughout Florida, including in this judicial district; engaging in extensive business transactions with Barn Light Electric and others throughout Florida, including in this judicial district; shipping products, including products sold under the infringing trademark BARNLIGHT ORIGINALS, directly to Florida residents; engaging in other acts of unfair competition described herein that harm consumers and Barn Light Electric in this judicial district; and receiving revenue from Florida residents.  Further, Hi-Lite has sent Barn Light Electric a cease and desist letter in this judicial district claiming infringement of the '477 patent.

10.      Defendant Jeffrey L. Ohai is a resident of California and is subject to this Court's jurisdiction.  Jeffrey L. Ohai is subject to this Court's jurisdiction at least by: directing and controlling the activities of trademark infringement and unfair competition committed by BLO; directing and controlling the activities of trademark infringement and unfair competition committed by Hi-Lite; and registering, operating, directing and controlling the domain name and fully interactive commercial website at www.barnlightoriginals.com, which targets Florida residents.  Additionally, Jeffrey L. Ohai is listed on the face of the '477 patent as the inventor and thus presumptive owner of the '477 patent, which is the subject of the infringement allegations against Barn Light Electric.

11.      In addition to its exclusive common law rights in the BARN LIGHT ELECTRIC marks developed through many years of use and promotion, Barn Light

Electric owns U.S. Trademark Reg. No. 3,748,277 on the principal register for the mark depicted in Figure 4 and covering the online marketing and sale of "a variety of goods, namely, lights, lighting fixtures and ceiling fans." A true and correct copy of the '277 registration is provided as Exhibit 2 of Dkt. 107.



12.    Barn Light Electric also owns U.S. Trademark Reg. No. 4,722,667 on the principal register for the mark BARN LIGHT ELECTRIC, covering "non-illuminated ceiling fans and non-illuminated ceiling fan kits comprised of ceiling fans, wiring and mounting brackets." A true and correct copy of the '667 registration is provided as Exhibit 3 of Dkt. 107.

Barn Light Electric also owns U.S. Trademark Reg. No. 3,723,964 on the supplemental register for the mark BARN LIGHT ELECTRIC COMPANY, covering the online marketing and sale of "a variety of goods, namely, lights, lighting fixtures and ceiling fans." A true and correct copy of the '964 registration is provided as Exhibit 4 of Dkt. 107. On Dec. 10, 2014, Barn Light Electric filed its Declaration of Continued Use Under Section 8 in connection with Reg. No. 3,723,964 for the mark BARN LIGHT ELECTRIC COMPANY evidencing continuous use of the mark for the past five years in connection with the services. Accordingly, the BARN LIGHT ELECTRIC COMPANY mark has become eligible for transfer to the principal register based on being listed on the supplemental register for five (5) years, Barn Light Electric's marks will also be eligible to become incontestable.

Plaintiff's Statement of Undisputed SJM Facts [Dkt. 198, Ex. 14] That Were Challenged

13.    Whether Hi-Lite has no marketing plan. Its marketing strategy is to "sell products." (See Motion, at 5 & n.3, citing Exhibit 2, J. Ohai Depo., p. 55, ln. 7 – p. 56, ln. 4).

14.    Whether Hi-Lite has not produced any advertising expenses and has refused to provide its product revenue. (See Motion, at 5; Plaintiff's Third Motion to Compel Production of Documents [Dkt. 109] at pgs. 13-23; Plaintiff's Motion to Compel Deposition of Defendant's Hi-Lite and Barnlight Originals and the Production of Documents [Dkt. 134] at pg. 19).

15. Whether CAL Lighting is a Hi-Lite distributor that markets Hi-Lite's products. (See Motion, at 6 & n.5, citing Exhibit 3(a), CAL Depo., p. 9, ln. 17–p. 12, ln. 10.).

16. Whether Paragraphs 36-38 and 40-43 of the SACC involve "guard cast" lighting and the name itself conveys that the design is meant to protect the light fixture. (See Motion, at 15 & n.41, citing Exhibit 1(a), Hi-Lite Depo., p. 195, ln. 15 – p. 197, ln. 8).

17. Whether Barn Light Electric's first lighting catalogue was available, and offered Hi-Lite products for sale to the public, well prior to October 18, 2009. (See Motion, at 21 & n.59, citing Scott Decl., ¶¶3, 4, citing, Exhibit 1)

18. Whether, in the lower, left-hand corner of page 12 of the first catalogue appears "The Original™ Warehouse Stem Mount," which equates to Hi-Lite Product Code 15116. (See Motion, at 21 & n.60, citing Scott Decl., ¶5, citing, Exhibit 1).

<u>Plaintiff's Third Amended Complaint's [Dkt. 107] Challenged, Factual Allegations</u>

19. Whether, in 2008, Bryan Scott founded Barn Light Electric in his backyard barn. The initial focus of the business was identifying and meticulously restoring vintage light fixtures to their former beauty. Mr. Scott spent countless hours refining his techniques until ultimately he was able to design and manufacture original, vintage-inspired goods that have not been available since the early to mid 1900s.

20. Whether Mr. Scott and his wife, Donna Scott, promoted Barn Light Electric's vintage inspired products through an original website, www.barnlightelectric.com. This site was coupled with a creative and winsome social media campaign, which gave Barn Light Electric a substantial Internet presence. Over time, Barn Light Electric grew into a tremendously successful lighting company dedicated to providing high-quality fixtures and home goods with a strong emphasis on American craftsmanship.

21. Whether, during its entire existence, Barn Light Electric has designed, manufactured and sold light fixtures and other products under its BARN LIGHT ELECTRIC CO. family of trademarks. Also, Barn Light Electric has long promoted itself as HOME OF "THE ORIGINAL BARN LIGHT," and has sold a highly popular family of light shades under the mark THE ORIGINAL. By virtue of years of extensively using and promoting its trademarks, Barn Light Electric established enormous goodwill in its marks.

22. Whether Barn Light Electric's constantly growing purchases from Hi-Lite were not enough for Hi-Lite. Hi-Lite's president and co-owner, Jeffrey L. Ohai, coveted exclusivity and control over Barn Light Electric's innovative products and

lucrative customer base. Notwithstanding the fact that Barn Light Electric was solely responsible for the inception of these products, time and again, Defendant Ohai demanded that Barn Light Electric sell almost exclusively Hi-Lite products. Essentially, Defendant Ohai tried to force Mr. Scott to abandon all sales of Barn Light Electric's non-porcelain products… or else.

23.     Whether Mr. Scott rejected Defendant Ohai's demands and refused to be bullied by his threats.

24.     Whether Defendant Ohai, through Hi-Lite, engaged in several bad faith acts with one obvious purpose: misappropriate Barn Light Electric's business. These acts included knocking off Barn Light Electric's products, copying its marketing strategy, illegally arrogating its intellectual property. Within a matter of days, Defendant Ohai registered the domain www.barnlightoriginals.com (the "BLO domain name"). In a matter of weeks, Defendant Ohai rushed to form BLO and complete a website operating under the BLO domain name, but derived from Barn Light Electric's website, www.barnlightelectric.com (the "BLO website").

25.     Whether, since then, Defendants Hi-Lite, BLO and Defendant Ohai, either alone or collectively, have willfully engaged in various forms of unfair competition, including infringing Barn Light Electric's trademarks and otherwise capitalizing on its goodwill in the marketplace.

26.     Whether Defendants' unlawful activities are causing actual consumer confusion.

27.     Whether Defendants' willful infringement and unfair competition has harmed consumers and irreparably damaged the goodwill associated with Barn Light Electric's common law and federally registered trademarks.

<u>Barn Light Electric Company</u>

28.     Whether, since its inception, Barn Light Electric has been a pioneer in the manufacture, distribution and sale in interstate commerce of high-quality, vintage-inspired lighting and other home products.

29.     Whether, like many successful businesses, Barn Light Electric had somewhat meager beginnings. Barn Light Electric has its origins in a barn behind founder Mr. Scott's home. In that barn, Mr. Scott dedicated years to avidly hand-restoring and rebuilding beautiful, American-crafted light fixtures. Eventually, that experience inspired Mr. Scott to coin the term BARN LIGHT and adopt the trademark: BARN LIGHT ELECTRIC.

30.     Whether many of the lights Mr. Scott restored—commonly known in the lighting industry as "RLM Lights"—were used in warehouses, factories and other

structures dating from the 1930s to the 1950s. He especially enjoyed restoring such light fixtures because of the high-quality craftsmanship that went into their manufacture.

31.     Whether Mr. and Mrs. Scott would search antique stores, attend estate sales, and even search abandoned buildings looking for vintage light fixtures to restore. After restoring them, Mr. Scott sold many of the light fixtures and kept others for his personal use.

32.     Whether Mr. Scott's experience and passion for restoring antique light fixtures led him to start designing and hand-crafting new light fixtures. In doing so, he researched and implemented techniques and materials from a bygone era, when light fixtures were made to last for generations.

33.     Whether Mr. Scott used highest-quality, commercial grade materials in Barn Light Electric's light fixtures.

34.     Whether the demand for Barn Light Electric's light fixtures swelled to the point where it constituted a sustainable business that required full time attention.

35.     Whether, in 2008, the Scotts left their professional careers to manage Barn Light Electric full time.

36.     Whether the aesthetic beauty and craftsmanship associated with Barn Light Electric's current products is self-evident, as illustrated below in Figure 1 (Barn Light Electric's Ivanhoe® Sky Chief Warehouse porcelain pendant light); Figure 2 (Ivanhoe® Seaside Radial Wave Reflector porcelain pendant light); and Figure 3 (Dean Clear Schoolhouse stem mount light).



FIGURE 1



FIGURE 2



FIGURE 3

37.    Whether Barn Light Electric has also manufactured, distributed and sold various vintage-inspired home goods, as well as restored antiques.  For example, Figure 3 above illustrates porcelain enamel nesting bowls made by Barn Light Electric.

Barn Light Electric's Marketing Efforts

38.     Whether Barn Light Electric has experienced stunning growth and success from its earliest days.  Such growth and success were especially remarkable considering it was during one of the darkest recessionary periods in United States history and in a competitive, hard-hit industry.

39.     Whether Barn Light Electric's success is not simply a matter of the craftsmanship, creativity and hard work, much of its success is a direct result of Barn Light Electric's brilliant marketing to its consumers.

40.     Whether Barn Light Electric has invested millions of dollars and countless hours engaging, inspiring, educating and charming its customers.

41.     Whether Barn Light Electric created and is always improving on its website, www.barnlightelectric.com.  A few minutes spent there reveals a great deal about Barn Light Electric and the exceptional quality of its products.  It also beckons users to stroll through countless design ideas that incorporate Barn Light Electric's products.

42.     Whether Barn Light Electric also invests time in marketing its products through a plethora of social networking websites.  These include, for example, Instagram, Pinterest, www.houzz.com and Facebook.  At such sites, Barn Light Electric inspires consumers with new ways to incorporate Barn Light Electric's products into their homes.  Barn Light Electric also uses such websites to educate consumers who may have questions about specific projects.

43.     Whether these efforts have led to a substantial following on Barn Light Electric's social media sites.

44.     Whether Barn Light Electric enjoys a following in the thousands and innumerable "likes."  Such followers and "likes" are authentic.  Barn Light Electric has never paid for fake followers or surreptitiously inflated its "likes."

45.     Whether, over the years, Barn Light Electric's all-American success story has garnered significant amounts of national media attention in virtually every form of modern media, including television, radio, print and Internet.  See Exhibit 1 (a listing of national media sources that have used BARN LIGHT ELECTRIC as a source identifier for Barn Light Electric's goods and services).

46.     Whether Barn Light Electric's unique products, marketing investments, and nationwide media have led to a wellspring of goodwill in the BARNLIGHT ELECTRIC trademarks.

The Barn Light Electric Marks

47.     Whether, since at least 2008, Barn Light Electric has continuously used in commerce the marks BARN LIGHT ELECTRIC, BARN LIGHT ELECTRIC COMPANY, BARN LIGHT ELECTRIC CO., HOME OF "THE ORIGINAL BARN LIGHT."  Barn Light Electric has also long used the mark THE ORIGINAL in connection with certain light fixtures.  Together, the marks identified herein are referred to as "the BARN LIGHT ELECTRIC marks" to identify the source and quality of its goods and services.

48.     Whether, by virtue of years of extensively using and promoting the BARN LIGHT ELECTRIC marks, Barn Light Electric has established enormous goodwill in these marks.  The BARN LIGHT ELECTRIC marks are well-known and uniquely associated with Barn Light Electric in the minds of consumers throughout the United States.

49.     Whether the BARN LIGHT ELECTRIC marks are entitled to common law trademark protection.

50.     Whether the BARN LIGHT ELECTRIC marks, when used in connection with Barn Light Electric's products and services, are distinctive and, through Barn Light Electric's extensive sales, advertising and promotional efforts, have acquired secondary meaning.

51.     Whether, as a result of Barn Light Electric's activities, the BARN LIGHT ELECTRIC marks have become valuable assets of Barn Light Electric, represent enormous goodwill of the company, and identify and distinguish Barn Light Electric's goods and services from those of others.

Hi-Lite, Ohai And BLO

52.     Whether Barn Light Electric purchased various components for its light fixtures from Hi-Lite, as opposed to some other source, specifically because Hi-Lite manufactured its components in the United States.

53.     Whether Hi-Lite wanted more.  Defendant Ohai repeatedly demanded that Barn Light Electric: (i) sell only Hi-Lite products on Barn Light Electric's own website, except for those Barn Light Electric light fixtures that Hi-Lite was not equipped to manufacture, i.e., porcelain enamel products; (ii) stop purchasing parts from other manufacturers; (iii) stop manufacturing parts at Barn Light Electric (the original manufacturing site); and (iv) stop selling a lower cost line of light fixtures that it sold to customers that could not afford the high-end fixtures (comprised primarily of Barn Light Electric's products).

54.     Whether Defendant Ohai coupled his unreasonable demands with intimidation and the threat that Hi-Lite would stop selling products to Barn Light Electric altogether.

55.     Whether Mr. Scott rejected Defendant Ohai's demands for exclusivity.

Ohai, Hi-Lite And BLO Engage In Trademark Infringement And Unfair Competition

56.     Whether, as a result of Mr. Scott's refusal to sell exclusively Hi-Lite products, Defendant Ohai devised a scheme to sell Hi-Lite light fixtures by trading off of the goodwill that Barn Light Electric had established in the BARN LIGHT ELECTRIC marks.

57.     Whether Defendant Ohai subsequently concealed his identity as the registrant of the BLO domain name.  Exhibit 6.

58.     Whether, within about two months, Defendant Ohai had formed BLO.  Under Defendant Ohai's direction and control, BLO created and exploits www.barnlightoriginals.com as a fully operative and interactive commercial storefront to sell Hi-Lite light fixtures.

59.     Whether BLO ships to consumers nationwide, including consumers residing in this judicial district.

60.     Whether Defendants, under the direction and control of Defendant Ohai, promote and sell Hi-Lite lighting fixtures using the marks BARNLIGHT ORIGINALS and BARNLIGHT ORIGINALS INC., as well as the website at www.barnlightoriginals.com.

61.     Whether, at the time Defendants began operating their online retail operation, Defendants knew of Barn Light Electric's exclusive rights to the BARN LIGHT ELECTRIC marks, including, inter alia, Barn Light Electric's use of the HOME OF "THE ORIGINAL BARN LIGHT" mark.

62.     Whether Defendants selected the BARNLIGHT ORIGINALS marks with the intent of causing consumer confusion, and thereby enabling Defendants to profit from the goodwill Barn Light Electric had established in the BARN LIGHT ELECTRIC marks.

63.     Whether, to make matters worse, Defendants also adopted specific product trademarks that are confusingly similar to those used by Barn Light Electric.

64.     Whether Defendants' infringement of Barn Light Electric's trademark THE ORIGINAL is particularly transparent.

65.     Whether Defendants seized on THE AUTHENTIC, which has exactly the same meaning and connation as THE ORIGINAL.  They did so in connection with a light fixture that is essentially identical in all material respects to the light fixture sold by Barn Light Electric as THE ORIGINAL.

66.     Whether this is best shown in comparing THE ORIGINAL and THE AUTHENTIC warehouse lights, which are in nearly all material aspects identical. Compare Figure 5 and Figure 6.

 

FIGURE 5: THE ORIGINAL          FIGURE 6: THE AUTHENTIC

by BLE                          by BLO

67.     Whether, further confirming Defendants' intent to cause consumer confusion, Defendants copied Barn Light Electric's marketing description:

Barn Light Electric: "The Original™ barn light is one of our best selling gooseneck lights!" A true and correct copy of Barn Light Electric's web page for THE ORIGINAL™ warehouse light is attached as Exhibit 7.

Barnlight Originals: "One of our most popular barn lighting fixtures at Barnlight Originals™ is The Authentic Warehouse Shade." A true and correct copy of Barnlight Original's web page for THE AUTHENTIC warehouse light is attached as Exhibit 8.

68.     Whether, ironically, Defendants' use of THE AUTHENTIC highlights the Defendants' utter lack of authenticity.

Ohai, Hi-Lite And BLO's Other Unfair Competition Tactics

69.     Whether Defendants have systematically copied numerous aspects of Barn Light Electric's website and its design. Just like Barn Light Electric's website, Defendants home page contains a logo in the upper left corner with the words "BARN LIGHT" prominently displayed against a rustic background. Both logos also include a picture of a vintage-inspired light fixture. Further, just as with Barn Light Electric's home page, Defendants placed a rotating carousel of multiple photographs of vintage-inspired lighting and light fixtures immediately below the logo. Further

still, Defendants have placed a graphical text box with the words "Free Shipping" immediately to the right of the logo.

70.    Whether Defendants went so far as to copy the copyright notice, as shown below.  Compare www.barnlightelectric.com and www.barnlightoriginals.com.

Barn Light Electric:   © 2004-2014 Barn Light Electric Co.® - A division of Barn Light USA™

Barnlight Originals:   © 2014 Barnlight Originals Inc. All rights reserved. A division of Barnlight International™

71.    Whether there is no actual "Barnlight International."

72.    Whether the copying by Defendants is particularly manifest in connection with the web pages directed to specific products.  Compare Figure 7 (Barn Light Electric Product Page for The Original™ gooseneck light) and 8 (BLO Product page for The Authentic gooseneck light).



FIGURE 7



FIGURE 8

73.    Whether. as shown in Figures 7 and 8, Defendants copied every material aspect of Barn Light Electric's product page.  From Barn Light Electric's product name to the photographs and carousel placement to Barn Light Electric's unique colored informational buttons found on each product, and which identify qualities of the lighting fixture (e.g., wet/dry rating; origin of product; certifications, etc.).  See Figure 8.

74.    Whether Defendants are further systematically stalking and supplanting Barn Light Electric's posts on various websites, including www.houzz.com.

75.    Whether Defendants have improperly and falsely inflated their followers and "likes" on one or more social media websites.

76.    Whether each of these actions is intended to confuse and mislead consumers about the source, quality and origin of BLO's products.

77.    Whether, based on the foregoing, Defendants have traded on and damaged the goodwill associated with the BARN LIGHT ELECTRIC marks.

BLO's Sham Trademark Registrations

78.    Whether, based on its unlawful use of the mark BARNLIGHT ORIGINALS INC., BLO applied for and received two trademark registrations.

79.    Whether BLO resorted to mimicking Barn Light Electric's business activities by filing two applications that mimic the Barn Light Electric registrations.

80.     Whether BLO's U.S. Reg. No. 4,464,241 is for the standard character mark BARNLIGHT ORIGINALS INC., and includes a disclaimer of the word "BARN LIGHT" and "INC." The '241 mark was registered on the supplemental register on January 7, 2014.

81.     Whether both the '241 registration and the '514 registration by BLO are directed to trademarks that are confusingly similar to and in the same classes as the BARN LIGHT ELECTRIC marks.

Ohai, Hi-Lite And BLO's Unlawful Acts Are Causing Actual Consumer Confusion

82.     Whether the net effect of Defendants' willful trademark infringement and unfair competition is actual harm and potential future harm to consumers and Barn Light Electric.

83.     Whether Barn Light Electric has documented numerous instances of actual confusion.

84.     Whether, for example, Barn Light Electric has received multiple communications from customers expressing confusion in connection with BLO products, as well as communications complaining about Defendants' website and products marketed and sold by Defendants.

85.     Whether, in at least one instance, an extensive purchase order having all BLO part numbers was submitted to Barn Light Electric.

Defendants' Affirmative Defenses [Dkt. 111]

86.     Whether Plaintiff's alleged marks are merely descriptive and have not acquired distinctiveness or secondary meaning in the minds of the consuming public and thus are not entitled to trademark protection.

87.     Whether Plaintiff's claims for equitable relief fail because of Plaintiff's unclean hands.

88.     Whether Defendants are entitled to set-off any potential award of damages to Plaintiff based upon Defendants' counterclaims and third-party complaint.

Challenged, Factual Allegations from Defendants' SACC [Dkt. 88-1]

89.     Whether Joinder of Third-party Defendants Bryan and Donna Scott is proper pursuant to Fed. R. Civ. P. 20.

90.     Whether the conduct of the Counterclaim-Defendant and Third-party Defendants that is the subject of this action has at all times material to this Complaint occurred in this district.

91.     Whether Barn Light Electric and the Scotts deny that Hi-Lite specializes in barn lighting and provides a wide range of American-made quality lightning to its customers.

92.     Whether, over the past 56 years, Hi-Lite has achieved success through attention to detail and an unwavering commitment to quality and customer service, using only the finest materials in the construction of high-quality barn lights and decorative lighting.

93.     Whether Hi-Lite has invested millions of dollars in equipment, labor, and intellectual property, which consistently place Hi-Lite at the top of the decorative lighting industry.

94.     Whether Hi-Lite name synonymous with high-quality barn lights and decorative lighting.

95.     Whether, in early 2008, based on Hi-Lite's reputation for quality and customer service, Bryan and Donna Scott, the co-owners of what is now known as Barn Light Electric, sought the assistance of Mr. Ohai and Hi-Lite for the manufacture and supply of high-quality barn lights.

96.     Whether Mr. Ohai and the Scotts reached a handshake agreement in which Barn Light Electric would purchase barn lights exclusively from Hi-Lite.  And, whether, in exchange for same, Hi-Lite gave a 5% discount to Barn Light Electric on all fully-assembled barn lights and reduced drop shipment charges for Barn Light Electric from the standard fifteen dollars to a mere five dollars (hereinafter "the Alleged Agreement").

97.     Whether the discounts provided under the Alleged Agreement saved Barn Light Electric several hundred thousand dollars over the course of about 4 years.

98.     Whether, pursuant to the Alleged Agreement, Barn Light Electric was to purchase exclusively from Hi-Lite in exchange for Hi-Lite providing Barn Light Electric with substantially discounted prices.

99.     Whether the Alleged Agreement was not a "private label" arrangement. Whether, Barn Light Electric was selling lighting fixtures under the well-known and highly-regarded Hi-Lite name.

100.     Whether the Scotts and Barn Light Electric tout their relationship with Hi-Lite as their sole source of barn lights in their Winter 2008-2009 catalog, 100% of which featured products manufactured by Hi-Lite.

101.     Whether, throughout the course of their business relationship, Mr. Ohai would often host the Scotts at the Hi-Lite manufacturing facility, giving them tours and showing them the Hi-Lite manufacturing process.

102.     Whether the motivation for the Scotts' visits to the facility was less than honorable. Whether, the Scotts and Barn Light Electric were secretly manufacturing products confusingly similar to those of Hi-Lite by using the processes devised by Hi-Lite over the course of about 50 years of business.

103.     Whether, between 2008-2009, the Scotts told Mr. Ohai and Hi-Lite of their intention to procure a porcelain baking oven.

104.     Whether, upon allegedly learning of Barn Light Electric's intent to purchase a porcelain baking oven, Hi-Lite reminded Barn Light Electric and the Scotts of the terms of the Agreement, and reiterated its position that it did not want to do business with a company that manufactures lighting fixtures similar to those manufactured by Hi-Lite.

105.     Whether, following this alleged discovery, on September 4, 2012, Hi-Lite terminated its relationship with Barn Light Electric.

106.     Whether Mr. Ohai decided to go into business for himself, founding Barnlight Originals, Inc., an American lighting retailer allegedly supplying top-quality lighting products because he was allegedly discouraged by the Scotts' and Barn Light Electric's willfully deceptive business practices, and without an online distributor that Hi-Lite could work closely with to market product effectively on the internet.

107.     Whether Barnlight Originals registered, and continuously used since January 2013, the BARNLIGHT ORIGINALS, INC. word mark on the Supplemental Register (U.S. Registration Number 4,464,241) (See Exhibit S) and the BARNLIGHT ORIGINALS logo on the Principle Register (U.S. Registration Number 4,489,514) (See Exhibit T) in connection with "on-line retail store services featuring commercial and residential lighting, lamps and accessories." (collectively "the Barnlight Originals Marks").

108.     Whether Barnlight Originals has common law rights in the mark "Barnlight Originals" by having allegedly used the mark in commerce.

109.     Whether Barnlight Originals registered the domain name www.barnlightoriginals.com, where it offers high-quality barn lights to consumers throughout the country and around the world.

110.     Whether the Scotts and Barn Light Electric trade on the alleged reputation and goodwill associated with Mr. Ohai, Hi-Lite, and now Barnlight Originals, and systematically, willfully, and intentionally, infringed the Barnlight Originals Marks.

111.    Whether the Scotts and Barn Light Electric intimidated a supplier of light fixtures to no longer supply its products to Barnlight Originals.

112.    Whether Mr. Ohai monitored the marketplace for use of the Barnlight Originals Marks and discovered the website www.barnlightelectric.com/barn-light-originals.html (the "Allegedly Infringing Website"). Whether the Allegedly Infringing Website includes a bold headline advertising "Barnlight Originals."

113.    Whether consumers are presented with the search result depicted in paragraph 81 of the SACC when attempting to locate Barnlight Originals via the Google search engine.

114.    Whether the Allegedly Infringing Website is operated by Barn Light Electric, is registered to Bryan Scott, and is targeted to individuals seeking barn lights with the intent of causing consumer confusion.

115.    Whether the Scotts and/or Barn Light Electric exercise control over and directly profit from the Allegedly Infringing Website.

116.    Whether the Scotts and/or Barn Light Electric know or have reason to know of the Allegedly Infringing Website and its use of the term "Barnlight Originals" in its advertising.

117.    Whether, as of October 2014, more than two years after Hi-Lite's termination of the Alleged Agreement, Barn Light Electric deceives its customers by displaying photos of Hi-Lite products to lure their customers into purchasing products manufactured by Barn Light Electric.

118.    Whether Barn Light Electric intentionally uses the mark BARNLIGHT ORIGINALS on its website in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

119.    Whether Barn Light Electric has infringed and is infringing Trademark Registration Nos. 4,464,241 and 4,489,514.

120.    Whether Barn Light Electric's conduct has created and will create confusion among the members of the relevant consuming public.

121.    Whether Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.

122.    Whether Barnlight Originals has been damaged by Barn Light Electric's use of the mark BARNLIGHT ORIGINALS due to the allegedly confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC registered mark.

123.    Whether Barnlight Originals is entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees.

124.    Whether Barn Light Electric has infringed and is infringing Barnlight Originals' common law rights to BARNLIGHT ORIGINALS.

125.    Whether Barnlight Originals has been damaged by Barn Light Electric's misappropriation and use of a confusingly similar trademark and will continue to be damaged by any further such use.

126.    Whether Barn Light Electric has engaged in acts of unfair competition by using in commerce the mark BARNLIGHT ORIGINALS as well as Hi-Lite part numbers in a manner that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the Barn Light Electric with Counterclaim-Plaintiffs, or as to the origin, sponsorship, or approval of its goods.

127.    Whether Barn Light Electric's alleged acts of unfair competition were done with the intent to damage the alleged reputation and goodwill associated with Counterclaim-Plaintiffs' goods and otherwise harm the business interests of Counterclaim-Plaintiffs.

128.    Whether Counterclaim-Plaintiffs have suffered, and are continuing to suffer, irreparable harm and damage and a loss of goodwill.

129.    Whether Counterclaim-Plaintiffs have no adequate remedy of law.

130.    Whether Counterclaim-Plaintiffs are entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Counterclaim-Plaintiffs, and (3) the costs of the action and to obtain a preliminary and a permanent injunction enjoining Barn Light Electric from any further use of the infringing trademarks and a destruction order mandating the destruction of all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Barn Light Electric, bearing the infringing trademarks.

131.    Whether, under common law, Counterclaim-Plaintiffs are entitled to recover all damages proximately caused by the alleged unfair competition and whether, due to the alleged willful nature of the unfair competition, is entitled to an award of punitive damages.

132.    Whether Barn Light Electric has engaged in acts of unfair competition by depicting Hi-Lite's products as its own.

133.    Whether Barn Light Electric uses Hi-Lite's part numbers and copyrighted photographs, and depictions of Hi-Lite products, to sell another manufacturer's products in a manner that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the manufacturer with Hi-Lite, or as to the origin, sponsorship, or approval of its goods.

134.    Whether Barn Light Electric's alleged acts of unfair competition were done with the intent to damage the alleged reputation and goodwill associated with Hi-Lite's goods and otherwise harm the business interests of Hi-Lite.

135.    Whether Hi-Lite has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.

136.    Whether Hi-Lite has no adequate remedy at law.

137.    Whether Hi-Lite is entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Hi-Lite, and (3) the costs of the action and to obtain a preliminary and a permanent injunction enjoining Barn Light Electric from any further use of Hi-Lite part numbers, photographs, and other depictions of Hi-Lite products and a destruction order mandating the destruction of all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Barn Light Electric, bearing the infringing part numbers and photographs.

138.    Whether, under common law, Hi-Lite is entitled to recover all damages proximately caused by the alleged unfair competition and whether, due to the alleged willful nature of the unfair competition, is entitled to an award of punitive damages.

139.    Whether Barn Light Electric uses depictions of Hi-Lite products, uses Hi-Lite part numbers, and uses Hi-Lite photographs, but ships non-Hi-Lite products, thereby allegedly deceiving customers into believing they are purchasing genuine Hi-Lite products when they are not.

140.    Whether Barn Light Electric's online advertisements are false and misleading, have deceived and continue to deceive consumers, the alleged deception has a material effect on the purchasing decisions of consumers, the misrepresented products affect interstate commerce, and Hi-Lite has been injured as a result of Barn Light Electric's alleged deception.

141.    Whether Barnlight Originals has been damaged by these improper actions and will continue to be damaged by such actions unless they are so restrained.

142.    Whether Hi-Lite has been damaged by Barn Light Electric's manufacture, sale, offers for sale, distribution, or advertisement of products that are allegedly confusingly similar to those of Hi-Lite.

143.    Whether Hi-Lite is entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Hi-Lite, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining the Barn Light Electric from any further manufacture, sale, or advertisement of its infringing products.

144.    Whether Bryan and Donna Scott know of, and/or have reason to know of Barn Light Electric's manufacture, sale, offering for sale, distribution, or advertising of products allegedly confusingly similar to those of Hi-Lite in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Hi-Lite or as to the origin, sponsorship, or approval of Hi-Lite's products and services.

145.    Whether Bryan and Donna Scott know or have reason to know of Barn Light Electric's alleged infringing conduct and have failed to take reasonable precautions against the alleged infringement.

146.    Whether Bryan and Donna Scotts' conduct has created and will create confusion among the members of the relevant consuming public.

147.    Whether Hi-Lite has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.

148.    Whether Hi-Lite will continue to suffer irreparable harm, for which it has no adequate remedy at law.

149.    Whether Hi-Lite is entitled to recover (1) Bryan and Donna Scotts' profits, (2) any damages sustained by Hi-Lite, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining Bryan and Donna Scott from contributing to Barn Light Electric's manufacture, sale, or advertisement of its infringing products.

150.    Whether Bryan and Donna Scott have a direct financial interest in and the right and ability to supervise Barn Light Electric's manufacture, sale, offering for sale, distribution, or advertising of products confusingly similar to those of Hi-Lite in a manner likely to cause confusion or mistake, or to cause mistake or to deceive, customers as to the affiliation, connection, or association of Barn Light Electric with Hi-Lite or as to the origin, sponsorship, or approval of Hi-Lite's products and services.

151.    Whether Bryan and Donna Scott have both an apparent and actual partnership with Barn Light Electric and have the ability to exercise joint control over Barn Light

Electric's manufacture, sale, offering for sale, distribution, or advertising of products confusingly similar to those of Hi-Lite.

152.    Whether Bryan and Donna Scotts' conduct has vicariously created and will create confusion among the members of the relevant consuming public.

153.    Whether Hi-Lite has been damaged by Bryan and Donna Scotts' affiliation with Barn Light Electric and Barn Light Electric's manufacture, sale, offering for sale, distribution, or advertising of products confusingly similar to those of Hi-Lite.

154.    Whether Bryan and Donna Scott know of, and/or have reason to know of Barn Light Electric's use the mark BARNLIGHT ORIGINALS in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

155.    Whether Bryan and Donna Scott know or have reason to know of Barn Light Electric's infringing conduct and have failed to take reasonable precautions against the infringement.

156.    Whether Bryan and Donna Scotts' conduct has created and will create confusion among the members of the relevant consuming public.

157.    Whether Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.  Whether Barnlight Originals will continue to suffer irreparable harm, for which it has no adequate remedy at law.

158.    Whether Barnlight Originals has been damaged by Bryan and Donna Scotts' knowledge of, or reason to know of, Barn Light Electric's use of the mark BARNLIGHT ORIGINALS due to the allegedly confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC. registered mark.

159.    Whether Barnlight Originals is entitled to recover (1) Bryan and Donna Scotts' profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining Bryan and Donna Scott from contributing to Barn Light Electric's use of the allegedly infringing trademarks.

160.    Whether Bryan and Donna Scott have a direct financial interest in and the right and ability to supervise Barn Light Electric's use the mark BARNLIGHT ORIGINALS in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, or to cause mistake or to deceive, customers as to the affiliation, connection, or association of

Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

161.    Whether Bryan and Donna Scott have both an apparent and actual partnership with Barn Light Electric and have the ability to exercise joint control over Barn Light Electric's use of the mark BARNLIGHT ORIGINALS.

162.    Whether Bryan and Donna Scotts' conduct has vicariously created and will create confusion among the members of the relevant consuming public.

163.    Whether Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill. Whether Barnlight Originals will continue to suffer irreparable harm, for which it has no adequate remedy at law.

164.    Whether Barnlight Originals has been damaged by Bryan and Donna Scotts' affiliation with Barn Light Electric and Barn Light Electric's use of the mark BARNLIGHT ORIGINALS due to the confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC. registered mark.

165.    Whether Barnlight Originals is entitled to recover (1) Bryan and Donna Scotts' profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining Bryan and Donna Scott from indirectly infringing the BARNLIGHT ORIGINALS, INC. mark.

Plaintiff's Affirmative Defenses [Dkt. 88-1 ]

166.    Whether the Defendants' claims are barred because Barn Light Electric is the true, prior owner of the marks BARN LIGHT ELECTRIC, BARN LIGHT, and THE ORIGINAL, and thus Defendants' purported BARNLIGHT ORIGINALS mark is invalid. Additionally, the product numbers that Defendants claim rights to are not valid trademarks at least because they do not function as a trademark, are merely descriptive and have not acquired any secondary meaning.

167.    Whether the Defendants' claims are barred, in whole or in part, by the doctrines of abandonment and failure to police trademarks. For many years, Defendants did not police or enforce their purportedly exclusive rights to one or more of those marks, allowing the public to use those purported marks unchecked.

168.    Whether, even if the Defendants had a valid trademark claim to the marks they claim rights to, which they do not, the Defendants engaged in naked licensing of those marks by failing to maintain the necessary control over use of the marks by their licensee(s).

169. Whether the Defendants' trademark claims are barred, in whole or in part, by the doctrine of fraud in the procurement as a result of willful misrepresentations made by Defendants to the USPTO, including without limitation the conduct described in the Second Amended Complaint.

170. Whether, to the extent Defendants' marks are valid, which they are not, use of them by Barn Light Electric has been in their primary, descriptive sense to describe products sold by Barn Light Electric. As such, Barn Light Electric's usage of the terms constitutes classic fair use.

171. Whether the Defendants' claims for relief are barred, in whole or in part, by the doctrine of laches. The Defendants offer no justification for its multi-year delay in raising any of its counterclaims. As a result of Defendants' unjustified delay, Barn Light Electric and the public have suffered prejudice.

172. Whether the Defendants' claims for relief are barred, in whole or in part, by the doctrines of Waiver and Acquiescence.

173. Whether the Defendants' claims for relief are barred, in whole or in part, by the doctrine of estoppel.

174. Whether the Defendants' claims for relief are barred, in whole or in part, by the doctrine of unclean hands, including without limitation the Defendants' conduct before the USPTO as set forth in the Second Amended Complaint.

175. Whether the Defendants' claims for relief are barred, in whole or in part, for failure to state a claim upon which relief may be granted.

176. Whether, to the extent that any statements published by Barn Light Electric contain statements of facts, those statements are truthful.

177. Whether Barn Light Electric is entitled to set off any award of damages to Defendants against the award due Barn Light Electric in connection with its claims in the Second Amended Complaint.

178. Whether the Defendants' claims for relief against Third-Party Defendants are barred, in whole or in part by the corporate veil doctrine.

179. Whether Barn Light Electric is an independent company selling product to the consuming public on its own behalf with Hi-Lite acting only as its manufacturer.

180. Whether the Defendants' claims for relief are barred, in whole or in part, by the doctrine of implied license.

181.    Whether the Defendants' claims for relief are barred, in whole or in part, by the statute of frauds.

182.    Whether the Defendants' claims for relief are barred, in whole or in part, by the statute of limitations.

183.    Whether the words "Original" and "Electric" are not confusingly similar.

184.    Whether the words "Original" and "Electric" appear distinct from one another.

185.    Whether the words "Original" and "Electric" have distinct meanings.

186.    Whether the words "Original" and "Electric" sound distinct from one another when spoken aloud.

187.    Whether the words "Original" and "Authentic" are not confusingly similar to one another.

188.    Whether the words "Original" and "Authentic" appear distinct from one another.

189.    Whether the words "Original" and "Authentic" have distinct meanings.

190.    Whether the words "Original" and "Authentic" sound distinct from one another when spoken aloud.

191.    Whether the products sold by Barn Light Electric under the name "The Original" were at one point in time manufactured by Hi-Lite for distribution by Barn Light Electric.

192.    Whether the products sold by Barn Light Electric under the name "The Original" were at one point in time sold to customers with the Hi-Lite name present on the product.

193.    Whether Barn Light Electric purchased complete light fixtures from Hi-Lite.

194.    Whether neither Barn Light Electric nor the Scotts are aware of any instance in which Hi-Lite has used the BARN LIGHT ELECTRIC marks.

195.    Whether neither Barn Light Electric nor the Scotts are aware of any instance in which Barnlight Originals has used the BARN LIGHT ELECTRIC marks.

196.    Whether Barnlight Originals owns the domain www.barnlightoriginals.com.

197. Whether Barn Light Electric owns www.barnlightelectric.com/barn-light-originals.html.

198. Whether Barn Light Electric controls content displayed in association with www.barnlightelectric.com/barn-light-originals.html.

199. Whether Bryan Scott has the authority to change content displayed in association with www.barnlightelectric.com/barn-light-originals.html.

200. Whether Bryan Scott has the authority to direct another person to change content displayed in association with www.barnlightelectric.com/barn-light-originals.html.

201. Whether Donna Scott has the authority to change content displayed in association with www.barnlightelectric.com/barn-light-originals.html.

202. Whether Donna Scott has the authority to direct another person to change content displayed in association with www.barnlightelectric.com/barn-light-originals.html.

203. Whether Bryan Scott is the registrant of the domain name barnlightelectric.com, as indicated in Exhibit V of the SACC.

204. Whether Bryan Scott has the ability to exercise control over content displayed in association with www.barnlightelectric.com.

205. Whether Donna Scott has the ability to exercise control over content displayed in association with www.barnlightelectric.com.

206. Whether Bryan Scott receives a share of the profits obtained by Barn Light Electric that result from sales via www.barnlightelectric.com.

207. Whether Bryan Scott receives a share of Barn Light Electric's profits.

208. Whether Donna Scott receives a share of the profits obtained by Barn Light Electric that result from sales via www.barnlightelectric.com.

209. Whether Donna Scott receives a share of Barn Light Electric's profits.

210. Whether Bryan Scott was aware of the use of the term "Barn Light Originals" on Barn Light Electric's website prior to August 14, 2014.

211. Whether Donna Scott was aware of the use of the term "Barn Light Originals" on Barn Light Electric's website prior to August 14, 2014.

212.    Whether Barn Light Electric received discounts on products purchased from Hi-Lite.

213.    Whether Barn Light Electric agreed to purchase lighting fixtures exclusively from Hi-Lite in return for reduced prices for said lighting fixtures.

214.    Whether Hi-Lite-manufactured fixtures sold by Barn Light Electric displayed the Hi-Lite name on at least a portion thereof.

215.    Whether Barn Light Electric's "The Original" was at one time manufactured by Hi-Lite.

216.    Whether At least one of Bryan and Donna Scott has visited a Hi-Lite facility in California.

217.    Whether At least one of Bryan and Donna Scott told Jeffrey Ohai that Barn Light Electric did not intend to manufacture lighting fixtures similar to those of Hi-Lite.

218.    Whether Hi-Lite terminated its business relationship with Barn Light Electric on September 4, 2012.

219.    Whether, on September 7, 2012, Donna Scott was instructed to remove all photographs of Hi-Lite products from Barn Light Electric's website.

220.    Whether, on September 7, 2012, Donna Scott was instructed to remove all depictions of Hi-Lite products from Barn Light Electric's website.

221.    Whether, on September 7, 2012, Donna Scott was instructed to remove all of Hi-Lite's product drawings from Barn Light Electric's website.

222.    Whether, on August 14, 2014, Barn Light Electric was using the mark BARN LIGHT ORIGINALS in connection with the sale, offering for sale, distribution, and/or advertising of its products and services.

223.    Whether at least one of Barn Light Electric, Bryan Scott, and Donna Scott have described Barn Light Electric's products as "barn lights."

224.    Whether Barn light is a generic term.

225.    Whether Bryan Scott has the right to control the content posted in association with Barn Light Electric's profile on www.houzz.com.

226.    Whether Bryan Scott has the authority to change the content posted in association with Barn Light Electric's profile on www.houzz.com.

227.    Whether Bryan Scott has the authority to direct another person to change the content posted in association with Barn Light Electric's profile on www.houzz.com.

228.    Whether Donna Scott has the right to control the content posted in association with Barn Light Electric's profile on www.houzz.com.

229.    Whether Donna Scott has the authority to change the content posted in association with Barn Light Electric's profile on www.houzz.com.

230.    Whether Donna Scott has the authority to direct another person to change the content posted in association with Barn Light Electric's profile on www.houzz.com.

231.    Whether, over the past 56 years, Hi-Lite has achieved success through attention to detail and an unwavering commitment to quality and customer service, using only the finest materials in the construction of high-quality barn lights and decorative lighting.

232.    Whether Hi-Lite has invested millions of dollars in equipment, labor, and intellectual property, which consistently place Hi-Lite at the top of the decorative lighting industry.

233.    Whether Hi-Lite's products have been used in numerous national restaurant chains, hotels, national retail chains, national grocery stores, and big box retailers, making the Hi-Lite name synonymous with high-quality barn lights and decorative lighting.

234.    Whether, in early 2008, based on Hi-Lite's reputation for quality and customer service, Bryan and Donna Scott, the co-owners of what is now known as Barn Light Electric, sought the assistance of Mr. Ohai and Hi-Lite for the manufacture and supply of high-quality barn lights.

235.    Whether Mr. Ohai and the Scotts reached a handshake agreement in which Barn Light Electric would purchase barn lights exclusively from Hi-Lite.   In exchange, Hi-Lite gave a 5% discount to Barn Light Electric on all fully-assembled barn lights and also reduced drop shipment charges for Barn Light Electric from the standard fifteen dollars to a mere five dollars (hereinafter "the Agreement").

236.    Whether combined, the discounts provided under the Agreement saved Barn Light Electric several hundred thousand dollars over the course of about 4 years.

237.    Whether pursuant to the Agreement, Barn Light Electric was to purchase exclusively from Hi-Lite in exchange for Hi-Lite providing Barn Light Electric with substantially discounted prices.

238.    Whether the Agreement was not a "private label" arrangement.  Rather, Barn Light Electric was selling lighting fixtures under the well-known and highly-regarded Hi-Lite name.

239.    Whether the Scotts and Barn Light Electric even went so far as to proudly tout their relationship with Hi-Lite as their sole source of barn lights in their Winter 2008-2009 catalog, 100% of which featured products manufactured by Hi-Lite, describing the relationship as follows:

240.    Soon the demand for Bryan's lighting exceeded the resources within his small barn.  Unable to keep up with the demand, he began looking for help.  Through his extensive research of the lighting industry, he found a true American Manufacturer who could manufacture barn lighting with the same high standards he had set for himself.  The manufacturer was able to produce quality commercial grade barn lighting and manufacture it faster than Bryan.

241.    Whether throughout the course of their business relationship, Mr. Ohai would often host the Scotts at the Hi-Lite manufacturing facility, giving them tours and showing them the Hi-Lite manufacturing process.

242.    Whether the motivation for the Scotts' visits to the facility was less than honorable, for it was only a matter of time before the Scotts and Barn Light Electric were secretly manufacturing products confusingly similar to those of Hi-Lite by using the processes devised by Hi-Lite over the course of about 50 years of business.

243.    Whether between 2008-2009, the Scotts told Mr. Ohai and Hi-Lite of their intention to procure a porcelain baking oven.

244.    Whether, upon learning of Barn Light Electric's intent to purchase a porcelain baking oven, Hi-Lite reminded Barn Light Electric and the Scotts of the terms of the Agreement, and reiterated its position that it did not want to do business with a company that manufactures lighting fixtures similar to those manufactured by Hi-Lite.

245.    Whether the Scotts assured Mr. Ohai and Hi-Lite that it was not their intent to manufacture lighting fixtures similar to those manufactured by Hi-Lite.

246.    Whether Barn Light Electric began manufacturing and selling their own lighting fixtures that were confusingly similar to those made by Hi-Lite.

247.    Whether Barn Light Electric had also secretly purchased the equipment necessary to manufacture "RLMs" (i.e. Reflector and Lamp Manufacturer) including metal spinning lathes required to spin metal shades.

248.     Whether Barn Light Electric was using Hi-Lite's product photographs, line drawings, installation sheets, descriptive artwork, product codes, part numbers, color codes, and color charts in its advertising, it was actually shipping its own products to customers.

249.     Whether Barn Light Electric purposefully hid activities from Mr. Ohai and Hi-Lite so that it could continue to reap substantial savings under the Agreement.

250.     Whether Barn Light Electric and the Scotts were systematically deceiving their customers and Hi-Lite by advertising Hi-Lite products and selling both Barn Light Electric-manufactured products and lower-quality, Chinese-manufactured products to their customers in violation of the Agreement.

251.     Whether Exhibit B of Defendants' SACC depicts 2010 Barn Light Electric catalog advertising Hi-Lite products.

252.     Whether Barn Light Electric was actually supplying non-Hi-Lite products.

253.     Whether, on August 25, 2010, Bryan Scott admitted to shipping Chinese-manufactured products in an email to Hi-Lite, in which he described all of Barn Light Electric's sales between January 1, 2010 and August 25, 2010 of products manufactured in China by Millennium Lighting.

254.     Whether Mr. Scott admitted to the lower quality of the Chinese-manufactured products in an email to a Hi-Lite employee dated August 26, 2010, describing the products as "CHINA S---."

255.     Whether Barn Light Electric was willfully and intentionally breaching the Agreement and deceiving its customers into thinking they were purchasing high-quality Hi-Lite products when in fact they were receiving lower quality non-Hi-Lite manufactured products.

256.     Whether Hi-Lite demanded that Barn Light Electric cease passing off foreign-made products as those of Hi-Lite, and Barn Light Electric agreed to do the same.

257.     Whether Barn Light Electric continues to use Hi-Lite's copyrighted photographs, product drawings, and part numbers in its advertising, yet sells products of another manufacturer... the quintessential "bait-and-switch."

258.     Whether Hi-Lite often referred its own customers to Barn Light Electric to purchase Hi-Lite products.  Whether those customers would often receive lower-quality products that were not manufactured by Hi-Lite.

259.     Whether, on May 10, 2011, Hi-Lite demanded that Barn Light Electric and the Scotts honor their distribution agreement.

260.     Whether, on suspicion that Barn Light Electric was continuing its fraudulent practices, Hi-Lite ordered a Hi-Lite product from Barn Light Electric.  Whether, while the invoice reflected Hi-Lite's part numbers, color designations, and line drawing designations, the lamps delivered were not Hi-Lite lamps at all.

261.     Whether, on September 4, 2012, Hi-Lite terminated its relationship with Barn Light Electric.  Whether after Hi-Lite's termination of its business relationship with Barn Light Electric following Barn Light Electric's breach of the Agreement, Barn Light Electric and the Scotts continued using Hi-Lite's part numbers in their advertising to trade on the Hi-Lite's well-established goodwill in the lighting industry and deceive their customers into purchasing inferior products.

262.     Whether Barn Light Electric and the Scotts used Hi-Lite's copyrighted product drawings in their advertising to trade on the Hi-Lite's well-established goodwill in the lighting industry and deceive their customers into purchasing inferior products.

263.     Whether Exhibit J of Defendants' SACC is a printout from the Wayback Machine depicting Barn Light Electric's use of Hi-Lite's product drawings on its website on October 8, 2012, which is more than a month after Hi-Lite's termination of the Agreement.

264.     Whether the Scotts' and Barn Light Electric's willful, intentional, and systematic deception of their customers has irreparably harmed, and continues to irreparably harm, the reputation and goodwill associated with Hi-Lite products.

265.     Whether Composite Exhibit K of Defendants' SACC includes print-outs from Barn Light Electric's website depicting pages from magazines, such as "Old House Interiors," "This Old House," and "Country Living."  Whether Barn Light Electric's website offers these as examples of Barn Light Electric's products being featured in national publications.

266.     Whether each of the magazines in composite Exhibit K [Dkt. 60]  include a link to a corresponding magazine article.  Whether Exhibit L [Dkt. 60] is a composite exhibit showing some of these articles.  Whether, in each case, a Hi-Lite fixture is depicted and not a Barn Light Electric fixture.

267.     Whether many of the articles depicted in Exhibit L [Dkt. 60]  link to a page on the Barn Light Electric website that allows consumers to purchase a Barn Light Electric product.

268.     Whether Exhibit M [Dkt. 60]  depicts the page that links from the "Arts and Crafts Fall 2011" cover depicted in Exhibit L [Dkt. 60], which invites the consumer to purchase Barn Light Electric's "Outback Gooseneck Light," a Barn Light Electric product.

269.     Whether Exhibit N [Dkt. 60] depicts the page that links from the "Cambria Style Summer 2010" cover depicted in Exhibit L [Dkt. 60], which invites the consumer to purchase Barn Light Electric's "Barn Light Benjamin Industrial Pendant," a Barn Light Electric product.

270.     Whether Exhibit O [Dkt. 60] depicts the page that links from the "Space Coast Living April 2011" cover depicted in Exhibit L [Dkt. 60], which invites the consumer to select from a variety of Barn Light Electric's Gooseneck Lighting products.

271.     Whether Exhibit P [Dkt. 60] depicts the page that links from the "The Week May 2010" cover depicted in Exhibit L [Dkt. 60], which invites the consumer to purchase Barn Light Electric's "The Outback Cord Hung Pendant," a Barn Light Electric product.

272.     Whether, as of the filing of Defendants' Counterclaim and Third-party Complaint, Barn Light Electric also continues to use photographs of Hi-Lite products to advertise on third-party websites such as www.houzz.com.

273.     Whether Exhibit Q of Defendants' SACC is a composite exhibit of webpages from the www.houzz.com website depicting numerous instances of Barn Light Electric passing off Hi-Lite products as their own, along with evidence of actual consumer confusion in the comment sections.

274.     Whether Barn Light Electric's media coverage in Exhibit 1 of its Second Amended Complaint depicts several magazine covers portraying actual Hi-Lite products.

275.     Whether, discouraged by the Scotts' and Barn Light Electric's willfully deceptive business practices, and without an online distributor that Hi-Lite could work closely with to market product effectively on the internet, Mr. Ohai decided to go into business for himself, founding Barnlight Originals, Inc., an American lighting retailer supplying top-quality lighting products.

276.     Whether Barnlight Originals registered the BARNLIGHT ORIGINALS, INC. word mark on the Supplemental Register (U.S. Registration Number 4,464,241) and the BARNLIGHT ORIGINALS logo on the Principal Register (U.S. Registration Number 4,489,514) in connection with "on-line retail store services featuring commercial and residential lighting, lamps and accessories." (collectively "the Barnlight Originals Marks"). The trademarks have been in continuous use since January 2013.

277.     Whether Barnlight Originals has common law rights in the mark "Barnlight Originals" by having used the mark in commerce.

278. Whether Barnlight Originals registered the domain name www.barnlightoriginals.com, where it offers high-quality barn lights to consumers throughout the country and around the world.

279. Whether, determined to continue their quest to trade on the reputation and goodwill associated with Mr. Ohai, Hi-Lite, and now Barnlight Originals, the Scotts and Barn Light Electric systematically, willfully, and intentionally, infringed the Barnlight Originals Marks.

280. Whether the Scotts and Barn Light Electric also intimidated a supplier of light fixtures to no longer supply its products to Barnlight Originals.

281. Whether, in the course of monitoring the marketplace for use of the Barnlight Originals Marks, Mr. Ohai discovered the website www.barnlightelectric.com/barn-light-originals.html (the "Infringing Website"). The Infringing Website includes a bold headline advertising "Barn Light Originals." See Exhibit U [Dkt. 60].

282. Whether, as a result of the Infringing Website, consumers are presented with the following search result when attempting to locate Barnlight Originals via the Google search engine.



283. Whether the Infringing Website is operated by Barn Light Electric, is registered to Bryan Scott, and is targeted to individuals seeking barn lights with the intent of causing consumer confusion.

284. Whether the Scotts and/or Barn Light Electric exercise control over and directly profit from the Infringing Website.

285. Whether the Scotts and/or Barn Light Electric know or have reason to know of the Infringing Website and its use of the term "Barn Light Originals" in its advertising.

286. Whether, as of October 2014, more than two years after Hi-Lite's termination of the Agreement, Barn Light Electric continues its systematic deception of its customers by displaying photos of Hi-Lite products to lure their customers into purchasing products manufactured by Barn Light Electric.

287. Whether Exhibit W of Defendants' SACC depicts a webpage from the Barn Light Electric website displaying photographs of Hi-Lite products.

288.    Whether Barn Light Electric intentionally uses the mark BARN LIGHT ORIGINALS on its website (See Exhibit U [Dkt. 60]) in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

289.    Whether, by virtue of the foregoing, Barn Light Electric has infringed and is infringing Trademark Registration Nos. 4,464,241 and 4,489,514.

290.    Whether Barn Light Electric's conduct has created and will create confusion among the members of the relevant consuming public.

291.    Whether Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.  Barnlight Originals has been damaged by Barn Light Electric's use of the mark BARN LIGHT ORIGINALS due to the confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC® registered mark.

292.    Whether, pursuant to the remedies set forth in Sections 34-36 of the Lanham Act, 15 U.S.C. §§1116-1118, Barnlight Originals is entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining the Barn Light Electric from any further use of the infringing trademarks.

293.    Whether Barn Light Electric intentionally used and/or uses the mark BARN LIGHT ORIGINALS on its website in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

294.    Whether Barn Light Electric has infringed and is infringing Barnlight Originals' common law rights to BARNLIGHT ORIGINALS.

295.    Whether Barnlight Originals has been damaged by Barn Light Electric's misappropriation and use of a confusingly similar trademark and will continue to be damaged by any further such use.

296.    Whether Barn Light Electric intentionally uses the mark BARN LIGHT ORIGINALS in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals

or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

297. Whether, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and Florida common law, Barn Light Electric has engaged in acts of unfair competition by using in commerce the mark BARN LIGHT ORIGINALS in a manner that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the Barn Light Electric with Counterclaim-Plaintiffs, or as to the origin, sponsorship, or approval of its goods.

298. Whether Barn Light Electric's acts of unfair competition were done with the intent to damage the reputation and goodwill associated with Counterclaim-Plaintiffs' goods and otherwise harm the business interests of Counterclaim-Plaintiffs.

299. Whether, by reason of the foregoing, Counterclaim-Plaintiffs have suffered, and are continuing to suffer, irreparable harm and damage and a loss of goodwill.

300. Whether Counterclaim-Plaintiffs have suffered damages as a result of the unfair competition and, pursuant to the remedies set forth in Sections 34-36 of the Lanham Act, 15 U.S.C. §§1116-1118, is entitled to recover (1) Barn Light Electric's profits, (2) any damages sustained by Counterclaim-Plaintiffs, and (3) the costs of the action and to obtain a preliminary and a permanent injunction enjoining Barn Light Electric from any further use of the infringing trademarks and a destruction order mandating the destruction of all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of Barn Light Electric, bearing the infringing trademarks. Further, under common law, Counterclaim-Plaintiffs are entitled to recover all damages proximately caused by the unfair competition and, due to the willful nature of the unfair competition, is entitled to an award of punitive damages.

301. Whether, in direct competition with Barnlight Originals, and in the same trade area, Bryan and Donna Scott know of, and/or have reason to know of Barn Light Electric's use the mark BARN LIGHT ORIGINALS in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

302. Whether Bryan and Donna Scott know or have reason to know of Barn Light Electric's infringing conduct and have failed to take reasonable precautions against the infringement.

303. Whether by reason of the foregoing, Bryan and Donna Scotts' conduct has created and will create confusion among the members of the relevant consuming public. Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill. Unless this Court restrains Bryan and Donna

Scott from contributing to further infringing conduct, Barnlight Originals will continue to suffer irreparable harm, for which it has no adequate remedy at law.

304.    Whether Barnlight Originals has been damaged by Bryan and Donna Scotts' knowledge of, or reason to know of, Barn Light Electric's use of the mark BARN LIGHT ORIGINALS due to the confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC.® registered mark.

305.    Whether, pursuant to the remedies set forth in Sections 34-36 of the Lanham Act, 15 U.S.C. §§1116-1118, Barnlight Originals is entitled to recover (1) Bryan and Donna Scotts' profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining Bryan and Donna Scott from contributing to Barn Light Electric's use of the infringing trademarks.

306.    Whether Bryan and Donna Scott have a direct financial interest in and the right and ability to supervise Barn Light Electric's use the mark BARN LIGHT ORIGINALS in connection with the sale, offering for sale, distribution, or advertising of products and services in a manner likely to cause confusion or mistake, or to cause mistake or to deceive, customers as to the affiliation, connection, or association of Barn Light Electric with Barnlight Originals or as to the origin, sponsorship, or approval of Barnlight Originals' products and services.

307.    Whether Bryan and Donna Scott have both an apparent and actual partnership with Barn Light Electric and have the ability to exercise joint control over Barn Light Electric's use of the mark BARN LIGHT ORIGINALS.

308.    Whether, by reason of the foregoing, Bryan and Donna Scotts' conduct has vicariously created and will create confusion among the members of the relevant consuming public.  Barnlight Originals has suffered, and is continuing to suffer, irreparable harm and damage and a loss of goodwill.  Unless this Court restrains Bryan and Donna Scott from contributing to further infringing conduct, Barnlight Originals will continue to suffer irreparable harm, for which it has no adequate remedy at law.

309.    Whether Barnlight Originals has been damaged by Bryan and Donna Scotts' affiliation with Barn Light Electric and Barn Light Electric's use of the mark BARN LIGHT ORIGINALS due to the confusing similarity with Barnlight Originals' BARNLIGHT ORIGINALS, INC.® registered mark.

310.    Whether, pursuant to the remedies set forth in Sections 34-36 of the Lanham Act, 15 U.S.C. §§1116-1118, Barnlight Originals is entitled to recover (1) Bryan and Donna Scotts' profits, (2) any damages sustained by Barnlight Originals, and (3) the costs and attorneys' fees of the action and to obtain a permanent injunction enjoining

Bryan and Donna Scott from indirectly infringing the BARNLIGHT ORIGINALS, INC.® mark.

311. Whether Counterclaim-Defendant and Third-party Defendants, their agents, employees, servants, privies, successors and assigns, and all persons acting in concert, participation or combination with the Counterclaim-Defendant and Third-party Defendants, should be permanently enjoined from all acts of direct, contributory, and vicarious trademark infringement.

312. Whether Counterclaim-Defendant, its agents, employees, servants, privies, successors and assigns, and all persons acting in concert, participation or combination with the Counterclaim-Defendant, should be permanently enjoined from all acts of direct, contributory, and vicarious unfair competition.

313. Whether that Counterclaim-Defendant and Third-party Defendants are required to pay to Counterclaim-Plaintiffs damages in a sum to be determined at trial and to account for all gains, profits and advantages derived by the Counterclaim-Defendant and Third-party Defendants.

314. Whether that Counterclaim-Plaintiffs should be awarded treble damages, reasonable attorneys' fees, and the costs and disbursements of this action.

315. Whether that Counterclaim-Plaintiffs should be awarded punitive damages.

316. Whether that Counterclaim-Plaintiffs should be awarded such other, further, and different relief as the Court deems just and proper.

317. Any material facts not stipulated to herein.

SECTION C: COPYRIGHT-RELATED STATEMENTS OF DISPUTED FACTS[8]

1. Whether Hi-Lite failed to expressly limit the scope of its implied license upon delivery of its copyrighted works.Whether Barnlight Originals sells non-illuminated ceiling fan kits.

2. Whether Barn Light Electric exceeded the scope of the copyright license granted by Hi-Lite.

3. Whether Barn Light Electric has infringed and/or is infringing Hi-Lite's copyrights in the works depicted below:

| Examples of Materials Copied from Hi-Lite's Catalogs |
| --- |

---

[8] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

## Examples of Materials Copied from Hi-Lite's Catalogs



## Examples of Materials Copied from Hi-Lite's Catalogs



| Examples of Materials Copied from Hi-Lite's Catalogs | |
|---|---|
|  | |

4.      Whether Hi-Lite granted Barn Light Electric a license to use its line drawings, installation sheets, descriptive artwork, product codes, part numbers, color codes, color charts, photographs and Hi-Lite Catalogs (collectively, the "Hi-Lite Works") with the intention Barn Light Electric copy and distribute the same in order to market and sell Hi-Lite's products. (See Motion, at 30 & n.84, citing Resp. 2nd RFAs at Request Nos. 71-87).

5.      Whether, throughout the parties' five year business relationship, Hi-Lite created and delivered digital copies of hundreds of Hi-Lite Works, including photographs contained in each of the Hi-Lite Catalogs, to Barn Light Electric on CD-ROM and through e-mails without any express limitation as to their use, at the time of delivery. (See Motion, at 31 & n.85, citing Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3).

6.      Whether Hi-Lite had actual knowledge of Barn Light Electric's use of the Hi-Lite Works on Barn Light Electric's website and other advertising and promotional medium from 2008 through September 7, 2012, and it continued to permit and facilitate such use throughout the parties' five year business relationship. (See Motion at 31-32 & nn.87-88, citing Exhibit 13, Comp. Exh. at BLE0035079, BLE0088798, BLE0098694, BLE0108255 and BLO0085712; Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37, 81-84; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3;  Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20; Exhibit 5, Schulz Depo., p. 206, lns. 11-22.)

7.      Whether Hi-Lite received in excess of $1,000,000 in sales revenue as a direct result of Barn Light Electric's use of the Hi-Lite Works and Catalogs on its website and within its other marketing materials. (See Motion, at 34 & n.90, citing Exhibit 12, Resp. 2nd RFAs, at Request No. 110).

8.     Whether Hi-Lite delivered the Hi-Lite Works and Hi-Lite Catalogs to Plaintiff for use in Plaintiff's marketing materials. (See Motion, at 38 & n.91, citing Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37).

9.     Whether Hi-Lite did not provide any express limitations relating to the use of its part numbers, line drawings, catalogs, photographs or other marketing materials at the time they were delivered to Barn Light Electric.  (See Motion at 31 & n.86, citing Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3; Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20.)

10.     Whether Hi-Lite granted Barn Light Electric an implied license to use, copy and distribute its copyrighted and uncopyrighted works without a written license agreement or any other express limitation.  (See Motion at 30 & n.83, citing Exhibit 11, Resp. 2nd Interrog. at Interrogatory No. 9; and Motion at 31 & n.86, citing Exhibit 4, McAdam Depo., p. 123, ln. 11-127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3.)

11.     Whether ,when it delivered the Hi-Lite Works to Barn Light Electric, Hi-Lite was aware and intended that the Hi-Lite Works be used by Barn Light Electric on the Barn Light Electric website.  (See Motion at 31 & n.86, citing Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3; and Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20.)

12.     Whether Hi-Lite does not provide express terms of use to its online distributors as to how they may use images provided to them by Hi-Lite.  (See Motion at 31 & n.86, citing Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20;  Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3.)

13.     Whether Hi-Lite routinely provides the Hi-Lite Works to its distributors and sales representatives, without any express limitation, with the intention that its distributors and sales representatives use its copyrighted material to market and sell its products.  (See Motion at 31, 36 & n.86, citing Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3.)

14.     Whether Hi-Lite's removed Hi-Lite logo watermarks from its photos and delivered them to Hi-Lite for Barn Light Electric without any express limitation as to the use of such photos.  (See Motion at 31 & n.87, citing Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37; Exhibit 13, Comp. Exh. at BLE0035079, BLE0088798, BLE0098694, BLE0108255 and BLO0085712; and n.85, citing Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3.)

15.     Whether Hi-Lite was aware of the common industry practice of online retailers in uploading the Hi-Lite Works to their websites and using them to market and sell products at the time it delivered the Hi-Lite Works and Hi-Lite Catalogs to Barn Light Electric without any express limitation.  (See Motion at 31-32 & n.89, citing, Exhibit 4, McAdam Depo., p. 179, ln. 2 – 180, ln. 1; and nn.87-88, citing Exhibit 13, Comp. Exh. at BLE0035079, BLE0088798, BLE0098694, BLE0108255 and BLO0085712; Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37, 81-84; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3; Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20; Exhibit 5, Schulz Depo., p. 206, lns. 11-22.)

16.     Whether Hi-Lite granted Barn Light Electric an implied license to use the Hi-Lite Works, including the Hi-Lite Catalogs.  (See Motion at 31 & nn.87-88, citing Exhibit 13 Comp. Exh. at BLE0035079, BLE0088798, BLE0098694, BLE0108255 and BLO0085712; Exhibit 9, Resp. 1st RFAs, Request Nos. 23, 35, 36 & 37, 81-84; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3; Exhibit 2, J. Ohai Depo, p. 53, lns. 18-20;  Exhibit 5, Schulz Depo., p. 206, lns. 11-22; Resp. 2nd RFAs, at Request No. 110.)

17.     Whether Hi-Lite provided the Hi-Lite Works, including Hi-Lite Catalogs, to Barn Light Electric as early as 2008.  (See Motion at 31 & n.88, citing Exhibit 9, Resp. 1st RFAs, Request Nos. 81-84; Exhibit 4, McAdam Depo., p. 123, ln. 11 – 127, ln. 3;  p. 128, lns. 21-25;  p. 179, ln. 2 – p. 180, ln. 3.)

18.     Whether Hi-Lite alleged copyright infringement claims against Barn Light Electric for the first time in it Second Amended Counterclaims, filed on April 21, 2015.  (See Motion at 39, citing SACC [Dkt. 60].)

19.     Whether Barn Light Electric used depictions of Hi-Lite products to sell products that did not originate with Hi-Lite. (*See Dkt*. 171, Ex.C; D. Scott Depo, 178:1–181:2; B. Scott Depo, 182:14–187:3; BLE 30(b)(6) Depo, 62:4–77:25; Hi-Lite 30(b)(6) Depo (McAdam), 82:9–100:22; D. Ohai Depo, 56:5-18; McAdam Depo, 219:1–221:24; Hi-Lite 30(b)(6) Depo (McAdam), 82:9–100:22; D. Scott Dec., ¶¶ 8-19; 20-29; 45-51; Exhibit A;  B. Scott Declaration, ¶¶ 26, 31, Exhibit F.

20.     Whether Hi-lite licensed to Barn Light Electric the right to use its copyrighted photographs and line drawings to sell Hi-Lite products.  (*See* D. Scott Depo 147:19-148:5; B. Scott Dec., ¶¶ 21-26, 31, Exhibit F; D. Scott Dec., ¶¶ 8-19; 20-29; 45-51; Exhibit A)

21.     Whether Hi-Lite revoked Barn Light Electric's license to use Hi-Lite's copyrighted photographs and line drawings in September of 2012.  (*See* Motion for Summary Judgment, Dkt. 165, Ex. 14 ¶¶ 25-41; D. Scott Dec., ¶¶ 8, 11-14, 20-22, 28-9; D. Scott Dec., ¶¶ 8, 11-14, 20-22, 28-9).

22.     Whether Barn Light Electric used photographs provided by Hi-Lite to sell products that did not originate with Hi-Lite. (*See* Sanders Depo., 10:4-18; 13:2-5; 13:6-9; 33:17-34:1; 35:16-36:2; 43:1–47:14; 49:5-50:11; 51:1-52:23; 54:5-56:13; 60:10-18; 62:11-63:2; 64:18-24; D. Scott Depo. 88:18-23; D. Scott Dec., ¶¶ 8, 11-14, 20-22, 28-9, 45-51, B. Scott Depo 42:22-43:1)

23.     Whether Exhibit P of Jeffrey Ohai's declaration includes drawings identical to those present in Hi-Lite's copyrighted 208 Catalog.  (*See* D. Scott Dec., ¶¶ 32, 36; D. Scott Dec., ¶¶ 8, 11-14, 20-22, 28-9, Exhibit A; Opposition to Defendants' Motion Dkt. 211, Ex. 20.)

24.     Whether, on September 7, 2012, Hi-Lite sent an email to Donna Scott at Barn Light Electric demanding that Barn Light Electric remove all of Hi-Lite's copyrighted photographs and product drawings depicting Hi-Lite products from their website.

25.     Whether, as of the filing of this action, Barn Light Electric and the Scotts use Hi-Lite's copyrighted photographs in their advertising to trade on Hi-Lite's alleged goodwill and deceive their customers into purchasing inferior products.   Whether Exhibit I includes examples of Hi-Lite photography and Hi-Lite products being used to sell Barn Light Electric products.   Whether numerous examples of this fraudulent practice can be found on Barn Light Electric's website to this day.

26.     Whether the images (shown in paragraph 61 of the SACC) on the left are copyrighted Hi-Lite photographs and the images on the right are excerpts from Barnlight Electric's website accessed on January 5, 2015.

27.     Whether the images below on the left are copyrighted Hi-Lite photographs and the images on the right are excerpts from Barnlight Electric's website accessed on January 5, 2015:




Hi-Lite                                    Barn Light Electric




28.                    Hi-Lite                              Barn Light Electric




Hi-Lite                              Barn Light Electric




Hi-Lite

Barn Light Electric




Hi-Lite

Barn Light Electric




Hi-Lite

Barn Light Electric




Hi-Lite                                    Barn Light Electric

 

Hi-Lite                                    Barn Light Electric



Hi-Lite                                    Barn Light Electric




Hi-Lite                                    Barn Light Electric

29.     Whether, after Hi-Lite's termination of its business relationship with Barn Light Electric following Barn Light Electric's breach of the Alleged Agreement, Barn Light Electric and the Scotts used Hi-Lite's part numbers in their advertising to trade on the Hi-Lite's alleged goodwill in the lighting industry and deceive their customers into purchasing inferior products.

30.     Whether Barn Light Electric and the Scotts use Hi-Lite's copyrighted product drawings in their advertising to trade on the Hi-Lite's alleged goodwill in the lighting industry and deceive their customers into purchasing inferior products.

31.     Whether the Scotts' and Barn Light Electric's willful, intentional, and systematic deception of their customers has irreparably harmed, and continues to irreparably harm, the reputation and goodwill associated with Hi-Lite products.

32.     Whether Barn Light Electric's website offers the pages from magazines, such as "Old House Interiors," "This Old House," and "Country Living" as examples of Barn Light Electric's products being featured in national publications.

33.     Whether each of the magazine pages displayed on Barn Light Electric's website include a link to a corresponding magazine article.  Whether a Hi-Lite fixture is depicted and not a Barn Light Electric fixture.

34.     Whether many of the magazine articles link to a page on the Barn Light Electric website that allows consumers to purchase a Barn Light Electric product.

35.     Whether the page that links from the "Space Coast Living April 2011" cover invites the consumer to select from a variety of Barn Light Electric's Gooseneck Lighting products.

36.     Whether, as of the filing of this Counterclaim and Third-party Complaint, Barn Light Electric use photographs of Hi-Lite products to advertise on third-party websites such as www.houzz.com.

37.     Whether Barn Light Electric's media coverage depict several magazine covers portraying actual Hi-Lite products.

38.     Whether Hi-Lite owns the copyright to all asserted copyright works.

39.     Whether Hi-Lite has complied with all statutory formalities under copyright laws and rules to maintain this action for copyright infringement.

40.     Whether Barn Light Electric's conduct has been without the permission, consent, or license of Hi-Lite.

41.     Whether the Scotts' conduct has been without the permission, consent, or license of Hi-Lite.

42.     Whether Barn Light Electric has directly infringed upon Hi-Lite's copyrights in the asserted materials.

43.     Whether the Scotts know of and/or have reason to know of, have induced, caused, and/or materially contributed to Barn Light Electric's alleged infringement of Hi-Lite's copyrights in the asserted works.

44.     Whether the Scotts' alleged contribution to Barn Light Electric's alleged infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.

45.     Whether Hi-Lite has suffered and will continue to suffer damage.

46.     Whether the alleged damage to Hi-Lite is, and will continue to be, irreparable at least because of the alleged continuing nature of the alleged copyright infringement.

47.     Whether the Scotts' alleged contribution to Barn Light Electric's alleged acts of infringement have been committed, and are continuing to be committed, with the knowledge that Barn Light Electric is allegedly infringing Hi-Lite's copyright in asserted works.

48.     Whether the Scotts' alleged acts contributing to Barn Light Electric's alleged infringement have been committed willfully.

49.     Whether Hi-Lite is entitled to an injunction and damages, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an

accounting for all gains, profits, and advantages allegedly derived by the Scotts, as well as any other damages provided for under the Copyright Act.

50.　　Whether the Scotts participate in, exercise control over, and receive a direct financial benefit from Barn Light Electric's alleged infringement of Hi-Lite's alleged copyrights in the asserted works, and thus are vicariously liable for such alleged infringement.

51.　　Whether the Scotts' alleged contribution to Barn Light Electric's alleged infringement of Hi-Lite's alleged copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.

52.　　Whether Hi-Lite has suffered and will continue to suffer damage. The damage to Hi-Lite is, and will continue to be, irreparable at least because of the allegedly continuing nature of the copyright infringement.

53.　　Whether Defendants' claims for relief are barred, in whole or in part, by the doctrine of fair use under the Copyright Act.

54.　　Whether Defendants' claims for relief are barred, in whole or in part, by the doctrine of fraud on the Copyright Office.

55.　　Whether Hi-Lite relies on a single purchase it made through its own sales representative, not a consumer, to claim Plaintiff used its copyrighted works to depict Hi-Lite's products, but shipped non-Hi-Lite products. *See* SACC, at ¶97, 101, 107, 113.

56.　　Whether, to the extent that the archived national magazine images are used as historical news of the popularity of the depicted products, the fair use doctrine should apply.

57.　　Whether, regardless of whether the scope of protection for the three registered catalogs, Hi-Lite failed to comply with the applicable statutory requirements. Thus, the Court should not find the Registrations to be valid.

58.　　Whether, assuming arguendo that, based on the subject matter claimed in the Registrations, Hi-Lite intended to register the photographs themselves as original works. However, the Registrations incorrectly list Hi-Lite as the author – rather than the true author of the photographs. Moreover, Hi-Lite failed to disclose preexisting works. Further, Hi-Lite clearly failed to comply with the statutory requirements because the Copyright Act precludes protection in any preexisting material pursuant to 17 U.S.C. § 103(b).

59.　　Whether, assuming arguendo that Hi-Lite intended the works to be registered as compilations or derivative works of the original photographs, the Registrations still

fail to comply with the applicable legal requirements. In the case of a compilation or derivative work, the Copyright Act expressly requires "an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9).

60. Whether, because there was no preexisting written agreement that Mr. Newman's photographs were to be made as a "work-for-hire," the subject matter that Hi-Lite seeks to assert via its Registrations cannot be considered a work-for-hire.

61. Whether, because Newman's photographs were not subject to the work-for-hire doctrine, the Registrations inaccurately list Hi-Lite – not Mr. Newman – as the author on the Registrations.

62. Whether, because Hi-Lite's CD-ROMs have been previously distributed to licensees, such as Plaintiff, without any restrictions, the original photographs are preexisting works that Hi-Lite should have disclosed in its copyright applications for the derivative images. Therefore, Hi-Lite failed to comply with the statutory requirements for such derivative works. *See* 17 U.S.C. § 409(9).

63. Whether, because the Registrations cannot protect preexisting material pursuant to 17 U.S.C. § 103(b), Hi-Lite failed to limit its claim to appropriate subject matter.

64. Whether the line drawings previously distributed by Hi-Lite are preexisting works.

65. Whether the line drawings in the 208 Catalog submitted to the Copyright Office are derivative works.

66. Whether the registered version of Hi-Lite's B-4 drawing is notably different from the version asserted in Defendants' Motion.

67. Whether Defendants' Motion improperly compares the accused drawings to unregistered drawings.

68. Whether, by comparing the registered drawing side-by-side with the unregistered versions shown in the Motion, this Court may note that the drawings contain certain dimensions, callouts, descriptions, shadings, and watermarks that are in fact different. These differences have been circled in red in Exhibit 20. *See* Dkt. 211-3.

69. Whether, pursuant to 17 U.S.C. § 411(b), the issues concerning the inaccuracies of the authorship, work-for-hire and preexisting works must be referred to the Copyright Office for an advisory opinion.

70.     Whether, because Hi-Lite has not shown which of Newman's Photographs were covered by the three original assignments, Hi-Lite has not provided any proof of ownership of the purportedly asserted copyrights.

71.     Whether Hi-Lite failed to prove Plaintiff copied "constituent elements of the work that are original."

72.     Whether there is no dispute as to the source of the photographs used in the magazines archived on Barn Light Electric's website.  A comparison of the original photographs, the Registration deposits, and the archived magazines demonstrate that the accused magazine photographs were taken directly from Newman's Photographs in their original form – and not from the derivative photographs recast in the Registration deposits.  The accused photographs from certain archived magazines contain subject matter, i.e. chain links, that do not appear in the asserted Registration photographs yet appear in preexisting original works.  *See* Exhibit 22, Chart of Non-Infringing Works [Dkt. 211-5]. Thus, necessarily, the accused photographs could not have been copied from the asserted photographs.

73.     Whether any similarity between the asserted photographs and the accused photographs concerns only preexisting work, i.e. the photographs previously published by Mr. Newman, Hi-Lite, its distributors or national magazines.

74.     Whether each of Hi-Lite's claims are premised upon the alleged infringement of its marketing materials (i.e., "*part numbers*, *copyrighted photographs and other depictions of Hi-Lite products*"), not the false-designation of origin of its tangible goods.  *See* SACC, Counts (II) at ¶97, (III) at ¶101, (IV) at ¶107 & (V) at ¶113.

75.     Whether Barn Light Electric paid consideration to Hi-Lite.

76.     Whether Plaintiff requested and Hi-Lite created and delivered hundreds of works to Plaintiff without any express limitation as to their use, at the time of delivery.

77.     Whether Defendant provided its works to Plaintiff with the intention Plaintiff use, reproduce, distribute and display its works.

78.     Whether There were no express limitations conveyed upon delivery of Hi-Lite's copyrighted works.

79.     Whether Hi-Lite had actual knowledge of Plaintiff's use of the requested Hi-Lite Works on its website and other advertising medium from 2008 through September 7, 2012, and it continued to facilitate such use throughout the parties' business relationship.

80.     Whether Barn Light Electric paid consideration the asserted copyright material, i.e. Hi-Lite's registered three catalogs, constitutes compilation works of the photographs arranged within the catalogs.

81.     Whether the asserted copyright material, i.e. Hi-Lite's registered three catalogs, contains photographs that constitute derivative works of the original photographs recast in the registered catalogs.

82.     Whether the original photographs recast in the asserted copyright material, i.e. Hi-Lite's three registered catalogs, were previously published by Hi-Lite before the registered catalogs were first published.

83.     Whether the original photographs were published prior to the publication of the registered catalogs.

84.     Whether "additional product photographs, line drawings, and part numbers" were provided to Plaintiff and Third-Party Defendants along with Hi-Lite's "various catalogs, including the 203 Catalog, 205 Catalog, and the 208 Catalog." *See* Ohai Dec. [Dkt. 172] at ¶ 14; *see* Exhibit 13, Resp. 1st RFAs at Request Nos. 31-33 ("REQUEST #33: Admit that each and every photograph in Catalog 208 was first published in the same calendar year.  RESPONSE: Denied.").

85.     Whether Hi-Lite distributed numerous CD-ROMs containing photographs of its products and digital copies of its catalogs, and permitted its distributors to use these photographs without any written limitations. *See* Exhibit 11, Resp. 2nd RFAs at Request No. 9, 71-78.

86.     Whether Hi-Lite's RLM Catalog was published prior to the publication of the registered catalogs.

87.     Whether Hi-Lite's RLM Catalog was published on Hi-Lite's website at least as earlier as June 2006. *See* Dkt. 212-1 (Ex. B of the Declaration of Donna Scott).

88.     Whether Mr. Newman distributed his original photographs to Hi-Lite for further dissemination without any disclosure restrictions. *See* Exhibit 11, Resp. 2nd RFAs at Request No. 9, 71-78.  Indeed, Newman's License provides: "I waive my right to inspect or approve the finished product … I understand that, although Hi-Lite will endeavor to use the above in accordance with standards of good judgment, Hi-Lite cannot warrant or guarantee that any further dissemination of the above will be subject to Hi-Lite's supervision or control."  Exhibit 14 of Dkt. 211.  Thereafter, Hi-Lite delivered Newman's Photographs and its catalogs to Plaintiff and other distributors without any restrictions with respect to disclosure of its contents.  Exhibit 13, Resp. 1st RFAs at Request Nos. 23, 35, 36 & 37 (admission by Hi-Lite that images were sent to Barn Light Electric from Catalog 203, 205 and 208 "without any written limitation regarding Barn Light Electric's use" of such photographs.); *see also*

Exhibit 13 (filed under seal as S-180) of Dkt. 165, Comp. Exh. (evidencing transmissions of photographs by Hi-Lite to Barn Light Electric).

89.     Whether it is undisputed that Hi-Lite did not list any preexisting works in its copyright applications.

90.     Whether, pursuant to Hi-Lite's Registrations, the works deposited with the Copyright Office were first published in 2003, 2004 and 2008.

91.     Whether Hi-Lite did not attempt to register its copyrights until 2014.

92.     Whether each of Hi-Lite's Registrations were obtained more than five (5) years after the date of first publications listed on the Registrations.

93.     Whether, while the deposits include three catalogs, Hi-Lite is attempting to extend protection to original photographs incorporated in the registered catalogs.

94.     Whether the original photographs recast in the registered catalogs were taken by various photographers, including independent contractor Dimitri Newman.

95.     Whether Hi-Lite obtained its copyrights from Mr. Newman via assignments – not the work-for-hire doctrine.

96.     Whether, although the Registrations claim rights to the original photographs themselves and represent Hi-Lite as the "author" via the work-for-hire doctrine (*see* Registrations), Hi-Lite offers no evidence of a preexisting written agreement that Mr. Newman's photographs were to be made as a "work-for-hire."

97.     Whether, because it knew Mr. Newman was not engaged in a work-for-hire agreement, Hi-Lite required him to sign a license agreement ("Newman's License") in 2012 and assignment agreements ("Assignments") in 2013.

98.     Whether, Hi-Lite knowingly included inaccurate statements in its copyright applications concerning the work-for-hire status of materials.

99.     Whether Hi-Lite also failed to disclose preexisting works to the Copyright Office.  Specifically, earlier versions of the asserted photographs and line drawings recast in the registered catalogs were previously published by Hi-Lite via an unregistered website and an unregistered catalog.

100.    Whether, while the Registrations suggest that their scope includes all of the photographs shown in the deposited catalogs, Hi-Lite failed to submit the original publications of the asserted photographs.

101.    Whether all of the accused photographs shown in Defendants' Motion are images from archived magazines that were used with Hi-Lite's permission at the time that the national magazines published.

102.    Whether a close comparison of the original photographs, the Registration deposits, and the archived magazines demonstrates that the accused magazine photographs were not copied from the derivative photographs recast in the Registration deposits.

103.    Whether Mr. Newman's assignments state that he was the author of the copyrighted works.

104.    Whether the assignments state that Hi-Lite purchased the works (i.e. copies of the Newman photographs), and that "at the time of the purchase [of Newman photographs], [Mr. Newman] represented to [Hi-Lite], and herein confirms, that [Mr. Newman] was the sole author of [Newman photographs]; [Mr. Newman] owned all copyright rights in and to [the Newman photographs]."

105.    Whether the Assignments memorialize Hi-Lite's and Mr. Newman's understanding of their respective rights at the time that the works were created: neither intended for a work-for-hire arrangement.

106.    Whether Hi-Lite asked Mr. Newman to sign a license agreement dated Dec. 18, 2012.

107.    Whether, if Hi-Lite believed that it could rely on the work-for-hire doctrine for copyright ownership of Newman's Photographs, there is no need for a written license from Mr. Newman in 2012.

108.    Whether Hi-Lite knew that it was not the author or copyright owner of Newman's Photographs.

109.    Whether, via an amendment to Newman's copyright assignment, Hi-Lite intended to have Mr. Newman assign 67 photographs as a supplemental exhibit and any photographs depicted in Catalog 208 as another exhibit.

110.    Whether the executed copies of the original assignments signed by Mr. Newman that were produced by Hi-Lite did not include copies of the exhibits.

111.    Whether the scope of Defendants' copyright claims relate to photographs and drawings.

112.    Whether Defendants' initial pleading sets forth their intent to assert infringement upon the procurement of "copyright registrations for various photographs and line drawings."

113.     Whether light fixtures were not at issue in the 2012 termination email.

114.     Whether, in 2012 and 2013, Defendants did not demand that Plaintiffs change the design of any fixtures.

115.     Whether Defendants' light fixtures do not bear copyright notices.

116.     Whether Defendants did not plead that the light fixtures themselves were copyrightable.

117.     Whether Defendants did not satisfy the precondition of obtaining a copyright registration for lighting fixtures.

118.     Whether Defendants' registrations did not list three-dimensional or sculptural works.

119.     Whether Defendants' registrations cannot be relied upon to permit an infringement action on fixture designs.

120.     Whether Defendants may not rely on the applications for supplementary registrations in this action.

121.     Whether Defendants had knowledge—since at least February 2, 2016—that the Eleventh Circuit limits the "effective registration doctrine" to circumstances where the registration expressly identifies preexisting materials.

122.     Whether Defendants waited–over a year after receiving notice of supplemental authority *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1231-32 (11th Cir. 2008)–to file applications for supplementary registrations.

## COPYRIGHT-RELATED STATEMENTS OF FACT RECENTLY PROPOSED BY DEFENDANTS THAT PLAINTIFFS DISPUTE[9]

123.     Whether Barn Light Electric has directed its employees to manufacture lighting fixtures similar in appearance to those of Hi-Lite.

124.     Whether Barn Light Electric has directed a third-party to manufacture lighting fixtures similar in appearance to those of Hi-Lite.

125.     Whether Barn Light Electric sells products similar in appearance to those sold by Hi-Lite.

---

[9] Defendants contend that all issues of fact, whether disputed or undisputed, are relevant to all of Defendants' counterclaims.

126. Whether Barn Light Electric manufactures products similar in appearance to those of Hi-Lite.

127. Whether Barn Light Electric has copied at least one of Hi-Lite's product designs.

128. Whether Barn Light Electric has provided examples of Hi-Lite products to its product designers.

129. Whether Paragraph 61 of Defendant's Second Amended Counterclaims contains copyrighted photographs of Hi-Lite. [Dkt. 60.]

130. Whether Exhibits J, K, L, M, N, and O of Jeffrey Ohai's declaration of November 23, 2015 each include a copyrighted photograph of Hi-Lite.

131. Whether Barn Light Electric had access to the Hi-Lite photographs depicted in Exhibits J, K, L, M, N and O of Jeffrey Ohai's declaration of November 23, 2015. Whether Barn Light Electric maintains that one of the protectable features of its website includes the use of drop down menus to select the features of a product.

132. Whether Barn Light Electric maintains that one of the protectable features of its website includes the use of product specification bubbles.

133. Whether Barn Light Electric maintains that one of the protectable features of its website include the use of a product specification box.

134. Whether U.S. Trademark Registration No. 3748277 includes a disclaimer for "BARN LIGHT ELECTRIC COMPANY."

135. Whether U.S. Trademark Registration No. 3723964 includes a disclaimer for "BARN LIGHT" and "COMPANY" apart from the mark as shown.

136. Whether U.S. Trademark Registration No. 3723964 is on the supplemental register.

137. Whether U.S. Trademark Registration No. 4722667 was filed on July 14, 2014 under U.S. Application Serial No. 86336562.

138. Whether U.S. Application Serial No. 86336562 initially included the following identification of goods: "Ceiling fans, ceiling fan kits; Residential and household interior lighting, namely, bath and vanity lighting fixtures, chandeliers, table lamps, desk lamps, wall sconces, pendant lighting fixtures, ceiling lighting fixtures, flush-mount lighting fixtures and post-mount lighting fixtures; Commercial lighting, namely, ceiling lighting fixtures, pendant lighting fixtures, bath and vanity lighting fixtures, wall sconces, chandeliers, table lamps, desk lamps, sign lighting,

flush-mount lighting fixtures and post-mount lighting fixtures; Industrial lighting fixtures, namely, ceiling lighting fixtures, pendant lighting fixtures, wall sconces, sign lighting, flush-mount lighting fixtures and post-mount lighting fixtures; Marine lighting fixtures, namely, bulkhead lighting fixtures, pendant lighting fixtures, ceiling lighting fixtures, wall sconces, chandeliers, table lamps, desk lamps, sign lighting, flush-mount lighting fixtures and post-mount lighting fixtures."

139.    Whether, during prosecution of U.S. Application Serial No. 86336562 the identification of goods was amended to read as follows: "Non-illuminated ceiling fans and non-illuminated ceiling fan kits comprised of ceiling fans, wiring and mounting brackets."

140.    Whether Barn Light Electric has not filed any trademark applications on the marks HOME OF THE ORIGINAL BARN LIGHT or THE ORIGINAL.

141.    Whether Barn Light Electric has used the term "barn light" descriptively to describe a type of lighting fixture.

142.    Whether Barn Light Electric used the mark "Barn Light Originals" on its website to sell a variety of lighting fixtures.

143.    Whether U.S. Trademark Registration No. 4464241 was filed on February 4, 2013 under U.S. Application Serial No. 85840496.

144.    Whether U.S. Trademark Registration No. 4464241 includes a disclaimer for "BARN LIGHT" apart from the mark as shown.

145.    Whether, during prosecution of U.S. Application Serial Number 85840496, the Examining Attorney noted that, "The attached evidence from barnlightelectric.com, amazon.com, hilitemfg.com, and alightingstore.com shows the wording BARN LIGHT is commonly used in connection with lighting fixtures to refer to a particular style of fixture. ORIGINAL is defined as "a primary form or type from which varieties are derived." See the attached evidence from dictionary.reference.com."

146.    Whether Barn Light Electric established the following landing page: www.barnlightelectric.com/barn-light-originals.html

147.    Whether Defendant had a bad faith intent to profit from the www.barnlightoriginals.com domain name.

148.    Whether, during the course of the parties business relationship, Hi-Lite gave Barn Light Electric a 5% discount on sales of lighting fixtures.

149.    Whether, during the course of the business relationship, Barn Light Electric informed Hi-Lite that Barn Light Electric was not manufacturing lighting fixtures.

150.    Whether, during the course of the business relationship, Barn Light Electric sent certain Hi-Lite lighting fixtures to Bay Area Innovations.

151.    Whether one purpose of sending the Hi-Lite lighting fixtures to Bay Area Innovations was to produce lighting fixtures similar in appearance to lighting fixtures manufactured by Hi-Lite.

152.    Whether Barn Light Electric accepted orders for Hi-Lite products but fulfilled those orders with products manufactured by Barn Light Electric.

153.    Whether Barn Light Electric's website currently includes photographs of Hi-Lite manufactured lighting fixtures.

154.    Whether, during the course of the relationship between the parties, Barn Light Electric used photography supplied by Hi-Lite to sell the products of other manufacturers.

155.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting                fixture:               http://www.barnlightelectric.com/national-media-placements/cowboys-and-indians-june-2010.html

156.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting fixture:  http://www.barnlightelectric.com/national-media-placements/space-coast-living-april-2011.html

157.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting  fixture:   http://www.barnlightelectric.com/national-media-placements/arts-and-crafts-homes-fall-2011.html

158.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting            fixture:              http://www.barnlightelectric.com/national-media-placements/traditional-home-may-2008.html

159.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting  fixture:    http://www.barnlightelectric.com/national-media-placements/old-house-interiors-march-april-2009.html

160.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting fixture:  http://www.barnlightelectric.com/national-media-placements/early-homes-spring-2010.html

161.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting fixture: http://www.barnlightelectric.com/national-media-placements/coastal-living-april-2010.html

162.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting fixture: http://www.barnlightelectric.com/national-media-placements/the-week-may-2010.html

163.    Whether the following page contains a photograph of a Hi-Lite manufactured lighting fixture: http://www.barnlightelectric.com/national-media-placements/cambria-style-summer-2010.html

164.    Whether Barn Light Electric Order No. 601930 to William Sanders was fulfilled with a lighting fixture manufactured by Barn Light Electric.

165.    Whether Barn Light Electric was terminated as a Hi-Lite distributor on September 4, 2012.

166.    Whether Barn Light Electric used depictions of Hi-Lite products to sell products that did not originate with Hi-Lite.

167.    Whether Hi-lite licensed to Barn Light Electric the right to use its copyrighted photographs and line drawings to sell Hi-Lite products.

168.    Whether Hi-Lite revoked Barn Light Electric's license to use Hi-Lite's copyrighted photographs and line drawings in September of 2012.

169.    Whether Barn Light Electric used photographs provided by Hi-Lite to sell products that did not originate with Hi-Lite.

170.    Whether Barn Light Electric primarily sells goods manufactured by Barn Light Electric on its website.

171.    Whether the photographs and line drawings included in Hi-Lite's Catalog 203, Catalog 205, and Catalog 208 were not created at the request of Barn Light Electric.

172.    Whether Barn Light Electric did not pay for the creation of the photographs and line drawings included in Hi-Lite's Catalog 203, Catalog 205, and Catalog 208.

173.    Whether Barn Light Electric sent photographs of light fixtures provided by Hi-Lite to Bay Area Innovations.

174.    Whether Bryan Scott sought out Hi-Lite for the specific purpose of becoming a retailer for Hi-Lite products.

175.    Whether Barn Light Electric was a retail distributor of Hi-Lite fixtures.

176.    Whether Hi-Lite provided Barn Light Electric with copies of its photographs for advertising Hi-Lite products on BLE's website.

177.    Whether Barn Light Electric deleted documents from its servers after it filed its initial complaint in this matter.

178.    Whether Hi-Lite has manufactured, advertised, and sold a wide variety of decorative lighting fixtures since 1958.

179.    Whether Hi-Lite's catalogs include extensive collections of photographs and line drawings of its lighting fixtures.

180.    Whether Barn Light Electric is owned and operated by Bryan and Donna Scott.

181.    Whether, in 2008, Barn Light Electric contacted Hi-Lite to inquire about becoming a retailer of Hi-Lite products, and the parties agreed that Barn Light Electric would be permitted to advertise and sell Hi-Lite products via its website.

182.    Whether, in order for Barn Light Electric to advertise Hi-Lite's products, Hi-Lite licensed to Barn Light Electric the right to use its copyrighted photographs, line drawings, and other depictions of its products on its website, which are protected by Hi-Lite's U.S. Copyright Registration Nos. VA 1-931-982; VA 1-931-193; and VA 1-931-001.

183.    Whether Hi-Lite asked a colleague, William Sanders, to order certain Hi-Lite products from Barn Light Electric's website.

184.    Whether Mr. Sanders went to the Barn Light Electric website and ordered Hi-Lite lighting fixtures advertised under Hi-Lite's distinct product codes – the H-15116 and H-15116G.

185.    Whether the advertisement encountered by Mr. Sanders also depicted a photograph of Hi-Lite's lighting fixture.

186.    Whether, after Mr. Sanders placed his order with Barn Light Electric, he received an order confirmation verifying his purchase of Hi-Lite's H-15116 and H-15116G products.

187.    Whether, when Mr. Sanders subsequently received the shipment from Barn Light Electric, he forwarded the boxes to Hi-Lite.

188.    Whether David McAdam, an employee at Hi-Lite, opened the boxes he received from Mr. Sanders and photographed their contents.

189.    Whether the photograph of the product that Mr. Sanders received from Barn Light Electric is depicted in McAdam Dec. at Ex. E.

190.    Whether the product received by Mr. Sanders bore Barn Light Electric's logo and was, in fact, manufactured by Barn Light Electric, not Hi-Lite.

191.    Whether, based on its understanding that Barn Light Electric was advertising Hi-Lite products and shipping Barn Light Electric products in their place, Hi-Lite terminated its business relationship with Barn Light Electric and expressly revoked any license permitting Barn Light Electric to use Hi-Lite's copyrighted photographs and line drawings.

192.    Whether Barn Light Electric has ignored Hi-Lite's revocation of the license and willfully continues to use Hi-Lite's copyrighted photographs and line drawings to sell Barn Light Electric products.

193.    Whether Hi-Lite licensed to Barn Light Electric the right to use its copyrighted photographs and line drawings to sell Hi-Lite products.

194.    Whether Hi-Lite revoked Barn Light Electric's license to use Hi-Lite's copyrighted photographs and line drawings in September of 2012. (*See* Donna Scott Depo. at Ex. 2).

195.    Whether Exhibits J, K, L, M, N, and O of Jeffrey Ohai's declaration each include a photograph of a Hi-Lite product.

196.    Whether Barn Light Electric had access to the Hi-Lite photographs depicted Exhibits J, K, L, M, N, and O of Jeffrey Ohai's declaration.

197.    Whether Barn Light Electric used photographs provided by Hi-Lite to sell products that did not originate with Hi-Lite.

198.    Whether Exhibit P of Jeffrey Ohai's declaration includes drawings identical to those present in Hi-Lite's copyrighted 208 Catalog.

199.    Whether, following Barn Light Electric's termination as a distributor, Hi-Lite demanded that its copyrighted photographs and line drawings be taken off Barn Light Electric's website.

200.    Whether Barn Light Electric initially agreed with Hi-Lite's request to take its copyrighted photographs and line drawings off Barn Light Electric's website.

201.     Whether, to this day, Hi-Lite's photographs remain prominently displayed on Barn Light Electric's website.

202.   Whether Hi-Lite's photographs are being commercially exploited to sell Barn Light Electric's lighting fixtures.

203.   Whether Hi-Lite's ownership of the copyrights at issue is unchallenged.

204.   Whether Hi-Lite applied for and received three copyright registrations covering the works at issue:  Certificate of Registration No. VA 1-931-982 was issued to Hi-Lite for "Hi-Lite Manufacturing Company, Inc. Catalog 203" (the 203 Catalog); Certificate of Registration No. VA1-931-193 was issued to Hi-Lite for "Hi-Lite Mfg Co, Inc. Residential Lighting/Commercial Lighting Catalog 205" (the 205 Catalog); Certificate of Registration No. VA 1-931-001 was issued to Hi-Lite for "Hi-Lite Mfg. Co. Commercial and Residential Lighting Catalog 208" (the 208 Catalog).

205.   Whether, as Defendants allege from the comparison in Figure 1 below, Barn Light Electric is using a copyrighted photograph of Hi-Lite's H-1385-D-74 lighting fixture on its website. The only differences in the photographs relate to slight changes in cropping and background coloring.  Otherwise, the photographs are exactly the same.  They depict identical lighting fixtures taken at identical angles.  Examining the various light reflections on the fixtures, and the corresponding shadows, demonstrates that the photographs have identical lighting. The only reasonable conclusion that can be drawn is that they are, in fact, the same photograph.   Thus, Hi-Lite has demonstrated both that Barn Light Electric had access to its copyrighted 203 Catalog and that it is now displaying an identical-- or at the very least a substantially similar-- photograph on its website.   This constitutes infringement of Hi-Lite's 203 Catalog.

**FIGURE 1**



H-1385-D-74

| Photograph from Page 24 of Hi-Lite's 203 Catalog | Reproduction by Barn Light Electric http://www.barnlightelectric.com/national-media-placements/cowboys-and-indians-june-2010.html |
| --- | --- |

206.     Whether, as Defendants allege in Figure 2 below, Barn Light Electric is using a copyrighted photograph of Hi-Lite's H-7132-D-11 lighting fixture on its website. The only differences in the photographs relate to how they are cropped and the background coloring. Otherwise, the photographs are identical. They depict identical lighting fixtures taken at identical angles. Again, as noted by how the light reflects off the fixtures, the photographs have identical lighting. The only reasonable conclusion that can be drawn is that they are the same photograph. Thus, Hi-Lite has demonstrated both that Barn Light Electric had access to its copyrighted 205 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 205 Catalog.

**FIGURE 2**



| Photograph from Page 26 of Hi-Lite's 205 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/early-homes-spring-2010.html |
| --- | --- |

207. Whether Figure 3 depicted below demonstrates Barn Light Electric's reproduction of Hi-Lite's copyrighted photograph of its H-CGU-10-1B-96-RIB lighting fixture. The two photographs contain different backgrounds, but are otherwise identical. They depict the same lighting fixture taken at the same angles. The light reflections and shadows are identical. Again, the only conclusion to be drawn is that they are the same photograph. Hi-Lite has, therefore, demonstrated that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 3**



| Photograph from Page 78 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/coastal-living-april-2010.html |
| --- | --- |

208. Whether, as Defendants allege from the below comparison in Figure 4, Barn Light Electric is using a copyrighted photograph of Hi-Lite's H-15312-B-95 lighting fixture on its website. There are meaningless differences in the backgrounds of the two photographs. Otherwise, they are the same photograph. They show the identical lighting fixture and photographed at identical angles and under identical lighting conditions. The only reasonable conclusion that can be drawn is that they are, in fact

the same photograph. Hi-Lite has, therefore, demonstrated that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 4**



| Photograph from Page 8 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/old-house-interiors-march-april-2009.html |

209. Whether, as Defendants allege in Figure 5 below, Barn Light Electric is currently displaying a copyrighted photograph of Hi-Lite's H-19414-B-77/CGU-FR-114 lighting fixture on its website. The only difference in the photograph relates to the background. Otherwise, the photographs are identical. They depict identical lighting fixtures taken at identical angles. Again, the photographs show the same reflections and shadowing. The only reasonable conclusion is that they are, in fact, the same photograph. Hi-Lite has, therefore, demonstrated that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 5**

| | |
|---|---|
|  |  |
| **Photograph from Page 40 of Hi-Lite's 208 Catalog** | **Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/old-house-interiors-march-april-2009.html** |

210.    Whether, the comparison below in Figure 6 shows Barn Light Electric is displaying a copyrighted photograph of Hi-Lite's H-19120-97/HL-A-97 lighting fixture on its website. The photographs having different cropping and backgrounds but are otherwise the same. The photographs are of identical lighting fixtures taken at identical angles.   As with the other photographs, the reflections and lighting are identical. The two photographs are the same. Hi-Lite has, therefore, demonstrated that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website.    This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 6**



| Photograph from Page 38 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/traditional-home-may-2008.html |
|---|---|

211.    Whether the below comparison of Figure 7 shows Barn Light Electric using a copyrighted photograph of Hi-Lite's H-15117/P-3 lighting fixture on its website. The only differences in the photograph relates to orientation; the Barn Light Electric photograph has been flipped with respect to the Hi-Lite photograph.  Otherwise, the photographs are identical.  They depict identical lighting fixtures taken at identical angles. The only reasonable conclusion that can be drawn is that they are the same photograph. Hi-Lite has, therefore, demonstrated that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website.  This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 7**



| Photograph from Page 5 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/traditional-home-may-2008.html |
| --- | --- |

212. Whether Figure 8 is a comparison of a copyrighted photograph of Hi-Lite's H-BUC-14-96/CW8-93 with an identical photograph from the Barn Light Electric website. The photographs differ slightly because Barn Light Electric has altered the Hi-Lite photograph. The fixture in the Hi-Lite fixture is hung by a cord, whereas Barn Light Electric shows the fixture on a gooseneck arm. Otherwise, the photographs of the lighting fixtures themselves are identical. They are the same lighting fixtures photographed at identical angles. They show identical lighting. Hi-Lite has, therefore, demonstrated both that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 8**



| Photograph from Page 232 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/space-coast-living-april-2011.html |
|---|---|

213. Whether the next comparison of Figure 9 shows Barn Light Electric's reproduction of a copyrighted photograph of Hi-Lite's H-3051-96/HL-A-96/CGU-FR-96 lighting fixture. Other than a change to the background, the photographs are identical. They depict identical lighting fixtures taken at identical angles. Also, as noted by how the light reflects off the fixtures, the photographs were taken under identical lighting. The only reasonable conclusion is that the photographs below are one and the same. Hi-Lite has, therefore, demonstrated both that Barn Light Electric had access to its copyrighted 208 Catalog and that it is now displaying an identical photograph from that catalog on its website. This constitutes infringement of Hi-Lite's 208 Catalog.

**FIGURE 9**



| Photograph from Page 234 of Hi-Lite's 208 Catalog | Reproduction by Barn Light Electric www.barnlightelectric.com/national-media-placements/space-coast-living-april-2011.html |
|---|---|

214. Whether Hi-Lite's 208 Catalog also includes drawings depicting a wide variety of wall brackets and mounting arms. This includes the mounting plates and hardware needed for hanging various lighting fixtures. Many of these drawings reflect fanciful designs that contribute to the décor of the lighting fixture. As shown on Pages 321-329 of the 208 Catalog, the drawings include the detailed dimensions needed for a consumer to determine the suitability of the bracket/arm. Each drawing also includes a conspicuous watermark unmistakably designating the drawing as being a proprietary Hi-Lite drawing. The back of the 208 Catalog further includes a copyright notice. Following Barn Light Electric's termination as a distributor, it was instructed to remove all Hi-Lite line drawings from its website. Despite its termination, Barn Light Electric continued to display Hi-Lite's line drawings. In fact, Hi-Lite's proprietary drawings remain on Barn Light Electric's website as of the filing of this motion. Figures 10, 11, and 12 below each compare one of Hi-Lite's copyrighted line drawing to an identical drawing from Barn Light Electric. The comparison shows the drawings to be identical. They contain identical dimensions, callouts, descriptions, and part numbers. The only difference is that Hi-Lite's proprietary watermark has been removed and replaced with the Barn Light Electric logo.

**FIGURE 10**

109



| Photograph from Page 321 of Hi-Lite's 208 Catalog | Reproduction on Barn Light Electric website (See Ohai Dec. at ¶ 27) |

**FIGURE 11**



| Hi-Lite Line Drawing from Pg. 321 of the 208 Catalog | Reproduction on Barn Light Electric website (See Ohai Dec. at ¶ 27) |

215.     Whether Figure 12 below also illustrates Hi-Lite's HL-M bracket, which includes a flowered flourish along the bottom of the arm.  Again, a comparison reveals that this decorative flower pattern has been reproduced in its entirety.  The bracket has been faithfully reproduced down to the position of the very last petal.

| FIGURE 12 | |
|---|---|
|  | |
| Hi-Lite Line Drawing from Pg. 328 of the 208 Catalog | Reproduction on Barn Light Electric website (*See* Ohai Dec. at ¶ 27) |

216. Whether provided herein are representative examples of Barn Light Electric infringement of Hi-Lite's copyrighted line drawings. A similar conclusion would be reached for all other Hi-Lite line drawings included on Pages 321-329 in Hi-Lite's 208 Catalog: B-1, B-4, B-5, B-6, B-7, HL-A, HL-C, HL-D, HL-H, HL-K, B-2, B-3, B-5, B-8, B-9, B-10, B-11, B-12, B-13, B-14, B-15, B-16, B-19, B-20, HL-A, HL-B, HL-C, HL-D, HL-E, HL-F, HL-G, HL-H, HL-I, HL-K, HL-M, HL-N, HL-O, HL-P, HL-R, and HL-U.

217. Whether Mr. Sanders received a Barn Light Electric product in fulfillment of an order for a Hi-Lite product.

218. Whether Bryan and Donna Scott each independently admitted that Barn Light Electric would systematically fulfill orders for Hi-Lite products with Barn Light Electric products.

219. Whether Barn Light Electric's former General Manager, Walter Solms, identified the extent to which Barn Light Electric was fulfilling orders for Hi-Lite products with Barn Light Electric products.

220. Whether Hi-Lite is the author of the *catalogs* that are the subject of the respective registrations because they were prepared by Hi-Lite employees acting within the scope of their employment.

221. Whether Hi-Lite's catalogs were prepared by its employees.

222.    Whether Mr. Dimitri Newman, the photographer responsible for some of the individual photographs included in Hi-Lite's catalogs, transferred his ownership of any copyrights in the individual photographs to Hi-Lite by assignment.

223.    Whether Plaintiff's allegation that Hi-Lite failed to produce a signed version of Mr. Newman's copyright assignment is untrue.

224.    Whether Hi-Lite is the owner of the copyrights in the individual photographs and is the author of the catalogs.

225.    Whether Hi-Lite is the author of its catalogs, which were prepared by Mr. Ohai and other Hi-Lite employees as works made for hire.

226.    Whether Hi-Lite is the owner of all the photographs in its catalogs.

227.    Whether Plaintiff has failed to demonstrate the existence of preexisting works.

228.    Whether the "[a]uthor created" fields on the face of the Hi-Lite's copyright registrations are accurate.

229.    Whether Hi-Lite has spent millions of dollars developing new and unique lighting fixtures.

230.    Whether Hi-Lite has spent considerable amounts of time and money advertising its fixtures.

231.    Whether Hi-Lite's lighting fixtures are featured at trade shows, in magazines, in catalogs, as well as in show rooms across the country.

232.    Whether Hi-Lite catalogs featuring the Hi-Lite Designs have been circulated to between 30,000 to 40,000 individuals.

233.    Whether Michael Schultz, a former Barn Light Electric employee, was hired to reverse engineer Hi-Lite's lighting fixtures, and his salary was based on his success in doing so.

234.    Whether, while employed at Barn Light Electric, Mr. Schultz received a list of the top-selling Hi-Lite products to copy.

235.    Whether Mr. Schultz testified that Bryan Scott gave Mr. Schultz a list of the top-selling Hi-Lite products with the express purpose of establishing Barn Light Electric as a lighting manufacturer.

236.    Whether Mr. Schultz was directed to "basically copy everything."

237.   Whether the Hi-Lite fixtures were purchased "strategically" to keep the copying hidden.

238.   Whether Plaintiff accepted revocation of any implied license, thereby terminating any implied license.

239.   Whether Plaintiff nonetheless exceeded the scope of any implied license and infringed on Defendants' copyrights.

240.   Whether Hi-Lite's claims are not time barred.

241.   Whether Plaintiff's defense of equitable estoppel fails.

242.   Whether, on September 4, 2012, Defendant Hi-Lite sent Plaintiff an email explicitly demanding that Plaintiff stop using Hi-Lite's "photos, artwork, line drawings, part numbers, instructions or any other data from Hi-Lite Mfg." on its websites.

243.   Whether Plaintiff responded by email dated September 4, 2012, and again on September 7, 2012, and indicated its willingness to comply with Hi-Lite's request to remove Hi-Lite's copyrighted works from its websites.

244.   Whether, in Plaintiff's emails to Defendants, Plaintiff accepted Hi-Lite's revocation of any implied license.

245.   Whether Plaintiff concedes the limitations on Plaintiff's use of Hi-Lite's copyrighted works was to display the works to sell Hi-Lite products.

246.   Whether the uncontested record makes clear that Hi-Lite provided photographs and other product information contained in the Hi-Lite catalogs for over four years with the specific intention that Barn Light Electric use its copyrighted materials to market and sell its products.

247.   Whether the scope of the implied license was mutually understood at the time of delivery as being limited to display on Barn Light Electric's websites to sell Hi-Lite products.

248.   Whether Plaintiff was on notice that any use beyond the scope of an implied license would constitute copyright infringement.

249.   Whether Plaintiff exceeded the scope of the implied license.

250.   Whether Plaintiff uses Hi-Lite's photographs to sell Plaintiff's own products on its website.

251.     Whether, when Plaintiff exceeded the scope of the implied license, and used Hi-Lite's works on its website to sell its own products, Plaintiff infringed on Defendants' copyrights.

252.     Whether any use of Hi-Lite's copyrighted works after September 4, 2012 could not have been to sell Hi-Lite products.

253.     Whether Bryan Scott has the right to control the content of www.barnlightelectric.com.

254.     Whether Bryan Scott has the authority to change the content of www.barnlightelectric.com.

255.     Whether Bryan Scott has the authority to direct another person to change the content of www.barnlightelectric.com.

256.     Whether Donna Scott has the right to control the content of www.barnlightelectric.com.

257.     Whether Donna Scott has the authority to change the content of www.barnlightelectric.com.

258.     Whether Donna Scott has the authority to direct another person to change the content of www.barnlightelectric.com.

259.     Whether Barn Light Electric and/or one of its employees had access to photographs depicted in Hi-Lite catalog number 203.

260.     Whether Bryan Scott had access to photographs depicted in Hi-Lite catalog number 203.

261.     Whether Donna Scott had access to photographs depicted in Hi-Lite catalog number 203.

262.     Whether Barn Light Electric and/or one of its employees had access to photographs depicted in Hi-Lite catalog number 205.

263.     Whether Bryan Scott had access to photographs depicted in Hi-Lite catalog number 205.

264.     Whether Donna Scott had access to photographs depicted in Hi-Lite catalog number 205.

265.     Whether Barn Light Electric and/or one of its employees had access to photographs depicted in Hi-Lite catalog number 208.

266. Whether Bryan Scott had access to photographs depicted in Hi-Lite catalog number 208.

267. Whether Donna Scott had access to photographs depicted in Hi-Lite catalog number 208.

268. Whether, on September 7, 2012, Hi-Lite demanded that Barn Light Electric cease using any photographs of Hi-Lite products.

269. Whether any use by Barn Light Electric of a photograph of a Hi-Lite product on Barn Light Electric's website or in its advertising since September 4, 2014 has been without the permission, consent, or license of Hi-Lite.

270. Whether, on April 20, 2015, Bryan Scott was aware of Barn Light Electric's use of a photograph of a Hi-Lite product on its website after September 4, 2012.

271. Whether, on April 20, 2015, Donna Scott was aware of Barn Light Electric's use of a photograph of a Hi-Lite product on its website after September 4, 2012.

272. Whether, after Hi-Lite identified in D.E. [24] certain photographs on Barn Light Electric's website as those of Hi-Lite, Barn Light Electric removed those photographs from its website.

273. Whether Hi-Lite owns the copyright to all works comprising "Hi-Lite Manufacturing Company, Inc. Catalog 203" ("Catalog 203"), which is the subject of U.S. Copyright Registration No. VA0001931982 ("the '982 registration").

274. Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

275. Whether Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 203.

276. Whether Barn Light Electric's conduct as set forth herein has been without the permission, consent, or license of Hi-Lite.

277. Whether Barn Light Electric has, by virtue of its above-described acts, directly infringed upon Hi-Lite's copyrights in Catalog 203 in violation of 17 U.S.C. § 101 et seq.

278. Whether Barn Light Electric's continued reproduction, use, publication, distribution, preparation of derivative works, and display of advertisements including the works comprising Catalog 203 is a direct infringement of Hi-Lite's copyrights in violation of 17 U.S.C § 101 et seq.

279. Whether Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite. Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite. The damage to Hi-Lite is, and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

280. Whether Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that they are infringing Hi-Lite's copyright in Catalog 203.

281. Whether Barn Light Electric's acts of infringement have been committed willfully.

282. Whether, as a result of Barn Light Electric's intentional and willful infringement, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by Barn Light Electric, as well as any other damages provided for under the Copyright Act.

283. Whether Hi-Lite owns the copyright to all works comprising "Hi-Lite MFG Co., Inc. Residential Lighting / Commercial Lighting Catalog 205" ("Catalog 205"), which is the subject of U.S. Copyright Registration No. VA0001931193 ("the '193 registration").

284. Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

285. Whether Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 205.

286. Whether Barn Light Electric's conduct as set forth herein has been without the permission, consent, or license of Hi-Lite.

287. Whether Barn Light Electric has, by virtue of its above-described acts, directly infringed upon Hi-Lite's copyrights in Catalog 205 in violation of 17 U.S.C. § 101 et seq.

288. Whether Barn Light Electric's continued reproduction, use, publication, distribution, preparation of derivative works, and display of advertisements including the works comprising Catalog 205 is a direct infringement of Hi-Lite's copyrights in violation of 17 U.S.C § 101 et seq.

289.    Whether Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.  Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite.  The damage to Hi-Lite is, and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

290.    Whether Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that they are infringing Hi-Lite's copyright in Catalog 205.

291.    Whether Barn Light Electric's acts of infringement have been committed willfully.

292.    Whether, as a result of Barn Light Electric's intentional and willful infringement, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by Barn Light Electric, as well as any other damages provided for under the Copyright Act.

293.    Whether Hi-Lite owns the copyright to all works comprising "Hi-Lite Mfg. Co Commercial and Residential Lighting Catalog 208" ("Catalog 208"), which is the subject of U.S. Copyright Registration No. VA0001931001 ("the '001 registration").

294.    Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

295.    Whether Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 208.

296.    Whether Barn Light Electric has, by virtue of its above-described acts, directly infringed upon Hi-Lite's copyrights in Catalog 208 in violation of 17 U.S.C. § 101 et seq.

297.    Whether Barn Light Electric's continued reproduction, use, publication, distribution, preparation of derivative works, and display of advertisements including the works comprising Catalog 208 is a direct infringement of Hi-Lite's copyrights in violation of 17 U.S.C § 101 et seq.

298.    Whether Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.  Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite.  The damage to Hi-Lite is,

and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

299.  Whether Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that they are infringing Hi-Lite's copyright in Catalog 208.

300.  Whether Barn Light Electric's acts of infringement have been committed willfully.

301.  Whether As a result of Barn Light Electric's intentional and willful infringement, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by Barn Light Electric, as well as any other damages provided for under the Copyright Act.

302.  Whether Hi-Lite owns the copyright to all works comprising Catalog 203, which is the subject of the '982 registration.

303.  Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

304.  Whether Third-party Defendants Bryan and Donna Scott and Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 203.

305.  Whether the Scotts' and Barn Light Electric's conduct as set forth herein has been without the permission, consent, or license of Hi-Lite.

306.  Whether the Scotts know of and/or have reason to know of, have induced, caused, and/or materially contributed to Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 203.

307.  Whether the Scotts' contribution to Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.  Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite. The damage to Hi-Lite is, and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

308.  Whether the Scotts' contribution to Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that Barn Light Electric is infringing Hi-Lite's copyright in Catalog 203.

309.    Whether the Scotts' acts contributing to Barn Light Electric's infringement have been committed willfully.

310.    Whether, as a result of the Scotts' intentional and willful acts, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by the Scotts, as well as any other damages provided for under the Copyright Act.

311.    Whether Hi-Lite owns the copyright to all works comprising Catalog 205, which is the subject of the '193 registration.

312.    Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

313.    Whether Third-party Defendants Bryan and Donna Scott and Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 205.

314.    Whether the Scotts' and Barn Light Electric's conduct as set forth herein has been without the permission, consent, or license of Hi-Lite.

315.    Whether the Scotts know of and/or have reason to know of, have induced, caused, and/or materially contributed to Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 205.

316.    Whether the Scotts' contribution to Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.  Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite. The damage to Hi-Lite is, and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

317.    Whether the Scotts' contribution to Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that Barn Light Electric is infringing Hi-Lite's copyright in Catalog 205.

318.    Whether the Scotts' acts contributing to Barn Light Electric's infringement have been committed willfully.

319.    Whether, as a result of the Scotts' intentional and willful acts, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by the Scotts, as well as any other damages provided for under the Copyright Act.

320.    Whether Hi-Lite owns the copyright to all works comprising Catalog 208, which is the subject of the '001 registration.

321.    Whether Hi-Lite has complied with all statutory formalities under Title 17 of the United States Code to maintain this action for copyright infringement.

322.    Whether Third-party Defendants Bryan and Donna Scott and Counterclaim-Defendant Barn Light Electric had access to the works comprising Catalog 208.

323.    Whether the Scotts' and Barn Light Electric's conduct as set forth herein has been without the permission, consent, or license of Hi-Lite.

324.    Whether the Scotts know of and/or have reason to know of, have induced, caused, and/or materially contributed to Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 208.

325.    Whether the Scotts' contribution to Barn Light Electric's infringement of Hi-Lite's copyrights is causing irreparable injury to Hi-Lite and, unless enjoined, will continue to cause irreparable injury to Hi-Lite.  Hi-Lite has suffered and will continue to suffer damage, the exact amount of damage being currently unknown to Hi-Lite. The damage to Hi-Lite is, and will continue to be, irreparable at least because of the continuing nature of the copyright infringement.

326.    Whether the Scotts' contribution to Barn Light Electric's acts of infringement have been committed, and are continuing to be committed, with the knowledge that Barn Light Electric is infringing Hi-Lite's copyright in Catalog 208.

327.    Whether the Scotts' acts contributing to Barn Light Electric's infringement have been committed willfully.

328.    Whether, as a result of the Scotts' intentional and willful acts, Hi-Lite is entitled to an injunction and damages in a sum to be determined at trial, including but not limited to actual damages, statutory damages, costs and attorneys' fees and an accounting for all gains, profits, and advantages derived by the Scotts, as well as any other damages provided for under the Copyright Act

329.    Whether the Scotts participate in, exercise control over, and receive a direct financial benefit from Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 203, and thus are vicariously liable for such infringement.

330.    Whether the Scotts participate in, exercise control over, and receive a direct financial benefit from Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 205, and thus are vicariously liable for such infringement.

331.     Whether the Scotts participate in, exercise control over, and receive a direct financial benefit from Barn Light Electric's infringement of Hi-Lite's copyrights in the works comprising Catalog 208, and thus are vicariously liable for such infringement.

SECTION C: DISPUTED STATEMENTS OF FACT PROPOSED BY DEFENDANTS
             WHICH PLAINTIFF BELIEVES SHOULD NOT BE INCLUDED IN THIS
             JOINT FINAL PRETRIAL STATEMENT

1.     Whether the document(s) identified by Bates number(s) BLE 0115259 – BLE 0115339 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

2.     Whether the document(s) identified by Bates number(s) BLE 0116000 – BLE 0116027 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

3.     Whether the document(s) identified by Bates number(s) BLE 0000327-BLE 0000332  is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

4.     Whether the document(s) identified by Bates number(s) BLE 0000348-BLE 0000349   is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

5.     Whether the document(s) identified by Bates number(s) BLE 0115215-BLE 0115217   is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

6.     Whether the document(s) identified by Bates number(s) BLE 0115997 – BLE 0115999  is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

7.     Whether the document(s) identified by Bates number(s) BLE 0122739  is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

8.     Whether the document(s) identified by Bates number(s) BLE 0122621- BLE 0122705   is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

9.     Whether the document(s) identified by Bates number(s) BLE 0122706 – BLE 0122727 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

10.     Whether the document(s) identified by Exhibit A to Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

11.     Whether the document(s) identified by Exhibit B to Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

12.     Whether the document(s) identified by Exhibit C to Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

13.     Whether the document(s) identified by Exhibit D to Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

14.     Whether the document entitled Order Info, dated January 13, 2012 and attached as Exhibit F to Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

15.     Whether the document(s) identified by Bates number(s) BLO 0030427 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

16.     Whether the document(s) identified by Exhibit G of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

17.     Whether the document(s) identified by Exhibit H of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

18.     Whether the document(s) identified by Exhibit I of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

19.     Whether the document(s) identified by Exhibit J of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

20.     Whether the document(s) identified by Exhibit K of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

21.     Whether the document(s) identified by Exhibit L of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

22.     Whether the document(s) identified by Exhibit M of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

23.     Whether the document(s) identified by Exhibit N of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

24.     Whether the document(s) identified by Exhibit O of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

25.     Whether the document(s) identified by Exhibit P of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

26.     Whether the document(s) identified by Exhibit R of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

27.     Whether the document(s) identified by Exhibit U of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

28. Whether the document(s) identified by Exhibit W of Defendants' Second Amended Counterclaims is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

29. Whether the document(s) identified by Bates number(s) BLE0043037-0043038 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

30. Whether the document(s) identified by Bates number(s) BLE0000438-442 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

31. Whether the document(s) identified by Bates number(s) BLE0000452 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

32. Whether the document(s) identified by Bates number(s) BLE0000758-761 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

33. Whether the document(s) identified by Bates number(s) BLE0000769 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

34. Whether the document(s) identified by Bates number(s) BLE0105709 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

35. Whether the document(s) identified by Bates number(s) BLE0005634 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

36. Whether the document(s) identified by Bates number(s) BLE0006816-6820 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

37. Whether the document(s) identified by Bates number(s) BLE0003286-3287 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

38. Whether the document(s) identified by Bates number(s) BLE0005640 is/are a record kept in the course of a regularly conducted activity of Plaintiff within the meaning of Rule 803(6) of the Federal Rules of Evidence.

39.     Whether the document(s) identified by Bates number(s) BLE 0115259 – BLE 0115339 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

40.     Whether the document(s) identified by Bates number(s) BLE 0116000 – BLE 0116027 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

41.     Whether the document(s) identified by Bates number(s) BLE 0000327-BLE 0000332 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

42.     Whether the document(s) identified by Bates number(s) BLE 0000348-BLE 0000349 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

43.     Whether the document(s) identified by Bates number(s) BLE 0115215-BLE 0115217 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

44.     Whether the document(s) identified by Bates number(s) BLE 0115997 – BLE 0115999 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

45.     Whether the document(s) identified by Bates number(s) BLE 0122739 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

46.     Whether the document(s) identified by Bates number(s) BLE 0122621- BLE 0122705 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

47.     Whether the document(s) identified by Bates number(s) BLE 0122706 – BLE 0122727 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

48.     Whether the document(s) identified by Exhibit A Defendants' Second Amended Counterclaims ("SACC") is/are a(n) original, true, correct, and genuine copy of its original.

49.     Whether the document(s) identified by Exhibit B Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

50.     Whether the document(s) identified by Exhibit C Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

51.     Whether the document(s) identified by Exhibit D Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

52.     Whether the document entitled Order Info, dated January 13, 2012 and attached as Exhibit F to Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

53.     Whether the document(s) identified by Bates number(s) BLO 0030427 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

54.     Whether the document(s) identified by Exhibit G of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

55.     Whether the document(s) identified by Exhibit H of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

56.     Whether the document(s) identified by Exhibit I of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

57.     Whether the document(s) identified by Exhibit J of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

58.     Whether the document(s) identified by Exhibit K of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

59.     Whether the document(s) identified by Exhibit L of Defendants' Second Amended Counterclaims produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

60.     Whether the document(s) identified by Exhibit M of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

61.     Whether the document(s) identified by Exhibit N of Defendants' Second Amended Counterclaims produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

62.     Whether the document(s) identified by Exhibit O of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

63.     Whether the document(s) identified by Exhibit P of Defendants' Second Amended Counterclaims produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

64.     Whether the document(s) identified by Exhibit R of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

65.     Whether the document(s) identified by Exhibit U of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

66.     Whether the document(s) identified by Exhibit W of Defendants' Second Amended Counterclaims is/are a(n) original, true, correct, and genuine copy of its original.

67.     Whether the document(s) identified by Bates number(s) BLE0043037- BLE 0043038 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

68.     Whether the document(s) identified by Bates number(s) BLE0000438-BLE0000442 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

69.     Whether the document(s) identified by Bates number(s) BLE0000452 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

70.     Whether the document(s) identified by Bates number(s) BLE0000758-BLE0000761 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

71.     Whether the document(s) identified by Bates number(s) BLE0000769 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

72.     Whether the document(s) identified by Bates number(s) BLE0105709 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

73.     Whether the document(s) identified by Bates number(s) BLE0005634 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

74.     Whether the document(s) identified by Bates number(s) BLE0006816-BLE0006820 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

75.     Whether the document(s) identified by Bates number(s) BLE0003286-BLE0003287 produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

76.     Whether the document(s) identified by Bates number(s) BLE0005640 is/are produced electronically, is/are a(n) original, true, correct, and genuine copy of its original.

77.     Whether Exhibit B of the SACC includes a genuine depiction of a 2010 Barn Light Electric Catalog advertising products manufactured by Hi-Lite.

78.     Whether Exhibit C of the SACC includes a genuine depiction of an email from Bryan Scott to Hi-Lite.

79.     Whether Exhibit D of the SACC includes a genuine depiction of an email from Bryan Scott to Hi-Lite.

80.     Whether Exhibit E of the SACC includes a genuine depiction of an email from David McAdam to Donna Scott.

81.     Whether Exhibit F of the SACC includes a genuine depiction of a Barn Light Electric sales receipt and a product manufactured by Barn Light Electric.

82.     Whether Exhibit G of the SACC includes a genuine depiction of an email from David McAdam to Donna Scott.

83.     Whether Exhibit H of the SACC includes a genuine depiction of an email from David McAdam to Donna Scott.

84.     Whether Exhibit I of the SACC includes a genuine depiction of products for sale on Barn Light Electric's website on October 7, 2014.

85.     Whether at least one photograph depicted in Exhibit I of the SACC was provided to Barn Light Electric by Hi-Lite.

86.     Whether Exhibit I of the SACC depicts at least three Hi-Lite part numbers.

87.     Whether Exhibit J of the SACC includes depictions of drawings that were displayed on Barn Light Electric's website on October 8, 2012.

88.     Whether Exhibit L of the SACC depicts lighting fixtures manufactured by Hi-Lite.

89.     Whether Exhibit M of the SACC depicts a lighting fixture manufactured by Barn Light Electric.

90.     Whether Exhibit N of the SACC depicts a lighting fixture manufactured by Barn Light Electric.

91.     Whether Exhibit O of the SACC depicts the page that that links from the "Space Coast Living April 2011" excerpt depicted in Exhibit L of the SACC.

92.     Whether the "Space Coast Living April 2011" excerpt depicted in Exhibit L of the SACC was present on Barn Light Electric's website on April 23, 2015.

93.     Whether, on April 23, 2015, clicking on the "Space Coast Living April 2011" except present on Barn Light Electric's website linked to the webpage depicted in Exhibit O of the SACC.

94.     Whether each product depicted in Exhibit O of the SACC is manufactured by Barn Light Electric.

95.     Whether Exhibit P of the SACC depicts a lighting fixture manufactured by Barn Light Electric.

96.     Whether Exhibit Q of the SACC depicts Barn Light Electric's profile on www.houzz.com.

97.     Whether the image below depicts a product manufactured by Hi-Lite.



98.     Whether the lighting fixture depicted immediately above is an example of a barn light.

99.     Whether Exhibit G of Defendants' First Request for Admissions to Plaintiffis a genuine depiction of a product for sale on Barn Light Electric's website.

100.    Whether the lighting fixture depicted in Exhibit G of Defendants' First Request for Admissions to Plaintiff, and reproduced below, is manufactured by Barn Light Electric.



101.    Whether the lighting fixture prominently displayed near the center of the photograph below is manufactured by Hi-Lite.



102.    Whether the lighting fixture identified in the preceding statement is an example of a barn light.

103.    Whether Exhibit U of the SACC is a genuine depiction of a page from Barn Light Electric's website as it appeared on October 7, 2014.

104.    Whether the following excerpt from the SACC depicts the phrase Barn Light Originals in association with www.barnlightelectric.com/barn-light-originals.html.

**Barn Light Originals**™ | Authentic RLM Lighting by ...
www.barnlightelectric.com/**barn-light-originals**.html ▾
Shop our **original** barn lighting for quality warehouse shade pendants, goosenecks, and wall sconce lighting. Made in America, these custom **barnlights** last a ...

her Exhibit W of the SACC includes at least one photograph of a product manufactured by Hi-Lite.

106.    Whether Exhibit W of the SACC includes at least one photograph of a product manufactured by Hi-Lite

107.    Whether Bryan Scott has not answered any of the allegations in the SACC.

108.    Whether Bryan Scott has not answered any of the allegations in Counts X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, or XIX of the SACC.

109.    Whether Donna Scott has not answered any of the allegations in the SACC.

110.    Whether Donna Scott has not answered any of the allegations in Counts X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, or XIX of the SACC.

111.    The product depicted below is commonly known as a "barn light."



112.    The product depicted below is commonly known as a "barn light."



113.

114.    Whether Barn Light Electric used depictions of Hi-Lite products to sell products that did not originate with Hi-Lite.

115.    Whether Barn Light Electric used Hi-Lite part numbers (or product designations) to sell products that did not originate with Hi-Lite.

116.    Whether, in January of 2012, William Sanders ordered a Hi-Lite product from Barn Light Electric.

117.    Whether the product received by Mr. Sanders was manufactured by Barn Light Electric.

118.    Whether Mr. Sanders testified that the depiction of Barn Light Electric's website in Exhibit C of David McAdam's declaration was as the website appeared on the day he ordered Hi-Lite's products from Barn Light Electric.

119.    Whether, when shown a photograph of the product Mr. Sanders received, Barn Light Electric's owner recognized it as a product manufactured by Barn Light Electric.

120.    Whether Hi-Lite has advertised and sold the H-15116 since the 1990s.

121.    Whether Exhibit O of Defendants' Second Amended Counterclaims [Dkt. 60] depicts a page that links (or at one time linked) from the "Space Coast Living April 2011" cover depicted in Exhibit L.

122.    Whether Exhibit P of Defendants' Second Amended Counterclaims [Dkt. 60] depicts a page that links (or at one time linked) from the "The Week May 2010" cover depicted in Exhibit L.

123.    Whether Photographs provided to Barn Light Electric by Hi-Lite were used on www.barnlightelectric.com to sell products originating from a source other than Hi-Lite.

124.    Whether the page www.barnlightelectric.com/barn-light-originals.html at one time offered for sale lighting fixtures that originated from a source other than Hi-Lite.

125.    Whether the page www.barnlightelectric.com/barn-light-originals.html at one time offered for sale lighting fixtures that originated from a source other than Barnlight Originals, Inc.

126.    Whether the lighting fixture depicted in paragraph 33 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "Wesco Sconce."

127.    Whether the lighting fixture depicted in paragraph 33 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

128.    Whether the lighting fixture depicted in paragraph 34 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Starfire Radial Wave Reflector Wall Sconce."The lighting fixture depicted in paragraph 34 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

129.    Whether the lighting fixture depicted in paragraph 35 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Original Wall Sconce."

130.    Whether the lighting fixture depicted in paragraph 35 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

131.    Whether the lighting fixture depicted in paragraph 36 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Outback Cord Hung Pendant."

132.    Whether the lighting fixture depicted in paragraph 36 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

133.    Whether the lighting fixture depicted in paragraph 37 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Blue Collar Pendant."

134.    Whether the lighting fixture depicted in paragraph 37 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

135.    Whether the lighting fixture depicted in paragraph 38 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Assembly 3 Light Chandelier."

136.    Whether the lighting fixture depicted in paragraph 38 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

137.    Whether the lighting fixture depicted in paragraph 39 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Von Braun 4 Light Chandelier."

138.    Whether the lighting fixture depicted in paragraph 39 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

139.    Whether the lighting fixture depicted in paragraph 40 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Coalition 3 Light Chandelier."

140.    Whether the lighting fixture depicted in paragraph 40 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

141.    Whether the lighting fixture depicted in paragraph 41 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Merger 2 Light Chandelier."

142.    Whether the lighting fixture depicted in paragraph 41 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

143. Whether the lighting fixture depicted in paragraph 42 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Bottom Line 4 Light Chandelier."

144. Whether the lighting fixture depicted in paragraph 42 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

145. Whether the lighting fixture depicted in paragraph 43 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Factory Overhead 6 Light Chandelier."

146. Whether the lighting fixture depicted in paragraph 43 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

147. Whether the lighting fixture depicted in paragraph 44 of the SACC and labeled "Barn Light Electric" is Barn Light Electric's "The Original Industrial Guard Post Mount."

148. Whether the lighting fixture depicted in paragraph 44 of the SACC and labeled "Barn Light Electric" is manufactured by Barn Light Electric.

149. Whether Barn Light Electric has directed its employees to manufacture lighting fixtures similar in appearance to those of Hi-Lite.

150. Whether Barn Light Electric has directed a third-party to manufacture lighting fixtures similar in appearance to those of Hi-Lite.

151. Whether Barn Light Electric sells products similar in appearance to those sold by Hi-Lite.

152. Whether Barn Light Electric manufactures products similar in appearance to those of Hi-Lite.

153. Whether Barn Light Electric has copied at least one of Hi-Lite's product designs.

154. Whether Barn Light Electric has provided examples of Hi-Lite products to its product designers.

155. Whether, on at least one occasion, Barn Light Electric sold a product manufactured by a party other than Hi-Lite Manufacturing Company, Inc. in fulfillment of an order for a product identified by at least one of a Hi-Lite part number and/or a photograph of a Hi-Lite-manufactured product.

156.     Whether Barn Light Electric continues to display at least one photograph including a Hi-Lite-manufactured product on at least one of its website and its advertising.

157.     Whether Hi-Lite's SACC does not allege that Plaintiff purchased its tangible products and repackaged them as its own.  See Dkt. 171 at ¶14 ("[T]he lighting fixtures were not manufactured by Hi-Lite"); see also Exhibit 10, Sanders Depo, 43:1-22; 54:5–56:13; 43:1–47:14; 51:1–52:23; 54:5–56:13.

158.     Whether Barn Light Electric has depicted images of Hi-Lite products in connection with the sale, offering for sale, distribution and/or advertising of its products and services during the time period between September 4, 2012 and the present.

159.     Whether Barn Light Electric has depicted Hi-Lite part numbers in connection with the sale, offering for sale, distribution and/or advertising of its products and services during the time period between September 4, 2012 and the present.

160.     Whether Barn Light Electric was not authorized to sell Hi-Lite products during the time period between September 4, 2012 and the present.

161.     Whether the conduct of the Counterclaim-Defendant and Third-party Defendants that is the subject of this action has at all times material to this Complaint occurred in this district.

162.     Whether Jeffrey Ohai is the Vice-President of Hi-Lite Manufacturing, Inc., a premier family-owned manufacturer of lighting fixtures since 1958.  Hi-Lite specializes in barn lighting and provides a wide range of American-made quality lighting to its customers.  Mr. Ohai manages the family business and designs most of Hi-Lite's products.

12.     **CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT**

SECTION A: ISSUES OF LAW THAT PLAINTIFF BELIEVES ARE SETTLED
                      PURSUANT TO THE 11THCIRCUIT'S PATTERN JURY
                      INSTRUCTIONS WHICH DEFENDANTS DISPUTES[10]

i.   NONCOPYRIGHT-RELATED ISSUES OF LAW

---

10 Defendants dispute in some cases the relevance of the cited law and further disputes whether they come from the Pattern Jury Instructions insomuch as Plaintiff has not provided a citation to such.

Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury
Instructions With Respect to Registered Trademarks

1.     If the registration in question matured from an application filed on or after November 16, 1989, the constructive nationwide priority attaching to it is effective as of the filing date of the application. *See* Trademark Law Revision Act of 1988, Pub. L. 100-667, § 128(b)(1), 102 Stat. 3944.

## Evidentiary Significance of Federal Registrations on the Principal Register

2.     The U.S. Patent and Trademark Office maintains two "registers" on which trademarks can be registered: (1) the Principal Register; and (2) the Supplemental Register. *See* 15 U.S.C. §§ 1051, 1091 (2006). Under Sections 7(b) and 33(a) of the Lanham Act, a federal registration on the Principal Register is, at least, "prima facie" evidence of the validity of the registered trademark and of the registration of the trademark, of the registrant's ownership of the trademark, and of the registrant's exclusive right to use the registered trademark in connection with the goods recited in the registration. *See* 15 U.S.C. §§ 1057(b), 1115(a) (2006).

3.     Nationwide constructive notice is provided for by Section 22 of the Lanham Act, 15 U.S.C. § 1072 (2006). *See generally John R. Thompson Co.*, 366 F.2d at 115; *Faciane v. Starner*, 230 F.2d 732, 738 n.12 (5th Cir. 1956).

## Infringement - General Introductory Charge

4.     The "touchstone" of a finding of infringement under Section 32 "is not simply whether there is an unauthorized use of a protected mark, but whether such use is likely to cause customer confusion." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2009), *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1205 (11th Cir. 2007); *see also Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 839 (11th Cir. 1983) (test for service mark infringement is whether or not the offending mark is "likely to cause confusion").

5.     The infringement analysis in these charges is the same for word marks, service marks, certification marks, collective marks, logos and trade dress. This is meant to promote a more consistent approach to the analysis and is believed by the drafters of this charge to be more consistent with the case authority. This approach varies from other jury charge sources. *See e.g., Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation*, American Bar Association Section of Litigation (2008).

## Likelihood of Confusion: Seven-Factor Test

6.     This is the test most commonly applied for direct infringement, in which the Defendant is using an allegedly confusingly similar trademark in connection with its

own goods. There are many Eleventh Circuit and former Fifth Circuit cases applying the seven-factor test set forth in these instructions. *See, e.g., Frehling Enters. v. Int'l Select Grp.*, 192 F.3d 1330, 1335 (11th Cir. 1999); *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1027 (11th Cir. 1989), *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989); *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542-43 (11th Cir. 1985); *E. Remy Martin & Co. v. Shaw-Ross, Int'l Imps.*, 756 F.2d 1525, 1530 (11th Cir. 1985); *Wesco Mfg. v. Tropical Attractions of Palm Beach*, 833 F.2d 1484, 1488 (11th Cir. 1984); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45-46 (5th Cir. 1975). Nevertheless, the Eleventh Circuit has allowed the consideration of other factors where appropriate. *See, e.g., Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010) ("Our circuit has recognized that new factors may merit consideration in determining whether there is a likelihood of confusion." (internal quotation marks omitted)); *accord Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir. 1986). Examples of those additional factors include the degree of care exercised by purchasers of the parties' goods and services, *see Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 n.10 (5th Cir. 1979), a prior affiliation between the parties, *see Prof'l Golfers Ass'n v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975), the Defendant's infringement of multiple trademarks owned by the plaintiff, *see Volkswagenwerk AG v. Rickard*, 492 F.2d 474, 479 (5th Cir. 1974), the geographic proximity between the parties, *see Tana*, 611 F.3d at 780-81, and, in cases involving product design trade dress, the prominence of any house trademarks used by the parties. *See Bauer Lamp  v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991).

7.      Whatever the factors used, the test for likely confusion is not applied by simply using a mathematical approach, that is, adding up how many factors have been proven or not proven. Rather, as the Eleventh Circuit has explained, "[a] district court should not determine whether a likelihood of confusion exists merely by computing whether a majority of the subsidiary factors indicate that such a likelihood exists. Rather, the district court must evaluate the weight to be accorded the individual subsidiary facts and make the ultimate fact decision." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 n.17 (11th Cir. 1983).

Types and Strength of Trademarks

8.      The test for genericness is set forth in Section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3) (2006). Eleventh Circuit cases bearing on the issue include *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358, 1359 n.4 (11th Cir. 2007), *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522 (11th Cir. 1991), and *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979).

9.      Types of trademarks that are considered descriptive include individual colors, *see Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 115 S. Ct. 1300, 1303

131 L. Ed. 2d 248 (1995), geographically descriptive terms, *see Elgin Nat'l Watch Co. v. Ill. Watch Case Co.*, 179 U.S. 665, 673, 65 S. Ct. 270, 273, 45 L. Ed. 365 (1901), and noninherently distinctive trade dress. *See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857-58 (11th Cir. 1983).

10.     In affirming a finding of no secondary meaning, one panel of the Eleventh Circuit has held that "[a]lthough we believe that proof of intentional copying is probative evidence on the secondary meaning issue, we cannot agree with Plaintiff that proof of intentional copying conclusively establishes that plaintiff's trademark or trade dress has acquired secondary meaning." *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983).  Because the court has not addressed the precise role played by intentional copying in the secondary meaning inquiry, the following four-factor test most commonly applied by the court is appropriate: 1. The length and nature of the trademark's use; 2. The nature and extent of advertising and promotion of the trademark; 3. The efforts of the trademark owner to promote a conscious connection between the trademark and its business; and 4. The degree to which the public recognizes [name of plaintiff]'s good by the trademark.

11.     Representative circuit case law bearing on the definition of suggestive trademarks includes *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987), *Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1545 (11th Cir. 1984), and *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980).

12.     Representative circuit case law bearing on the definition of arbitrary and coined trademarks includes *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307. 1312 (11th Cir. 1999), *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 n.3 (11th Cir. 1985), and *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252. 260 (5th Cir. 1980).

13.     The Eleventh Circuit's treatment of the considerations properly taken into in the trademark strength inquiry has been inconsistent. On the one hand, the court has suggested that suggestive, arbitrary, and coined trademarks, as well as those covered by incontestable registrations, are strong as a matter of law. *See, e.g., Frehling Enters. v. Int'l Select Grp.*, 192 F.3d 1330, 1335-36 (11th Cir. 1999) ("Arbitrary marks are the strongest of the four categories.); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) ("[T]he scope of protection increases as the [trademark] moves toward the arbitrary end of the spectrum."); *Sun Banks, Inc. v. Sun Federal Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981) ("A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive."); *see also Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010) (holding plaintiff's incontestably registered service mark strong as a matter of law); *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989) (same).

14.     On the other hand, however, a number of the court's decisions have departed from these bright-line rules in favor of an examination of the marketplace strength of the trademark sought to be protected. *See, e.g., Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1547 (11th Cir. 1984) ("The presumption of validity afforded plaintiff's [registered] mark under the Lanham Act is not material to [whether confusion is likely]."); *see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974-75 n.13 (11th Cir. 1983) ("Of course, even if [the plaintiff's mark] initially was weak, it may have subsequently acquired strength through [the plaintiff's] promotional efforts."). In particular, those opinions have often focused on the extent of third-party use of arguably similar marks. *See, e.g., Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1183 (11th Cir. 1985) (finding plaintiff's suggestive mark weak as a matter of law on appeal based in part on evidence of third-party use); *Exxon Corp. v. Tex. Motor Exch.*, 628 F.2d 500, 504 (5th Cir. 1980) (affirming finding of trademark strength based on absence of evidence of third-party use); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) (finding plaintiff's arbitrary mark weak as a matter of law on appeal based in part on evidence of third-party use). Therefore, a dual approach that focuses on both the conceptual strength of the Plaintiff's trademark, as reflected in the trademark's placement on the spectrum of distinctiveness, and its commercial strength, as reflected in these other considerations, is appropriate.

Similarity or Dissimilarity of the Parties' Trademarks

15.     Representative circuit case law applying this factor includes *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007), *Dippin' Dots, Inc. v. Frosty Bites, Distrib., LLC*, 369 F.3d 1197, 1207-09 (11th Cir. 2004). *Frehling Enters. v. Int'l Select Grp.*, 192 F.3d 1330, 1337-38 (11th Cir. 1999), *Exxon Corp. v. Tex. Motor Exch.*, 628 F.2d 500, 504-05 (5th Cir. 1980), *Eskay Drugs, Inc. v. Smith Kline & French Labs.*, 188 F.2d 430, 431-32 (5th Cir. 1951).

Similarity or Dissimilarity of the Parties' Goods

16.     Representative circuit case law applying this factor includes *Tana v. Dantanna's*, 611 F.3d 767, 777-78 (11th Cir. 2010), *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1541 (11th Cir. 1986), *Jellibeans, Inc. v. Skating Clubs of Ga. Inc.*, 716 F.2d 833, 842 (11th Cir. 1983), *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 832 (11th Cir. 1982), and *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982).

Similarity or Dissimilarity of the Parties' Retail Outlets and Purchasers

17.     Representative circuit case law applying this factor includes *Carnival Brands Seafood v. Carnival Brands, Inc.*, 187 F.3d 1307, 1313-14 (11th Cir. 1999), *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir, 1983), *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980) *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 505 (5th Cir. 1980), and *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792, 797 (5th Cir. 1954).

<u>Similarity or Dissimilarity of the Parties' Advertising Media</u>

18.     Representative circuit case law applying this factor includes *Tana v. Dantanna's*, 611 F.3d 767, 776-77 (11th Cir. 2010), *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 967-77 (11th Cir. 1983), *Exxon Corp. v. Tex. Motor Exch.*, 628 F.2d 500, 506 (5th Cir. 1980), and *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 478 (5th Cir. 1974).

<u>Actual Confusion</u>

19.     Under Eleventh Circuit law, there can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) (footnote omitted).

20.     Nevertheless, the Eleventh Circuit has held that "there is no absolute scale as to how many instances of actual confusion establish the existence of that factor." *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir. 1986). The sufficiency of "actual confusion" evidence depends on the circumstances. These circumstances can include the amount of actual confusion in the context of the case. *Compare Tana*, 611 F.3d at 779 (affirming finding of no infringement based in part on testimony of only two instances of actual confusion) and *Sun Banks v. Sun Fed. Sav. & Loan*, 651 F.2d 311, 319 (5th Cir. 1981) (nineteen reports of actual confusion over a three-year period was insufficient to establish a finding of actual confusion under the circumstances in that case) *with Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (testimony of three witnesses sufficient to support a finding of actual confusion) and *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975) (reversing trial court for applying a test of "statistically significant" confusion and finding confusion likely as a matter of law based on testimony of four instances of actual confusion). They can also include the type of person who was allegedly confused. *Compare Frehling Enters. v. Int'l Select Grp.*, 192 F.3d 1330, 1341 (11th Cir. 1999) (reversing finding of no likelihood of confusion based in part on evidence of confusion by plaintiff's professional buyer) and *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1510 n.10 (11th Cir. 1984) (affirming finding of likely confusion based on actual confusion among customers) *with Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1550 (11th Cir. 1987) (according testimony of confusion among nonconsumers little weight) and *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985) (same).

<u>The Defendant's Intent</u>

21.     Representative circuit case law applying this factor includes *Bauer Lamp v. Shaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991) (per curiam), *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164 n.4 (11th Cir. 1982), *Sun Banks*

*v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 318-19 (5th Cir. 1981), and *Aetna Cas. & Surety Co. v. Aetna Auto Fin., Inc.*, 123 F.2d 582, 584 (5th Cir. 1941).

Likelihood of Confusion: Resale of new genuine goods bearing the Plaintiff's trademark

22.     Under ordinary circumstances, the infringement cause of action is unavailable to trademark owners that already have sold their goods and are seeking to prevent subsequent sales by downstream purchasers. Specifically, the "genuine" nature of the goods will preclude confusion as to their source. *See generally Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001) ("The resale of genuine trademarked goods generally does not constitute infringement… Therefore, even though a subsequent sale is without a trademark owner's consent, the resale of a genuine good does not violate the [Lanham] Act."). The protection afforded by the "first sale" doctrine does not apply, however, when the good or the packaging has been materially altered. *See id.* at 1301 ("This [first sale] doctrine does not hold true when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner."). When an infringement claim is grounded in the resale of goods bearing a plaintiff's trademark that are genuine but that are materially different from their authorized counterparts, the inquiry should focus on whether material differences exist and not the seven-factor test set forth above.

Likelihood of Confusion: Resale of used or reconditioned goods bearing the Plaintiff's mark

23.     The sale of used or reconditioned goods bearing a plaintiff's trademark without adequate disclosure of the goods' status can constitute actionable infringement. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S. Ct. 1136, 91 L. Ed. 1386 (1947), is the seminal case on this theory of relief. In *Champion*, the Supreme Court held that used goods can be sold under the trademark owner's trademark in a way that does not confuse the public. The public's expectations for used goods are different than for new goods. *See also Nitro Leisure Prods., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1359-60, 1367 (Fed. Cir. 2003)) (applying Eleventh Circuit law to hold that the "material differences" test for the resale of new goods has not replaced the statutory "likelihood of confusion" test in the resale of used or reconditioned trademarked goods). When an infringement claim is grounded in the resale of used or refurbished genuine goods bearing a plaintiff's trademark, the inquiry should focus on whether material differences exist and not the seven-factor test set forth above.

Contributory Infringement

24.     The test for liability for infringement set forth above is one for direct infringement. Liability for contributory trademark infringement is governed by the standard set forth in *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 853-54, 102 S. Ct. 2182, 2188, 72 L. Ed. 2d 606 (1982) ("Thus, if a manufacturer or distributor

intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer is contributorily responsible for any harm done as a result of the deceit.").

## Award of the Plaintiff's Actual Damages

25.     It is "inappropriate" under Eleventh Circuit authority to award a trademark holder the "profit [it] would have made on sales to the defendant." *St. Charles Mfg. Co. v. Mercer*, 737 F.2d 891, 893 (11th Cir. 1983) ("While Plaintiffs in Lanham Act cases often receive profits from lost sales, these sales are sales made by Defendants to purchasers who sought to buy plaintiffs' products and instead received defendants'.") Nonetheless, franchise fees and lost royalties during the infringement period are recoverable. *See Ramada Inns*, 804 F.2d at 1565. An award of actual damages also may be based on findings that the Defendant's infringement has diverted sales from the Plaintiff or that the poor quality of the Defendant's goods has harmed the Plaintiff's business reputation. *See Boston Prof'l Hockey Ass'n  v. Dallas Cap Mfg.*, 597 F.2d 71, 75 (5th Cir. 1979).

## Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions With Respect to Unregistered Trademarks

26.     The three prerequisites for a trademark's validity, namely, use in commerce, distinctiveness, and nonfunctionality, are well-established under Eleventh Circuit law. *See, e.g., Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038-39 (11th Cir. 1996); *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 776-77 (11th Cir. 1996); *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1170 (11th Cir. 1991); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). The nonfunctionality/functionality distinction typically comes into play in disputes over the validity of claimed trade dresses.

## Use in Commerce

27.     The definitions of use in commerce are drawn from the statutory definition of use in commerce found in Section 45 of the Lanham Act, *id*. § 1127, as well as from the U.S. Patent and Trademark Office's internal operating guidelines. *See* United States Patent & Trademark Office, *Trademark Manual of Examining Procedure*, §§ 1303.01, 1306.01-03, 1304.08-.09 (2010); Restatement (Third) of Unfair Competition §§ 10-11 (1995). Eleventh Circuit opinions addressing the issue have done so in the context of the extent of use in commerce necessary to create common-law rights, but the underlying principles are the same. *See, e.g., Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1193-2000 (11th Cir. 2001) (applying statutory definition of use in commerce and holding that nonmonetary transactions can create protectable rights); *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (requiring claimed trademark to be used in a manner recognizable as a trademark); *Geovision, Inc. v. Geovision Corp.*, 928 F.2d 387, 388-89 (11th Cir. 1991) ("[A] mere

contract of sale without a product or mark is not within the statutory meaning of a sale."); *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1267 (5th Cir. 1975) (shipments of goods made only to create or to preserve trademark rights do not qualify as bona-fide uses in commerce).

28.     Section 5 of the Lanham Act, 15 U.S.C. § 1055 (2006), expressly recognizes the ability of a plaintiff to qualify for registration through the properly licensed use of registered trademark, and this principle has long been recognized by the law of the Circuit as well. *See generally Turner v. H M H Publ'g Co.*, 380 F.2d 224, 229 (5th Cir. 1967) (affirming validity of licensed service mark); *see also Planetary Motion*, 261 F.3d at 1198 (same); *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992) (same); *Prof'l Golfers Ass'nof Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 688 (5th Cir. 1975) (affirming validity of licensed collective mark).

29.     *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1312-13 (11ᵗʰ Cir. 1999), suggests that the zone of natural expansion applies to goods and services as well as to geographic areas. *Planetary Motion*, 261 F.3d at 1201 n.23, however, criticizes this methodology as conflating the use-in-commerce prerequisite for protectable rights with the likelihood-of-confusion test for infringement.

Infringement - General Introductory Charge

30.     The statutory basis for the federal tort of infringement of unregistered trademarks is Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which proscribes the use in commerce "by any person" of: any word, term, symbol, or device, or any combination thereof, … which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.  15 U.S.C. § 1125(a). This language has long been recognized as creating a cause of action against the violation of rights to unregistered trademarks substantively equivalent to the federal infringement cause of action under Section 32 of the Act, *id*. § 1114, which is reserved to owners of trademarks that have been federally registered on the U.S. Patent and Trademark Office's Principal Register.

31.     In keeping with conventional practice, these instructions refer to unfair competition grounded in the alleged misappropriation of a trademark as "infringement." Assuming that a protectable trademark exists, the "touchstone" of a finding of infringement "is not simply whether there is an unauthorized use of a protected trademark, but whether such use is likely to cause customer confusion." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2009); *see also Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200. 1205 (11th Cir. 2007); *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833,

839 (11th Cir. 1983) (test for service mark infringement is whether or not the offending service mark is "likely to cause confusion").

32.     The infringement analysis in these charges is the same for word marks, logos and trade dress. This is meant to promote a more consistent approach to the analysis and is believed by the drafters of this charge to be more consistent with the case authority. This approach varies from other jury charge sources. *See, e.g.*, American Bar Association Section of Litigation, *Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation*, (2008).

Nominative and Descriptive Fair Use

33.     Descriptive fair use is a defense to a claim of trademark infringement. Defendant is not liable for infringement if it proves by a preponderance of the evidence that its use of plaintiff's trademark is necessary to accurately describe a characteristic of its goods. To establish this defense, defendant must prove that plaintiff's trademark is used: 1. Other than as a trademark; 2. In a descriptive sense; and 3. Fairly and in good faith – that is, defendant did not intend to trade on the goodwill of plaintiff by creating confusion as to the source of defendant's goods. Descriptive fair use by the Defendant of either the Plaintiff's trademark or the words making up the Plaintiff's trademark may be justified under either of two theories. First, Section 33(b)(4) of the Lanham Act recognizes as a defense to the conclusive evidentiary presumption attaching to an incontestably registered trademark that a defendant is using a personal name "in his own business" or other words "fairly and in good faith only to describe the [associated] goods or services… or their geographic origin." 15 U.S.C. § 1115(b)(4) (2006). Second, the common law preserves defendants' ability to use personal names and descriptive terms in their primary descriptive sense. *See generally KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004); *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir. 1954); *Creamette Co. v. Conlin*, 191 F.2d 108 (5th Cir. 1951).

Abandonment

34.     Eleventh Circuit case law suggests that a defendant alleging that a plaintiff has abandoned its trademark faces a high burden: "[T]he burden a defendant bears on the affirmative defense of abandonment is, in fact, 'strict.' Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1174 (11th Cir. 2002) (citation omitted) (footnote omitted); *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984) ("The defense of abandonment is one for which we require strict proof."); *Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1545 (11th Cir. 1984) (affirming finding that defendants had failed to carry the "strict burden of proof applicable to abandonment claims"). The

court has not, however, expressly held that abandonment must be shown by clear and convincing evidence.

## Trademark Principals Based on Annotations from 11th Circuit's Pattern Jury Instructions With Respect to Cancellation of a Federal Trademark Registration

35.     Under Sections 1(a)-(b) of the Lanham Act, use in commerce is a prerequisite for the registration of a trademark owned by a United States domiciliary. 15 U.S.C. § 1051 (a)-(b) (2006). The statutory basis of this ground for cancellation is Section 14 (1) of the Act. *Id*. § 1064(1). This ground for cancellation may not be asserted against a registration that has reached its fifth anniversary of issuance or against a registration that issued under Section 44 or Section 66 of the Act. *Id*. §§ 1064(3)-(5), 1126, 1141 (f). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation. *See id*. § 1052(f). And a defendant pursuing cancellation therefore need not prove the absence of acquired distinctiveness to prevail.

36.     The definitions of use in commerce bearing on this ground for cancellation depart from the express statutory definition of use in commerce in connection with goods to the extent that that definition fails to require use in interstate commerce or in commerce with a foreign country. *See* 15 U.S.C. § 1127.

## The Plaintiff lacked a bona-fide intent to use its trademark in commerce at a time the Plaintiff represented to the U.S. Patent and Trademark Office it had such an intent:

37.     The statutory basis of this ground for cancellation is Section 1(b) of the federal Lanham Act. 15 U.S.C. § 1051(b) (2006). It may not be asserted against a registration that has reached its fifth anniversary of issuance. *See id*. § 1064(3)-(5). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation and a defendant pursuing it therefore need not prove the absence of acquired distinctiveness to prevail. *See id*. § 1052(f).

38.     With regard to the issue of what is necessary for a bona fide intent to use an applied-for trademark, the inquiry is an objective one that ordinarily requires the applicant to produce documentary evidence predating the application's filing date. *See Spirits Int'l B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim satis Kooperatiferi Birligi*, 99 U.S.P.Q.2d 1545, 1549 (T.T.A.B. 2011); *SmithKline Beecham Corp. v. Omnisource DDS LLC*, 97 U.S.P.Q.2d 1300, 1305 (T.T.A.B. 2010); *see also* S. Rep. No. 100-515, at 23 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5587 ("In connection with the [Lanham Act's intent-to-use provisions], 'bona fide' should be read to mean a fair, objective determination of the applicant's intent based on all the circumstances."). Under the Board's case law: (1) the registrant bears an initial burden of producing contemporary documentary evidence of a bona fide intent to use its trademark in connection with the goods and services covered by the application; but, if the registrant satisfies its burden of production, (2) the burden of proof reverts

to the party challenging the validity of the registration. *See Boston Red Sox Baseball Club L.P. v. Sherman*, 88 U.S.P.Q.2d 1581, 1587-88 (T.T.A.B. 2008); *SmithKline Beecham Corp.*, 97 U.S.P.Q.2d at 1305.

The registered trademark is a generic designation for the goods or services covered by the registration:

39.     The statutory basis of this ground for cancellation is Section 14(3) of the Lanham Act, which also contains the statutory definition of genericness. 15 U.S.C. § 1064(3) (2006). It may be asserted against a registration that has reached the fifth anniversary of its issuance. *See* 15 U.S.C. § 1064(3). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation, and a defendant pursuing it therefore need not prove the absence of acquired distinctiveness to prevail. *See id.* § 1052(f).

40.     A finding that a registered trademark is generic means that the trademark cannot be protected *as* a trademark, and a jury finding a registration subject to cancellation on this ground therefore should not evaluate whether the plaintiff has proven valid rights to the claimed trademark independent of the registration. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 2757, 120 L. Ed. 2d 615 (1992). The examples of generic designations set forth in this instruction are drawn from *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358, 1359 n.4 (11th Cir. 2007); *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522 (11th Cir. 1991); and *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979).

If the registered trademark is a conventional trademark, the trademark is descriptive of the goods or services covered by the registration, and lacked acquired distinctiveness as of the registration date:

41.     The statutory basis of this ground for cancellation is Section 2(e)(1) of the Lanham Act, 15 U.S.C. § 1052(e)(1) (2006). It may not be asserted against a registration that has reached the fifth anniversary of its issuance. *See id.* § 1064(3)-(5) .

42.     In affirming a finding of no secondary meaning, one panel of the Eleventh Circuit has held that "[a]lthough we believe that proof of intentional copying is probative evidence on the secondary meaning issue, we cannot agree with [the plaintiff] that proof of intentional copying conclusively establishes that [plaintiff's] trademark or tradedress has acquired secondary meaning." *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983); *see also CPG Prods. Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1012 (Fed. Cir. 1985) (concluding, in application of Eleventh Circuit law, that "[e]vidence of intentional copying in this case, also supports a finding of secondary meaning."). Because the court has not

addressed the precise role played by intentional copying in the secondary meaning inquiry, the four-factor test most commonly applied by the court is appropriate.

43.     The examples of descriptive trademarks set forth in the instruction bearing on this ground for cancellation are drawn from *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011), *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522-24 (11th Cir. 1990), *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987), and *Beneficial Indus. Loan Corp. v. Allenstein*, 173 F.2d 38, 40 (5th Cir. 1949).

<u>If the registered trademark is a trade dress, the trademark is not an inherently distinctive indicator of the origin of the goods or services covered by the registration and lacked acquired distinctiveness as of the registration date:</u>

44.     The statutory basis of this ground for cancellation is Section 2(e)(1) of the Lanham Act, 15 U.S.C. § 1052(e)(1) (2006). It may not be asserted against a registration that has reached the fifth anniversary of its issuance. *See id.* § 1064(3)-(5) .

45.     The test for distinguishing between inherently distinctive and noninherently distinctive trademarks bearing on this ground for cancellation is taken from *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857-58 (11th Cir. 1983), and has its origin in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977). In *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986), the court declined to disturb the district court's reliance on the *Seabrook* factors in finding a claimed trade dress to be inherently distinctive, although the court also invoked the four-tiered spectrum of distinctiveness for conventional trademarks, service marks, collective marks, and certification marks. *See id.* at 1347; *see also Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 776 n.4 (11th Cir. 1996) (noting use of both tests in prior case law). Because there is no necessary inconsistency between the two tests, the application of the spectrum-of-distinctiveness test in actions to protect claimed trade dresses is not foreclosed.

<u>If the registered trademark comprises matter that, as a whole, is functional:</u>

46.     The statutory basis of this ground for cancellation are Sections 2(e)(5) and 14 (3) of the Lanham Act, 15 U.S.C. §§ 1052(e)(2) & 1064(3) (2006). It may be asserted against a registration that has reached the fifth anniversary of its issuance. *See* 15 U.S.C. § 1064(3). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation, and a defendant pursuing it therefore need not prove the absence of acquired distinctiveness to prevail. *See id.* § 1052(f).

47.    A finding that a registered trademark is functional means that the trademark cannot be protected *as* a trademark, and a jury finding a registration subject to cancellation on this ground therefore should not evaluate whether the plaintiff has proven valid rights to the claimed trademark independent of the registration. *See Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1206-07 (11th Cir. 2004). Under limited circumstances, however, a defendant's use of a functional designation can lead to liability for the tort of passing off. *See, e.g., Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 120, 59 S. Ct. 109, 120, 83 L. Ed. 2d 73 (1938).

48.    The functionality doctrine prevents trademark law, which seeks to promote competition, from instead inhibiting legitimate competition. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32-33, 121 S. Ct. 1255, 1261-62 149 L. Ed. 2d 164 (2001); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S. Ct. 1300, 1304, 131 L. Ed. 2d 248 (1995); *Dippin' Dots*, 369 F.3d at 1202-03; *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1579-80 (Fed. Cir. 1995) (applying Eleventh Circuit law); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986).

49.    The requirement that a trademark be nonfunctional in the utilitarian sense is often regarded as necessary to maintain the distinction between possibly perpetual trademark protection and the temporally limited protection available under federal utility patent law. *See TrafFix Devices*, 532 U.S. at 34, 121 S. Ct. at 1262, 149 L. Ed. 2d 164 ("The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.").

50.    At least some Circuit case law, however, suggests that the requirement has constitutional dimensions. *See, e.g., Wilhelm Pudenz GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1208 (11th Cir. 1999) ("[W]hen the operation of the Lanham Act would upset the balance struck by the Patent Act, the Lanham Act must yield. The functionality doctrine serves this purpose by eliminating the possibility of a perpetual exclusive right to the utilitarian features of a product under trademark law, which would be impossible (as well as unconstitutional) under the Patent Act."); *cf. B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d, 1254, 1254, 1258-59 (5th Cir. 1971) ("It runs counter to federal purposes, and perhaps borders on the unconstitutional, for a state to prolong or to create any trade monopoly, to an originator [of a useful article] by forbidding the production of copies under the rubric of unfair competition.").

51.    This instruction bearing on this ground for cancellation contemplates two different tests for functionality. The first test is most commonly applied when the claim of functionality or nonfunctionality bears on the utilitarian characteristics of the trademark sought to be protected. It has its origins in the Court of Customs and Patent Appeals' decision in *In re Morton-Norwich Prods.*, 671 F.2d 1332, 1336 (C.C.P.A. 1982), and is consistent with the approach taken by such designs as *Dippin' Dots*, 369

F.3d at 1203, *Elmer*, 67 F.3d at 1579-80 (applying Eleventh Circuit law), and *J.R. Clark Co. v. Murray Metal Prods. Co.*, 219 F.2d 313, 320 (5th Cir. 1955). The second test is most commonly applied when the claim of functionality or nonfunctionality bears on the aesthetic characteristics of the trademark sought to be protected. *See Dippin' Dots*, 369 F.3d at 1203 ("[T]he second test… is commonly called the competitive necessity test and generally applied in cases of aesthetic functionality…"). It has its origins in *Qualitex*, 514 U.S. at 164, 115 S. Ct. at 1304, 131 L. Ed. 2d 248. The two are not mutually exclusive, and, indeed, some courts have applied both in the same litigation. *See, e.g., Dippin' Dots*, 369 F.3d at 1203-04, 1206-07.

<u>If the registered trademark has been abandoned through non-use or failure to police:</u>

52.     The statutory basis of this ground for cancellation is Section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3) (2006). It may be asserted against a registration that has reached the fifth anniversary of its issuance. *See id.* § 1064(3). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation, *see id.* § 1052(f), and a defendant pursuing it therefore need not prove the absence of acquired distinctiveness to prevail.

53.     A finding that a registered trademark has been abandoned means that the registration is subject to cancellation and that the plaintiff no longer has valid rights as of the date of abandonment. Nevertheless, because the plaintiff may have acquired new rights to its trademark by resuming the use of its trademark after the initial abandonment took place, a jury finding that a registration is subject to cancellation on this ground is not dispositive of the plaintiff's rights, and the jury therefore evaluate whether the plaintiff has proven valid rights to the claimed trademark independent of the registration. The plaintiff's resumption of a trademark's use after abandonment will not allow the plaintiff to claim valid rights that date back to its original use; rather, the new rights will date only from the resumed use. *See generally AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1549-50 (11th Cir. 1986).

54.     Eleventh Circuit case law suggests that a defendant alleging that a plaintiff has abandoned its trademark faces a high burden: "[T]he burden a defendant bears on the affirmative defense of abandonment is, in fact, 'strict.' Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1174 (11th Cir. 2002) (citation omitted) (footnote omitted); *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984) ("The defense of abandonment is one for which we require strict proof."); *Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1545 (11th Cir. 1984) (affirming finding that defendants had failed to carry the "strict burden of proof applicable to abandonment claims"). The

court has not, however, expressly held that abandonment must be shown by clear and convincing evidence.

<u>If the registered trademark has been abandoned through uncontrolled, or "naked," licensing:</u>

55.     The statutory basis of this ground for cancellation is Section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3) (2006). It may be asserted against a registration that has reached the fifth anniversary of its issuance. *See id.* Cancellation of a registration on this ground prevents the former registrant from establishing valid rights to its mark as of the date of abandonment but does not prevent the plaintiff from potentially cultivating new rights dating from its resumption of the mark's use.

56.     Few courts have addressed the issue of abandonment through uncontrolled licensing in the registration context. Outside of that context, however, the invalidation of rights under this theory requires a showing that the trademark owner failed to exercise control over the nature and quality of the goods provided by the licensee under the licensor's mark. *See generally Eva's Bridal Ltd. v. Halanick Enters.*, 639 F.3d 788 (7th Cir. 2011); *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509 (9th Cir. 2010). Thus, for example, in *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313 (11th Cir. 2011), although not referring to the naked license doctrine by name, the court affirmed a finding that the defendants, although once licensees of the plaintiff, had become the owners of the service mark covered by the license because they, rather than the licensor, controlled the quality of the services provided under it. *See id.* at 1323.

<u>If the registration of the trademark was procured or maintained fraudulently:</u>

57.     The statutory basis of this ground for cancellation is Section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3) (2006); although that statute expressly authorizes the cancellation "at any time" only of registrations that were "obtained fraudulently," interpretations of it have held that it reaches the maintenance of registrations through fraudulent filings. *See, e.g., Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986) (upholding cancellation of fraudulently renewed, rather than fraudulently obtained, registration on ground that "[f]raud in obtaining renewal of a registration amounts to fraud in obtaining a registration within the meaning of [15 U.S.C. § 1064 (3)]."). This ground for cancellation may be asserted against a registration that has reached the fifth anniversary of its issuance. *See* 15 U.S.C. § 1064(3). The existence or nonexistence of acquired distinctiveness, or "secondary meaning," is irrelevant to this ground for cancellation, and a defendant pursuing it therefore need not prove the absence of acquired distinctiveness to prevail. *See id.* § 1052(f). The test set forth in this instruction is drawn from *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1210 (11th Cir. 2008) and *Citibank, N.A. v. Citibanc Grp.*, 724 F.2d 1540, 1544-45 (11th Cir. 1984).

58.     To prove a violation of the ACPA, a plaintiff must prove the following facts by a preponderance of the evidence: 1. defendant has registered, trafficked in, or used the subject domain name; 2. plaintiff's trademark was distinctive at the time of defendant's registration of its domain name and that domain name is identical or confusingly similar to plaintiff's trademark; or plaintiff's trademark was famous at the time of defendant's registration of its domain name and that domain name is identical to, confusingly similar to, or likely to dilute plaintiff's trademark; and 3. defendant has committed such acts with a bad-faith intent to profit from plaintiff's trademark.

59.     "Dilution" is the decrease in the power of a famous trademark to identify its goods. Plaintiff's trademark is "famous" if it is widely recognized by the general public as identifying its goods.

60.     The term "traffics in" means to engage in a transaction including, but not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration. For example, selling a domain name constitutes "trafficking in" that domain name.

61.     Defendant is not liable for use of the domain name unless that defendant is the registrant or the registrant's authorized licensee.

62.     Defendant is not liable for violation of the ACPA with respect to the domain name if that defendant has proven by a preponderance of the evidence that at the time defendant registered or otherwise obtained its domain name: 1. defendant had reasonable grounds to believe that the use of its domain name was a fair use or otherwise lawful; and 2. defendant actually believed that the use of its domain name was fair use or otherwise lawful.

## ii.   COPYRIGHT-RELATED ISSUES OF LAW

Copyright Principals Based on Annotations from 11th Circuit's Pattern Jury
Instructions

1.      The reverse of the "effective registration" doctrine occurs where the alleged infringement is of a later, unregistered version of an earlier-registered work.  The earlier registration may be effective to support an infringement action as to those portions of the earlier work incorporated into the later, unregistered version at issue in the suit. *See Montgomery v. Noga*, 168 F.3d 1282, 1292-93 (11th Cir. 1999).

2.      When the plaintiff's copyright registration contained material inaccuracies, whether by omission or misrepresentation, a registration will be invalidated if the

inaccuracy was material and the registrant acted with *scienter*, i.e., an intent to mislead the Copyright Office. *See* 17 U.S.C. § 411(b)(1) (a certificate of registration satisfies the registration requirement "regardless of whether the certificate contains any inaccurate information, unless… (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration"); *St. Luke's Cataract and Laser Institute P.A. v Sanderson*, 573 F.3d 1186, 1201-02 (11th Cir. 2009) (citing *Original Appalachian Artworks, Inc. v. Toy Loft Inc.*, 684 F.2d 821, 828 (11th Cir. 1982)) ("omissions or misrepresentations in a copyright application can render the registration invalid" where there has been "intentional or purposeful concealment of relevant information"; there must be a showing of "scienter").

3.      The burden of proof for fraud on the Copyright Office is the preponderance of the evidence standard.

4.      As used in copyright law, "original" means that a work was independently created by its author and possesses at least some minimal degree of creativity. *See Utopia Provider Systems, Inc. v. Pro-Med Clinical Systems, LLC*, 596 F.3d 1313, 1319-20 (11th Cir. 2010) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345, 111 S. Ct. 1282, 1287, 113 L. Ed 2d 358 (1991)).  The examples of insufficient creativity in the selection, arrangement, and coordination of preexisting materials or data comprising a compilation that are provided in this instruction come from *Bellsouth Adver. & Publ'g. Corp. v. Donnelly Info. Publ'g., Inc.*, 999 F.2d 1436, 1440 (11th Cir. 1993). *See Bellsouth Adver. & Publ'g*, 999 F.2d at 1440 ("[T]here is nothing remotely creative about arranging names alphabetically in a white pages directory. It is an old-age practice, firmly rooted in tradition and so commonplace that is has come to be expected as a matter of course."); *see also Id.* at 1442 (stating that arrangement of business telephone directory in an alphabetized list of business types, with individual businesses listed in alphabetical order under the applicable headings, "is not only unoriginal, it is practically inevitable").

5.      No author may copyright facts or ideas. The copyright is limited to those aspects of the work that display the stamp of the author's originality. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349-50, 111 S. Ct. 1282, 1290, 113 L. Ed. 2d 358 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547-548, 105 S. Ct. 2218, 2223-24, 85 L. Ed. 2d 588 (1985)); *see also* Model Jury Instructions, Copyright, Trademark and Trade Dress Litigation §§ 1.4.2, 1.4.3, 1.4.4 (Todd S. Holbrook and Alan Nathan Harris eds., American Bar Association Section of Litigation, 2008).

6. "The merger doctrine provides that 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007). The merger doctrine operates as an exception to the idea-expression dichotomy. *See id.* at 1143; s*ee also* Model Jury Instructions, Copyright, Trademark and Trade Dress Litigation §§ 1.4.7 (Todd S. Holbrook and Alan Nathan Harris eds., American Bar Association Section of Litigation, 2008).

7. The legal or beneficial owner of an exclusive right under a copyright is entitled to institute an action for any infringement of that particular right committed while he or she is the owner of it. 17 U.S.C. § 501(b).

8. 17 U.S.C. § 101 definition of copyright owner reflects fact that exclusive licensees are treated as copyright owners for purpose of protection and remedy pursuant to 17 U.S.C. § 201(d)(2). 17 U.S.C. § 101 ("Copyright owner," with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.). 17 U.S.C. § 201(d) provides: (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession; and, (2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

9. Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object. 17 U.S.C. § 202.

10. Section 204 addresses transfers of copyright ownership: (a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent; (b) A certificate of acknowledgement is not required for the validity of a transfer, but is prima facie evidence of the execution of the transfer if - - (1) in the case of a transfer executed in the United States, the certificate is issued by a person authorized to administer oaths within the United States; or (2) in the case of a transfer executed in a foreign country, the certificate is issued by a diplomatic or consular officer of the

United States, or by a person authorized to administer oaths whose authority is proved by a certificate of such an officer. 17 U.S.C. § 204(a).

11.     Transfer must be in writing. 17 U.S.C. § 204(a); *see also Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532-3 (11th Cir. 1994).

12.     Before there can be contributory infringement by one Defendant, there must first be a direct or primary infringement by another. Further, before there can be contributory infringement, the Defendant must have acted with the requisite knowledge. The United States Supreme Court included a specific reference to an "intentional" inducement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d, 781 (2005) ("*Grokster*") ("One infringes contributorily by intentionally inducing or encouraging direct infringement."). *See also, BUC Intern. Corp. v International Yacht Council*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007). ("Contributory infringement refers to the intentional inducement, causation or material contribution to another's infringing conduct.").

13.     The United States Supreme Court has observed that "'the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn…' [citation omitted]. The lack of clarity in this area may, in part, be attributable to the fact that an infringer is not merely one who uses a work without authorization by the copyright owner, but also one who authorizes the use of a copyrighted work without actual authority from the copyright owner." *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 435 n.17, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984).

14.     To find that a party is liable for another party's infringement, you must first find that that party had the right and ability to control or supervise the other party's infringing action and either controlled the action, or failed to exercise its right and ability to prevent the infringement. Also, you must find that that party directly profited from the other's infringement. *Grokster*, 545 U.S. at 931 n.9 (noting the requirement that a defendant "profit directly."). The Supreme Court did not address MGM's vicarious liability theory in *Grokster*, and instead resolved the case based on an inducement theory. Nevertheless, the Supreme Court referred to the vicarious liability theory as articulated in *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963), which is the applicable test.

15.     A Defendant can fully negate any infringement claim if he can prove by a preponderance of the evidence that he independently created his work. *See Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1233 (11th Cir. 2002) (affirming district court's grant of summary judgment in favor of Defendant where Defendant presented uncontradicted evidence of independent creation, even though Plaintiff's and Defendant's works were "practically identical") (citing *Benson v. Coca-Cola Co.*, 795

F.2d 973, 975 (11th Cir. 1986) ("[U]ncontradicted evidence of independent creation… fully negat[es] any claim of infringement.")).

16.    The affirmative defense of fair use is a mixed question of law and fact as to which the proponent carries the burden of proof. *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1307 n.21 (11th Cir. 2008).

17.    Section 107 of the Copyright Act lists the four factors to be considered to determine if the use of the copyright holder's work is a fair use. 17 U.S.C. § 107. Nevertheless, the fair use doctrine is an "equitable rule of reason," and neither the examples of possible fair uses nor the four factors recited in the statute are to be considered exclusive. *Peter Letterese & Assocs.*, 533 F.3d at 1308 (citing *Stewart v. Abend,* 495 U.S. 207, 236-37, 110 S. Ct. 1750, 1768, 109 L. Ed. 2d 184 (1990)). Moreover, the statutory factors are not to be treated in isolation, one from another – all four factors "are to be explored, and the results weighed together in light of the purposes of copyright." *Id.*

18.    The first factor to be considered, the purpose and character of the use of the copyrighted work (17 U.S.C. § 107(1)), is a factor with several facets. *SunTrust Bank*, 268 F.3d at 1269. Two of these facets are "(1) whether the use serves a nonprofit educational purpose, as opposed to a commercial purpose; and (2) the degree to which the work is a 'transformative' use, as opposed to a merely superseding use, of the copyrighted work." *Peter Letterese & Assocs.*, 533 F.3d at 1309. These facets are not to be used to create hard evidentiary presumptions or categories of presumptively fair use. *Id.* at 1309. "Rather, the commercial or non-transformative uses of a work are to be regarded as separate factors that tend to weigh against a finding of fair use, and the force of that tendency will vary with the context." *Id.*

19.    As to the first of these facets, the "Supreme Court has emphasized that '[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain, but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *Id.* at 1310 (*quoting Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 105 S. Ct. 2218, 2231, 85 L. Ed. 2d 588 (1985)).

20.    The second facet is the degree to which the defendant's use is "transformative," as opposed to a superseding use, of the copyrighted work. *Id.* A transformative work is "'one that adds something new, with a further purpose or different character, altering the first work with new expression, meaning or message.'" *Id.* at 1310 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S. Ct. 1164, 1171, 127 L. Ed. 2d 500 (1994). The more transformative the new work, the less significance is to be afforded other factors, like commercialism, that may weigh against a finding of fair use. *Id.* at 1309-9.

21.     Under the second factor, the nature of the copyrighted work (17 U.S.C. § 107 (2)), there is a hierarchy of copyright protection, depending upon the nature of the copyrighted work. Original works merit greater protection than derivative works; creative works merit greater protection than factual works; and unpublished works merit greater protection than published works. *Peter Letterese & Assocs.*, 533 F.3d at 1312; *SunTrust Bank*, 268 F.3d at 1271.

22.     The out-of-print nature of a work is also entitled to consideration under this second factor. The legislative history of Section 107 provides: "A key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case…" S. Rep. No. 94-473, at 64 (1975) (1975 WL 370213). The Eleventh Circuit endorsed the relevance of the "out-of-print" nature of a work under the second factor in *Peter Latterese & Assocs., Inc. v. World Inst. Of Scientology Enters.*, 533 F.3d 1287, 1313 (11th Cir. 2008).

23.     The third factor to be considered is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. 17 U.S.C. § 107(3). In order to come within a fair use, the portion of the copyrighted work that a defendant has taken must be reasonable in light of the purpose and character of the use. *Peter Letterese & Assocs.*, 533 F.3d at 1314. This factor is also "intertwined" with the fourth factor, and "partly functions as a heuristic to determine the impact on the market for the original." *Id*. The inquiry, therefore, is whether the amount taken is reasonable in light of the purpose of the use and the likelihood of market substitution. *Peter Letterese & Assocs.*, 533 F.3d at 1314 n.30.

24.     Two points on this factor bear particular emphasis. First, the amount and substantiality of the portion used is measured with respect to the copyrighted work as a whole, and it is not measured with respect to the putatively infringing work. *Peter Letterese & Assocs.*, 533 F.3d at 1314-15. Second, in addition to evaluating the quantity of the work copied, what must be also considered is its quality and importance to the original work. Even if it is only a small amount of material that is copied, it may be substantial from a qualitative standpoint if the defendant has copied the heart of the copyrighted work. *Id*.

25.     The fourth factor to be considered is the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). Here, two inquiries are to be made: "(1) the extent of the market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market." *Peter Letterese & Assocs.*, 533 F.3d at 1315 (quoting *Campbell*, 510 U.S. at 590, 114 S. Ct. at 1177) (internal quotation marks omitted).

26.     The adverse effect with which fair use is primarily concerned is that of market substitution. Because the focus here is on uses "that most directly threaten the incentives for creativity which the copyright tries to protect," a court should be far less concerned if the user is profiting from an activity of which the copyright owner could not possibly take advantage for his own profit. *Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984).

27.     The doctrine of estoppel is an equitable defense. *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 875-76 (11th Cir. 2005). Thus, the judge and not the jury should decide whether estoppel applies, though the judge may have the jury consider the issue in an advisory capacity. *See* Fed. R. Civ. P. 3(c).

28.     To establish that a copyright claim is barred by the statute of limitations, which is a time limit for bringing a claim, the alleged infringer must prove by a preponderance of the evidence that the claimant failed to file [his/her/its] lawsuit within three years after it knew or, in the exercise of reasonable diligence, should have known about the infringement. Each act of infringement is a separate harm that creates an independent claim for relief. The statute of limitations prevents the claimant from recovering remedies for infringing acts that occurred more than three years before it filed its lawsuit. *See* 17 U.S.C. § 507(b); *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1236 (11th Cir. 2002) (Birch, J., specially concurring), *cert. denied*, 539 U.S. 903, 123 S. Ct. 2251 (2003).

29.     By statute, the "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement." 17 U.S.C. 504(b). The damages suffered are to compensate of the copyright for any injury to the market value of the copyrighted work, and it "often is measured by the revenue that the plaintiff lost as a result of the infringement." *Montgomery v. Noga*, 168 F.3d 1282, 1294, 1295 n.19 (11th Cir. 1999). To collect actual damages, a copy right claimant must demonstrate a causal connection between the infringing party's activity and any injury to the market value of the copyrighted work at the time of infringement. *Id.* at 1294.

30.     A plaintiff's statutory burden must also be read in conjunction with the well-established principle that any claim of damages may not be based on pure speculation. See e.g *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004) (addressing claim that damages were too speculative); *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974) (noting that "the defendant is normally not assessed damages on wholly speculative expectations of profits"). "[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and the loss of revenue, the burden shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper & Row Publishers v.*

*National Enterprises*, 471 U.S. 539, 567 105 S. Ct. 2218, 2233, 85 L. Ed. 2d 588 (1985).

31.     Under 17 U.S.C. § 412, statutory damages are unavailable for copyright infringement that commenced prior to registration of an unpublished work or for infringement that commenced before registration within three months of its publication.

32.     One measure of statutory damages is allowed *per work* infringed for *all infringements* of that work. 17 U.S.C. § 504(c); *MCA Television Ltd. V. Feltner*; 89 F.3d 766, 768-69. All the parts of a compilation or derivative work, however, constitute one work. 17 U.S.C. § 504(c).

33.     The defense of innocent infringement is applicable under 17 U.S.C. §§ 401-02 if a copyright notice is not used in proper form.  Three requirements typically must be met – the proper symbol or word, the year of first publication, and identification of the copyright owner.  Under section 401(b)(2), in cases involving a compilation or derivative work incorporating previously published material, the year of first publication of the compilation or derivative work must be used.

34.     "An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work."  *Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1235 (11th Cir. 2010).

35.     In the Eleventh Circuit "an implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Latimer*, 601 F.3d at 1235.

36.     The Eleventh Circuit has held where there is no evidence that the licensor intended to limit the scope of licensee's use of its works at the time that licensor delivered the renderings, licensor "could not have, as a matter of law, limited the scope of the nonexclusive license he granted."  *Karlson v Red Door Homes, LLC et al*, 611 Fed. Appx. 566, 571 (11th Cir. 2015).  In *Karlson*, the Eleventh Circuit held that the copyright holder's attempt to limit or revoke the irrevocable nonexclusive implied license it granted was ineffective even where the Defendant voluntarily complied with its cease and desist request, removing Plaintiff's photos from its website, internally informing its sub-licensees not to use the photographs and replacing the allegedly infringing photos.

37.     If the licensee makes out the existence of any license, the burden shifts to the licensor to show that the licensee's use exceeded the scope of that license.  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630 (2d Cir. 1995).

38.     Even if there was a breach on the licensee's part, the licensor has a breach of contract claim against the licensee, "not a copyright infringement claim." *Davis v. Tampa Bay Arena, Ltd.,* 2013 WL 3285278, at *7 (M.D. Fla. June 27, 2013).

39.     "[A] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008) (internal citations omitted).

40.     "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b).

41.     In other words, preexisting material cannot be protected by copyright registrations for the derivative works that are based on the preexisting material. Rather, such registrations can protect only the new material added by the derivation.

42.     A "prima facie case of copyright infringement requires a plaintiff to prove that the work is original and that the plaintiff complied with the applicable statutory formalities." *AppSoft Dev., Inc. v. Diers, Inc.*, 2014 WL 3893316, at *5 (M.D. Fla. Aug. 8, 2014), citing *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-33 (11th Cir. 2010); *see also Bateman v. Mnemonics, Inc*., 79 F.3d 1532, 1541 (11th Cir. 1996) ("To 'satisfy *Feist's* first prong, a plaintiff must prove that the work ... is original and that the plaintiff complied with applicable statutory formalities.'"), quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995), *aff'd by*, 516 U.S. 233 (1996).

43.     "A certificate of registration … is not conclusive on the copyright ownership issue." *Progressive Lighting, Inc. v. Lowe's Home Centers, Inc.*, 549 Fed. Appx. 913, 918 (11th Cir. 2013) (holding that the presumption of copyright validity from a certificate of registration was rebutted because the works at issue were useful articles that did not contain separable copyrightable elements; and affirming summary judgment of non-infringement because light fixtures did not contain separable elements entitled to copyright protection).

44.     "[T]o rebut the presumption of validity, an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *Progressive Lighting, Inc. v. Lowe's Home Centers, Inc.*, 549 Fed. Appx. 913, 919 (11th Cir. 2013), quoting *United Fabrics Int'l, Inc. v. C & J Wear, Inc.,* 630 F.3d 1255, 1257 (9th Cir. 2011) (internal alterations omitted), citing *Palladium Music, Inc. v. EatSleepMusic, Inc.,* 398 F.3d 1193, 1196 (10th Cir. 2005).

45.     "[I]t has been suggested that a reasonable approach in situations where there has been an inadvertent material omission, is to deny the plaintiff the benefits of the

presumption of § 410(c) and to require plaintiff to establish the copyrightability of the work claimed to be infringed." *Block State Testing Services, L.P. v. Kontractor's Prep Corp.*, 4 F. Supp. 2d 1365, 1366-67 (M.D. Fla. 1997) (finding sufficient rebuttal of prima facie case of infringement in light of an inadvertent material omission), *citing* M. Nimmer & D. Nimmer, *Nimmer on Copyright,* § 7.20, at 7–197–198 (1990).

46.     The Copyright Act expressly requires "an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered."  17 U.S.C. § 409(9).

47.     The "work made for hire," pursuant to its definition set forth in 17 U.S.C. § 101, requires a written instrument for commissioned works. *Ivory v. Holme*, No. 8:07-CV-2354-T-TBM, 2009 WL 513720, at *8 (M.D. Fla. Feb. 27, 2009).

48.     A properly executed work-for-hire agreement would make the commissioning party the "author" of the work and hence the original copyright owner, whereas a transfer via an assignment would convey ownership – not authorship – of the copyright.  17 U.S.C. § 201.

49.     When work-for-hire status is claimed, the year of publication is particularly critical because it determines the length of the copyright term.  *See* 17 U.S.C. § 302(c).

50.     Without a valid registration, Hi-Lite cannot bring an action for copyright infringement.  17 U.S.C. § 411(a).

51.     Based on the statutory mandate of § 411(b), such procedures are triggered without any allegation of fraud or scienter. *See Olem Shoe Corp. v. Washington Shoe Co.,* 2010 WL 3505100, at *2 (S.D. Fla., Sept. 03, 2010) (holding that allegations of inaccurate information are sufficient to trigger the advisement requirement).

52.     The Court "must apply the substantial similarity test to only those elements of the copyrighted work that are actually subject to copyright protection—that is, elements of original expression in the copyrighted work."  *Baby Buddies, Inc. v. Toys R Us, Inc.,* 611 F.3d 1308, 1315 (11th Cir. 2010), quoting *Feist,* 499 U.S. at 361.

53.     "To satisfy *Feist's* second prong, a plaintiff must establish, as a factual matter, that the alleged infringer actually copied plaintiff's copyrighted material." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010).

54.     The copyright owner must prove that "'the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar.'"  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010),

*quoting Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'd by*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996).

55.     A failure to comply with § 411(a)'s registration requirement amounts to a failure to state a claim, which cannot be waived. *See Dowbenko v. Google Inc.,* 582 Fed.Appx. 801, 805 (11th Cir. 2014) ("The Supreme Court recently clarified that, although § 411(a)'s registration requirement is not jurisdictional, it nevertheless amounts to 'a precondition to filing a claim.'"); affirming dismissal of copyright claim for failure to state a claim); *Marc Anthony Builders, Inc.,* at *1-3 (dismissing copyright claim for failure to state a claim on a motion evaluated as a 12(c) motion); *BWP Media USA Inc. v. A.R. Commc'ns, LLC*, No. 6:14-CV-120-ACC-KRS, 2014 WL 5038590, at *3 (M.D. Fla. 2014) ("Unregistered Photographs cannot support a claim for copyright infringement").

56.     This Court has the authority to dismiss a copyright claims *sua sponte* at any time where the Court finds that the asserted registrations are invalid or that their scope cannot protect the asserted material. *Kernel Records Oy v. Mosley,* 694 F.3d 1294, 1302, n.8 (11th Cir. 2012), *citing Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170-71 (2010).


## SECTION B: NONCOPYRIGHT-RELATED ISSUES OF LAW TO BE DETERMINED BY THE COURT

1.      "'[T]here is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain.'" *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983) (citations omitted).

2.      15 U.S.C. § 1057(b) provides in pertinent part that "[a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark...."

3.      15 U.S.C. § 1115(b) provides in pertinent part that "[t]o the extent that the right to use the registered mark has become incontestable …, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."

4.      "An expert witness may testify as to the likelihood of customer confusion, even when the expert does not support his opinions with direct evidence from consumers." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2295269, at *2 (S.D. Fla. June 8, 2011) (expert may testify as to, *inter alia,* "consumer marketing and brand strategy, which may be probative of Defendants' intent" and "strength and distinctiveness of the marks").

5.     "Absent a false statement about geographic origin, a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the 'characteristics of the good itself' — such as its properties or capabilities." *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.,* 796 F.3d 576, 590 (6th Cir. 2015) (dismissing § 43(a)(1)(A)&(B) claims under *Dastar* even where Defendant sold cloned light fixtures using Plaintiff's tooling, advertised the *light fixtures* in Defendant's catalog, and used Plaintiff's *product numbers*, box design, and UL numbers on the products).

6.     "Most courts apply the rule that the senior user must prove … secondary meaning in its mark just prior to the time and place that the junior user first began use of that mark."  2 J.T. McCarthy, *Trademarks and Unfair Competition* § 15:4 (4th ed. 2015).

7.     Secondary meaning must already be established *prior* to the act of copying.  Otherwise, the copying cannot confuse consumers.  *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 136-39 (2d Cir. 1992) (rejected the doctrine of secondary meaning *in the making* under the Lanham Act).

8.     Any material issues of law raised on summary judgment not stipulated to herein.

9.     Whether a trademark infringement Plaintiff may rely on the zone of natural expansion doctrine to assert a registered trademark against goods that were excluded from the good and services description in response to a rejection of the application by the USPTO.

10.     Whether a trademark infringement Plaintiff may assert a registered trademark based on a Defendants sale of goods for which the registered mark is generic or merely descriptive.

11.     Whether prosecution history estoppel applies to registered trademarks.

12.     Whether a trademark infringement plaintiff can assert a registered trademark against goods or services that were disclaimed or excluded during prosecution of the trademark application.

13.     Whether a portion of a mark that has been disclaimed is considered to be the non-dominant portion of the mark.

14.     Whether a Plaintiff may maintain an infringement action for goods or services not listed in the goods and services description.

15.     Whether Barn Light Electric's marks are misdescriptive or misleading because Barn Light Electric is not the original source of the goods marketed as the Original.

16.     In the *Sovereign Military Hospitaller* case, the Eleventh Circuit further stated:

With respect to the first element of infringement—validity—incontestability provides "*conclusive* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." *Id.* § 1115(b) (emphasis added). Registration alone, by contrast, provides only "*prima facie* evidence of ... validity." *Id.* § 1115(a) (emphasis added).

In this Circuit, incontestability also benefits plaintiffs with respect to the second element of infringement—confusion. We held in *Dieter* that incontestability gives plaintiffs an advantage with respect to the first factor in the seven-factor balancing test for likelihood of confusion. *See* 880 F.2d at 328–29; *see also Caliber Auto. Liquidators*, 605 F.3d at 939; *Frehling Enters.*, 192 F.3d at 1336. An incontestable mark is "presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter*, 880 F.2d at 329.

*Id.*, at *9-10.

17.     The recent *Sovereign Military Hospitaller* case further explains the difference between the "conclusive presumption of validity" and the "prima facie presumption of validity," as follows:

The defenses in section 1115(b) rebut the conclusive presumption of validity that comes with incontestability. *See* 15 U.S.C. § 1115(b). When that presumption is rebutted, however, the defendant does not automatically prevail. Rebuttal reduces the conclusive presumption of validity to a prima facie presumption of validity. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 199 n. 6, 105 S.Ct. 658, 664, 83 L.Ed.2d 582 (1985) ("If one of the defenses [in section 1115(b)] is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark."). The defendant must still identify some additional reason why the plaintiff's marks are invalid. *See* 15 U.S.C. § 1115(a). Here, whether or not sections 1115(b)(5) and (b)(6) apply, the Sovereign Order's marks are presumptively valid because they are registered. *See id.* The district court erred by treating sections 1115(b)(5) and (b)(6) as complete defenses to infringement. *See* 6 McCarthy § 32:153; *see also id.* at § 32:157 (treating the defenses in section 1115(b) as defenses on the merits leads to the "absurdity of a challenger finding it easier to prove a defense to an incontestable registration than to an unregistered, common-law mark").

*Id.*, at *18.

18.     The *Sovereign Military Hospitaller* Court concluded that the defenses of prior-use "defeat only the conclusive presumption that incontestable marks are valid,

not the presumption that incontestable marks are strong for purposes of confusion." *Id.*, at *9.

19.     Intentional copying does not conclusively establish acquired secondary meaning.  *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983) (in affirming a finding of no secondary meaning, noting that the Eleventh Circuit has held that "[a]lthough we believe that proof of intentional copying is probative evidence on the secondary meaning issue, we cannot agree with Plaintiff that proof of intentional copying conclusively establishes that plaintiff's trademark or trade dress has acquired secondary meaning.").

## SECTION C: COPYRIGHT-RELATED ISSUES OF LAW TO BE DETERMINED BY THE COURT

1.     The Lanham Act does not protect "originality or creativity," nor does it "creat[e] a cause of action for, in effect, plagiarism." *Id.* at 37.  "The right to copy creative works, with or without attribution, is the domain of copyright, not of trademark or unfair competition."  *Freeplay Music, Inc. v. Cox Radio, Inc.,* 409 F.Supp.2d 259, 263 (S.D.N.Y. 2005).

2.     In the Eleventh Circuit, "'[a]n implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work.'"  *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 569 (11th Cir. 2015) (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010)).

3.     "In determining whether an implied license exists, a court should look at objective factors evincing the party's intent, including deposition testimony, and whether the copyrighted material was delivered '*without warning that its further use would constitute copyright infringement*.'" *Wilchombe v. Teevee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009) (*quoting I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir.1996)); *Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 756 (9th Cir.2008) ("The relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct.") (citing *Effects,* 908 F.2d at 558 n. 6).

4.     If the licensee makes out the existence of any license, the burden shifts to the licensor to show that the licensee's use exceeded the scope of that license.  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630 (2d Cir. 1995).

5.     "But an implied license is 'limited to a specific use only if that limitation is expressly conveyed *when the work is delivered.*'"  *Karlson*, 611 F. App'x at 571 (quoting *Latimer,* 601 F.3d at 1235).

6.     "[A] 'copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement' and can sue only for breach of contract." *Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008); *see also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753-54 (11th Cir. 1997) (breach of a covenant in a copyright license does no more than provide licensor an opportunity to seek rescission of the license, but does not constitute an *ab initio* rescission of the licensee's permission to use a copyrighted work; further refusing to allow rescission where permission to use was granted to recipient of the work and use was subsequently encouraged by the copyright holder, even without consideration).

7.     Courts in the Eleventh Circuit have held that "even assuming that [a copyright holder] attached conditions to the [recipient, limiting the scope of] use of his images . . . these conditions [a]re covenants, not condition precedents to the granting of [an] implied license . . . [providing for] a breach of contract claim . . . not a copyright infringement claim." *Davis v. Tampa Bay Arena, Ltd.,* Case No. 8:12-cv-60-T-30MAP, 2013 WL 3285278, *6-9 (M.D. Fla. 2012).

8.     State law dictates the sufficiency of consideration to support a finding of an implied license. *See, e.g., Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (applying Florida contract law to infer the creation of implied license); *Fodere v. Lorenzo*, Case No. 09-CV23120, 2011 WL 465468, at *5 (S.D. Fla. Feb. 4, 2011), *aff'd,* 441 F. App'x 666 (11th Cir. 2011) ("Whether a copyright owner has granted a nonexclusive license is determined by state contract law, not federal copyright law.") (citing *Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270 F.3d 821, 827 (9th Cir.2001) ("State law determines whether a copyright holder has granted [a nonexclusive] license."); *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003) (applying Texas law to determine adequacy of consideration for implied copyright license); *McCoy v. Mitsubishi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995) ("Whether express or implied, a license is a contract governed by ordinary principles of state contract law.")).

9.     Under Florida law, in order to constitute valid consideration there must simply be either a benefit to the promisor or a detriment to the promisee. *Mangus v. Present*, 135 So.2d 417, 418 (Fla. 1961). Neither the benefit to the promisor nor the detriment to the promisee need be actual. Rather, it is a sufficient legal detriment to the promisee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform. *Id.*; *see also* Williston on Contracts § 7:4 (4th ed. 2008).

10.    An implied nonexclusive license supported by consideration is likewise irrevocable, as a matter of law, even for preexisting works created by or for a licensor. *See, e.g., Sprengel*, 2013 WL 645532, at *12 (finding that an implied license to exploit a preexisting work was irrevocable when supported by

consideration in the form of sweat equity); *Unclaimed Prop. Recovery Serv., Inc. v. Kaplan*, Case No. 11-CV-1799 CBA RER, 2012 WL 4195241, at *5 (E.D.N.Y. Sept. 20, 2012), *aff'd*, 734 F.3d 142 (2d Cir. 2013) (finding that an implied license to use a previously compiled work was irrevocable).

11. Courts considering the existence of an implied license have found implied licenses for preexisting and previously compiled works created by a licensor and delivered to a licensee without limitation. *See, e.g., Sprengel*, 2013 WL 645532, at *12 (finding that an implied license to exploit a preexisting work was irrevocable); *Unclaimed Prop. Recovery Serv., Inc. v. Kaplan*, Case No. 11-CV-1799 CBA RER, 2012 WL 4195241, at *5 (E.D.N.Y. Sept. 20, 2012), *aff'd*, 734 F.3d 142 (2d Cir. 2013) (finding that an implied license to use a previously compiled work was irrevocable); *Falcon Enterprises, Inc. v. Publishers Serv., Inc.*, 438 F. App'x 579, 581 (9th Cir. 2011) (finding an implied license based on the parties' conduct despite the fact that licensor did not produce content at licensee's specific request); *accord* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A] [7] at 10-55 (2013) (it is "questionable" for courts to apply the three-factor rigidly and to hold that no implied license exists when one factor is absent); *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 500 (5th Cir. 2012) ("we have never held that an implied license could not arise in other circumstances"); *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 41 (1st Cir. 2003) (considering nonexclusive license defense where third party, not defendant, requested production of copyrighted work).`

12. "These requirements, while perfectly acceptable, do not exhaust the possibilities." 2 William F. Patry, *Patry on Copyright* § 5:131 (noting that the Ninth Circuit held that licensee-requested creation of the material in question is not necessary).

13. Courts have held that the statute of frauds defense is inapplicable to implied licenses for copyrights. *See Gerffert Co. v. William J. Hirten Co., LLC*, 815 F. Supp. 2d 521, 527 (D.R.I. 2011), which provides: "[T]he weight of authority suggests that the statute of frauds has no applicability where, as here, the existence of a nonexclusive license is implied by the conduct of the parties and asserted as an affirmative defense. In contrast to an exclusive license, a nonexclusive license does not amount to a transfer of copyright ownership.... Therefore, a nonexclusive license is not governed by the statute of frauds provision of 17 U.S.C. § 204, and may be granted "orally, or may even be implied from conduct." 3 Melvin B. & David Nimmer, *Nimmer on Copyright*, § 10.03[A][7] (2001).

14. The existence of a nonexclusive license, if granted to the defendant in an infringement action, operates as an affirmative defense to a claim of infringement. *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir.1998); *I.A.E.*, 74 F.3d at 775; *Effects*, 908 F.2d at 559. *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 186

F.Supp.2d 1, 18 (D.Mass.2002); *accord Holtzbrinck Pub. Holdings, L.P. v. Vyne Commc'ns, Inc.*, No. 97 CIV 1082(KTD), 2000 WL 502860, *6 (S.D.N.Y. Apr. 26, 2000) ("A license implied by the law is an exception to the proscriptions of the Statute of Frauds."); *Natkin v. Winfrey*, 111 F.Supp.2d 1003, 1012 (N.D.Ill.2000) (The "statute of frauds is simply inapplicable to a copyright license implied by law from the parties' conduct")."

15.     The Eleventh Circuit held that objects in the public domain. *Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000).

16.     The Eleventh Circuit held that objects that are useful articles are not protected by copyright. *Progressive Lighting, Inc. v. Lowe's Home Ctrs., Inc.*, 549 Fed. Appx. 913, 921 (11th Cir. 2013) ("Our precedent makes clear that an entire useful article cannot receive copyright protection, no matter how many superfluous, aesthetic individual components it has.").

17.     A copyright owner may not rely on an application for supplementary registration filed after the commencement of a lawsuit. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1231-32 (11th Cir. 2008) (holding that "[t]o allege infringement of the latter [registration], Oravec was required to amend his complaint," and affirming district court's denial of plaintiff's motion to amend complaint after belated copyright registration); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.7 (11th Cir. 2012) (noting the district court's conclusion that the failure to register prior to filing suit doomed its infringement claim, and affirming that Kernel failed to comply with statutory prerequisites prior to filing the action).

18.     The Eleventh Circuit held that pending applications do not satisfy the Copyright Act's registration requirement. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1302 n.8 (11th Cir. 2012) (noting that Eleventh Circuit precedent applies the "registration" approach while other circuits permit applications to satisfy the statutory prerequisite).

19.     Once an implied license is granted, "such a license is revocable unless and until consideration is accepted by the licensor." *Vergara Hermosilla v. Coca-Cola Co.*, 717 F. Supp. 2d 1297, 1303 (S.D. Fla. 2010) (citing *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451 (5th Cir. 2003)).

**13.     CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF FEDERAL RULES OF EVIDENCE OR FEDERAL RULES OF CIVIL PROCEDURE**

To the extent that disagreements arise, the Parties will file motions *in limine* pursuant

to the Amended Case Management and Scheduling Order in this matter [Dkt. 370].

14. **LIST OF ALL MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT**

1. Hi-Lite Manufacturing Company, Inc. and Jeffrey Ohai's Motion for Partial Summary Judgment and Memorandum of Law in Support (*Copyright*) [Dkt. 167]

2. Barn Light Electric Company, LLC and Bryan and Donna Scott's Amended Motion for Summary Judgment (*Copyright*) [Dkt. 198]

3. Barnlight Originals, Inc. and Hi-Lite Manufacturing Company, Inc.'s Motion to Compel Discovery Responses or in the Alternative Motion for Sanctions Due to Spoliation [Dkt. 372]

4. Barn Light Electric Company, LLC and Bryan and Donna Scott's Response in Opposition re D.E. 372 Motion to Compel Discovery Responses or in the Alternative Motion for Sanctions [Dkt. 375]

5. Hi-Lite Manufacturing Company, Inc.'s Supplemental Briefing on Implied License. [Dkt. 377]

6. Barn Light Electric's Response to Hi-Lite Manufacturing Company, Inc.'s Supplemental Briefing on Implied License. [Dkt. 383]

7. Barn Light Electric Company, LLC and Bryan and Donna Scott's Unopposed Motion for Leave to File Motion *in Limine* to Preclude Any Evidence or Argument, at the Evidentiary Hearing and at Trial, Regarding Copyright Infringement Based on the Design, Manufacture or Sale of Light Fixtures. [Dkt. 403]

8. Barn Light Electric Company, LLC and Bryan and Donna Scott's Motion for Leave to File Motion to Redact the Transcript of the January 19, 2017 Hearing. [Dkt. 405]

9. Barn Light Electric Company, LLC and Bryan and Donna Scott's Motion for leave to file Motion *in Limine* to Preclude any Evidence or Argument, at the Evidentiary Hearing and at Trial, regarding Copyright Infringement based on the Preexisting Material listed in the Applications for supplementary registration. [Dkt. 411]

10. Plaintiff's Motion for Leave to File Motion to Request Pretrial Conference. [Dkt. 417]

11. Defendants' Motion for Leave to File Motion to Continue Trial Deadlines. [Dkt. 418]

15. **PARTIES' PROPOSED *VOIR DIRE* QUESTIONS**

The jointly proposed *voir dire* questions are attached hereto as **Exhibit F**.

## 16.   PARTIES' PROPOSED JURY INSTRUCTIONS AND VERDICT FORM

Plaintiff's proposed jury instructions and verdict form are attached hereto as **Exhibit G**.

Defendants' proposed jury instructions and verdict form are attached hereto as **Exhibit H.**

Dated: March 27, 2017                          Respectfully submitted,

/s/ Alejandro J. Fernandez                    /s/ Michael J. Colitz, III
Alejandro J. Fernandez                        Michael J. Colitz, III
Florida Bar No.: 32221                        Trial Counsel
afernandez@brinksgilson.com                   Florida Bar No. 164348
Joseph R. Sozzani                             michael.colitz@gray-robinson.com
Florida Bar No.: 120297                       Stefan V. Stein
jsozzani@brinksgilson.com                     Florida Bar No. 300527
Stephen J. Leahu                              stefan.stein@gray-robinson.com
Florida Bar No.: 54037                        Stephen G. Anderson
sleahu@brinksgilson.com                       Florida Bar No. 0105697
BRINKS GILSON & LIONE, P.C.                   stephen.anderson@gray-robinson.com
401 E. Jackson Street, Suite 3500             GRAYROBINSON, P.A.
Tampa, FL 33602                               401 E. Jackson Street, Suite 2700
Tel: (312) 321-4200                           Tampa, FL 33602
Fax: (312) 331-2499                           Tel: (813) 273-5000
Gregory L. Hillyer                            Fax: (813) 273-5145
Florida Bar No.: 682489
ghillyer@brinksgilson.com                     *Attorneys for Defendant and Counterclaim*
Evi T. Katsantonis                            *Plaintiffs*
ekatsantonis@brinksgilson.com
Admitted Pro Hac Vice
BRINKS GILSON & LIONE, P.C.
1775 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
Tel: (202) 296-6911
Fax: (202) 296-8701

*Counsel for Plaintiff, Counterclaim-*
*Defendants and Third Party Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2017, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system which will send a copy to all counsel of record.

/s/ Alejandro J. Fernandez
ATTORNEY