# EXHIBIT E

**JOINT DEPOSITION DESIGNATIONS, OBJECTIONS & COUNTER-DESIGNATIONS**

**AND**

**DISPUTED DEPOSITION TESTIMONY EXCERPTS**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BARN LIGHT ELECTRIC COMPANY, LLC,
a Florida limited liability company,

       Plaintiff,

v.

BARNLIGHT ORIGINALS, INC., et al.,

       Defendants.
_____/      Case No. 8:14-CV-1955-T-35AEP

BARNLIGHT ORIGINALS, INC., at al.,

       Counterclaim Plaintiffs,

v.

BARN LIGHT ELECTRIC COMPANY,
LLC, a Florida limited liability company,

       Counterclaim Defendant,

and

BRYAN AND DONNA SCOTT, individual
Florida Residents,

       Third-Party Defendants.
_____/

## DEFENDANTS' DEPOSITION DESIGNATIONS AND PLAINTIFF'S OBJECTIONS/COUNTER-DESIGNATIONS

| Butala, Michael (06/25/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 53:9-25; 54:1-25; 56:2-15; 59:17-25; 60:1-11 | | | 36:8-18 |
| | | | 39:13-40:12 |
| | | | 52:7-53:24 |
| | | | 54:17-55:11 |
| | | | 55:12-56:1 |
| | | | 56:2-23 |
| | | | 57:15-59:15 |
| | | | 59:16-64:21 |
| | | | |
| | | | |
| | | | |

| Gonzalez, George (10/16/2015) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 33:15-19; 34:9-14; 36:1-21; 37:19-25; 38:1-2; 40:6-25; 41:1-20; 47:8-25; 48:1-8; 49:1-5; 50:25; 51:1-7; 52:3-21; 53:12-25; 54:1-10, 19-25; 55:1-14, 20-25; 56:1-25; 57:1-25; 58:1-3; 61:23-25; 62:1-9; 72:3-13; 7:41-25; 75:1-11; 84:24-25; 85:1-25; 86:1-3; 90:1-7; 95: 20-25; 96:1-2, 23-25; 97:1-4; 101:10-14, 20-25; 102:1-25; 103:1-13; 125:1-5; 164:6-25; 165:1-25; 166:1-25; 167:1-25; 168:1-19 | 74:1-2 | IP | 49:6-50:4 169:24 – 170:5 |

| Koller, Michael (01/28/16) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 2:11-19; 3:17-25; 4:1-8, 12-25; 5:1-2; 7:10-23; 12:4-8; 13:11-25; 14:1-11; 17:9-25; 18:1-25; 19:1-16; 21:10-25; 22:1-5, 8-25; 23:1-7, 11-25; 24:1-25; 25:1-2; 29:16-23; 30:16-25; 31:1-14, 21-25; 33:14-25; 34:1; 35:3-25; 36:1, 6-15; 37:6-25; 38:1-15; 39:4-12, 20-25; 40:1-7; 41:6-25; 42:1-10; 44:5-9, 14-25; 45:1-25; 46:1-2, 23-25; 47:1-10; 50:13-25; 51:1-2, 23-25; 52:1-12; 53:17-25; 54:1-19; 55:5-14; 56:17-25; 57:1-15; 59:2-22; 60:4-25; 61:1-7, 16-25; 62:1-3, 17-25; 63:1-25; 64:21-25; 65:1-6; 68:15-21; 69:5-8; 70:4-25; 71:1-2, 16-18; 79:21-25; 80:1-16 | | | 5:19-6:14 |
| | 6:18-21 | R | |
| | | | 7:2-16 |
| | 7:18-8:4 | R | |
| | | | 8:5-17 |
| | | | 9:2-10:15 |
| | 10:16-11:4 | R | |
| | | | 11:5-13 |
| | 15:11-15 | R | |
| | | | 15:16-16:17 |
| | 16:18-17:18 | R, F | |
| | 20:16-22:25 | R | |
| | 24:19-28:11 | R | |
| | 34:24-20 | R, F | |
| | | | 34:25-35:5 |
| | 35:6-12 | R | |
| | | | 35:14-25 |
| | | | 36:11-24 |
| | 36:25-37:12 | R | |
| | | | 37:13-38:13 |
| | 38:14-39:12 | R | |
| | | | 39:13-16 |
| | 39:17-40:1 | R | |
| | | | 40:2-17 |
| | 40:18-42:2 | R | |
| | | | 42:3-15 |
| | 42:16-24 | R | |
| | | | 42:25-43:6 |

| Koller, Michael (01/28/16) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | 43:7-19 | R | |
| | | | 44:7-17 |
| | 44:18-45:23 | R | |
| | 47:17-21 | R | |
| | 48:2-49:16 | R | |
| | 50:12-25 | R | |
| | | | 52:1-17 |
| | | | 53:1-24 |
| | 53:25-54:17 | R | |
| | | | 54:18-55:12 |
| | 55:13-56:2 | R | |
| | | | 56:3-8 |
| | 57:7-58:9 | R | |
| | 58:19-59:3 | R | |
| | | | 59:4-21 |
| | | | 60:11 |
| | 60:12 | R, F | |
| | 60:13-61:10 | R | |
| | | | 61:11-22 |
| | 62:23-63:18 | R | |
| | 63:25-65:3 | R | |
| | 65:12-24 | R | |
| | 66:13-67:23 | R | |
| | 68:12-25 | R | |
| | 68:25-69:2 | R, F | |
| | | | 69:3-4 |
| | | | 70:23-72:9 |
| | 72:10-20 | R | |
| | 73:3-7 | R | |

| \ | \ | \ | \ |
|---|---|---|---|
| **Koller, Michael (01/28/16)** | | | |
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | | | 73:12-20 |
| | 74:2-75:2 | R | |
| | | | 75:3-15 |
| | 75:16-18 | R | |
| | | | 75:19-76:6 |
| | 83:23-84:18 | R | |
| | | | 83:19-97:20 |

| \ | \ | \ | \ |
|---|---|---|---|
| **Leon, Carlos (10/22/15)** | | | |
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 4:24-25; 5:1-25; 6:1-25; 7:1-6; 8:1-18; 10:23-25; 11:1-19; 17:16-25; 18:1-25; 19:1-17; 22:9-15; 38:1-9; 40:5-6; 46:13-25; 47:1-25; 48:1-25; 49:1-20 | | | 10:17-22 |
| | | | 11:20-12:10 |
| | | | 13:3-14:12 |
| | | | 17:5-15 |
| | | | 19:18-20:5 |
| | | | 21:2-11 |
| | | | 22:16-22 |
| | | | 22:23-25:14 |
| | | | 25:15-26:12 |
| | | | 26:22-27:5 |
| | | | 27:6-28:1 |
| | | | 29:5-31:6 |
| | | | 31:18-33:13 |
| | | | 33:16-35:16 |
| | | | 37:2-10 |
| | | | 37:18-25 |
| | | | 38:17-40:10 |

| Leon, Carlos (10/22/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | | | 41:6-42:7 |
| | | | 45:18-46:12 |
| | 46:13-21 | R, IP | |
| | 47:15-20 | F, V, R, IP | |
| | 48:17-49:20 | R | |
| | | | 50:3-51-:1 |

| Nolan, Josh (09/25/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 21:17-24; 32:8-17; 41:24-25; 42:1-17; 44:14-25; 45:17-25; 46:1-3; 47:1-22; 48:5-18; 49:15-25; 50:1-4; 52:21-25; 53:1-25; 54:1-15; 57:8-16; 58:15-25; 59:1-2, 23-25; 60:1-18; 61:25; 62:1-25; 63:1-7, 18-23; 64: 9-19; 65:5-16; 66:12-21; 69:22-25; 70:1-2; 74:2-4; 79:1-14; 80:2-15; 81:4-7; 85:6-12; 87:4-11, 15-19; 90:12-15; 91:16-24; 92:19-25; 93:1-8; 101:16-23; 102:12-20; 104:7-22; 106:12-25; 107:22-25; 108:1-9; 113:7-10; 115:1-7; 117:24-25; 118:1-13; 119:15-20; 120:25; 121:1-13, 15-25; 122:1; 126:13-25; 127:1-4; | 44:14 - 28 | F | 101:9 - 14 |
| | 47:1 – 12 | H | 122:2 - 16 |
| | 47:14 – 22 | R | 133:4 - 5 |
| | 52:21 – 53:6 | R | 171:1 – 172:5 |
| | 61:25 – 63:7 | R | |
| | 69:22 – 70:2 | V | |
| | 81:4 – 7 | R | |
| | 87:4 – 11 | F | |
| | 91:16 – 24 | R | |
| | 133:21 – 25 | R | |
| | 184:18 – 185:2 | R | |
| | 201:17 – 202:4 | R | |
| | 205:19 – 206:5 | V, F | |
| | 206:9 - 12 | IP | |
| | 207:3 – 21 | V, R, F | |
| | 207:22 – 208:11 | V, R, F | |

| Nolan, Josh (09/25/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 131:12-25; 132:1-25; 133:1-3, 21-25; 136:11-25; 137:9-20: 150:1-9; 161:11-25; 162:1-4, 25; 163:1-5; 166:3-25; 167:1-4, 9-13; 168:4-25; 169:1-5; 170:14-21; 175:24-25; 176:1-15; 184:18-25; 185:1-2; 201:17-25; 202:1-25; 203:14-21; 204:8-25: 205:1-25; 206:1-5, 7-17, 19-25; 207:1-25; 208:1-11; 211:4-25 | 211:4 – 25 | R, F | |


| Sanders, William (10/01/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 6:25; 7:1-4; 9:6-25; 10:1-25; 11:1-25; 12:1-25; 13:1-25; 14:1-25; 15:1-25;16:1-25; 17:1-25; 18:1-25; 19:1-5; 68:1-25; 69:1-4, 11-25; 70:1-12 | 9:13-10:22 | R, V | 9:2-5 |
| | 10:23-11:3 | R, F | 35:16-36:2 |
| | 11:5-12:16 | R, V | |
| | 12:18-13:1 | R, V, F, UD | |
| | 13:2-14 | R | |
| | 13:15-14:15 | R, V, F, UD | |
| | 14:16-19:5 | R, | |
| | 68:1-12 | V, F | |
| | 68:13-69:4 | R, V | |
| | 69:11-70:5 | V | |
| | 70:6-10 | V, F | |

| Schultz, Michael (09/29/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 7:8-11; 12:6-8; 15:15-25; 16:1-25; 17:1-25; 18:1-25; 19:1-25; 20:1-25; 21:1-25; 22:1-13; 24:1-25; 25:1-7; 32:16-25; 33:1-25; 34:1-17; 35:1-25; 36:1-25; 37:1-16; 53:1-25; 54:1-25; 55:1-16; 59:19-25; 60:1-25; 61:1-25; 62:1-18; 110:25; 111:1-3; 148:5-25; 149:1-25 | 7:7-11 | NO | 12:6-8 <br> 13:17–14:25 <br> 25:8-16 <br> 31:11 – 19 <br> 32:1 – 32:15 <br> 98:12 – 99:15 <br> 111:5-23 <br> 112:3-113:13 <br> 114:11-17 <br> 127:14-128:18 <br> 135:10-14 <br> 148:1-7 <br> 153:1-154:15 <br> 158:1-164:23 <br> 165:16-166:1 <br> 167:2-9 <br> 168:12-21 <br> 168:23-170:22 <br> 172:12-19 <br> 173:14 – 174:15 <br> 175:3 – 176:4 <br> 176:5-15 <br> 177:13 - 180:11 <br> 185:2 - 195:1 <br> 185:2-195:18 <br> 196:19-198:11 <br> 200:6-24 <br> 206:10-22 <br> 208:1-15 |
| | 12:5-9 | NO | |
| | 15:15 – 22:12 | A, F, H, R, UD, UP, IP, V | |

| Schultz, Michael (09/29/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | 24:2 – 25:7 | A, F, H, R, UP, IP, LW, V | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | 32:16 – 34:17 | F, A, H, R, UD, UP, IP | |
| | | | |
| | | | |
| | | | |
| | 35:3 – 37:16 | F, A, H, R, UD, UP, IP | |
| | 53:1 – 55:16 | V, F, H, R, UP, IP, LW | |
| | 59:19 – 61:24 | V, F, H, R, UP, IP, LW | |
| | | | |
| | | | |
| | | | |
| | 62:1-19 | V, F, H, R, UP, IP, LW | |
| | | | |

| Schultz, Michael (09/29/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | | | |
| | | | |
| | | | |
| | 110:24 – 111:3 | V, F, A, H, R, UD, UP, IP, LW | |
| | | | |
| | | | |
| | 148:6 – 149:24 | V, F, H, UD, UP, IP, LW | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Solms, Walter (10/08/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| 7:5-12; 23:19-25; 24:1-25; 25:1-25; 26:1-25; 27:1-25; 28:1-25; 29:1-25; 30:1-25; 31:1-25; 32:1-20; 37:11-25; 39:12-25; 40:1-25; 41:22-25; 42:1-25; 43:1-25; 44:1-5; 53:12-25; 54:1-25; 55:1-25; 56:1-10; 101:5-13; 102:16-25; 103:1; 104; 7-19; 105:1-21; 251:20-25; 252:1-6 | 7:5-12 | NO | 9:3 – 9:12 |
| | 23:18-25 | NO | 10:7 – 10:28 |
| | 24:1–32:20 | A, F, H, R, UD, UP, IP, V | 18:25 – 19:8 |
| | 37:11-25 | A, F, H, R, UP, IP, LW, V | 37:4-10 |
| | 39:12 – 40:25 | F, A, H, R, UD, UP, IP, V | 44:6 – 44:11 |
| | 41:21 – 44:5 | F, A, H, R, UD, UP, IP | 45:16 – 46:23 |

| | Solms, Walter (10/08/15) | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | 53:12 – 56:10 | V, F, H, R, UP, IP | 49:13-18 |
| | 101:5-13 | F, H, R, UP, IP | 58:4-11 |
| | 102:16 – 103:2 | V, F, H, R, UP, IP | 59:14-17 |
| | 104:7-20 | V, F, A, R, UP, IP, LW | 61:16 – 62:2 |
| | 105:1-22 | V, F, UP, IP, LW | 65:4-20 |
| | 251:19 – 252:6 | V, F, U, R, | 67:15-25 |
| | | | 71:7-13 |
| | | | 73:20 – 74:8 |
| | | | 83:18 – 84:14 |
| | | | 101:14-16 |
| | | | 102:10-15 |
| | | | 121:9 – 123:22 |
| | | | 125:18 – 126:1 |
| | | | 126:25 – 127:15 |
| | | | 127:18 – 128:5 |
| | | | 129:6-12 |
| | | | 135:8 – 138:15 |
| | | | 129:20 – 141:10 |
| | | | 142:7-9 |
| | | | 142:15-25 |
| | | | 143:17 – 145:5 |
| | | | 146:21 – 147:3 |
| | | | 148:10-16 |
| | | | 169:16 – 170:12 |
| | | | 179:2 – 182:11 |
| | | | 182:13 – 183:4 |
| | | | 189:3 – 191:5 |
| | | | 196:8 – 203:23 |

| Solms, Walter (10/08/15) | | | |
|---|---|---|---|
| **DESIGNATIONS** | **DESIGNATION (OBJECTED TO)** | **OBJECTION** | **COUNTER-DESIGNATIONS** |
| | | | 206:24 – 207:3 |
| | | | 209:6 – 209:17 |
| | | | 210:25 – 222:2 |
| | | | 223:11 – 226:3 |
| | | | 227:19 – 228:2 |
| | | | 228:9 – 232:12 |

| | |
|---|---|
| NO | No Objection |
| V | Vague or ambiguous question |
| F | Lack of foundation or calls for speculation |
| A | Authenticity (F.R.E. 901 et seq.) |
| H | Hearsay (F.R.E. 801 et seq.) |
| I | Incomplete Document (F.R.E. 106) |
| LP | Late Production: Failure to produce during discovery pursuant to properly propounded requests (*see* Fed. R. Civ. P. 37(c)(1)) |
| R | Relevance (F.R.E. 402) |
| UD | Document either not produced or not properly identified |
| UP | Undue prejudice / confusion of the issues / misleading / waste of time (F.R.E. 403) |
| IP | Improper Predicate and/or Incomplete Question or Answer in Designation |
| LW | Opinion testimony or Expert Conclusion by a lay witness (F.R.E. 701) |

| BE | Best Evidence Rule (F.R.E. 1001 et. seq.) |
|---|---|
| O | Outside scope of 30(b)(6) Notice or subject to objection |
| S | Compromise Offers and Negotiations (F.R.E. 408) |

## PLAINTIFF'S DEPOSITION DESIGNATIONS AND DEFENDANTS' COUNTER-DESIGNATIONS

| George Gonzalez – October 16, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 10:8 – 10 | | 61:15 – 62:9 |
| 17:21 – 24 | | 64:1 – 10 |
| 20:16 - 18 | | 74:1 – 76:5 |
| 21:13 – 22:12 | | 90:1 – 91:6 |
| 22:15 – 23:17 | | 95:20 – 96:2 |
| 23:23 – 25 | | 157:5 – 25 |
| 24:16 – 25 | | |
| 25:4 – 14 | | |
| 26:7 – 9 | | |
| 27:10 – 28:11 | | |
| 30:6 – 31:2 | | |
| 32:2 – 9 | | |
| 32:20 – 33:23 | | |
| 33:25 – 34:14 | | |
| 35:14 – 16 | | |
| 35:19 – 36:18 | | |
| 36:22 – 37:20 | | |
| 39:23 – 41:2 | | |
| 42:7 – 17 | | |

| George Gonzalez – October 16, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 42:21 – 43:12 | | |
| 43:16 – 44:10 | | |
| 44:18 – 46:11 | | |
| 46:18 – 47:2 | | |
| 47:4 – 7 | | |
| 47:17 – 48:5 | | |
| 48:9 – 25 | | |
| 50:25 – 51:1 | | |
| 51:3 – 7 | | |
| 51:11 – 52:1 | | |
| 52:3 – 4 | | |
| 52:8 – 10 | | |
| 52:14 – 21 | | |
| 52:23 – 54:10 | | |
| 54:19 – 55:8 | | |
| 55:15 – 56:5 | | |
| 56:7 – 22 | | |
| 57:14 - 25 | | |
| 58:4 – 59:2 | | |
| 60:4 – 7 | | |
| 60:9 – 61:7 | | |
| 61:9 – 14 | | |
| 62:12 – 16 | | |
| 62:18 – 63:7 | | |
| 63:12 – 25 | | |
| 64:21 – 24 | | |
| 65:4 – 12 | | |
| 65:16 – 68:5 | | |
| 76:7 – 78:22 | | |

| George Gonzalez – October 16, 2015 | | |
| --- | --- | --- |
| **Designation** | **Objection** | **Counter Designations** |
| 81:21 – 25 | | |
| 82:2 – 84:16 | | |
| 84:24 – 86:3 | | |
| 91:18 – 93:16 | | |
| 97:2 – 10 | | |
| 97:17 – 21 | | |
| 98:4 – 99:8 | | |
| 99:18 – 22 | | |
| 100:6 – 18 | | |
| 101:4 – 8 | | |
| 101:11 – 18 | | |
| 101:20 – 102:6 | | |
| 102:8 – 103:13 | | |
| 103:15 – 21 | | |
| 103:25 – 104:5 | | |
| 105:3 – 106:5 | | |
| 107:21 – 108:11 | | |
| 108:21 – 22 | | |
| 109:8 – 110:2 | | |
| 110:4 – 6 | | |
| 110:12 – 15 | | |
| 110:19 – 113:2 | | |
| 114:16 – 115:2 | | |
| 116:23 – 119:24 | | |
| 120:1 – 121:22 | | |
| 122:18 – 124:4 | | |
| 124:6 – 10 | | |
| 124:17 – 18 | | |
| 125:6 – 126:2 | | |

| George Gonzalez – October 16, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 126:4 – 5 | | |
| 126:7 – 11 | | |
| 126:13 – 16 | | |
| 127:2 – 6 | | |
| 127:12 – 128:23 | | |
| 129:19 – 130:1 | | |
| 130:5 – 8 | | |
| 131:13 – 133:10 | | |
| 133:12 – 16 | | |
| 135:2 – 137:14 | | |
| 137:17 – 23 | | |
| 138:10 – 23 | | |
| 139:1 – 8 | | |
| 139:12 – 140:8 | | |
| 140:19 – 23 | | |
| 141:1 – 24 | | |
| 142:1 – 143:18 | | |
| 144:2 – 14 | | |
| 144:20 – 145:5 | | |
| 147:1 – 6 | | |
| 148:5 – 149:24 | | |
| 152:8 – 20 | | |
| 152:25 – 156:13 | | |
| 157:1 – 4 | | |
| 168:4 – 20 | | |

| Bold Array, LLC / Josh Nolan – September 25, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 8:10 – 13 | | 44:7 – 47:10 |
| 8:16 – 22 | | 49:14 – 50:12 |
| 14:9 – 11 | | 53:7 – 54:19 |
| 18:1 – 8 | | 58:1 – 60:18 |
| 20:7 – 15 | | 63:1 – 23 |
| 21:8 – 10 | | 65:5 – 14 |
| 21:17 – 24 | | 69:22 – 70:2 |
| 22:12 – 25 | | 87:4 – 20 |
| 23:3 – 10 | | 90:12 – 25 |
| 23:12 – 24:13 | | 95:14 – 96:12 |
| 25:2 – 8 | | 101:15 – 22 |
| 25:16 – 26:2 | | 102:12 – 20 |
| 26:13 – 29:14 | | 105:1 – 10 |
| 29:25 – 31:3 | | 115:1 – 7 |
| 31:14 – 32:6 | | 117:24 – 118:11 |
| 39:6 – 40:11 | | 119:15 – 20 |
| 40:22 – 41:17 | | 204:8 – 20 |
| 43:11 – 44:6 | | |
| 50:13 – 51:18 | | |
| 52:14 – 20 | | |
| 56:23 – 57:10 | | |
| 57:18 – 24 | | |
| 64:21 – 65:4 | | |
| 65:15 – 67:11 | | |
| 68:5 – 16 | | |
| 71:20 – 77:22 | | |
| 78:19 – 24 | | |
| 80:16 – 20 | | |
| 81:9 – 83:6 | | |
| 83:16 – 20 | | |

| Bold Array, LLC / Josh Nolan – September 25, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 84:20 – 86:2 | | |
| 86:14 – 87:3 | | |
| 87:21 – 88:6 | | |
| 88:8 – 90:11 | | |
| 91:1 – 4 | | |
| 92:4 – 18 | | |
| 94:7 – 94:18 | | |
| 95:4 – 13 | | |
| 99:9 – 14 | | |
| 99:20 – 100:7 | | |
| 101:8 – 14 | | |
| 101:25 – 102:11 | | |
| 104:7 – 25 | | |
| 105:14 – 106:2 | | |
| 106:19 – 25 | | |
| 107:7 – 18 | | |
| 107:22 – 108:2 | | |
| 108:10 – 14 | | |
| 109:22 – 110:4 | | |
| 110:8 – 111:4 | | |
| 111:9 – 112:4 | | |
| 112:9 – 113:17 | | |
| 118:18 – 119:14 | | |
| 120:4 – 16 | | |
| 122:8 – 16 | | |
| 123:1 – 18 | | |
| 128:7 – 13 | | |
| 129:22 – 130:5 | | |
| 134:4 – 135:9 | | |
| 136:7 – 138:3 | | |

| Bold Array, LLC / Josh Nolan – September 25, 2015 | | |
|---|---|---|
| **Designation** | **Objection** | **Counter Designations** |
| 138:13 – 139:7 | | |
| 139:17 – 25 | | |
| 141:19 – 142:17 | | |
| 143:24 – 144:18 | | |
| 150:1 – 9 | | |
| 150:24 – 152:14 | | |
| 153:19 – 154:17 | | |
| 155:20 – 22 | | |
| 156:3 – 157:8 | | |
| 158:6 – 159:22 | | |
| 160:1 – 25 | | |
| 161:11 – 23 | | |
| 162: 6 – 14 | | |
| 172:16 – 176:1 | | |
| 177:9 – 180:12 | | |
| 181:10 – 182:2 | | |
| 183:20 – 184:3 | | |
| 185:12 – 186:4 | | |
| 186:8 – 187:19 | | |
| 188:2 – 189:12 | | |
| 190:7 – 18 | | |
| 191:24 – 192:14 | | |
| 194:24 – 195:6 | | |
| 195:10 – 197:20 | | |
| 199:23 – 200:18 | | |
| 208:4 – 209:6 | | |
| 209:17 – 210:4 | | |
| 210:25 – 211:3 | | |
| 212:7 – 22 | | |

1           BEFORE THE UNITED STATES DISTRICT COURT
2              FOR THE MIDDLE DISTRICT OF FLORIDA
3
4      _____
                                     )
5      BARN LIGHT ELECTRIC COMPANY,  )
       LLC, a Florida Limited        )
6      Liability Company,            )
                                     )
7              Plaintiff,            )
                                     )
8         vs.                        ) No. 8:14-CV-1955-T-35AEP
                                     )
9      BARNLIGHT ORIGINALS, INC., a  )
       Nevada corporation; and       )
10     HI-LITE MANUFACTURING         )
       COMPANY, INC., a Nevada       )
11     corporation; JEFFREY L. OHAI, )
       an individual California      )
12     resident,                     )
                                     )
13             Defendants.           )
       _____)
14
15
16               DEPOSITION OF GEORGE GONZALEZ
17               Rancho Cucamonga, California
18                Friday, October 16, 2015
19                       Volume I
20
21
22     Reported by:
       VALERIE D. GRANILLO
23     CSR No. 11469
       Job No. 2152419
24
25

1  around it.

2      A    Yes, sir.

3      Q    Okay.  That's in your copy as well?

4      A    Yes, sir.

5      Q    Okay.  Was Mr. McAdam forwarding you text from

6  the Barn Light Electric Web site in which Barnlight

7  Original had been placed where Barn Light Electric used

8  to appear?

9           MR. ANDERSON:  Object to the form.

10          THE WITNESS:  I'm not sure, sir.

11 BY MR. HILLYER:

12     Q    Could this be an example of Barnlight

13 Originals using product descriptions from Barn Light

14 Electric for Barnlight Originals?

15          MR. ANDERSON:  Object to the form.

16          THE WITNESS:  No, sir.

17 BY MR. HILLYER:

18     Q    Why do you say that when you said you don't

19 remember what it is?

20     A    I think -- I think that -- I think that this

21 e-mail was when David was trying to show me that Barn

22 Light Electric started using the Barnlight Original

23 variation of Barnlight Originals' name in their

24 descriptions, I think.  Again, I'm not really 100

25 percent sure on the premise of what this was all about.

IN THE UNITED STATED DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____

BARN LIGHT ELECTRIC COMPANY,
LLC, a Florida limited
liability company,

      Plaintiff,                  CASE NO.
                                8:14-CV-1955-T-35AEP

v.


BARNLIGHT ORIGINALS, INC., a
Nevada corporation; and HI-LITE
MANUFACTURING COMPANY, INC., a
California corporation; and
JEFFREY L. OHAI, an individual
California Resident

      Defendants.
-----------------------------/

BARNLIGHT ORIGINALS, INC., a
Nevada corporation; and HI-LITE
MANUFACTURING COMPANY, INC., a
California corporation,

      Counterclaim Plaintiffs,

v.


BARN LIGHT ELECTRIC COMPANY,
LLC, a Florida limited
liability company,

and

BRYAN AND DONNA SCOTT,
individual Florida Residents,

      Third-Party Defendants.
-----------------------------/

DEPOSITION OF: MICHAEL STEVEN KOLLER

1    minor in math.

2         Q.    Where did you go to school?

3         A.    Rollins College.

4         Q.    Do you have any particular training in

5    electronically stored information?

6         A.    Just from the college degree and years of work

7    experience.

8         Q.    Okay.  In the context of litigation, whenever

9    there's a -- a case that's coming up, the parties

10   exchange preservation letters.  Do you know what that

11   term means?

12        A.    Yes.

13        Q.    Okay.  What does that term mean to you?

14        A.    It means basically don't destroy any data.

15        Q.    Okay.  Have you heard the term "litigation

16   hold letter"?

17        A.    I don't believe so, no.

18        Q.    Okay.  Do you recall, as director of IT,

19   having received a litigation hold letter in connection

20   with this case?

21        A.    No.

22              MR. STEIN:  Court reporter, let's mark this

23        exhibit as Koller Exhibit 1.

24              (Thereupon, Exhibit Number 1 was marked for

25   purposes of identification.)

58f91224-f096-4655-831d-3368570e9f96

1    BY MR. STEIN:

2         Q.    Mr. Koller I'm going to hand you what's been

3    marked Koller Exhibit 1.  Could you flip through that

4    letter dated October 30th, 2014, and then I'll ask you

5    some questions.

6                Okay.  Are you finished reading it?

7         A.    Yes.

8         Q.    Okay.  Have you seen that letter before today?

9         A.    I have not.

10        Q.    Okay.  Do you recognize it as a form as an ASI

11   preservation letter?

12        A.    I'm not sure I understand your question.

13        Q.    Have you seen letters of that nature and -- in

14   -- in previous instances or lawsuits that you may have

15   been involved in?

16        A.    No.

17        Q.    No.

18                And in connection with the lawsuit with

19   Michael Schultz, you don't recall receiving a

20   preservation letter of that type in connection with that

21   lawsuit?

22        A.    No.

23        Q.    In connection with the litigation involving

24   Walter Solms.  Do you recall receiving a preservation

25   letter in connection with his litigation?

1       A.      No.

2       Q.      Have you ever seen a letter that's of the type

3   that we would call a preservation letter?

4       A.      I have not.

5       Q.      Okay.  Do you have any experience, since

6   graduating from college, in what is required to preserve

7   electronically stored information?

8       A.      Yes.

9       Q.      What -- what is that experience?

10      A.      I worked for a company called Beckman Coulter,

11  who does biomedical devices, so they have to follow HIPAA

12  rules.

13      Q.      Is that all?

14      A.      I worked for Westinghouse for a number of

15  years and maintained their data storage devices for every

16  drawing of every device that Westinghouse has ever

17  created.

18      Q.      From a corporate standpoint but not from a

19  litigation standpoint?

20      A.      Correct.

21      Q.      Okay.  The -- the HIPAA requirements for

22  Beckman Coulter -- those requirements weren't in

23  connection with the litigation, were they?

24              MR. SOZZANI:  Objection to form.

25      Q.      You still have to answer the question.

58f91224-f096-4655-831d-3368570e9f96

1    reporter as follows:

2         "Question:  Were you involved in the

3    collection of electronically stored information in

4    connection with the Solms case or the Schultz case?")

5         MR. SOZZANI:  I'm going to instruct my -- my

6         client to not divulge the substance of any

7         communications that you've had with counsel.  That

8         would include directions you received from counsel.

9    BY MR. STEIN:

10        Q.    What's your answer?

11        A.    What was the question?

12             MR. STEIN:  Can you read back my question

13        again?

14             (The pending question was read back by the

15   reporter as follows:

16             "Question:  Were you involved in the

17   collection of electronically stored information in

18   connection with the Solms case or the Schultz case?")

19        A.    Not to my knowledge.

20        Q.    Other than what you testified to about Beckman

21   Coulter and Westinghouse, have you had any experience in

22   the collection of electronically stored information in --

23   in connection with a litigation matter?

24        A.    Not to my knowledge.

25        Q.    Have you had any experience with regard to the

58f91224-f096-4655-831d-3368570e9f96

1    preservation -- not just the collection, but the

2    preservation of electronic -- electronically stored

3    information in connection with a litigation matter?

4         A.    No.

5         Q.    Who was your predecessor at BLE?

6         A.    There was a former IT employee.  Jessie was

7    his first name.  I don't recall his last name.

8         Q.    Okay.  Jessie Lee Stinger?

9         A.    That could be it.

10        Q.    Okay.  Is it Stinger or Stringer?

11        A.    I'm not sure.

12        Q.    Okay.

13        A.    I just called him Jessie.

14        Q.    Was he here in the United States?

15        A.    He was, yes.

16        Q.    Was he working for Barn Light Electric?

17        A.    Yes.

18        Q.    Okay.  What was his title?

19        A.    I'm not -- I -- I don't know.

20        Q.    And is he still with the company?

21        A.    Not to my knowledge.

22        Q.    Okay.  Do you know when he ceased being

23   employed by Barn Light Electric?

24        A.    No.

25        Q.    Was it contemporaneous from when you started?

58f91224-f096-4655-831d-3368570e9f96

1      A.    Yes.

2      Q.    Okay.  Are any of your other clients involved

3   with the lighting industry?

4      A.    No.

5      Q.    Okay.  Are any of your other clients involved

6   with Barn Light USA, Inc., Barn Light Electric Company?

7      A.    No.

8      Q.    Okay.  What is it, generally, that you do for

9   your other clients?

10     A.    IT operations.

11     Q.    Okay.  If I asked you my questions about your

12  past experience in the preservation and collection of

13  ESI -- have you had any experience with regard to your

14  other clients in the collection or preservation of ESI?

15     A.    No.

16     Q.    Okay.  Jessie Lee Stinger or Stringer.  When

17  did you last meet him?

18     A.    I don't recall.

19     Q.    Recently?

20     A.    I don't recall.

21     Q.    What was the reason that you met him?

22     A.    He was working for Barn Light Electric when I

23  was brought on.

24     Q.    Okay.  Is that the only time that you met him?

25     A.    Yes.

1    Q.    Okay.  Just the one time?

2    A.    No.  I mean, we worked together.

3    Q.    Okay.  How often would he come to the United

4    States?

5    A.    My interaction with him was while he was in

6    the States.

7    Q.    Okay.  When did he leave the States?

8    A.    I don't recall.

9    Q.    Okay.  Well, Barn Light Electric Australia.

10   Do you know when it was created?

11   A.    I do not.

12   Q.    Do you recall it being around 2012?

13   A.    I don't recall.

14   Q.    What is your understanding as to the

15   connection between Barn Light Electric in the United

16   States and Barn Light Electric in Australia?

17   A.    I don't know.

18   Q.    Well, we'll get into this more later, but

19   is -- is Mr. Stinger or Stringer -- does he have an

20   e-mail address, BarnLightElectric.com?

21   A.    I -- I don't know.

22   Q.    Okay.  Why don't you know?

23   A.    I haven't looked at the e-mail server use --

24   list of user accounts --

25   Q.    Okay.

1      A.     -- in recent time.

2      Q.     How many users are there?

3      A.     I don't know.

4      Q.     Hundreds?

5      A.     I would say less than that.

6      Q.     Less than a hundred, more than 50?

7      A.     I don't know.  I would say less than hundreds.

8      Q.     Okay.  Would you say less than a hundred?

9             MR. SOZZANI:  Asked and answered.

10     Q.     You still have to answer.

11     A.     I don't know.

12     Q.     Okay.  So sitting here today you don't know if

13  there's more or less than a hundred e-mail accounts on

14  the Barn Light Electric server?

15            MR. SOZZANI:  Objection.  Form.  Asked and

16     answered.

17     Q.     Is that correct?

18     A.     That's correct.

19     Q.     Are you familiar with the architecture of Barn

20  Light Electric's computer systems?

21     A.     Yes.

22     Q.     Okay.  Can you describe it to me?

23     A.     We have an internal infrastructure, and we

24  have an external infrastructure.

25     Q.     Okay.  Let's start with the internal.

58f91224-f096-4655-831d-3368570e9f96

1      Q.    ShoreTel, S-H --

2      A.    -- O-R-E-T-E-L.

3      Q.    And is that a brand name?

4      A.    Yes.

5      Q.    Okay.  What -- what's the name of the company

6 that manufacturers that?

7      A.    ShoreTel.

8      Q.    Oh, it is?

9      A.    Yeah.

10     Q.    Okay.  And what kind of phone system server is

11 it?

12     A.    It's an IP phone system.

13     Q.    Okay.  And incoming voicemail would be stored

14 on the phone system server?

15     A.    That's correct.

16     Q.    Okay.  And the other one, the file server,

17 what -- what software is running on it?

18     A.    It's a Linux operating system, so it's UNIX.

19 And it's running just open source software that comes

20 with the version of Linux that we have on there, which is

21 CentOS.

22     Q.    Okay.  And you're using it as a file server?

23     A.    Correct.

24     Q.    Okay.  How is that set up?

25     A.    There's two storage directories on there.  One

58f91224-f096-4655-831d-3368570e9f96

1   is home directories for users --

2       Q.   Uh-huh.

3       A.   -- and the other one is a shared folder for

4   users to use to exchange files.

5       Q.   Every user has their own directory?

6       A.   Every user has their home directory, but it's

7   not necessarily mounted to their desktop.

8       Q.   Okay.  You would be the one to mount the

9   drives?

10       A.   Correct.

11       Q.   Okay.  What are the access permissions

12   between -- or among the home user directories?

13       A.   They're protected by a user ID, so only that

14   user has access to that home directory.  There is no

15   sharing between those directories.

16       Q.   Okay.  Except for you, if you had root access?

17       A.   I'm the only one that has root access.

18       Q.   Okay.  Who is your backup when you're not in

19   the office?

20       A.   Don't have one.

21       Q.   Okay.  So you have the root password?

22       A.   Yes.

23       Q.   Okay.  The -- the users have access to the

24   shared folder, I take it?

25       A.   They have access to specific directories

58f91224-f096-4655-831d-3368570e9f96

1   within the shared folder.

2       Q.      Okay.  And you -- you set up those

3   permissions?

4       A.      Yes.

5       Q.      Okay.  And what exists externally?

6       A.      We're using a data center located in Orlando.

7       Q.      What's the name of the data center?

8       A.      It's Colo Solutions.

9       Q.      C-O --

10      A.      -- L-O, Solutions.

11      Q.      Okay.

12      A.      And in there we have, I would say, six

13  servers.

14      Q.      Okay.

15      A.      And housed there is our website -- external

16  website, our e-mail server, and other various websites.

17  So we have our e-commerce website, and then we have other

18  websites.

19      Q.      What are the other websites?

20      A.      We have a knowledge base that contains

21  documents for customers, and we have a blog website.

22      Q.      And what does the log website do?

23      A.      It's blog, B-L-O-G.

24      Q.      Blog.  I'm sorry.  Okay.

25      A.      And it houses various marketing articles.

58f91224-f096-4655-831d-3368570e9f96

1    A.    Yes.

2    Q.    Where was the mail server housed before you

3    set up the data center?

4    A.    External vendor.

5    Q.    Okay.  And who was that?

6    A.    I don't recall.

7    Q.    Was it a company like Google mail, or was it

8    actually a vendor?

9          MR. SOZZANI:  Object to form.

10         MR. STEIN:  That didn't sound right.

11   BY MR. STEIN:

12   Q.    Was it a e-mail server like Gmail or Yahoo or

13   AOL, or was it typically a private company smaller in

14   operation that would run their own e-mail server?

15         MR. SOZZANI:  Objection to form.

16   A.    Smaller.

17   Q.    Okay.  You don't know who that was?

18   A.    I don't recall.

19   Q.    Okay.  Did you migrate all the data from the

20   external vendor to the data center --

21   A.    No.

22   Q.    -- when you went live?

23         Why not?

24   A.    I didn't have access to that data.

25   Q.    Why not?

1      A.    The vendor would not grant us access to their

2   infrastructure.

3      Q.    So Barn Light Electric was a customer of this

4   vendor, and the vendor would not release the data?

5      A.    Correct.

6      Q.    Why not?

7      A.    I don't know.

8      Q.    So when you went live in the data center, was

9   that just the e-mail going forward?

10     A.    It was empty e-mail accounts going forward.

11     Q.    Okay.  Well, we have e-mail traffic in

12   connection with this case that was produced.  Do you know

13   what was produced in this case?

14     A.    I do not.

15     Q.    Okay.  We'll get into that in a few minutes;

16   okay?

17           Are there any other servers other than ones

18   that you have identified?

19     A.    No.

20           Let me rephrase that.  There is another one.

21     Q.    Okay.

22     A.    We had previously talked about the internal

23   servers at the sales building.  There are servers at the

24   manufacturing facility.

25     Q.    Okay.  And which ones are those?

58f91224-f096-4655-831d-3368570e9f96

1    A.    We have the production Navision server.

2    Q.    And?

3    A.    A SOLIDWORKS server.

4    Q.    Okay.

5    A.    That's it.

6    Q.    Is the SOLIDWORKS server the one you refer to

7  internally as "the vault"?

8    A.    Correct.

9    Q.    Okay.  Were you director of IT when the vault

10  was in the possession of Bay Area Innovations and it was

11  switched over to Barn Light Electric?

12          MR. SOZZANI:  Objection.  Form.

13    A.    I -- I installed the SOLIDWORKS software and

14  created the vault.

15    Q.    Okay.  And whose vault was it?  Was it --

16    A.    It's Barn Light's, Barn Light Electric.

17    Q.    Okay.  Wasn't it, at one point, originally Bay

18  Area Innovations?

19    A.    No.

20    Q.    Okay.  We'll get back to that in a second.

21          Have you heard the term "request for

22  production of documents"?

23    A.    I don't know.

24    Q.    Okay.  You don't know what that term means?

25    A.    I don't know if -- I don't recall ever hearing

58f91224-f096-4655-831d-3368570e9f96

1    it.

2         Q.    Okay.  Well, are you aware that in the context

3    of litigation that one side asks the other side for

4    documents?

5         A.    I'm not familiar with that.

6         Q.    Okay.  Well, the -- the -- the mechanism --

7    one mechanism for doing that is for the one side to send

8    the other side a request for production of documents in

9    the form of a pleading, which I'm going to show you.

10   You're not familiar with that?

11        A.    No.

12        Q.    Okay.

13              MR. STEIN:  Court reporter, we're going to

14        mark these as 2, 3, 4, and 5.

15              (Thereupon, Exhibit Numbers 2, 3, 4, and 5

16   were marked for purposes of identification.)

17   BY MR. STEIN:

18        Q.    Mr. Koller I'm going to hand you what's been

19   marked as Exhibits -- Koller Exhibits 2, 3, 4, and 5,

20   which are counterclaim plaintiff's, which is us, first

21   request for production of documents, second request for

22   production of documents, third request, and fourth

23   request.

24              I don't expect you to read those, but have you

25   ever seen those documents before?

58f91224-f096-4655-831d-3368570e9f96

1  A. No.

2  Q. Okay.  If you look at Exhibit 2, for starters,

3 the first number of pages are a bunch of definitions and

4 instructions.  But if you start at page 6, you see where

5 it says "documents and things to be produced"?

6  A. Yes.

7  Q. Okay.  Number 1, "All documents evidencing any

8 communication between you and" -- so-and-so.  Okay.  Have

9 you ever seen language like that where the other side in

10 litigation is asking your company to produce documents?

11  A. I have not.

12  Q. Okay.  Could you flip through all four of

13 those, first, second, third, fourth requests, to see if

14 there's any language that maybe refleshes -- refreshes

15 your recollection?

16  A. For Exhibit 2 I do recall seeing Exhibit A.

17  Q. Okay.  In what context do you recall having

18 been shown Exhibit A?

19  A. I believe it was a PDF document.

20  Q. Okay.

21  A. It was either a PDF or a screen shot that I

22 was shown these fixtures.

23  Q. Okay.  And why were you being shown?

24   MR. SOZZANI:  I'm going to caution the witness

25  not to divulge the substance of any conversations

1    discussed, was there anything about the other -- the four

2    requests for production of documents that you wanted to

3    comment on?

4        A.    Page 6 of Exhibit 3.

5        Q.    Uh-huh.

6        A.    A through F.

7        Q.    Yes.

8        A.    Number 12 --

9        Q.    Uh-huh.

10       A.    -- looks familiar.

11       Q.    Okay.  That's it?

12       A.    Yes.

13       Q.    Okay.  Now, were you the person who was, on

14   behalf of Barn Light Electric, charged with the task of

15   producing documents, gathering documents together?

16            MR. SOZZANI:  Objection.  Form.  Compound

17       question.

18            You can answer if you understand.

19       A.    There was data that was requested for me to

20   provide.

21       Q.    Okay.  What was requested?

22       A.    Copy of our e-commerce database, QuickBooks

23   database, hard drive images, copies of home directory,

24   copies of e-mail.  That's it.

25       Q.    Okay.  Why -- do you know why they were asking

58f91224-f096-4655-831d-3368570e9f96

1   for that information to be collected?

2       A.    Lawsuit.

3       Q.    Okay.  Let's go over each of those that you

4   mentioned.  Were there any other documents?

5       A.    No.

6       Q.    Okay.  Okay.  When you say the e-commerce

7   data, that's vis-a-vis the website?

8       A.    Right.

9       Q.    And you produced all of it?

10      A.    I produced all of it to a company called Iris.

11      Q.    Uh-huh.

12      A.    Who submitted the question -- request to me.

13      Q.    Okay.

14      A.    So the website lives in a file structure.  I

15  provided a copy of the entire file structure and

16  database.

17      Q.    Okay.  So you had the entire directory

18  structure?

19      A.    Yes.

20      Q.    And all the content?

21      A.    Yes.

22      Q.    And you provided that to Iris?

23      A.    Correct.

24      Q.    Do you know who at Iris you dealt with?

25      A.    I believe his name was Greg.

1     Q.    Do you know when?

2     A.    I do not.

3     Q.    Was there one occasion or more than one

4 occasion that you did this?

5     A.    For the e-commerce site?

6     Q.    Uh-huh.

7     A.    I believe one occasion.

8     Q.    Do you know when that was, in connection with

9 this lawsuit?

10    A.    I do not.

11    Q.    Okay.  QuickBooks.  What did you do with

12 regard to QuickBooks?

13    A.    Exported a complete backup.

14    Q.    And?

15    A.    That's it.

16    Q.    Gave it to Iris?

17    A.    Yes.

18    Q.    Same -- Greg?

19    A.    Yeah.

20    Q.    Same person?

21    A.    Right.

22    Q.    Your hard disc -- you don't know Greg's last

23 name?

24    A.    I do not.

25    Q.    Okay.  When you say the hard drive images,

1    they were images of which hard drives?

2         A.    Copy of Donna Scott's desktop and a copy of

3    Bryan Scott's desktop.

4         Q.    Any other -- any others?

5         A.    I believe there was Katie Schilling and Anna

6    Williams.

7         Q.    All right.  Any others?

8         A.    That's it.

9         Q.    Okay.  And it was just their desktop?

10        A.    Correct.

11        Q.    Why was it limited to their desktop?

12        A.    That's -- that was what I was requested.

13        Q.    Okay.  Desktop -- just so we're clear on that,

14   you're talking about on their C drive on their office

15   computer, the desktop directory?

16        A.    Well, they have Apple Macintosh, so...

17        Q.    Oh, okay.

18        A.    It wouldn't be C colon, but it was a complete

19   copy, sector by sector, of the hard drive.

20        Q.    Of the?

21        A.    Desktop.

22        Q.    Okay.  How -- how are you using the word

23   "desktop" in connection with the Mac?

24        A.    The hard drive that resides inside the

25   Macintosh computer.

1     Q.    Okay.  And that was a bit-by-bit copy?

2     A.    Correct.

3     Q.    Okay.  Did they give you a drive to plug in to

4  make that with?

5     A.    No.

6     Q.    Okay.  How did you do it?

7     A.    We provided the drive.

8     Q.    You pulled the drive out?

9     A.    No.  We bought external hard drives, and I

10  made an image of that drive and copied that drive.

11     Q.    On the external -- you sent the externals to

12  the Iris company?

13     A.    Yes.

14     Q.    Okay.  Okay.  And then I think you said home

15  directory?

16     A.    Right.  Which would be on the file server, the

17  internal file server.  If there was any content in the

18  directories of those four people, then we would have made

19  a copy of the entire directory structure for those user

20  home directories.

21     Q.    For their home directories that would have

22  been on the Linux system?

23     A.    Correct.

24     Q.    Okay.  What about the shared folder?

25     A.    No.

58f91224-f096-4655-831d-3368570e9f96

1      Q.    You didn't provide anything on the shared

2   folder?

3      A.    I don't recall.

4      Q.    Okay.  And the e-mail server -- the e-mail

5   copy?

6      A.    Right.  So the e-mails reside on the file

7   system of the e-mail server, and it was a copy of the

8   e-mail directory for those users.

9      Q.    Okay.  Just those users?

10     A.    To my knowledge.

11     Q.    Okay.  And did you export that data?

12     A.    Yes.

13     Q.    Okay.  In what format?

14     A.    Tarfile.

15     Q.    And you gave that to Iris also?

16     A.    Correct.

17     Q.    Did you export any data or provide any data

18   from the -- from the manufacturing server, either the

19   SOLIDWORKS server or the production server?

20     A.    I don't recall.

21     Q.    Did you export and provide to Iris any data

22   from the phone system?

23     A.    I don't recall.

24     Q.    Did you provide any data to the sandbox

25   server?

 1       A.    No.

 2       Q.    Okay.  Did you provide any -- did you provide

 3  Iris with a copy of the e-commerce website?

 4       A.    Yes.

 5       Q.    Okay.  As opposed to the data?

 6       A.    I'm not sure I understand your question.

 7       Q.    Okay.  The -- the -- the website is a bunch of

 8  HTML files?

 9       A.    Right.

10       Q.    Okay.  And then you have a bunch of back-end

11  data that you store?

12       A.    Correct.  So I provided a copy of the file

13  structure, the entire e-commerce site, which would be the

14  HTML files, and a dump of the database.

15       Q.    Okay.  Which would have been the back-end data

16  itself?

17       A.    Yes.

18       Q.    Okay.  You did not provide any data from the

19  e-mail server other than for the individuals that you

20  identified?

21       A.    To my knowledge.

22             MR. SOZZANI:  Objection to the last question.

23       Form.

24       Q.    And you didn't provide any data to Iris with

25  regard to the knowledge database?

1             MR. SOZZANI:  Objection.  Form.

2       A.    I don't recall.

3       Q.    Okay.  Did you provide any data from the blog

4  website?

5       A.    I don't recall.

6       Q.    Do you have a counterpart at the company?

7       A.    I have a employee that works underneath me.

8       Q.    Okay.  What's that person's name?

9       A.    Currently?  His name is Brandon.

10      Q.    Brandon?

11      A.    Yes.

12      Q.    Like Brandon over here?  B-R-A-N-D-O-N?

13      A.    Yes.

14      Q.    Okay.  And before Brandon who did you have?

15      A.    His first name was Joe.

16      Q.    All right.  Would Joe or Brandon have gathered

17  data without -- without informing you?

18      A.    I don't know.

19      Q.    And I'm saying in connection with this case.

20      A.    Well, the only access they have would have

21  been desktop.

22      Q.    Okay.  They don't have the root password or

23  anything?

24      A.    No.

25      Q.    Okay.

```
 1        A.    They don't have user access.  They don't have
 2   any access to the servers.
 3        Q.    Okay.  Can you estimate the size of the pieces
 4   of data that you gave to Iris --
 5              MR. SOZZANI:  Objection.
 6        Q.    -- like the e-commerce data?
 7              MR. SOZZANI:  Objection.  Form.
 8        A.    I don't know.
 9        Q.    A gigabyte?  A hundred gigabytes?
10        A.    I don't know.
11        Q.    You can't make a guess?
12              MR. SOZZANI:  Objection to form.  Asked and
13        answered.
14        A.    I copied the directory as requested.  I copied
15   it to an external drive.
16        Q.    Okay.  Well, the -- the SOLIDWORKS server --
17   in manufacturing, isn't that where all of the SOLIDWORKS
18   renderings are kept?
19        A.    Yes.
20        Q.    Okay.  Would they be kept anywhere else?
21        A.    I don't know.
22        Q.    Are you aware of them being kept anywhere
23   else -- stored anywhere else?
24        A.    No.
25        Q.    The company's policy would be that if you had
```

58f91224-f096-4655-831d-3368570e9f96

1    a -- a SOLIDWORKS drawing of a rendering, that it should

2    be stored on the SOLIDWORKS server --

3             MR. SOZZANI:  Objection.  Assumes facts that

4        are not in evidence.

5        Q.    -- correct?

6        A.    I don't know.

7        Q.    You're -- you're able to identify a SOLIDWORKS

8    file; right?

9        A.    No.

10       Q.    By the extension?

11       A.    I don't know what the extension is.

12       Q.    Okay.  Well, what is the purpose of a

13   SOLIDWORKS server?

14       A.    It houses a piece of software called the

15   vault, that users put files into.

16       Q.    Okay.  Drawing files; correct?

17       A.    I believe so.

18       Q.    Okay.  Is that what the server is for?

19       A.    Yes.

20       Q.    So someone may have a drawing squirrelled away

21   on their desktop, but it should be stored on the

22   SOLIDWORKS server; correct?

23             MR. SOZZANI:  Objection.  Form.

24       A.    I don't know.

25       Q.    Well, as -- as director of IT, would you not

58f91224-f096-4655-831d-3368570e9f96

1   expect the employees of the company to store drawings

2   where they're supposed to be stored?

3           MR. SOZZANI:  Objection.  Form.

4       A.    I don't know.

5       Q.    You don't know?

6       A.    I don't know.

7       Q.    Okay.  Does the company have any policy about

8   IT operations?

9       A.    We have policies in the employee handbook.

10      Q.    Okay.  And what does the employee handbook say

11  about where they can keep documents?

12      A.    I -- it doesn't specify where to keep them.

13      Q.    Okay.  So what is mentioned in the employee

14  handbook about IT operations?

15      A.    Things like they can't use external services,

16  they can't connect up personal devices, can't spend time

17  on the desktop doing personal things.

18      Q.    Okay.  Does the company or any employee of the

19  company, to your knowledge, use any cloud services like

20  Box or Dropbox or OneDrive, Google Drive, or anything of

21  that nature?

22      A.    I don't know.

23      Q.    You're not personally aware of anyone using

24  outside cloud services like that?

25      A.    I --

1          MR. SOZZANI:  Objection.  Form.

2     A.    I'm not aware.

3     Q.    Okay.  Are you aware of any employees of the

4  company that are using or have used external e-mail

5  servers like Gmail for company business?

6     A.    I -- I don't know.

7     Q.    You're not aware of any?

8     A.    I'm not.

9     Q.    Okay.  Do you know what Iris did with the data

10 that you did give them?

11    A.    I don't know.

12    Q.    Okay.  Have you been tasked with -- other than

13 that one instance when you provided the data, have you

14 since been tasked with -- to maybe go back and look for

15 some more data?

16         MR. SOZZANI:  Objection.  I'm going to caution

17    the witness not to divulge any communications with

18    counsel or with an expert witness in the presence of

19    counsel.

20         You can answer the question yes or no.

21    A.    To Iris?  No.

22    Q.    To anyone else?

23    A.    Counsel.

24    Q.    The invoices that would be stored on your

25 system for purchases made between Barn Light Electric and

1      Q.    Now, did you -- did you provide any of the ERP

2 accounting inventory data to Iris?

3      A.    I don't recall.

4      Q.    You provided the QuickBooks but not the ERP

5 accounting?

6           MR. SOZZANI:   Objection.

7      A.    I don't --

8           MR. SOZZANI:   Form.

9      A.    I don't recall on the ERP side.

10      Q.    Okay.   You don't know which one would be

11 geared towards storing the invoices, QuickBooks -- if you

12 had to choose QuickBooks or the ERP?

13      A.    I don't know.   I don't work in purchasing.

14      Q.    Who -- who would be in charge of that?

15           MR. SOZZANI:   Objection.   Form.

16      A.    I don't know.

17      Q.    Okay.   Can you -- do you recall, in connection

18 with this case, having received a list of keywords for

19 the purpose of using those keywords to search for

20 documents?

21      A.    No.

22           MR. STEIN:   Let's mark this as Exhibit 6.

23           (Thereupon, Exhibit Number 6 was marked for

24 purposes of identification.)

25

1   BY MR. STEIN:

2       Q.   I'm going to hand you Exhibit 6, which is an

3   e-mail dated March 24th, 2015.

4            (Document tendered.)

5            Do you recall receiving a -- a list of

6   keywords of this nature?

7       A.   No.

8       Q.   Now, you're the only one that had root access,

9   so would there be anyone else in the company that would

10  have had the permission -- the access permission to do a

11  global search for these words?

12      A.   I don't know.

13      Q.   What do you mean you don't know?

14      A.   I -- as I stated earlier, I'm the only one

15  that has access to the servers on a root level.

16      Q.   Right.  So you're the only one that could have

17  done a global search?

18      A.   On the internal servers.

19      Q.   Which you did not do?

20      A.   I don't -- I provided the data that was

21  requested of me.

22      Q.   But -- but you did not search for these key

23  terms?

24      A.   I did not.

25      Q.   And the only -- the only one in the company

1  that would have had permission, from the standpoint of

2  being able to do that across the servers, would have been

3  you?

4       A.    On a root level, yes.

5       Q.    Okay.  Are you alluding to any other level

6  that that might be possible?

7       A.    There's a user level, as I stated earlier.  We

8  did have a set of shared drives.  Someone could have done

9  a directory search on the level of access they had to the

10  shared drive.

11       Q.    But whatever that level would have been, it

12  would have been, in some regards, limited; correct?

13       A.    Yes.

14       Q.    Because the only user that had root access was

15  you, and you didn't do the search?

16       A.    Yes.

17            MR. STEIN:  Okay.  What number were we on?

18            THE COURT REPORTER:  That was 6.  7 is next

19       one.

20            MR. STEIN:  Let's go to 7.

21            If you could mark this one as -- in fact, to

22       speed things along, if you could just mark these

23       separately as, you know, Exhibits 7, 8, 9, 10,

24       et cetera.

25            (Off the record from 2:16 p.m. to 2:19 p.m.)

1          (Thereupon, Exhibit Numbers 7 through 23 were

2     marked for purposes of identification.)

3               MR. SOZZANI:  Before you present that, I just

4          want to make sure that we don't have anything that

5          is confidential.  These all appear to be marked as

6          BAI documents and are highly confidential attorneys'

7          eyes only documents.  It would not be proper for a

8          Barn Light Electric employee to view pursuant to the

9          protective order in the case, Counsel.

10              MR. STEIN:  We'll come back to that in a

11         second.

12    BY MR. STEIN:

13         Q.    Mr. Koller, when you identified the

14    individuals for whom you searched documents from, you

15    didn't include yourself, did you?

16         A.    I didn't search documents.

17         Q.    Let me rephrase that question.

18               When you produced the data in connection with

19    the individuals that you previously identified, Katie,

20    Anna, Bryan, Donna, whatever they were on the record, you

21    didn't include yourself, did you?

22         A.    I don't recall being requested for access to

23    my data.

24         Q.    So no, you did not produce any?

25         A.    I don't recall.

1    Q.    Okay.  And his hard drive that was repurposed,

2  what was the interval between the time that you looked at

3  it to see if there was anything on there that you would

4  want versus when it was repurposed?

5    A.    I don't know.

6    Q.    Was it months?

7    A.    I don't know.

8    Q.    Years?

9    A.    I don't know.

10    Q.    Well, how do you know it was repurposed?

11    A.    It's going to sit on a specific shelf in my

12  office until somebody requests a system.  It's taken off

13  the shelf, the next one in line, and given to that

14  employee.

15    Q.    Okay.  You didn't have any way of tracking

16  that particular hard drive?

17    A.    No.

18    Q.    Okay.  I may have asked you already, but do

19  you recall, in connection with the Schultz litigation --

20  you didn't know about the litigation, but did anybody

21  ever tell you to preserve his hard drive?

22    A.    No.

23    Q.    Okay.  And it was not preserved; correct?

24    A.    Not to my knowledge.

25    Q.    Okay.  Do you know of anybody who took an

58f91224-f096-4655-831d-3368570e9f96

1    image of that drive?

2        A.    No.

3        Q.    Okay.  Now, his e-mails that would have been

4    on that drive would have also been on the server;

5    correct?

6        A.    Not necessarily.

7        Q.    Why not?

8        A.    He could be using POP, which pulls them off of

9    the server and copies them local.

10       Q.    Well, does he use POP?

11       A.    He could have.

12       Q.    But was he?

13       A.    I don't know.

14       Q.    Did you check?

15       A.    Not to my knowledge.

16       Q.    You don't know what he was using?

17       A.    I do not.

18       Q.    Was he using -- what's the other one, M-A-P-I?

19       A.    There's only two, so he was either using POP

20    or IMAP.

21       Q.    Yeah, IMAP.  You don't know which one?

22       A.    I don't.

23       Q.    You don't know if he was either -- if he was

24    using either one, do you?

25       A.    Well, he would have to be using one of them.

58f91224-f096-4655-831d-3368570e9f96

1      Q.    On a Unix system?

2      A.    That's where the mail server is.

3      Q.    The Unix mail system has to use POP or IMAP?

4      A.    For a desktop client to communicate with it.

5      Q.    Could he not have been connected directly to

6  the server?

7      A.    How?  I set up the mail server.  It only uses

8  two protocols, POP and IMAP.

9      Q.    Which version of Linux was that?

10     A.    CentOS.

11     Q.    You don't know the version number?

12     A.    5.

13     Q.    Okay.  Now, if he was using POP -- even if you

14 make that assumption -- how do you know the traffic was

15 not kept on the server?

16     A.    When I looked at his e-mail account, there

17 were no e-mails in there.

18     Q.    When you looked at his e-mail account on what?

19     A.    On the e-mail server.

20     Q.    And what did that mean to you?

21     A.    That he was using POP.  Either that or he went

22 in and deleted everything.

23     Q.    Could he have done that?

24     A.    Sure.

25     Q.    Did you -- do you -- did you have a practice

58f91224-f096-4655-831d-3368570e9f96

1    of keeping backups?

2        A.    Yes.

3        Q.    Okay.  At the time that you discovered that he

4    had deleted the e-mail traffic, did you take any steps to

5    preserve any of the backups?

6        A.    No.

7        Q.    Why not?

8        A.    Didn't have a reason to.

9        Q.    Didn't have reason to -- again, you didn't

10   know about the litigation?

11       A.    Correct.

12       Q.    Okay.  Would you have reason to if you had

13   known about the litigation?

14       A.    According to the letter you showed me at the

15   beginning, sure.

16       Q.    Okay.  But you don't have any recollection of

17   that?

18       A.    I do not.

19       Q.    Okay.  And -- and do you have an understanding

20   today that there was litigation between Schultz and Barn

21   Light Electric?

22       A.    Possibly.

23       Q.    You know about it today?

24       A.    Yes.

25       Q.    Okay.  But when did you become aware of it?

58f91224-f096-4655-831d-3368570e9f96

1      A.    I don't recall.

2      Q.    Do you know when -- if that was before or

3  after the hard drive was repurposed?

4      A.    I don't know.

5      Q.    Could it have been before?

6      A.    I don't know.

7      Q.    Now, the -- the litigation with Solms, were

8  you aware of that litigation?

9      A.    Yes.

10      Q.    Okay.  What were you aware of?

11      A.    Just that there was a lawsuit.

12      Q.    Okay.  Did you take any steps at that time to

13  preserve his data?

14      A.    No.

15      Q.    No steps whatsoever?

16      A.    No.

17      Q.    Did you understand that in the Solms

18  litigation -- which I understand was fairly contentious

19  because it dealt with an alleged forgery of his

20  noncompete agreement --

21      A.    I don't know.

22      Q.    You don't know anything about that?

23      A.    Uh-uh.

24      Q.    Were you ever asked to try to find the

25  previous versions of his noncompete agreement?

58f91224-f096-4655-831d-3368570e9f96

1     A.    No.

2     Q.    Okay.  Who did you report to?

3           MR. SOZZANI:  Objection.  Form.

4     A.    I don't understand the question.

5     Q.    Who -- who was your boss?

6     A.    Bryan and Donna.

7           MR. SOZZANI:  Objection to form.

8     Q.    Okay.  Was there anybody between you and them?

9     A.    No.

10    Q.    Have you since heard that the Solms litigation

11 was particularly contentious because of the alleged

12 forgery of a noncompete agreement?

13    A.    No.

14          MR. SOZZANI:  Objection to form.

15    Q.    The first you've heard of it today?

16    A.    Those specific details, yes.

17    Q.    You had known that there was litigation?

18    A.    I knew --

19          MR. SOZZANI:  Objection.

20          Counsel, I have no -- this -- it absolutely

21     has nothing to do with the storage of documents or

22     the collection of documents in this litigation.

23     Where are you going with this?  This questioning has

24     nothing to do with this case whatsoever, nor does it

25     have anything to do with this custodian deposition,

1        which was specifically ordered for the purposes of

2        discussing this matter and how documents were

3        collected and produced in this matter.

4            MR. STEIN:  It was for the purpose of

5        exploring the procedures of the company with regard

6        to the storage and collection of documents.

7            And in this particular case we have three

8        pieces of litigation, one very contentious involving

9        a forgery, and your director of IT has made no

10       effort whatsoever to preserve anything in connection

11       with three cases; so it's a pattern and we intend to

12       present that to the judge.  We're not the only one

13       where documents were not preserved and were not

14       properly collected.  There's a pattern with two

15       previous cases, one of which involved a forgery.

16           MR. SOZZANI:  I would -- I would certainly

17       dispute that, but that's neither here nor there for

18       today's purposes for discussing the matter at hand.

19       This litigation before the Middle District of

20       Florida has nothing to do with any other litigation

21       that is ancillary to this litigation.

22           MR. STEIN:  Okay.  Can you read back my last

23       question?

24           (The pending question was read back by the

25   reporter as follows:

58f91224-f096-4655-831d-3368570e9f96

1          "Question:  You had known that there was

2    litigation?")

3               MR. SOZZANI:  Objection.  Form.

4               THE WITNESS:  Heard there was a lawsuit.

5    BY MR. STEIN:

6         Q.    Okay.  So you were aware of the Schultz

7    litigation -- excuse me.  You were aware of the Solms

8    litigation and this litigation, and except for what you

9    testified to today you have not made any other efforts to

10   preserve or collect electronically stored information?

11              MR. SOZZANI:  Objection.  Form.

12        A.    I've made efforts to preserve data.

13        Q.    Okay.  What have you done?

14        A.    I have set up archiving of our current data

15   sets.

16        Q.    Okay.  And how did you set that up?

17        A.    We have a -- for the production servers I use

18   external discs to take a backup of business-critical file

19   systems.  And then it's taken off of the external drive

20   and put on to a file server for archiving.

21        Q.    And where is that file server?

22        A.    It's in the data center in Orlando.

23        Q.    Okay.  Well, you didn't identify that one, did

24   you?

25        A.    Well, it's recent.

1      Q.     Recent as in how recent?

2      A.     Eight months.

3      Q.     Okay.  But before eight months what efforts

4   did you undertake to preserve data?

5      A.     External drives on the servers.

6      Q.     Okay.  Where are those external drives now?

7      A.     In the data server.

8      Q.     Physically stored or electronically stored?

9      A.     Well, the drives are physically attached to

10  the servers.

11     Q.     Okay.  You moved them over?

12     A.     Well, I mean, they've -- I'm not sure I

13  understand your question.  I mean, moved them from where?

14     Q.     Well, I thought you said the data center was

15  fairly new.

16     A.     No.

17     Q.     Okay.

18     A.     I said the file server for archiving is fairly

19  new.

20     Q.     Okay.  And so where were the backups before

21  the file server for archiving went live?  Where were they

22  kept?

23     A.     On the external drives.

24     Q.     The external drives of what?

25     A.     Of the production servers.

1      Q.    That's the one in the manufacturing?

2      A.    No.

3      Q.    Okay.  Where is the production server?

4      A.    In the data center in Orlando.

5      Q.    Okay.  You didn't identify that one.

6      A.    I did.

7      Q.    You did?

8      A.    Yeah.  You're talking about the archiving one?

9      Q.    Yeah.

10     A.    I did not identify that one.  Like I said,

11 it's new.

12     Q.    Okay.  I'm sorry.  I was -- I wasn't there.

13 Okay.

14          So recently you've started archiving data in

15 the data center?

16     A.    Correct.

17     Q.    Okay.  Was any of that archived data collected

18 in connection with this case?

19     A.    I was instructed to preserve data in the data

20 center.

21     Q.    Okay.  Which you have done recently?

22     A.    Yes.

23     Q.    Okay.  But have you been instructed to collect

24 any data from those archives in connection with this

25 lawsuit?

1          MR. SOZZANI:  I'm going to instruct the

2     witness not to divulge any communications from

3     counsel.  Those would be attorney-client privilege

4     and attorney work product privilege communications.

5          You can answer the question.

6     A.   At the time Iris requested data I did not have

7     the archive server in place.

8     Q.   Okay.  And you haven't, since then, gone back

9     and collected data from the archive and given it to Iris?

10    A.   Correct.

11    Q.   Okay.  Now, assuming that we have an e-mail

12    sent to you from Bryan Scott dated August 3rd, 2012, it's

13    a Bates stamp BAI0000 -- four zeros -- 184, that was

14    produced by Bay Area Innovations but was not produced by

15    Barn Light Electric -- assuming that's the case, do you

16    have any explanation as to why such a document was not

17    also produced by Barn Light Electric?

18    A.   No.

19         MR. STEIN:  I'd like to take a short break,

20    because I'm not familiar with the protective order

21    with BAI, so I'd like to talk with Stephen.

22         MR. SOZZANI:  Sure.  We can go off the record.

23         (Off the record 2:39 p.m. to 2:49 p.m.)

24    BY MR. STEIN:

25    Q.   Mr. Koller, the e-mail that we were just

58f91224-f096-4655-831d-3368570e9f96

1  discussing had been sent by Bryan Scott to Shawn Best at

2  Bay Area Innovations, and you were copied on that e-mail.

3  I believe you testified that Mr. Scott was one of the

4  e-mail accounts that you had pulled documents from; is

5  that correct?

6      A.    That's correct.

7      Q.    Okay.  And you had given that to Iris in

8  connection with your task for collecting documents;

9  correct?

10     A.    Correct.

11     Q.    Okay.  Do you have any explanation as to why

12 this e-mail from August 3rd, 2012, was not received from

13 Bay Area -- Barn Light Electric, but we did receive it

14 from Bay Area Innovations?

15     A.    It could be that Bryan deleted it from, you

16 know, the server.

17     Q.    Okay.  Any other?

18     A.    We don't have backups -- we weren't taking

19 long-term backups of the mail server in 2012.

20     Q.    Okay.  Any other explanation that you can

21 offer?

22     A.    No.  Like I said, it would have been deleted

23 from Bryan's account.

24     Q.    And -- and Bryan would have done that?

25     A.    Yes.

1       Q.      Okay.  Are you aware of any documents that

2    have been deleted --

3       A.      No.

4       Q.      -- in -- in connection with what may have been

5    requested in this case?

6       A.      No.

7       Q.      So Mr. Scott could have deleted these

8    documents, but you didn't participate?

9       A.      He could have deleted e-mails.

10      Q.      Yeah.

11      A.      Back in 2012.

12      Q.      The -- do you know Katie Fredricks?

13      A.      I worked with her before.

14      Q.      That's not one of the accounts that you pulled

15   the e-mail traffic from; correct?

16      A.      I don't recall.

17      Q.      And if I was to say there was an e-mail from

18   July 25th, 2012, from Ms. Fredricks to Mr. Schultz and to

19   Shawn Best and a C. Stewart, would you have any

20   information as to why that e-mail was not produced in

21   connection with this litigation?

22      A.      Could be that she deleted it --

23      Q.      Any other explanation?

24      A.      -- from her e-mail account.

25              Well, we have a company policy, back in 2012,

1    that we would disable an e-mail account for one year, and

2    at the end of the year we would delete the e-mail

3    account.

4         Q.    And when did she leave the company?

5         A.    I don't know.

6         Q.    Okay.  So you don't know either way whether

7    that was done?

8         A.    I -- I don't know.

9         Q.    Okay.  You're just guessing?

10        A.    As far as her account being deleted?

11        Q.    Uh-huh.

12        A.    I don't know.

13        Q.    Okay.  It's okay not to know.

14              That's Bates stamp BAI70, which we have marked

15    Exhibit 8, also attorneys' eyes only.

16              Exhibit 9 was BAI12134, e-mail from Shawn Best

17    to Michael Schultz.  Again, not produced by Bay Area

18    Electric -- Barn Light Electric but was produced by Bay

19    Area Innovations.  Any other explanation other than maybe

20    Mr. Best deleted the e-mail?

21        A.    That would be my guess.

22        Q.    Okay.  Excuse me.  Mr. Schultz deleted the

23    e-mail?

24        A.    That would be my assumption.

25        Q.    Next is an e-mail from August 3rd, 2012, Shawn

1   Best to Bryan Scott copied to yourself, Tracey McCain,

2   and Donna Scott.  It's Bates BAI1752, which we had marked

3   Exhibit 6, but it is attorneys' eyes only.

4           Again, do you have any -- any -- can you offer

5   any explanation as to why this e-mail was not produced in

6   connection with this litigation?

7      A.   If it was on the server when Iris requested me

8   to take a copy of the account, then they received it.

9      Q.   Okay.  But you -- you only did Bryan and Donna

10   and Katie and Anna; right?

11      A.   Those are the only ones that I recall.

12      Q.   Okay.  You didn't do yourself, and you didn't

13   do Mark Leathlean?

14      A.   I don't recall.

15      Q.   Or Tracey McCain?

16      A.   I don't remember.

17      Q.   BAI3 is traffic -- e-mail traffic from

18   July 24th, 2012, from Michael Schultz to Shawn Best.

19   Again, not -- not produced by Barn Light Electric.  I

20   guess your explanation here is that he deleted his e-mail

21   traffic?

22      A.   If it was on the server and was requested, I

23   provided it.

24      Q.   But you didn't produce anything for him?

25      A.   I don't recall.

58f91224-f096-4655-831d-3368570e9f96

1      Q.    Well, he's not one of the individuals that you

2  identified?

3      A.    Correct.

4      Q.    Okay.  So maybe it was there.  You just didn't

5  look for it?

6      A.    I don't recall the exact list of users that

7  were requested a copy of their e-mail account.

8      Q.    Well, do you know today if it's there?

9      A.    No.

10      Q.    How long have you known about this deposition?

11      A.    A couple weeks.

12      Q.    Okay.  It didn't occur to you that maybe you

13  should try to reconstruct what you did so that you could

14  give some testimony today?

15      A.    No.

16            MR. SOZZANI:  Objection to form.

17      Q.    What would cause you to remember those but not

18  any of the others?

19            MR. SOZZANI:  Objection to form.

20      A.    I don't know.

21      Q.    I mean, are you guessing as to these that you

22  have identified?

23      A.    No.  I just remember getting those and making

24  a copy of them.

25      Q.    Okay.  And -- and you remember not getting any

1    others?

2        A.    Correct.

3        Q.    Okay.

4              MR. SOZZANI:  Objection to form.

5        Q.    That was Exhibit 11, a July 24th, 2012,

6    e-mail.

7              Next is BAI3136, which we have marked as

8    Exhibit 12.  More e-mail traffic from Katie Fredricks to

9    Shawn Best, carbon copy to Michael Schultz.  I assume the

10   same explanation?

11       A.    Yes.

12       Q.    BAI3752, which we have marked as Exhibit 13,

13   was traffic from March 6th from Katie Fredricks to Donna

14   Scott, Mike Schultz, and Shawn Best.

15             Do you have any explanation as to why this was

16   not produced by Barn Light Electric?

17       A.    If it was on the server or her desktop, it was

18   produced.

19       Q.    But you -- you do remember pulling her e-mail

20   traffic?

21       A.    Donna Scott?

22       Q.    Yeah.

23       A.    Yes.

24       Q.    Okay.  Do you remember the vault -- vault

25   being moved?

58f91224-f096-4655-831d-3368570e9f96

1          exactly, but...

2     BY MR. STEIN:

3          Q.    Do you understand that the vault, back at that

4     time frame, had gigabytes of data?

5          A.    I don't know what the size is.

6          Q.    Well, if it's taking a day or two to

7     transfer -- to migrate it, that would indicate that it

8     was fairly large, wouldn't it?

9          A.    Not necessarily.

10         Q.    Over a VPN?

11         A.    I -- I don't have any -- I don't recall the

12    migration of the vault.  I set up the vault, and I -- Bay

13    Area used the vault.  I don't know to what extent.

14         Q.    Bay Area had access to the vault?

15         A.    Yes.

16         Q.    For what purpose?

17         A.    I don't know.

18         Q.    Okay.  And then was there a time when they did

19    not have access?

20         A.    Yes.

21         Q.    Okay.  Why?

22         A.    I don't know.

23         Q.    Okay.

24               MR. SOZZANI:  Counsel, can we go off the

25         record for a minute here?

58f91224-f096-4655-831d-3368570e9f96

1            MR. STEIN:  Yeah.

2            (Off the record from 3:04 p.m. to 3:05 p.m.)

3    BY MR. STEIN:

4        Q.    To finish up that discussion, the vault would

5    have been all of the drawing renderings -- correct? --

6    the SOLIDWORKS files?

7        A.    That was the intent of setting up the vault.

8        Q.    Okay.  Who is Christopher Stewart?

9        A.    Ex-employee of Barn Light.

10       Q.    Do you know when he was there?

11       A.    I do not.

12       Q.    What is the SOLIDWORKS PDM vault?

13       A.    It's a piece of software that's used to store

14   images.

15       Q.    Okay.  And that's the -- the software that

16   Barn Light Electric was using?

17       A.    SOLIDWORKS.

18       Q.    That's the one we've been talking to as being

19   the vault?

20       A.    Yes.

21       Q.    Okay.  And do you recall being told to stop

22   the service on the server?

23            MR. SOZZANI:  Objection to form.

24       A.    Stop the vault?

25       Q.    To stop -- stop the service on the server for

58f91224-f096-4655-831d-3368570e9f96

1    the vault.

2          A.     No.

3          Q.     Did there come a point in time when Bay Area

4    Innovations was no longer permitted access to the vault?

5          A.     Yes.

6          Q.     Okay.  And would you have been the one to

7    implement that?

8          A.     Yes.

9          Q.     By denying them access?

10         A.     Yes.

11         Q.     Okay.  Did that occur?

12         A.     Yeah.

13         Q.     Why?

14                MR. SOZZANI:  Objection.

15                Counsel, what does this have to do with the

16         collection of documents?

17                MR. STEIN:  Well, we have a document -- I'll

18         read it into the record.

19                MR. SOZZANI:  Access to the server --

20                MR. STEIN:  Bay Area Innovations 674, which we

21         had marked Exhibit 19.  It is marked attorneys' eyes

22         only.  I have noted your objection, but it's an

23         e-mail from Shawn Best to Mr. Koller, and it was not

24         produced in connection with this case.

25                MR. SOZZANI:  I understand that, and I think

1        there have been reasons that have been provided as

2        to why that may --

3              MR. STEIN:  It's certainly an area I can

4        cover.

5              MR. SOZZANI:  But you're asking him about

6        permission as to access to a specific folder and the

7        date that those permissions were --

8              MR. STEIN:  Well, certainly corroborates the

9        e-mail.

10              MR. SOZZANI:  Okay.  You can continue your

11        line of questioning.  That's fine.  I'm sorry.

12   BY MR. STEIN:

13        Q.    Do you recall setting up VPN connections for

14   all Bay Area Innovations users?

15        A.    No.

16        Q.    Do you recall Bay Area Innovations and Barn

17   Light Electric users being added to the new vault?

18        A.    Yes.

19        Q.    So they would have access to it?

20        A.    Who?

21        Q.    The people who you gave permission to.

22        A.    Sure.

23        Q.    Okay.  Do you know how to mount a network

24   share in Windows?

25        A.    Yes.

1       A.      Yes, it is.

2       Q.      -- with a great deal of electronically stored

3   information.

4       A.      That's correct.

5       Q.      And you were responsible for managing all of

6   that information and at times collecting information on

7   request?

8       A.      Sure.

9       Q.      And -- and also protecting that information --

10      A.      That's correct.

11      Q.      -- from destruction?

12      A.      That's correct.

13      Q.      So would it be fair to say that you have

14  decades of experience in dealing with electronically

15  stored information?

16      A.      Yes.  I started back in 1986.

17      Q.      Okay.  So then after Walt Disney World what

18  was your next position?

19      A.      Then I started working for Barn Light

20  Electric.

21      Q.      For Barn Light Electric.

22      A.      Yes.

23      Q.      And what year was that that you started

24  working for Barn Light Electric?

25      A.      2011.

58f91224-f096-4655-831d-3368570e9f96

1       Q.      2011.

2               What were the circumstances under which you

3       started working at Barn Light Electric?

4       A.      At the time they had two IT personnel, and one

5       of them, the senior person, had some discrepancies with

6       the company, so he had malicious acts of destroying the

7       e-commerce website and all of the e-mails on the -- on

8       the hosted site.

9       Q.      And what year was this?

10      A.      I believe it was 2011.

11      Q.      So was there an attempt made to try to salvage

12      any of the information that was destroyed by this person?

13      A.      I -- I know there was requests from Jessie,

14      who worked there in IT.  And I know he did -- he was able

15      to at least recover some of the e-commerce file.

16      Q.      Okay.

17      A.      None of the e-mails, but I know the e-commerce

18      site and the database.

19      Q.      So that was recovered?

20      A.      Correct.

21      Q.      Let's move a little bit further down the line

22      from -- from when you started.

23              That e-commerce information which you've

24      referred to, does that exist today in -- at Barn Light

25      Electric, the e-commerce information?

58f91224-f096-4655-831d-3368570e9f96

## Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:14-CV-1955-T-35AEP

BARN LIGHT ELECTRIC COMPANY,
LLC, a Florida Limited
Liability Company,

    Plaintiff,

-vs-

BARNLIGHT ORIGINALS, INC., a
Nevada Corporation; and HI-LITE
MANUFACTURING COMPANY, INC., a
Nevada Corporation, JEFFREY L.
OHAI, an Individual California
Resident,

    Defendants.

_____/

* * *

DEPOSITION OF CARLOS LEON
* * *

Thursday, October 22, 2015
1:00 p.m. - 2:15 p.m.

Two South Biscayne Boulevard, 30th Floor
Miami, Florida 33131

Reported By:
CATHERINE FITZPATRICK, FPR, CRI, Court Reporter
Notary Public, State of Florida

## Page 2

1  APPEARANCES:
2    On behalf of the Plaintiff:
    Gregg H. Metzger, Esquire
3  AND Matthew N. Horowitz, Esquire
    FELDMAN GALE, P.A.
4    2 South Biscayne Boulevard
    30th Floor
5    Miami, Florida 33131
    (305) 358-5001
6
    On behalf of the Defendants:
7    Michael J. Colitz, III, Esquire
    GRAY ROBINSON
8    401 East Jackson Street
    Suite 2700
9    Tampa, Florida 33602
    (813) 273-5000
10
11  ALSO PRESENT:
12    Alejandro J. Fernandez, Esquire VIA TELEPHONE
    Joseph R. Sozzani, Esquire VIA TELEPHONE
13

    - - -

## Page 3

1             I N D E X
2  WITNESS:               PAGE:
3         CARLOS LEON
4  DIRECT EXAMINATION        4
    BY MR. METZGER:
5  CROSS-EXAMINATION         42
    BY MR. COLITZ, III:
6  REDIRECT EXAMINATION      50
    BY MR. METZGER:
7
8          - - -
9    N O  E X H I B I T S  M A R K E D
10       - - -

## Page 4

1      Deposition taken before CATHERINE
2  FITZPATRICK, FPR, CRI, Court Reporter and Notary Public
3  in and for the State of Florida at Large, in the above
4  cause.
5        - - -
6  Thereupon,
7      CARLOS LEON,
8  having been first duly sworn or affirmed, was examined
9  and testified as follows:
10    THE WITNESS: Yes.
11    MR. METZGER: Okay. I just want to state for
12  the record, just to make sort of an appearance
13  here, my name is Gregg Metzger. I'm with the
14  Feldman Gale Law Firm. We represent Barn Light
15  Electric in this matter. With me, of my firm, here
16  today is Matthew Horowitz and, also, on the phone
17  with my firm's Tampa office are Alex Fernandez and
18  Joe Sozzani.
19    MR. COLITZ, III: Yes. Mike Colitz, with the
20  Law Firm of Gray Robinson. And I'm here on behalf
21  of the Defendants, Barnlight Originals, Hi-Lite
22  Manufacturing, and Mr. Jeffrey Ohai.
23    DIRECT EXAMINATION
24  BY MR. METZGER:
25    Q. Would you please state your name and address

Electronically signed by Catherine Fitzpatrick (401-348-621-6590)
Electronically signed by Catherine Fitzpatrick (401-348-621-6590)
8ceda4be-66a3-4463-a471-46caf545216a

ANTHEM REPORTING. LLC

BY MR. COLITZ, III:

Q. And while you were a Hi-Lite sales rep, were you, in fact, aware of Barn Light Electric sourcing RLMs from other manufacturers?

A. I wouldn't know.

Q. In your experience with Hi-Lite, if Barn Light Electric had been sourcing RLMs from another manufacturer, would Hi-Lite have been upset about it?

MR. METZGER: Object to form.

THE WITNESS: I mean, that's - I wouldn't know about that. That's not my - I mean, every dealer can buy supply sources from whoever they want to buy from.

BY MR. COLITZ, III:

Q. But you're not aware of it?

A. I wouldn't be aware. I wasn't involved in that kind of business. That's not my problem.

Q. And you're currently a sales rep for Barn Light Electric; is that correct?

A. Yes.

Q. And are you aware of Barn Light Electric having its own factory?

A. From the best of my knowledge, yes.

Q. Have you ever visited it?

A. No.

Q. Were you aware of that factory while you were a Hi-Lite sales rep?

A. No.

Q. We've been referring to them as RLM lights. Have you ever heard them referred to as just barn lights?

A. What do you mean?

Q. Have you ever heard someone use the term barn lights?

A. For RLMs?

Q. For RLMs, yes.

A. No, never.

Q. I think you said that - when you were a sales rep for Hi-Lite, did you ever meet Bryan Scott?

A. I don't remember.

Q. Did you ever meet Donna Scott?

A. I don't remember.

Q. Did you ever meet with - while you were a Hi-Lite rep, did you ever meet with anybody from Barn Light Electric in person?

A. No.

Q. And while you were a Hi-Lite rep, were you based here in Miami?

A. The corporation was based in Puerto Rico, but I lived here in Miami.

Q. And Barn Light Electric was based in Titusville?

A. Yeah.

Q. Did you ever make the trip up there while you were a Hi-Lite rep?

A. No.

Q. I think you testified that while you were a Hi-Lite rep, that Barn Light Electric was 90 to 95 percent of your business?

A. At the end of it, yes.

Q. That was about $500,000?

A. To the best of my recollection, yes.

Q. Would that have been annually?

A. Yeah.

Q. So based on my math, that means that your other clients were somewhere between $20,000 to $30,000?

MR. METZGER: Object to form. Go ahead and - are you asking about his business, or Hi-Lite's business at the time?

MR. COLITZ, III: I'll clear that up.

MR. METZGER: Okay.

BY MR. COLITZ, III:

Q. When you - you testified that when you were a Hi-Lite representative that your business for Hi-Lite,

90 to 95 percent of that came from Barn Light Electric; is that correct?

A. Correct, at the end of the relationship.

Q. At the end of the relationship, your business with Barn Light Electric was 90 to 95 percent of your overall sales for Hi-Lite?

A. For Hi-Lite, yes.

Q. So your other sales for Hi-Lite in your territory would have been $20,000 to $30,000 - something in that range?

A. I don't remember the exact numbers.

Q. Less than $100,000?

A. Yeah, I would say.

Q. Do you know who made the decision to terminate you as a Hi-Lite sales rep?

A. No.

Q. Would it surprise you if somebody at Barn Light Electric said that they did not want you as a sales rep anymore?

A. It would.

Q. Would it surprise you if they said one of the reasons they didn't want you as their sales rep anymore is because they had never met you?

A. It would.

Q. It would surprise you?

Electronically signed by Catherine Fitzpatrick (401-348-621-6590)
Electronically signed by Catherine Fitzpatrick (401-348-621-6590)

8ceda4be-66a3-4463-a471-46caf545216a

ANTHEM REPORTING. LLC

## Page 49

1     A. Yes.

2     Q. Would it surprise you if I told you that Donna

3 Scott was the one who said that she wanted you

4 terminated as a sales rep?

5     A. It would.

6     Q. Are you aware of Barn Light Electric getting a

7 discount on its sales from Hi-Lite after you were

8 terminated as a sales rep?

9     A. I wouldn't know that.

10     Q. Did anybody at Hi-Lite ever complain to you

11 that you were not doing enough to grow your sales in

12 your territory?

13     A. David would.

14     Q. And what did he say?

15     A. I don't remember the details.

16     Q. But there were complaints?

17     A. I wouldn't say complaints. I would say all

18 the regional managers are always putting pressure on the

19 sales reps. So I wouldn't say complaints. It was just

20 like anyone in sales - pushing for sales.

21     MR. COLITZ, III: Okay. No further questions.

22     MR. METZGER: I just have two more, and we're

23 done.

24     THE WITNESS: Okay.

25

## Page 50

1     REDIRECT EXAMINATION

2 BY MR. METZGER:

3     Q. Okay. Do you remember - when you were

4 testifying a moment ago, in response to Mr. Colitz's

5 questions, you said you didn't recall whether Barn Light

6 Electric purchased just shades, for example, from

7 Hi-Lite through Lighting Reps; correct?

8     A. No.

9     Q. You don't remember?

10     A. I don't remember.

11     Q. So just to be clear, you don't remember either

12 way?

13     A. I don't remember the orders. I don't remember

14 the details of the orders, no.

15     Q. Okay. So is it the case, though, that from

16 time to time purchasers to whom Lighting Reps sold or

17 sell products buy just shades from RLM SKUs?

18     A. It's not the norm.

19     Q. Okay. But it's something that might have

20 happened when Lighting Reps was still representing

21 Hi-Lite and selling to Barn Light Electric?

22     A. It could have.

23     MR. COLITZ, III: Object to the form.

24 BY MR. METZGER:

25     Q. It could have?

## Page 51

1     A. It could have.

2     Q. How many suppliers does Lighting Reps

3 currently represent in addition to Barn Light

4 Electric?

5     A. How many other manufacturers, you mean?

6     Q. Yes.

7     A. Probably about 20 to 25.

8     MR. METZGER: All right. Can you indulge me

9 for one minute? I don't think I have any other

10 questions, but I want to make sure. I want to make

11 a quick phone call. I'm just being candid with

12 you, and then we'll be done.

13     THE WITNESS: Okay.

14     (Thereupon, a brief recess was held off the

15 record.)

16     MR. METZGER: Okay. I'm done.

17     MR. COLITZ, III: I'm done.

18     MR. METZGER: Okay. We're done. I've

19 completed my questioning; Mr. Colitz has indicated

20 he's completed his questioning.

21     THE WITNESS: Okay.

22     MR. METZGER: I really appreciate your coming

23 by today to help us out.

24     THE WITNESS: All right.

25     MR. METZGER: You have two options. You

## Page 52

1 have - this is going to be transcribed and turned

2 in to a written booklet-type document.

3     THE WITNESS: Okay.

4     MR. METZGER: You, as the person who

5 testified, have the right to review it to make sure

6 it's accurate. It's called reading the Deposition.

7 Or you can waive that right.

8     THE WITNESS: I'll waive that.

9     (Thereupon, the DEPOSITION was concluded at

10 2:15 p.m.)

11     - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Catherine Fitzpatrick (401-348-621-6590)
Electronically signed by Catherine Fitzpatrick (401-348-621-6590)

13 (Pages 49 to 52)
8ceda4b8-66a3-4463-a471-46caf545216a

ANTHEM REPORTING, LLC

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF FLORIDA

3

4   BARN LIGHT ELECTRIC COMPANY,

    LLC, A FLORIDA LIMITED

5   LIABILITY COMPANY,

6         Plaintiff,     No.

                         8:14-CV-1955-T-35AEP

7     vs.

8   BARNLIGHT ORIGINALS, INC., A

    NEVADA CORPORATION; AND

9   HI-LITE MANUFACTURING

    COMPANY, INC., A NEVADA

10  CORPORATION; JEFFREY L. OHAI,

    AN INDIVIDUAL CALIFORNIA

11  RESIDENT,

12        Defendants.

13

14  _____

15

16           **CONFIDENTIAL**

17

18      VIDEOTAPED DEPOSITION OF JOSH NOLAN

19        Los Angeles, California

20       Friday, September 25, 2015

21

22  Reported by:

    MARIA ELLERSICK

23  CSR No. 10531

24  Job No. 2141795

25

1  working on the project for Hi-Lite?
2        MR. ANDERSON: Objection to form.
3        MS. MC CLIMAN: Are you talking "you"
4  personally or Bold Array?
5        MR. SOZZANI: Bold Array.
6        MS. MC CLIMAN: Okay.
7  BY MR. SOZZANI:
8     Q  And just to be clear, throughout this
9  deposition, when say I say "you," I'm referring to
10 Bold Array. You're here as a representative of
11 Bold Array today.
12    A  Okay.
13    Q  To the extent that I have a question that
14 relates directly to you, I will make that very clear
15 that it's to you individually.
16    A  It's really foggy, but it would be like
17 maybe 2000- -- might be the end of 2012.
18    Q  If I was to say that --
19    A  Or beginning.
20    Q  Strike that. Strike that. Okay. Thank
21 you. Thank you.
22       What was your understanding as to Hi-Lite's
23 purpose in developing a website?
24       MR. ANDERSON: Object to the form.
25       MS. MC CLIMAN: Calls for speculation.

1  BY MR. SOZZANI:
2     Q  As it was explained to you by David McAdam
3  prior to your signing the agreement with Hi-Lite,
4  what was the purpose of developing a website?
5        MR. ANDERSON: Object to form.
6        MS. MC CLIMAN: If you know.
7        THE WITNESS: When you say "a website," you
8  mean the final end product, the --
9  BY MR. SOZZANI:
10    Q  Let me rephrase. I'm sorry.
11       Was the purpose communicated to you by
12 David McAdam in developing the website
13 BarnLight Originals.com?
14    A  Yes.
15    Q  And what was that purpose?
16    A  To sell their -- the product they created
17 to the market -- to the consumer.
18    Q  And what was the product that they created,
19 Hi-Lite? What was the product Hi-Lite created?
20       MR. ANDERSON: Object to form.
21       THE WITNESS: Lighting fixtures, you know,
22 light bulbs -- stuff that light bulbs go into.
23 Yeah, you see them in restaurants and stuff, that
24 type of stuff. Custom lighting might be the easiest
25 way to put it.

1  BY MR. SOZZANI:
2     Q  And as you understand it, was the website
3  going to be for the purpose of selling to endusers?
4     A  Yes. Well, define "enduser."
5     Q  Retail customer.
6     A  Yes.
7     Q  Or somebody that would utilize to light
8  themselves, whether it's a company or a person.
9     A  Yes.
10    Q  And was it explained to you that the
11 website would act as a retail conduit to sell
12 lighting fixtures?
13    A  Yes.
14    Q  And as you understand it, when you were
15 initially contacted by Hi-Lite, was
16 BarnLight Originals.com going to be a division of
17 Hi-Lite?
18       MR. ANDERSON: Objection to form.
19       MS. MC CLIMAN: If you know.
20       Calls for speculation.
21       If you know, you can answer.
22 BY MR. SOZZANI:
23    Q  As you understand it, Mr. Nolan.
24    A  As we understand it, the two were not
25 related. They're separate companies.

1     Q  When you were initially contacted by
2  Hi-Lite, did BarnLight Originals.com exist?
3        MS. MC CLIMAN: If you know.
4        MR. ANDERSON: Objection to form.
5        THE WITNESS: I don't recall.
6  BY MR. SOZZANI:
7     Q  Okay. To your knowledge, did Hi-Lite
8  develop the BarnLight Originals.com website to
9  compete with Barn Light Electric.com?
10    A  In our project planner, they listed
11 Barn Light Electric as a competitor or as a known
12 competitor, but it would be competing against
13 anybody selling a similar product. That could be
14 Lamps Plus. That could be anybody. You know, just
15 entering that retail market since they were already
16 doing manufacturing.
17    Q  So yes or no, is it your understanding that
18 BarnLight Originals.com was launched at least in
19 part to compete with Barn Light Electric.com?
20       MR. ANDERSON: Objection to form.
21       THE WITNESS: It's kind -- it's kind -- it
22 would be to compete with anybody selling a similar
23 item. I wouldn't say it was necessarily them. The
24 only reason -- you know, that was one -- the company
25 listed or the website listed on the -- when we gave

1 them the project planner to say who's your
2 competition, that was, you know, what was listed
3 there.
4 BY MR. SOZZANI:
5    Q   Okay.  Okay.  And we can go into a little
6 bit further detail with some of the documents.
7 Perhaps, that will clarify that issue.
8        Can you please tell me what you know about
9 Hi-Lite's relationship with Barn Light Electric?
10   A   Hi-Lite's relationship with
11 Barn Light Electric.  In a meeting we had with them,
12 there was --
13       MS. MC CLIMAN:  That's not the question.
14       THE WITNESS:  Okay.
15       MS. MC CLIMAN:  What is your understanding
16 of the relationship?
17       THE WITNESS:  My understanding?
18       MS. MC CLIMAN:  Yes.
19       THE WITNESS:  They know each other.
20 They've done business in the past.  That's our
21 understanding.
22 BY MR. SOZZANI:
23   Q   Is there anything else?
24   A   We just know they've done business in the
25 past with each other.

1    Q   Were there any meetings where you were
2 present where Barn Light Electric was discussed?
3    A   Yes.
4    Q   And can you please tell me what was said at
5 those meetings regarding Barn Light Electric?
6    A   That they had done business together, and
7 there was a falling out, and that designs were
8 stolen of lighting fixtures.  For us, we didn't
9 really care.
10       MS. MC CLIMAN:  You've answered the
11 question.
12       THE WITNESS:  Okay.
13 BY MR. SOZZANI:
14   Q   And who was present at that meeting?
15   A   Dave McAdam, Jeffrey Ohai, and myself at
16 one meeting.  And then another meeting where the
17 same item was said, it was Matios, Jeffrey Ohai,
18 Dave McAdam, and myself.
19   Q   Were there any other instances where
20 Barn Light Electric was discussed in a meeting?
21   A   I don't recall any.  It was just really the
22 initial items.
23       This chair is not comfortable.
24   Q   Do you need to a take break?
25   A   Maybe in a little bit.  Stretch the legs a

1 little bit.  Get the blood flowing.
2    Q   Feel free to let me know if you want to
3 take a break.
4    A   Okay.
5    Q   Was there a specific format or model used
6 to develop the BarnLight Originals.com website?
7        MS. MC CLIMAN:  Vague and ambiguous.
8        THE WITNESS:  Define "model."
9 BY MR. SOZZANI:
10   Q   Example.
11   A   Examples would be general E-commerce;
12 Amazon.com, Buy.com.  You know, the E-commerce basic
13 website, the model where -- anywhere from like -- if
14 you've ever used the Nike configurator to design
15 shoes.  You know, even, I think, Franklin, the
16 glove -- that makes baseball gloves.  We looked at
17 those with them.  Those E-commerce, in general,
18 product configurators from all different industries.
19   Q   Was there -- let me erase that.
20       Did Hi-Lite request that you utilize a
21 specific format in building the website?
22       MR. ANDERSON:  Objection to form.
23       MS. MC CLIMAN:  Vague and ambiguous.
24       THE WITNESS:  We went to Hi-Lite --
25 BY MR. SOZZANI:

1    Q   Let me rephrase the question.  Did Hi-Lite
2 request that you use a specific format in designing
3 the BarnLight Originals.com website?
4        MR. ANDERSON:  Objection to form.
5        MS. MC CLIMAN:  Vague and ambiguous.
6        THE WITNESS:  "Format" meaning what?
7 BY MR. SOZZANI:
8    Q   Meaning model.
9    A   Model.
10       MS. MC CLIMAN:  Same objection.  Vague and
11 ambiguous.
12       THE WITNESS:  "Model" is ambiguous, too, or
13 a model.
14 BY MR. SOZZANI:
15   Q   Did Hi-Lite request that you utilize a
16 specific design in developing the
17 Barn Light Electric -- BarnLight Originals.com
18 website?
19       MS. MC CLIMAN:  Vague and ambiguous.
20       MR. ANDERSON:  Objection to the form.
21       MS. MC CLIMAN:  Are you asking about the
22 entire site or -- okay.
23       THE WITNESS:  They -- the direction was
24 given by them on what they wanted items to look
25 like.  As the design of the site, common U.S.

1 guidelines for web usability is, you know, kind of
2 stated in stone to make it easy for your users. So
3 there's kind of rules we already follow when it
4 comes to web design.
5 BY MR. SOZZANI:
6    Q   Was there a specific look and feel that
7 Hi-Lite wanted in the website?
8        MR. ANDERSON: Objection to form.
9        THE WITNESS: I could say rustic, dirty,
10 kind of grainy, textured, you know, that type of
11 stuff.
12 BY MR. SOZZANI:
13    Q   Okay. Were you asked to copy or mimic any
14 specific aspects of the Barn Light Electric.com
15 website?
16    A   We were asked to -- the direction was given
17 by them for elements that were required for the
18 website.
19        MS. MC CLIMAN: You're not answering the
20 question. The question was were you asked --
21        THE WITNESS: Were we asked?
22        MS. MC CLIMAN: -- to --
23 BY MR. SOZZANI:
24    Q   I'll ask the question again. Were you
25 asked to copy or mimic any aspect of the Barn Light

1 Electric.com website?
2        MS. MC CLIMAN: That's a yes or no.
3        THE WITNESS: Yes.
4 BY MR. SOZZANI:
5    Q   And what specific aspects of Barn Light
6 Electric.com were you asked to copy or mimic?
7    A   I don't even know what it's called.
8 There's one element where they outright said we want
9 it this way, just like it is on this site, and it's
10 icons that are like the lighting fixture is water
11 safe or -- I don't know. Something to do with like,
12 you know, will it work in a damp area or its
13 voltage, stuff like that. It was icons, the
14 positioning, you know, kind of how they work and
15 stuff.
16    Q   And were those icons that appeared on the
17 product pages of Barn Light Electric.com?
18    A   Yes.
19    Q   Are there any specific documents that would
20 refresh your memory as to what those icons were?
21    A   Probably in an E-mail. It could be an item
22 they signed off on, too.
23        MS. MC CLIMAN: You've already done it.
24 He's reaching into his box.
25        THE WITNESS: I know. Good time for lunch.

1 BY MR. SOZZANI:
2    Q   Were there any other aspects which you were
3 asked to copy or mimic from the Barn Light Electric
4 website?
5    A   No.
6    Q   Are you sure of that?
7    A   Not to my recollection.
8    Q   Fair enough.
9    A   It was a while back.
10    Q   We'll revisit that issue after our next
11 break. I believe I have documents that I might be
12 able to show you, I believe, refer to what you're
13 referencing as icons.
14        Were you asked at any point to download the
15 entire Barn Light Electric.com website?
16        MS. MC CLIMAN: Vague and ambiguous.
17        THE WITNESS: Yes.
18 BY MR. SOZZANI:
19    Q   And who asked you to do so?
20    A   Dave McAdam.
21    Q   Would you agree that the
22 BarnLight Originals.com website looks very similar
23 to the Barn Light Electric.com website?
24        MR. ANDERSON: Objection to form.
25        MS. MC CLIMAN: Vague and ambiguous.

1        Do you understand the question?
2        THE WITNESS: Not entirely. It's a --
3 BY MR. SOZZANI:
4    Q   Would you like me to rephrase the question,
5 Mr. Nolan?
6    A   Yes.
7    Q   Would you agree that
8 BarnLight Originals.com is a very similar website to
9 Barn Light Electric.com?
10        MR. ANDERSON: Object to form.
11        MS. MC CLIMAN: Vague and ambiguous.
12        Do you understand the question?
13        Do you mean -- I mean, do you mean similar
14 like they both sell lights or similar like look and
15 feel?
16        THE WITNESS: They both sell lights. They
17 both --
18        MS. MC CLIMAN: Similar in coloring?
19        THE WITNESS: They follow how E-commerce
20 websites work, like Amazon. Logo's in the top left
21 like nearly every website in North America because
22 our language is left to right.
23 BY MR. SOZZANI:
24    Q   Well, let's start with appearance.
25    A   It follows normal web design guidelines for

1 received?
2    A   Yeah.
3    Q   Are these icons pictured in these documents
4 the icons that you were asked to copy from the
5 Barn Light Electric.com website?
6        MR. ANDERSON:  Object to the form.
7 BY MR. SOZZANI:
8    Q   Strike that.  Don't answer the question.
9 Strike that.
10    A   You only get so many do-overs.
11    Q   You referred to icons earlier; is that
12 correct --
13    A   Yes.
14    Q   -- Mr. Nolan?
15        Are the icons that you referred to earlier
16 as icons you were asked to copy by Hi-Lite contained
17 in the document that I just handed to you as
18 Exhibit 1A?
19        MR. ANDERSON:  Object to the form.
20        THE WITNESS:  The location is what we were
21 asked to copy.  The icons, I don't know, but it was
22 the location of their placement on the page.
23 BY MR. SOZZANI:
24    Q   So is your answer yes or no to my question?
25 And I can have the court reporter read it back, if

1 you'd like.
2    A   The icons themselves, it would be no.
3    Q   So the placement of the icons that you
4 referred to, can you please explain what you mean by
5 "placement"?
6    A   On Exhibit 1A, the first page or the second
7 page, the icons along the top of the box, their
8 placement, where you see the bunch of circles.
9    Q   So in the upper right-hand corner on top of
10 the box, there are circular icons.  Are those the
11 icons that you're referring to?
12    A   Yes.
13    Q   And what were those icons for?
14    A   From our understanding, the icons were
15 representative of the -- that product's features or
16 you know, like its ratings.
17    Q   So would the icons include characteristics
18 such as "Made in the U.S.A."?
19    A   Yes.
20    Q   And would they also include characteristics
21 including a wet rating?
22    A   Yes.
23    Q   And as you understand it, were those
24 characteristics that were included in the icons on
25 Barn Light Electric.com's website when you were

1 asked to copy them?
2        MS. MC CLIMAN:  Misstates testimony.
3        MR. ANDERSON:  Object to the form.
4 BY MR. SOZZANI:
5    Q   You can answer the question.
6    A   I know.
7        Not that I know of.  I didn't really look
8 at Barn Light Electric's website when it came to
9 like what icons they had on the website.
10    Q   But you were asked to copy --
11    A   Was asked to copy the location, and they
12 told us where to place those on the page.
13    Q   How did you know what icons to place on the
14 page?
15    A   They provided the icons, a list of -- the
16 names of the icons and then what they would like
17 them to look like.  I guess, it's industry standard
18 stuff.  I'm not a lighting expert.
19        MS. MC CLIMAN:  Don't guess.
20        THE WITNESS:  So it's what was also in
21 their catalog on defining the light fixtures.  So
22 it's industry based.
23 BY MR. SOZZANI:
24    Q   Would it surprise you to know that the
25 icons used on Barn Light Electric.com's website are

1 unique to Barn Light Electric.com?
2        MR. ANDERSON:  Object to the form.
3        MS. MC CLIMAN:  Calls for speculation.
4        THE WITNESS:  What do you mean by
5 "surprise"?
6 BY MR. SOZZANI:
7    Q   What do you mean by "surprise"?  What does
8 "surprise" mean to you, Mr. Nolan?
9    A   I don't know.
10        MS. MC CLIMAN:  What does it mean to you?
11        THE WITNESS:  What does "surprise" mean to
12 me?  Like something that would be out of the --
13 BY MR. SOZZANI:
14    Q   Out of the ordinary.
15    A   -- ordinary.
16    Q   So would it be out of the ordinary for you
17 to learn that the icons used on
18 Barn Light Electric.com's website are unique to
19 Barn Light Electric.com?
20        MR. ANDERSON:  Object to the form.
21        THE WITNESS:  What do you mean by "unique"?
22 From --
23        MS. MC CLIMAN:  I think he wants --
24 BY MR. SOZZANI:
25    Q   Have you -- have you ever seen these icons

Page 62

1 on any other website?
2     MS. MC CLIMAN:  There you go.
3     THE WITNESS:  Have I -- any of these icons
4 ever on another website?
5 BY MR. SOZZANI:
6     Q   Correct.
7     A   I can't even tell what they are.
8         Yes.
9     Q   Which icons?
10    A   Like "ELT listed," "UL listed."
11    Q   Those specific icons, you've seen?
12    A   Those two, I've seen on other websites,
13 yes.
14    Q   That text or he those specific icons?
15    A   The "ELT," I've seen before.  The "UL,"
16 I've seen before.  I've seen those on other websites
17 related to lighting or electricity.
18        MS. MC CLIMAN:  You're not answering the
19 question.  Is it the actual pictures or is it the
20 words?
21        THE WITNESS:  The words, yeah.
22 BY MR. SOZZANI:
23    Q   But not the icons themselves?  The circular
24 icons is what I'm asking.
25    A   The circular icon?  Yeah, I've seen

Page 63

1 circular icons on other sites with those letters.
2        MS. MC CLIMAN:  He wants to know if you've
3 seen those particular icons that look exactly like
4 that on another site.
5        Correct, Counsel?
6        MR. SOZZANI:  That's correct.
7        THE WITNESS:  There's so bad.
8 BY MR. SOZZANI:
9     Q   Mr. Nolan, have you ever seen those
10 circular icons listed in Exhibit 1A on page 3, in
11 the placement that they appear on page 2 of
12 Exhibit 1A?
13        MR. ANDERSON:  Object to the form.
14 BY MR. SOZZANI:
15    Q   On any other website other than
16 Barn Light Electric.com?
17    A   Not to my recollection.
18    Q   So would you say that the icons that are
19 pictured on page 3 of Exhibit 1A are unique to
20 Barn Light Electric.com?
21        MS. MC CLIMAN:  Calls for speculation.
22        MR. ANDERSON:  Object to the form.
23        THE WITNESS:  Unique, no.
24 BY MR. SOZZANI:
25    Q   Let's go back.  You were asked to copy

Page 64

1 icons from Barn Light Electric.com's website; right?
2        MS. MC CLIMAN:  Misstates testimony.
3        MR. ANDERSON:  Object to form.
4        MS. MC CLIMAN:  He said he was asked to
5 copy the placement.
6        THE WITNESS:  I was asked to copy the
7 placement, the location of where they would appear.
8 BY MR. SOZZANI:
9     Q   Okay.  And these icons -- these circular
10 icons that appear on page 3, who could completed the
11 artwork for those icons?
12    A   Mr. Kilp with the direction of Jeff or
13 George Gonzalez.
14    Q   Okay.  So is it fair to say that Bold Array
15 was responsible for the artwork of the icons that
16 appear on page 3 of Exhibit 1A?
17        MS. MC CLIMAN:  Vague and ambiguous.  What
18 do you mean "responsible"?
19        THE WITNESS:  Yeah.
20 BY MR. SOZZANI:
21    Q   Did Bold Array complete the artwork that
22 appears on page 3 of Exhibit 1A?
23    A   We completed the artwork.
24    Q   Did you originate the artwork that is on
25 page 3 of Exhibit 1A?

Page 65

1     A   The icons were defined by
2 BarnLight Originals or Hi-Lite.  We were told what
3 to produce or what to use or what it was supposed to
4 look like.
5     Q   And to the best of your knowledge, was
6 Hi-Lite -- was Hi-Lite's intention in asking you to
7 produce these icons on page 3 to copy
8 Barn Light Electric.com's website?
9        MR. ANDERSON:  Object to the form.
10        MS. MC CLIMAN:  Calls for speculation.
11        If you know.
12 BY MR. SOZZANI:
13    Q   You can answer the question.
14    A   No.
15    Q   Who asked you to put these icons together?
16    A   George Gonzalez.
17    Q   Why?
18        MR. ANDERSON:  Object to the form.
19        MS. MC CLIMAN:  Calls for speculation.
20        If you know, you can answer.
21        THE WITNESS:  Jeff and Dave asked him to
22 ask us to create the icons.
23 BY MR. SOZZANI:
24    Q   And for what purpose were the icons
25 created?

17 (Pages 62 - 65)

1    MS. MC CLIMAN:  Calls for speculation.
2    If you know.
3    MR. ANDERSON:  Object to the form.
4    THE WITNESS:  The icons represent the
5 lighting fixtures or -- it's kind of above what I
6 understand because I'm not an electrician.  But like
7 "UL listed," it's what that light is capable of
8 doing or features.  From what we were told, it's
9 industry standard that's, you know, regular or a
10 feature of electricity for lighting fixtures.
11 BY MR. SOZZANI:
12    Q  Can you turn to page 3 of Exhibit 1A.
13 Could you read the list of icons?
14    A  "Wet rating," "Damp rating," "Dry rating,"
15 "No return," "Return policy," "Made to order,"
16 "Energy efficient," "UL listed," "ETL listed,"
17 "BarnLight Originals exclusive," "Quick ship," "Made
18 in the U.S.A.," and "International."
19    Q  Thank you.  And whose signature is at the
20 bottom of that page?
21    A  Jeffrey Ohai.
22    Q  I'll ask you again.  What were those icons
23 for, having read that list?
24    A  For the product detail page.
25    Q  For the product detail page.  And where are

1 the icons placed on the product detail page?
2    A  Where it shows on the first page of
3 Exhibit A -- 1A and on the second page.
4    MR. ANDERSON:  Object to the form.  I'm
5 sorry.  That was an answer, not a question.  Forgive
6 me.
7 BY MR. SOZZANI:
8    Q  It was on the upper right-hand corner?
9    A  Yeah.  Yes.
10    Q  Of the product detail page?
11    A  Yes.
12    Q  Okay.  Thank you.  Has Bold Array ever been
13 contacted to develop a website for the purpose of
14 competing with an existing company?
15    MR. ANDERSON:  Object to the form.
16    MR. SOZZANI:  On what basis?
17    MR. ANDERSON:  Speculation.
18    MR. SOZZANI:  Personal knowledge.
19    MR. ANDERSON:  As to the purpose of the
20 company.
21    MR. SOZZANI:  I'll repeat the question.
22 I'll repeat the question.
23    Q  Has Bold Array ever been contacted to
24 develop a website for the purpose of competing with
25 an existing company?

1    A  It's an open-ended question.
2    MS. MC CLIMAN:  It's a yes or no question.
3    THE WITNESS:  It's a yes or no?  Yes.
4 BY MR. SOZZANI:
5    Q  Was Bold Array contacted by Hi-Lite for the
6 purpose of competing with an existing company?
7    MR. ANDERSON:  Object to the form.
8    THE WITNESS:  Yes.
9 BY MR. SOZZANI:
10    Q  And was that company Barn Light
11 Electric.com?
12    A  Yes.
13    Q  When you were hired to design and develop
14 BarnLight Originals.com, was Barn Light Electric.com
15 already online and operating?
16    A  Yes.
17    Q  Do you know the length of time that
18 Barn Light Electric.com was in existence prior to
19 the launch of BarnLight Originals.com?
20    A  No.
21    Q  Can you take me through the initial
22 planning process after you were contacted by Hi-Lite
23 regarding the BarnLight Originals.com website?
24    A  Take you through the process?
25    Q  What's the first step in planning the

1 BarnLight Originals.com website?  What was the first
2 step?
3    A  We would provide what they call wire
4 frames, kind of an outline, boxes, that kind of
5 represent, and then submit those to clients for
6 alterations, changes.  And then, you know, client
7 feedbacks.  They say where they kind of want stuff.
8 And then from there, it's the design, and we talk
9 with them on what they want, how they want things to
10 work, placement of items.
11    Q  Let me stop you there.  So wire frames, are
12 wire frames shapes within the screen?
13    A  More paper.  It's on paper in a way.
14    Q  It's on paper?
15    A  Yeah.  It's kind of like boxes.
16 Generalization of, you know, here's the header of
17 the website.  Here's the footer, and it's just a
18 box.
19    Q  So do wire frames identify the placement of
20 different elements of a web page?
21    A  Yeah.
22    Q  And did Hi-Lite ask you to take a look at
23 the wire frames on Barn Light Electric.com's
24 website?
25    MR. ANDERSON:  Object to the form.

1       MS. MC CLIMAN:  Yeah, objection.
2       THE WITNESS:  No.
3  BY MR. SOZZANI:
4       Q   I'm sorry.  Can you tell me what the next
5  step would be after wire frames were provided to a
6  client?
7       A   Mockup designs.  That would be the design
8  phase where we would do a design, and then present
9  the client -- but in order to do the design, we have
10 to discuss with the client how they would want
11 things.  You know, talk with them and see where they
12 want placement, you know, colors, elements of the
13 page.  Kind of a general idea how you want things to
14 work.  You know, kind of like a little bit of the
15 user interface, but it's more aesthetics.
16      But it's all based upon -- you know we
17 collect information from them.  Ask them questions
18 to see what they want, and then produce the mockup
19 based upon their responses or the direction they
20 provide.
21      Q   Okay.
22      A   And then --
23      Q   Would it be common for a client of yours to
24 provide sample websites or example websites to
25 communicate their image --

1       A   Yes.
2       Q   -- of what they wish to be built for their
3  company?
4       A   Part of the design process is always asking
5  what -- what elements on other sites do you like
6  just in general.  It's not necessarily the same
7  industry.  It's -- the design phase is objective.
8  It's up to the opinion or the likes of the client.
9  So we'll ask at times what other -- what other
10 websites have you seen that you like in the way they
11 function or you know, maybe -- you know, a color or
12 something like that just to kind of get an idea of
13 what their likes and dislikes are, but that's a
14 pretty common element or common question we would
15 ask in our industry anyway just to try to understand
16 the client better.
17      (Exhibit 2 was marked for
18      identification by the court reporter.)
19 BY MR. SOZZANI:
20      Q   Okay.  I'm going to hand you what is marked
21 as Exhibit 2, which is the Bold Array Project
22 Planner.  Are you familiar with this document,
23 Mr. Nolan?
24      MS. MC CLIMAN:  Look through it.
25      THE WITNESS:  Yeah, I'm familiar with this

1  one.
2  BY MR. SOZZANI:
3       Q   And what is it?
4       A   It's the planner document we give to
5  clients prior to engaging with them.
6       Q   And this is a document that Bold Array sent
7  to Hi-Lite; is that correct?
8       A   Yes.
9       MR. ANDERSON:  Object to form of the
10 question, but go ahead.
11 BY MR. SOZZANI:
12      Q   Did you personally send this document to
13 Hi-Lite?
14      A   Yes.
15      Q   And who did you send it to?
16      A   Dave McAdam.
17      Q   And I'd like to turn your attention to
18 page 1 of the document that's marked Exhibit 2.  And
19 at the top of the page, it has two sections that are
20 titled in bold print that state "Contact
21 Information" and "Organization Information."  Can
22 you please tell me for the record who is listed in
23 the Organization Information section?
24      A   Company name is Hi-Lite Manufacturing.
25 Company address is 13450 Monte Vista Avenue, Chino,

1  California 91710.  Phone number and fax number,
2  (909) 465-1999, (909) 465-0907.  And the E-mail
3  address is DavM@HiLiteMFG.com.
4       Q   DavidM@HiLite?
5       A   Oh, yeah, David M.
6       Q   And does this establish that Bold Array was
7  providing its services to Hi-Lite?
8       MS. MC CLIMAN:  Calls for legal conclusion.
9       If you know.
10      THE WITNESS:  No.  Well, I don't understand
11 the question.
12 BY MR. SOZZANI:
13      Q   Does this project planner relate to
14 Hi-Lite Manufacturing, the company that is
15 identified under "Organization Information"?
16      A   Yes.
17      Q   With regard to the "Contact Information"
18 section at the top of the page, who is listed there?
19      A   The name is David McAdam.
20      Q   That's okay.  You don't have to read the
21 rest of it.  The name is David McAdam; is that
22 correct?
23      A   Yes.
24      Q   And was Mr. McAdam your main contact at
25 Hi-Lite?

1      MR. ANDERSON: Object to the form.
2      MS. MC CLIMAN: Vague and ambiguous.
3      If you understand the question, you can
4  answer.
5  BY MR. SOZZANI:
6    Q  Did Hi-Lite operate the website
7  BarnLight Originals.com?
8      MR. ANDERSON: Object to the form.
9      MS. MC CLIMAN: Same objections.
10      THE WITNESS: Can you clarify that a little
11  bit more when you say "operate"?
12  BY MR. SOZZANI:
13    Q  Did Hi-Lite sell products on the website
14  BarnLight Originals.com?
15      MS. MC CLIMAN: Calls for speculation.
16      If you know.
17      MR. ANDERSON: Object to the form.
18  BY MR. SOZZANI:
19    Q  Did Hi-Lite publish images of its products
20  on BarnLight Originals.com?
21      MR. ANDERSON: Object to the form.
22      MS. MC CLIMAN: Calls for speculation.
23  Vague and ambiguous.
24      THE WITNESS: Yes.
25  BY MR. SOZZANI:

1    Q  Did Hi-Lite receive orders for products on
2  BarnLight Originals.com?
3      MR. ANDERSON: Object to the form.
4      MS. MC CLIMAN: Calls for speculation.
5  BY MR. SOZZANI:
6    Q  You can answer the question.
7    A  Yeah, I know.
8      MS. MC CLIMAN: Was thinking.
9      THE WITNESS: I'm thinking because I don't
10  understand where the division of the two
11  organizations were at. So at this time, when orders
12  were being placed, as far as we understood, it was
13  going through BarnLight Originals. The orders were
14  being received by BarnLight Originals.
15  BY MR. SOZZANI:
16    Q  Well, at this point when the project
17  planner was sent to --
18    A  Okay. If we go based upon the project
19  planner, everything at this point --
20    Q  Let me -- let me complete my statement so
21  that we have a clear record. At the point that this
22  project planner was sent to Dave McAdam and he
23  filled it out and returned this to you somewhere
24  around September of 2012, did Hi-Lite -- strike
25  that.

1      Let's move to the next question. Next
2  question, "Is your -- is your organization receptive
3  to working with vendors remotely?" Are you aware of
4  any time that Hi-Lite worked with a vendor remotely?
5    A  Yes.
6    Q  And did Bold Array work with Hi-Lite
7  remotely?
8    A  Yes.
9    Q  Can you give me an example of how a vendor
10  would work on a website remotely?
11    A  The example would be we do the development
12  and the design at our premise, and then that's
13  where -- that's working remotely. It's not, you
14  know, in the sense of we're on site at their
15  location doing the work.
16    Q  Okay. Under the next section, which is
17  titled "Project Information," it asks "What is the
18  website's URL, if you currently have one?" And can
19  you please read the response into the record?
20    A  WWW.BarnLight Originals.com.
21    Q  Did Hi-Lite have
22  WWW.BarnLight Originals.com registered prior to your
23  involvement with them?
24      MR. ANDERSON: Object to the form.
25      MS. MC CLIMAN: Call for speculation.

1      If you know, you can answer the question.
2      THE WITNESS: I don't recall.
3  BY MR. SOZZANI:
4    Q  Are you aware that BarnLight Originals.com
5  was registered on September 11, 2012?
6      MR. ANDERSON: Object to the form.
7      THE WITNESS: No, I'm not aware.
8  BY MR. SOZZANI:
9    Q  After that question is another question
10  which asks "Have you ever been through a website
11  development process before?" Can you please read
12  the answer to that question into the record?
13    A  Yes, with WWW.Hi-LiteMFG.com.
14    Q  And when you say "dub, dub, dub," are you
15  saying "WWW"?
16    A  WWW, yes.
17    Q  Okay. Are you familiar with the website
18  WWW.Hi-LiteMFG.com?
19    A  Yes.
20    Q  And what is that website?
21      MR. ANDERSON: Object to the form.
22      THE WITNESS: It's Hi-Lite Manufacturing
23  website.
24  BY MR. SOZZANI:
25    Q  So Hi-Lite had a website prior to your

Page 86

1 correct?
2     A   Correct.
3     Q   Did Hi-Lite have full control over the
4 design and development of the
5 BarnLight Originals.com website?
6       MR. ANDERSON: Object to the form.
7       MR. SOZZANI: What's your basis, Counsel?
8       MR. ANDERSON: It's misleading.
9 BY MR. SOZZANI:
10     Q   You can answer the question. Do you need
11 me to repeat the question, Mr. Nolan?
12     A   Can you clarify what "full control"
13 pertains to?
14     Q   Did Hi-Lite have full control of all final
15 decisions regarding the design and development of
16 the BarnLight Originals.com website?
17     A   Yes.
18     Q   And did Hi-Lite have full control over the
19 final decision as to the BarnLight Originals logo?
20     A   Yes.
21     Q   Did Jeffrey Ohai also personally direct and
22 control the design and development for the
23 BarnLight Originals.com website?
24     A   Yes.
25     Q   Did Jeffrey Ohai also personally direct and

Page 87

1 control the design and development of the
2 BarnLight Originals logo?
3     A   Yes.
4     Q   Why do you think Hi-Lite chose to use the
5 domain name "BarnLight Originals.com"?
6       MR. ANDERSON: Object to form.
7       MS. MC CLIMAN: Calls for speculation.
8 BY MR. SOZZANI:
9     Q   You can speculate.
10     A   They sell barn lights. That's their
11 primary product, barn lights.
12     Q   Did BarnLight Originals sell lighting
13 fixtures that were not barn lights?
14     A   Yes.
15     Q   Would it be fair to say that
16 Barn Light Electric and BarnLight Originals have
17 websites with very similar names?
18       MR. ANDERSON: Object to the form.
19       THE WITNESS: They both sell barn lights.
20 BY MR. SOZZANI:
21     Q   That's not the question. You can answer
22 the question. Would it be fair to say that
23 Barn Light Electric and BarnLight Originals have
24 websites with very similar names?
25     A   Yeah. Yes.

Page 88

1     Q   Thank you. Would you expect both
2 BarnLight Originals.com and Barn Light Electric.com
3 to appear within the same results of a search on
4 Google or Bing?
5       MR. ANDERSON: Object to the form.
6       THE WITNESS: Yes.
7 BY MR. SOZZANI:
8     Q   Let's go back to the project planner, which
9 is Exhibit 2.
10     A   Which page?
11     Q   Page 2. Under "Project Information," do
12 you see the subsection that states "New Website" in
13 the middle of the page?
14     A   Yes.
15     Q   Could you read the question and answer that
16 appear -- or the two questions and answers that
17 appear under the subsection "New Website"?
18       MS. MC CLIMAN: Counsel, are we going to
19 read most of this document? I mean, he's already
20 testified that this was a document that he provided
21 to Mr. McAdam with the questions, and Mr. McAdam
22 provided the answers to. I don't understand why
23 we're reading them.
24       MR. SOZZANI: I'm going to ask your client
25 his understanding of certain responses, which may

Page 89

1 not be clear because there may be typos there within
2 the responses.
3       THE WITNESS: "What is the primary goal of
4 the website? What impact will the website have for
5 your business? That's the question.
6       The answer is "Do sell 3-Commerce under a
7 different company name."
8 BY MR. SOZZANI:
9     Q   How do you interpret Hi-Lite's response?
10     A   It's a typo.
11     Q   And what's your understanding of what that
12 response means?
13     A   "Do" would be the word "to," and the "3"
14 would be the letter "E."
15     Q   So can you read that response as you
16 understand it?
17     A   To sell E-commerce under a different
18 company name.
19     Q   And was that purpose communicated to you by
20 anybody at Hi-Lite other than within this document?
21     A   Yes.
22     Q   And who communicated that purpose to you?
23     A   Dave McAdam and Jeffrey Ohai.
24     Q   Thank you. And when it says "under a
25 different company name," what do you think is meant

23 (Pages 86 - 89)

1 by that?
2     A  Just what it says, under a different
3 company name.
4     Q  So under a different company name other
5 than Hi-Lite Manufacturing?
6     A  Well, whatever they wanted to call it,
7 yeah.
8     Q  But something other than
9 Hi-Lite Manufacturing?  Is that what is meant by
10 that response?
11     A  Yes.
12     Q  Thank you.  Did Hi-Lite ever explain to you
13 why it desired to use the tradename
14 "BarnLight Originals"?
15     A  They sell barn lights.
16     Q  Did Hi-Lite ever explain why it desired to
17 sell its products through the domain name
18 "BarnLight Originals.com"?
19     A  We -- didn't we answer this before with
20 the -- with their distributors and everything?  It's
21 the same response as that.
22         MS. MC CLIMAN:  I don't think that was the
23 same question.
24         Can you reread the question back, please.
25 BY MR. SOZZANI:

1     Q  Did Hi-Lite ever explain to you why it
2 desired to sell its products through the domain name
3 "BarnLight Originals.com"?
4     A  It's a domain name they purchased.
5     Q  Did Hi-Lite ever explain to you why it
6 didn't choose a different domain name?
7     A  No.
8     Q  Did you ever inquire with Hi-Lite as to why
9 they were not redesigning their existing
10 Hi-Lite Manufacturing website?
11     A  No.
12     Q  So you never asked Hi-Lite why it was not
13 choosing a domain name that was more closely related
14 to Hi-Lite Manufacturing?
15     A  No.
16     Q  The next section is entitled "Already have
17 an existing website."  Why do you believe that the
18 answers to each of the four questions under that
19 subsection are responded to with "not applicable" or
20 "N/A"?
21         MR. ANDERSON:  Object to the form.
22         THE WITNESS:  That's a default.  When we
23 send them the project planner, that's what's already
24 there.
25 BY MR. SOZZANI:

1     Q  Okay.  So it's not something that was
2 entered?
3     A  No.
4     Q  At the bottom of the page, Mr. Nolan,
5 there's a section that's entitled "General
6 Information."  Do you see that section?
7     A  Yeah.
8     Q  Can you please read that first question
9 into the record?
10     A  "What sites/companies do you consider to be
11 competitors?"
12     Q  And what are the responses that are
13 provided by Hi-Lite?
14     A  "WWW.Barn Light Electric.com,
15 WWW.SchoolHouseElectric.com,
16 HTTP://WWW.Rejuvenation.com," and then in capital
17 letters "Just to be clear, Barn Light Electric is
18 the most important."
19     Q  Did anybody else at Hi-Lite express to you
20 that Barn Light Electric was the most important
21 competitor of Hi-Lite?
22     A  Not that I recall.
23     Q  Were you specifically directed by Hi-Lite
24 to target Barn Light Electric as a competitor?
25         MS. MC CLIMAN:  Vague and ambiguous.

1 BY MR. SOZZANI:
2     Q  You can answer the question.
3     A  Only Barn Light Electric or as one of the
4 ones listed?
5     Q  Were you specifically --
6     A  No.
7     Q  -- directed?
8     A  No.
9     Q  Okay.  All right.  Let's turn to page 3,
10 please.  In response to the question "What makes you
11 better than your competitors" and "What
12 differentiates your site or idea from the
13 competition," the response that's provided "We offer
14 more products," and "To make it be easy to use."  Do
15 you see that on page 3?
16     A  Yes.
17     Q  And what do you think is meant by that
18 response?
19         MR. ANDERSON:  Object to the form.
20         THE WITNESS:  They offer more products and
21 ease of use.
22 BY MR. SOZZANI:
23     Q  And when they say they offer more products,
24 who do you think they're referring to?
25         MS. MC CLIMAN:  If you know.

Page 130

1     MS. MC CLIMAN:  Vague and ambiguous.
2 BY MR. SOZZANI:
3     Q   You can answer the question.
4     A   Based on the E-mails that you presented,
5 there was references.
6        (Exhibit 26 was marked for
7        identification by the court reporter.)
8 BY MR. SOZZANI:
9     Q   Let me give you what has been marked as
10 Exhibit 26, and this is a series of E-mails between
11 Hi-Lite and Bold Array, dated September 26, 2013.
12 If you could please take a brief look at this
13 document, Mr. Nolan.
14     A   Reviewed.
15     Q   If you can let me know when you're done
16 reviewing that, Mr. Nolan.
17     A   I already reviewed it.
18     Q   Okay.  If you take a look at the bottom of
19 page 2, just a very brief E-mail from George
20 Gonzalez.  Actually, it begins at the bottom of
21 page 1.  My apologies.  If you could read that into
22 the record where it says "Hi Sabrina."
23     A   "Hi Sabrina.  On page 3 of the first
24 proposal that was ever sent there was a great image
25 of Barn Light pendants.  Do you remember where you

Page 131

1 found this image?"
2     Q   And on then the next page, the E-mail
3 continues.
4     A   "I attached the image to this E-mail.
5 Thank you, George."
6     Q   And then the response from Sabrina to that
7 E-mail, what does that state?
8     A   "George, the image was supplied by our
9 design team.  It seems our team -- our design team
10 got that image from the Barn Light Electric blog
11 site."
12     Q   Is it fair to say that Hi-Lite knew
13 that images were being used on its website that
14 were copied from Barn Light Electric's
15 website --
16        MR. ANDERSON:  Object to the form.
17 BY MR. SOZZANI:
18     Q   -- as early as September 26, 2013?
19        MS. MC CLIMAN:  Calls for peculation.
20        MR. ANDERSON:  Object to the form.
21        THE WITNESS:  No.  This E-mail -- what he's
22 referring to has nothing to do with the website.
23 This was -- we found the image through Google
24 search, and we just included it in the website -- or
25 not the website, but we included it on our proposal

Page 132

1 because it had barn lights.  Our proposal back then,
2 we would show images that related to the company in
3 order to kind of give it a personal touch.
4        So this E-mail, actually -- what George was
5 referring to is an E-mail or is an image on a
6 proposal that we had sent.  It has nothing to do
7 with the website here.
8 BY MR. SOZZANI:
9     Q   When you say it was "an image on a
10 proposal," a proposal for what?
11     A   A proposal to do the project because what
12 we do is we include -- along the bottom, we would
13 include like -- you know, if it was a restaurant,
14 we'd include pictures of food.  In this case, it
15 was, you know, a lighting fixture.  So we just find
16 a quick image of a lighting fixture included in
17 there.
18        So it wasn't anything to do with like, you
19 know -- really, we didn't even know where the
20 product came from or the image came from until we
21 like, you know, actually looked.  Oh, there it is in
22 Google search -- in the image search.  This actually
23 has nothing to do with their website in this
24 instance, the image that he's referring.  This is
25 all on the proposal.

Page 133

1     Q   Okay.  So this was an image that Bold Array
2 used in a proposal to BarnLight --
3     A   Yes.
4     Q   -- or I'm sorry -- to Hi-Lite?
5     A   To Hi-Lite, yeah.
6     Q   To illustrate what they might be able to do
7 for BarnLight Originals?
8     A   Yes.
9        MR. ANDERSON:  Object to form.
10        THE WITNESS:  It was just -- it was
11 actually not even to Hi-Lite what could be done.  It
12 had nothing to do with that.  It was just along the
13 bottom of the proposal.  It was just kind of like a
14 shot of a product.  It was not, you know, saying
15 hey, you could do this or anything.  It was just
16 kind of like, you know, if you put up a picture of
17 people walking down the beach type thing because
18 you're doing a proposal for a resort type thing.
19 They just liked the picture.
20 BY MR. SOZZANI:
21     Q   Did they ever utilize that picture at
22 another time?
23        MR. ANDERSON:  Object to the form.
24        MS. MC CLIMAN:  Calls for speculation.
25        THE WITNESS:  I have no idea.

34 (Pages 130 - 133)

1    Q   You can answer the question.
2    A   Yes.
3    Q   Is it out of the ordinary for logo approval
4  to take as long as it did with
5  Hi-Lite Manufacturing?
6    A   No.
7    Q   No.
8        MR. ANDERSON:  Object to the form of that
9  question.
10 BY MR. SOZZANI:
11   Q   Would you say that -- strike that.
12       Mr. McAdam --
13       MS. MC CLIMAN:  McAdam?
14       MR. SOZZANI:  McAdam.  Sorry.  I'm very
15 tired.  I apologize for that, Mr. Nolan.  I've said
16 "McAdam" many times today.
17       I am going to hand you what I will mark as
18 1A.
19       MS. MC CLIMAN:  You've already got a 1A.
20       MR. SOZZANI:  How about 1B.
21       MS. MC CLIMAN:  Perfect.
22       (Exhibit 1B was marked for
23       identification by the court reporter.)
24 BY MR. SOZZANI:
25   Q   And these are the documents which -- or at

1  least a portion of them, which you have provided in
2  response to your subpoena, and I just want you to
3  look through them.  Take your time doing so.  I'd
4  like you to confirm that they are true and correct
5  copies of the documents that you have provided to
6  us.
7        MS. MC CLIMAN:  Or some of the documents.
8        MR. SOZZANI:  Correct.
9        Why don't we take a 5-minute break.  We'll
10 come back.
11       THE WITNESS:  I'm almost done.
12       MR. SOZZANI:  It's okay.  We can take a
13 5-minute break.
14       THE VIDEOGRAPHER:  All right.  Off the
15 record at 5:17 p.m.
16       (Recess.)
17       THE VIDEOGRAPHER:  And we're back on the
18 record at 5:20 p.m.
19 BY MR. SOZZANI:
20   Q   Mr. Nolan, we're back on the record.  Have
21 you had an opportunity to review the documents in
22 Exhibit 1B?
23   A   Yes.
24   Q   And do you agree that they are true and
25 correct copies of the documents which you provided

1  in response to Plaintiff Barn Light Electric's
2  subpoena?
3    A   Yes.
4        MS. MC CLIMAN:  Some of the documents.
5        THE WITNESS:  Some of the documents because
6  the other ones I provided digitally.
7        MR. SOZZANI:  Correct.
8        THE WITNESS:  Provided digitally.
9        MR. SOZZANI:  Okay.  That's all.  You can
10 pass those to the side.
11   Q   Was BarnLight Originals.com intended to
12 bring Hi-Lite into the digital age?
13       MR. ANDERSON:  Object to the form.
14       THE WITNESS:  I have no idea if that was
15 the intention, saying digital age.  The intention
16 was to sell product online.
17 BY MR. SOZZANI:
18   Q   Did you ever meet Dorothy Ohai?
19   A   No.
20   Q   Do you know who Dorothy Ohai is?
21   A   Jeff's mom.
22   Q   Do you know if Dorothy Ohai was aware of
23 BarnLight Originals.com?
24       MS. MC CLIMAN:  Calls for speculation.
25 BY MR. SOZZANI:

1    Q   You can speculate.
2    A   I have no idea.
3    Q   Who else was involved in the development of
4  BarnLight Originals.com outside of Bold Array?
5        MR. ANDERSON:  Object to the form.
6        MS. MC CLIMAN:  Calls for speculation.
7        If you know, you can answer.
8  BY MR. SOZZANI:
9    Q   That you're aware of.
10   A   I am not -- the name that we discussed
11 today, that's all I'm aware of.
12   Q   How did you program the product
13 configurator with the various Hi-Lite parts?
14   A   How did we program?  They had -- different
15 parts were assigned different SKU numbers, and there
16 was rules -- we'd built a rules engine that would
17 say if this part's selected, here's the parts that
18 go with it and here's the parts that don't go with
19 it, but they had certain relationships that they
20 explained to us on how those parts interact.
21   Q   Okay.
22   A   And then the end result was all those part
23 numbers cacophonated with there's your product.
24   Q   So there were various combinations of
25 parts?

1    A    "The reason Mr. Fulton was originally sent
2  out to Hi-Lite offices was to spend time with you
3  and Jeff in order to gain a decent understanding of
4  your product, how it works, and then able to apply
5  that knowledge to the configurator."
6    Q    What does -- what does that mean?
7    A    That means Ryan went out to Hi-Lite offices
8  to gain a better understanding of the their product,
9  and he was supposed to sit with Jeff and Dave.
10    Q    And was Ryan an employee of Bold Array?
11    A    Yes.
12    Q    Is Mr. Fulton still an employee of
13  Bold Array?
14    A    No.
15    Q    Did it work out the way you had planned?
16    A    What?
17    Q    Having Mr. Fulton go and sit with Jeff at
18  Hi-Lite.
19        MS. MC CLIMAN:  Vague and ambiguous.
20        MR. ANDERSON:  Object to the form.
21        THE WITNESS:  It planned out to gain
22  information?  If you read the next sentence, we
23  didn't really move forward in gaining anymore
24  knowledge on how the product worked.  They were --
25  the day that we went out there, they were too busy.

1  BY MR. SOZZANI:
2    Q    What were some of the problems that you had
3  developing the configurator?
4    A    Miscommunication.
5    Q    Between?
6    A    Us and them.
7    Q    Bold Array and Hi-Lite?
8    A    Yeah.
9    Q    It says that Mr. Fulton left abruptly; is
10  that correct?  On the next page.  Sorry.
11    A    Yeah, that is correct.
12    Q    Did that impact the project that you were
13  working on for Hi-Lite?
14        MR. ANDERSON:  Object to the form.
15        THE WITNESS:  It did have an impact.
16  BY MR. SOZZANI:
17    Q    What was Mr. Fulton's role in developing
18  the project for Hi-Lite?
19        MR. ANDERSON:  Object to the form.
20        THE WITNESS:  We've gone over this, but a
21  developer on the project.
22  BY MR. SOZZANI:
23    Q    Having reviewed all the E-mails that I've
24  put in front of you today, would you agree that
25  Hi-Lite has systematically and repeatedly referenced

1  the Barn Light Electric.com website in developing
2  BarnLight Originals.com?
3        MR. ANDERSON:  Object as to form.
4        MS. MC CLIMAN:  Vague and ambiguous.
5        THE WITNESS:  It's mentioned throughout
6  various E-mails.
7  BY MR. SOZZANI:
8    Q    And throughout a time period; isn't that
9  correct?
10    A    Based on the dates and the timestamps on
11  the E-mails, it's throughout a time period.
12    Q    Would you say that it's a fair statement
13  that Bold Array was directed by Hi-Lite to reference
14  Barn Light Electric.com throughout the entire
15  development and design period for
16  BarnLight Originals.com?
17        MR. ANDERSON:  Object to the form.
18        THE WITNESS:  Yes.
19  BY MR. SOZZANI:
20    Q    Mr. Nolan, are there any answers to any of
21  my questions that you wish to change before I
22  suspend this deposition?
23    A    Not that I know of.
24    Q    Is there any information concerning a topic
25  that we've discussed today which you'd like to

1  provide additional information?
2    A    Not that I can think of.
3        MR. SOZZANI:  Okay.  Well, thank you,
4  Mr. Nolan for being here today.  Greatly appreciate
5  your time and Counsel's time as well.
6        I have no further questions at this time.
7  I will reserve the remainder of my time to redirect
8  subject to opposing Counsel's cross-examination, and
9  I will also reserve the rest of my time pending
10  Plaintiff's motion to compel.  That's all.
11
12        EXAMINATION
13  BY MR. ANDERSON:
14    Q    We can stay on the record.  I just have few
15  quick questions.  What I want to do generally is ask
16  you some questions to clarify the record.
17        You testified earlier that you understood
18  that Hi-Lite and BarnLight Originals were two
19  distinct companies; correct?
20    A    Yes.
21    Q    Do you know when BarnLight Originals was
22  formed?
23    A    No.
24    Q    Do you know who the domain name
25  "BarnLight Originals.com" is registered to?

51 (Pages 198 - 201)

1   A   No.
2   Q   Do you know who the owner of
3   BarnLight Originals is?
4   A   No.
5   Q   Who did you -- with regard to the
6   BarnLight Originals website and the
7   BarnLight Originals logo, who did you believe had
8   ultimate approval with regard to any changes to the
9   logo or the website?
10      MR. SOZZANI: Objection. Speculation.
11      THE WITNESS: Based on signature, it would
12  be Jeff Ohai.
13  BY MR. ANDERSON:
14   Q   Will you refer back to Plaintiff's
15  Exhibit 1B, please. I see a number of signatures on
16  various pages throughout Exhibit 1B. Do they all
17  appear to be by the same person?
18      MS. MC CLIMAN: Counsel, you mean -- are
19  you including initials as well?
20      MR. ANDERSON: Initials and signatures.
21      THE WITNESS: They appear to be.
22  BY MR. ANDERSON:
23   Q   And whose signature and initials does it
24  appear to be of?
25   A   Jeff Ohai.

1   Q   David McAdam has testified this week that
2   he serves as the executive assistant to Jeffrey
3   Ohai. Would that make sense to you?
4      MR. SOZZANI: Objection form.
5      THE WITNESS: That he serves as the
6   executive assistant?
7   BY MR. ANDERSON:
8   Q   Let me rephrase that. If Jeff Ohai, you
9   said, you had sort of the final say with regard to
10  the BarnLight Originals website and logo designs,
11  but most of your communication was with Dave McAdam;
12  correct?
13   A   Correct.
14   Q   So from your perspective, was David McAdam
15  mostly conveying the wishes of Jeff Ohai to
16  Bold Array?
17      MR. SOZZANI: Objection. Objection to
18  form.
19      THE WITNESS: From my understanding, yes.
20  He was what we would consider the conduit in a lot
21  of cases.
22  BY MR. ANDERSON:
23   Q   The point of contact?
24   A   Exactly.
25   Q   It's also of record in this case that

1   Jeffrey Ohai is the owner of BarnLight Originals and
2   that he is also the person to whom the domain name
3   "BarnLight Originals.com" is registered to.
4      MR. SOZZANI: Objection. Mischaracterizes
5   the record. Assumes facts not in evidence.
6      MS. MC CLIMAN: There's no question.
7   BY MR. ANDERSON:
8   Q   When you first started interacting with
9   David McAdam with regard to the creation of the
10  BarnLight Originals.com website, the checks to
11  Bold Array, you said, were paid by Hi-Lite?
12   A   The initial check was by Hi-Lite.
13   Q   But then they subsequently came from
14  BarnLight Originals?
15   A   Exactly. BarnLight Originals is who ended
16  up paying us.
17   Q   And the initial E-mail communications with
18  regard to the creation of the BarnLight Originals
19  website came from a Hi-Lite E-mail address; correct?
20   A   Correct.
21   Q   Why were there no BarnLight Originals
22  E-mail addresses in the beginning?
23   A   I have no idea why.
24   Q   Was the establishment of the
25  BarnLight Originals' E-mail address part of the

1   design or part of the project in designing the
2   BarnLight Originals.com website?
3   A   No.
4   Q   So the BarnLight Originals' E-mail
5   addresses came from somewhere else other than
6   Bold Array?
7   A   Correct.
8   Q   But you did eventually start receiving
9   E-mails from BarnLight Originals and not Hi-Lite?
10   A   Yes.
11   Q   You said that two of the major points of
12  contact with regard to the development of the
13  BarnLight Originals' website were David McAdam and
14  George Gonzalez; correct?
15   A   Correct.
16   Q   And George Gonzalez eventually had a
17  BarnLight Originals' E-mail account?
18   A   Correct.
19   Q   So wouldn't it stand to reason that all of
20  the direction and control that Bold Array received
21  either from David McAdam as the executive assistant
22  of the owner of BarnLight Originals, Jeffrey Ohai,
23  or from George Gonzalez, eventually with the
24  BarnLight Originals' E-mail address, that all of the
25  direction and control relating to the website and

52 (Pages 202 - 205)

1 the logo design were actually by
2 BarnLight Originals?
3     MR. SOZZANI:  Objection to form.
4     THE WITNESS:  In the end, you could say
5 yeah.
6 BY MR. ANDERSON:
7     Q   Right.  So initially --
8     A   Initially.
9     Q   -- you had some guys maybe with an idea for
10 a new company?
11     A   Correct.  Yeah.  Initially, I mean, all the
12 communication was through a Hi-Lite domain.
13     Q   Right.  But it all seemed to be directed by
14 Jeff Ohai?
15     MR. SOZZANI:  Objection.
16     THE WITNESS:  He had the final say.
17     MR. SOZZANI:  Form.
18 BY MR. ANDERSON:
19     Q   He had the final say.  He signed
20 everything?
21     A   Yes.  Everything -- in order for us to move
22 forward in the project, his signature was always the
23 required signature and that's what we were told is
24 he's the one who has to sign off on it.
25     Q   Right.

1     A   David or George did not have the authority
2 or Matios.
3     Q   So then doesn't it follow that the
4 direction with regard to the website and the logo
5 having ultimately having to be approved by Jeff
6 Ohai, the owner of BarnLight Originals, all that
7 direction was in Jeff Ohai's capacity as the owner
8 of BarnLight Originals or in David McAdam's capacity
9 as the executive assistant to Jeff Ohai?
10     MR. SOZZANI:  Objection to form.
11 BY MR. ANDERSON:
12     Q   It was a confusing question.  Who do --
13     A   We didn't understand -- we were never -- we
14 were never -- we never understood the separation
15 between Hi-Lite and BarnLight Originals.
16     Q   But you understood they were separate?
17     A   We understood they were separate because
18 they were considered separate entities.
19     Q   Right.
20     A   And beyond that, we had -- they're separate
21 entities as far as we know.
22     Q   So if you had to choose who you thought the
23 owner of the logo was, would you guess it was
24 BarnLight Originals or Hi-Lite?
25     MS. MC CLIMAN:  Calls for speculation.

1     Don't guess.
2     MR. SOZZANI:  Objection to form.
3 BY MR. ANDERSON:
4     Q   Who do you think owns the
5 BarnLight Originals logo?
6     MR. SOZZANI:  Objection to form.  Asks for
7 speculation.
8 BY MR. ANDERSON:
9     Q   You can answer.
10     A   The one signing the document to approve it,
11 which would be Jeffrey Ohai.
12     Q   Jeffrey Ohai, the owner of
13 BarnLight Originals?
14     MR. SOZZANI:  Objection to form.
15     THE WITNESS:  We weren't aware who the
16 actual owner was.  He was listed -- everything he
17 signed, he always signed as "VP" also.
18 BY MR. ANDERSON:
19     Q   Can I direct your attention to Plaintiff's
20 Exhibit 47.
21     A   The part list?
22     Q   That's right.  You testified that these
23 were Hi-Lite parts; correct?
24     A   Yes.
25     Q   How did you know that?

1     A   They came from a Hi-Lite E-mail address.
2     Q   And is there anything in the part numbers
3 that would lead you to believe that they were
4 Hi-Lite parts?
5     A   We were told by Matios they were Hi-Lite
6 parts.
7     MR. ANDERSON:  I have no further questions.
8     MR. SOZZANI:  Brief redirect.
9     MR. ANDERSON:  I'd like to reserve the
10 remainder of my time, of course.
11     MR. SOZZANI:  Re-redirect, Counsel?
12     MR. ANDERSON:  Just to the extent it's
13 needed in the future.
14
15     FURTHER EXAMINATION
16 BY MR. SOZZANI:
17     Q   Mr. Nolan, you stated that when Mr. Ohai
18 would sign documents for Bold Array approving
19 designs and things of that nature relating to the
20 BarnLight Originals.com website, that he would often
21 sign "VP"; is that correct?
22     A   We noticed that it said "VP" under title.
23     Q   What is -- what does "VP" mean to you?
24     A   Most commonly, it's known as
25 vice president.

1    Q   Did you know that Jeffrey Ohai is
2  vice president of Hi-Lite Manufacturing?
3    A   No, but you would assume based on initial
4  contact that he would be.
5    Q   So would you have a different understanding
6  of who is signing the documents if you knew that
7  Jeffrey Ohai was vice president and was signing
8  "VP"?
9        MR. ANDERSON:  Object to form.
10       MS. MC CLIMAN:  Misstates testimony.
11  BY MR. SOZZANI:
12    Q   Let me rephrase that.  I'm sorry that was a
13  poor question.
14       Knowing that Jeffrey Ohai was
15  vice president of Hi-Lite Manufacturing and knowing
16  that he signed many of the documents using the
17  initials "VP" either before or after his name, would
18  you assume that he was signing those documents in
19  his capacity as vice president of
20  Hi-Lite Manufacturing?
21       MS. MC CLIMAN:  Don't guess.
22       MR. ANDERSON:  Object to the form.
23       THE WITNESS:  No, I wouldn't assume.
24  BY MR. SOZZANI:
25    Q   Do you -- do you believe that he was

1  signing Bold Array documents in his capacity as
2  vice president of Hi-Lite Manufacturing?
3    A   Did I believe that?  Yes.
4    Q   You also stated earlier that you just
5  didn't understand the difference between the
6  entities; right?
7    A   Correct.
8    Q   Between BarnLight Originals on one hand and
9  Hi-Lite on the other hand.  Why did you feel that
10  way?
11    A   For us, we just didn't see a clear
12  definition between the two companies, nor did it
13  really matter to us.  We were hired to do a job, and
14  we were told who to interact with.  And if those
15  people changed companies or -- we never really
16  asked.  We just know this is -- we first got our
17  check from Hi-Lite, and then all proceeding checks
18  were from BarnLight.  So we just continued working
19  with the individuals we were told, but we never
20  really inquired what company is this.  We just knew
21  that we had to build the BarnLight Originals
22  website.
23    Q   I understand.
24    A   So from that perspective, it was kind of
25  irrelevant to us.

1    Q   Was it your understanding that the
2  companies are both housed in the same building?
3        MR. ANDERSON:  Object to the form.
4        THE WITNESS:  I have no idea where
5  BarnLight Originals is housed, but --
6  BY MR. SOZZANI:
7    Q   Fair enough.  Let me ask you the question
8  differently.  You said early on in today's
9  deposition that you had some in-person meetings with
10  Mr. Ohai and Mr. McAdam?
11    A   Correct.
12    Q   At Hi-Lite?
13    A   Correct.
14    Q   Did you visit the Hi-Lite facilities?
15    A   Yes.
16    Q   When you were at the Hi-Lite facilities,
17  were you told that BarnLight Originals was going to
18  exist in the same location?
19    A   No.  There was never a reference --
20  whenever we visited Hi-Lite facilities, there was
21  never a reference that this is BarnLight Originals'
22  location.  That's just where we met.
23    Q   Where does BarnLight Originals exist?
24       MS. MC CLIMAN:  Calls for speculation.
25       MR. ANDERSON:  Object to the form.

1        MS. MC CLIMAN:  Vague and ambiguous.
2  BY MR. SOZZANI:
3    Q   What's your understanding as to where
4  BarnLight Originals exists?
5        MS. MC CLIMAN:  Vague and ambiguous.
6        MR. ANDERSON:  Object to form.
7        THE WITNESS:  It's a Nevada corporation.
8        MR. SOZZANI.  Fair enough.
9        I have no further questions.  Reserve my
10  time.
11       MR. ANDERSON:  We're done.
12       MS. MC CLIMAN:  Excellent.
13       MR. SOZZANI:  Thank you very much,
14  Mr. Nolan.
15       THE WITNESS:  Thank you.
16       THE VIDEOGRAPHER:  We're off the record at
17  6:15 p.m.
18       (TIME NOTED: 6:15 p.m.)
19
20
21
22
23
24
25

54 (Pages 210 - 213)

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA


BARN LIGHT ELECTRIC COMPANY,       )
LLC,                               )
                                   )
              Plaintiff,           )  Civil Action No.:
                                   )  8:14-cv-01955-MSS-AEP
vs.                                )
                                   )
                                   )
BARNLIGHT ORIGINALS, INC.,         )
HI-LITE MANUFACTURING              )
COMPANY, INC., and JEFFREY         )
L. OHAI,                           )
                                   )
              Defendants.          )

               - - - - -

THE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
              WILLIAM SHAWN SANDERS
            THURSDAY, OCTOBER 1, 2015
               - - - - -


        The videotaped videoconference deposition
of WILLIAM SHAWN SANDERS, called by the
Defendants for examination pursuant to the
Federal Rules of Civil Procedure, taken before
me, the undersigned, Elaine S. Newlin, Notary
Public within and for the State of Ohio, taken
at the offices of Cady Reporting Services, Inc.,
Western Reserve Building, Suite 440, 1468 West
9th Street, Cleveland, Ohio, commencing at
9:58 a.m., the day and date above set forth.

---

2

APPEARANCES:

On behalf of the Plaintiff:
    Joseph Sozzani, Esq. (via videoconference)
    Feldman Gale, PA
    400 North Tampa Street, Suite 2830
    Tampa, Florida 33602
    813-374-8890
    jsozzani@feldmangale.com

On behalf of the Defendants:
    Michael J. Colitz, Esq. (via videoconference)
    Gray Robinson, PA
    401 East Jackson Street, Suite 2700
    Tampa, Florida 33602
    813-273-5000
    michael.colitz@gray-robinson.com

ALSO PRESENT:
    Ivan Bercian, Videographer

---

3

WILLIAM SHAWN SANDERS DEPOSITION INDEX

Examinations                    Page
BY MR. COLITZ:.....................6
BY MR. SOZZANI:....................20
BY MR. COLITZ:.....................67
BY MR. SOZZANI:....................70


E X H I B I T S
(All exhibits were premarked.)

No.        Description          Page

Exhibit No. 1  Barn Light Electric Company   10
               Sales Receipt dated 1/16/12;
               Bates No. BLO0030427

Exhibit No. 2  1-page document entitled      11
               Order: Order info - The
               Original Barn Light:
               Gooseneck Lights, Rustic
               Lighting, Sign...Page 1 of 2

Exhibit No. 3  Photo of three stacked        12;
               cardboard boxes; top box      47
               says Barnlight Electric

Exhibit No. 4  Two photos of a black light   47
               fixture with a Barnlight
               Electric label

Exhibit No. 5  Internet Archive Wayback      13
               Machine printout of a
               January 9, 2012 blog re
               Barnlight Electric Barn
               Pendants with attached photo
               of a light fixture (4 pages)

Exhibit No. 6  Internet Archive Wayback      16
               Machine printout of a
               December 27, 2012 Barn Light
               Electric Barn Lighting list
               with attached photo of a
               light fixture (4 pages)

---

4

E X H I B I T S (Continued)
(All exhibits were premarked.)


No.        Description          Page


Exhibit No. 1A  24 pages of various e-mails   --
                to and from David McAdam and
                Shawn Sanders dating from
                10/21/11 to 1/25/12 (Premarked
                but not identified on the
                record.)

Exhibit No. 2A  Part Numbers list of 10 items 59

Exhibit No. 2B  21 pages of printouts of      --
                various light fixtures and
                lighting accessories with
                pricing and specifications
                information (Premarked but
                not identified on the record.)

1    It might be longer.  I can't remember.
2    Q  Have you likewise heard of a company called
3        Barn Light Electric?
4    A  I have, only in looking on the Internet here
5        and there.
6    Q  How did you come to learn about Barn Light
7        Electric?
8    A  Basically I had heard from some distributors
9        that their -- Hi-Lite was selling lighting
10       fixtures online.  I looked at it at that point
11       and then I -- Hi-Lite asked me to purchase some
12       products from the company.
13   Q  Now, did he ask you to purchase products from a
14       company called Barn Light Electric?
15   A  Yes.
16   Q  And so you visited -- did you visit the Barn
17       Light Electric website?
18   A  I did.
19   Q  And what did you purchase from Barn Light
20       Electric?
21   A  They asked me to purchase, I think it was -- I
22       guess from this, it was seven different
23       fixtures and --
24   Q  What are you referring to right now?
25   A  Exhibit 1.

1                    - - - - -
2             (Exhibit No. 1 was premarked.)
3                    - - - - -
4    Q  What do you identify Exhibit 1 to be?
5    A  My sales receipt from Barn Light Electric in
6        which I purchased seven different fixtures,
7        including one set that has arm -- an arm with
8        it.
9    Q  And does this appear to be the sales receipt
10       that you received?
11   A  This is the sales receipt that I received.
12   Q  And what types of lighting fixtures does it
13       show that you purchased?
14   A  It looks like three different models of a
15       16-inch shade in -- a couple in black, a couple
16       in galvanized, cord hung, and then one that is
17       attached with three arms that go with it in
18       black.
19   Q  Did somebody ask you to make this purchase?
20   A  Yes.
21   Q  Who asked you to make this purchase?
22   A  David McAdam.
23   Q  And do you know why he asked you to make the
24       purchase?
25             MR. SOZZANI:        Object to

1        form.
2    A  He had -- he wanted to verify that they were
3        actually selling true Hi-Lite product.
4                    - - - - -
5             (Exhibit No. 2 was premarked.)
6                    - - - - -
7    Q  And I believe you also have what's been marked
8        as Exhibit Number 2.  Do you recognize that
9        document?
10   A  I do.
11   Q  And what do you recognize it to be?
12   A  It was their e-mail confirmation to me on the
13       order that I placed with them.
14   Q  And when you say they, are you referring to --
15   A  Barn Light -- yes, Barn Light Electric's
16       confirmation to me on my sales receipt.
17   Q  Okay.  And was that generated from their
18       website?
19   A  This was generated from their website.  As you
20       can see from the bottom, it came from
21       www.barnlightelectric.com.
22   Q  And do you -- there's a couple different part
23       numbers on there.  Do you recognize some part
24       numbers on this document?
25   A  Yes.  The H-15116 refers to a Hi-Lite -- it's

1        their -- that's the Hi-Lite model number for a
2        16-inch warehouse shade.  And then in the first
3        line of both -- of the Exhibit 2, they have the
4        HL-A which is Hi-Lite's model number for their
5        arm which is their HL-A.
6    Q  So you recognize those numbers as corresponding
7        to Hi-Lite products?
8    A  Those are Hi-Lite product part numbers, yes.
9    Q  And after you placed this order, did you
10       actually receive the products?
11   A  I did.  I received products at my house in
12       Solon.
13   Q  Did they come in boxes?
14   A  They did.
15             MR. SOZZANI:        Objection.
16       Form.
17                    - - - - -
18            (Exhibit No. 3 was premarked.)
19                    - - - - -
20   Q  Turning now to Exhibit Number 3, do those boxes
21       appear to be or do they look like the boxes
22       that you received as a result of this order?
23   A  Those are --
24             MR. SOZZANI:        Objection.
25       Form.

1   A  Those are the boxes I received, yes.

2   Q  Do you recall if anywhere on the box there was

3       a reference to Hi-Lite Manufacturing?

4   A  As far as I know, there was not any reference

5       to Hi-Lite Manufacturing on the box.

6   Q  Did you look at the products inside of the

7       boxes?

8   A  Honestly, I don't remember if I actually opened

9       up the boxes or not to look at them.

10  Q  Are you familiar with something called the

11      Internet Archive --

12  A  No.

13  Q  -- or the Way Back Machine?

14  A  No.

15  Q  Let me turn your attention to Exhibit Number 5

16      which you should have before you.

17      - - - - -

18      (Exhibit No. 5 was premarked.)

19      - - - - -

20  Q  I can tell you that the Internet Archive or the

21      Way Back Machine is a way to tell what a

22      website looked like on a particular date back

23      in history.

24           MR. SOZZANI:     Objection.

25      Form.

1   Q  And Exhibit 5 is a printout from the Internet

2       Archive in January of 2012.

3          Does the document that -- let me back up.

4          In order to make the -- to place the

5      order that you placed, did you actually visit

6      the Barn Light Electric website --

7   A  Yes.

8   Q  -- in order to make that order?

9   A  That's the only way I could do so, yes.

10  Q  Does Exhibit 5 appear to you to look like what

11      the website looked like when you placed your

12      order?

13           MR. SOZZANI:     Objection to

14      form.

15  A  Yes.

16  Q  When you visited the Barn Light Electric

17      website, were there pictures of the products

18      you could order?

19  A  Yes.

20  Q  Were there pictures of barn pendants?

21  A  Yes.

22  Q  Do you recall when you visited the website to

23      place your order, do you recall seeing any H

24      part numbers?

25  A  Yes.

1   Q  And looking at Exhibit Number 5, do you see a

2      part number there H-15116?

3   A  Yes.

4           MR. SOZZANI:     Objection to

5      form.

6   A  That's the part number that I purchased.

7   Q  And do you see there in Exhibit 5 next to that

8      part number a depiction of a light fixture?

9   A  Yes.

10  Q  And does that appear to correspond to that

11      H-15116 part number?

12  A  Yes.

13  Q  And the last page of that exhibit, do you

14      recognize that light fixture?

15           MR. SOZZANI:     Objection.

16      Form.

17  A  Which fixture?

18  Q  It should be the last page of Exhibit 5.

19  A  Oh, I'm sorry.  The last page.  Okay.  Yeah.

20      Yes, I do.  Sorry.

21  Q  On the basis of the part number in that image,

22      would it be your understanding that you were --

23      strike that.

24          On the basis of the part number in that

25      image, when you placed your order, was it your

1      understanding that you were purchasing a

2      Hi-Lite product?

3   A  Yes.

4   Q  Was it your understanding that you were

5      purchasing a product manufactured by Hi-Lite

6      Manufacturing?

7   A  Yes.

8   Q  And at the time you placed your order, did you

9      in fact believe you were purchasing a Hi-Lite

10      product?

11  A  Yes.

12  Q  Did you subsequently come to learn that what

13      you received was not a Hi-Lite product?

14           MR. SOZZANI:     Objection.

15      Form.

16  Q  Let me turn your attention now to Exhibit

17      Number 6.

18      - - - - -

19      (Exhibit No. 6 was premarked.)

20      - - - - -

21  Q  Exhibit 6 is likewise a printout from the

22      Internet Archive.  Does Exhibit 6 appear to be

23      a page of the website that you visited at Barn

24      Light Electric?

A Yes.

Q And do you see on this page any Hi-Lite part numbers?

A Yes.

Q Do you see a part number there that corresponds with your purchase?

A Yeah. The H-15116G.

Q And, again, do you see the photo that corresponds to that part number?

A Yes.

Q Looking at the last page of that exhibit, do you recognize that light fixture?

A Yes, I do.

MR. SOZZANI: Objection. Form.

Q And what do you recognize it to be?

MR. SOZZANI: Objection. Form.

A It looks like a Hi-Lite lighting fixture.

Q On the basis of the part number and the image, would it be your understanding that you would have been purchasing a Hi-Lite product?

MR. SOZZANI: Objection. Form.

A Yes.

MR. COLITZ: What's the basis of the objection?

MR. SOZZANI: There's no foundation laid. What are you referring to?

Q On the basis of -- in Exhibit Number 6, on the basis of the part number H-15116G and the picture that is next to it, would it be your understanding that you would be purchasing a Hi-Lite light fixture?

A Yes.

Q And when you placed the order that's referenced in Exhibit Number 2, was it your belief at the time you placed that order that you were, in fact, purchasing a Hi-Lite product?

A Yes.

Q Did you subsequently come to learn that what you had purchased was not a Hi-Lite product?

A Yes.

Q One other question. The part numbers that are reflected in -- the part number that's reflected in Exhibit 6, the H-15116G, is that the same part number that's reflected in the order information in Exhibit 2, H-15116G?

A That is the first line item in the order information that I received, yes.

Q And likewise, with Exhibit 5, the part number H-15116, does that correspond to the part number that's reflected in the order info in Exhibit 2?

A Yes, it is.

MR. COLITZ: I have no further questions.

MR. SOZZANI: Thank you, counsel.

Before I begin, Mr. Sanders, the court reporter should have a number of exhibits which we've had scanned over to your location in Ohio. If the court reporter could confirm receipt of those exhibits.

THE REPORTER: We received Exhibits 1 through 6.

MR. SOZZANI: Do you have an exhibit which is marked 1A, 2A or 2B?

THE REPORTER: I do not.

MR. SOZZANI: All right. Let's go off the record and if you could check with your front office --

THE VIDEOGRAPHER: Okay. We're off the record --

MR. SOZZANI: -- see if

they've arrived.

THE VIDEOGRAPHER: We're off the record. The time is now 10:16.

(Short break taken.)

THE VIDEOGRAPHER: We're back on the record. The time is now 10:18.

- - - - -

EXAMINATION OF WILLIAM SHAWN SANDERS BY MR. SOZZANI:

Q Good morning, Mr. Sanders.

A Good morning.

Q It looks like we've resolved the issue and we have been able to locate the exhibits which were sent over and we'll get to those in a little bit here.

Just by way of introduction, my name is Joseph Sozzani. I represent the plaintiffs Barn Light Electric Company, LLC in this matter.

And you understand your testimony today is being recorded and it may be utilized in open court should this case go to trial? Do you understand that?

A Yes.

Q Okay. And what did you do to prepare for your

it's ten after. I have some additional
questions.

    MR. SOZZANI:    I just have a
couple of additional questions and I'll be done
here in a second, counsel. I apologize.

BY MR. SOZZANI:

**Q  Did you return the items that you received from**
**Barn Light Electric to Barn Light Electric?**

A  I did not.

**Q  Why not?**

A  'Cause I sent them to Hi-Lite.

**Q  Do you know if they returned them?**

A  I doubt that they would since they didn't have
the receipt. Wouldn't I have to return them?

**Q  I would think. So you kept the receipt?**

A  I did.

**Q  So Hi-Lite never received the receipt from you?**

A  Well, Hi-Lite, I believe I sent the sales
receipt with, but I think I kept another e-mail
that showed another receipt, with my credit
card receipt.

**Q  So you're not sure whether the sales receipt**
**which is Exhibit Number 1 was ever sent to**
**Hi-Lite; is that correct?**

A  I am 100% sure that this would have been sent

---

to Hi-Lite.

**Q  Do you know when you sent it to Hi-Lite?**

A  I don't know if I sent it in along with the
fixtures or if I sent it separately in the mail.

**Q  Do you have an e-mail --**

A  I do.

**Q  -- that shows that particular receipt?**

A  You mean did I send this via e-mail? It's
possible.

**Q  You're just not sure --**

A  Since it's from 2000 --

**Q  -- whether you sent it via e-mail or by letter,**
**by U.S. mail; is that correct?**

A  Since it's from 2012, I have absolutely no
recollection what I did at that time.

**Q  Okay. Fair enough.**

    And this was the only time you ever
**purchased anything from Barn Light Electric;**
**is that correct?**

A  Yes.

    MR. SOZZANI:    I have no
further questions. I will reserve the rest of
my time for redirect.

    - - - - -

---

    RE-EXAMINATION OF WILLIAM SHAWN SANDERS

BY MR. COLITZ:

**Q  Thank you, Mr. Sanders.**

    Mr. Sanders, are you testifying
**truthfully today?**

A  Yes.

**Q  Has anybody paid you so that you would alter**
**your testimony here today?**

A  No.

**Q  Is there anything someone could have paid you**
**to lie here today or not answer truthfully?**

A  No.

**Q  So if you got a free pass to Lightfair, that's**
**not going to change your testimony today?**

    MR. SOZZANI:    Objection.
Form.

A  The $100 or so from Lightfair wouldn't make or
break me one way or another.

**Q  Thank you.**

    I think you previously testified that
your company Opalescence is a Hi-Lite
distributor. Is that correct?

A  It's a manufacturers' repping agency.

**Q  So they're a representative of Hi-Lite?**

A  We're a representative of Hi-Lite, yes.

---

**Q  Does Hi-Lite -- in your capacity as a**
**representative, does Hi-Lite ever provide you**
**photos of its products?**

A  Yes.

**Q  Would you ever use those photos to sell**
**something other than a Hi-Lite product?**

A  No.

    MR. SOZZANI:    Objection.
Form.

    MR. COLITZ:    What's the
basis?

    MR. SOZZANI:    Speculation.

**Q  Have you ever used one of the photos that**
**Hi-Lite provided you to sell a product that was**
**something other than a Hi-Lite product?**

A  Absolutely not.

**Q  And would you ever do that?**

A  No. They would fire us.

**Q  Do you think it's common sense that you**
**shouldn't do that?**

    MR. SOZZANI:    Objection to
form.

A  Yes.

**Q  Would you ever use a part number such as**
**H-15116 to sell to something other than a Hi-Lite**

---

1  part?
2  A  No.
3      MR. SOZZANI:      Objection.
4  Form.
5  Q  Does Hi-Lite allow you to have a private label
6     agreement with them?
7  A  Not us.  They might do it for a distributor.
8  Q  But you don't have any kind of private label
9     agreement with them?
10  A  No.
11  Q  I'm going to ask you to take a look at one of
12     the exhibits that we have gone over.  It's
13     Exhibit Number 6.  If you could turn your
14     attention to Exhibit Number 6.
15  A  Okay.
16  Q  I'm going to ask you to look to the third page
17     of that exhibit.  Do you see where it says
18     Information?
19  A  Yes.
20  Q  Can you read the first sentence under that,
21     under Information?
22  A  "Our collection of Barn Lighting combines
23     numerous shade styles originally seen almost 80
24     years ago."
25  Q  When you read that, is it your understanding

1      that Barn Light as it's used there is
2      describing a type of lighting fixture?
3          MR. SOZZANI:      Objection.
4      Form.
5  A  Correct.  Yes.
6  Q  To the best of your knowledge, does anybody own
7     Barn Light?  Does anybody own that term?
8          MR. SOZZANI:      Objection to
9      form.
10  A  As far as I know, no.
11      MR. COLITZ:      No further
12  questions.
13      MR. SOZZANI:      I just have a
14  couple of last questions for you and I promise
15  we'll get you out of here right away here.
16          - - - - -
17      RE-EXAMINATION OF WILLIAM SHAWN SANDERS
18  BY MR. SOZZANI:
19  Q  Mr. Sanders, are you aware of any private label
20     agreements that Hi-Lite had with any distributor
21     in your 16 years?
22  A  Like I -- the only one that was ever brought to
23     my attention was Barn Light Electric.
24  Q  And was it your understanding that they had a
25     private label agreement with Hi-Lite?

1  A  It was my understanding that Hi-Lite provided
2     fixtures to Barn Light Electric for resale.
3  Q  And is it your understanding that Hi-Lite
4     provided fixtures to Barn Light Electric with a
5     Barn Light Electric logo on the fixture for
6     resale?
7  A  That I do not know.
8  Q  Is it possible?
9  A  It is possible.
10      MR. SOZZANI:      I have no
11  further questions.  Thank you very much for
12  your testimony today, Mr. Sanders.
13      THE WITNESS:      Thank you,
14  guys.
15      MR. COLITZ:      Thank you,
16  Mr. Sanders.  I appreciate your time.
17      THE WITNESS:      No problem.
18      MR. COLITZ:      Hopefully we
19  got you out of here on time.
20      THE WITNESS:      I appreciate
21  it.  Have a great day.
22      MR. COLITZ:      Thank you.
23  You, too.
24      THE VIDEOGRAPHER:   All right.
25  We're off the record.  The time is now 11:21.

1          - - - - -
2      (The videotaped videoconference deposition
3  concluded at 11:21 a.m.)
4          - - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 8:14-CV-01955-MSS-AEP

BARN LIGHT ELECTRIC COMPANY, LLC,

    Plaintiff,

vs.

BARNLIGHT ORIGINALS, INC., HI-LITE
MANUFACTURING COMPANY, INC., and
JEFFREY L. OHAI,

    Defendants.
_____/

\*\*\* HIGHLY CONFIDENTIAL \*\*\*

VIDEOTAPED DEPOSITION OF MICHEAL WILLIAM SCHULTZ
Tuesday, September 29, 2015
10:22 a.m. - 4:07 p.m.
GRAY ROBINSON, P.A.
401 East Jackson Street, Suite 2700
Tampa, Florida 33602
-----------------------------------------

REPORTED BY:
MICHELLE OLSEN BADEN, RPR, FPR, CSR(IL)
Registered Professional Reporter
Florida Professional Reporter
Certified Shorthand Reporter(IL)
Job No.: 1327734

### Page 2

APPEARANCES:

Attorneys for Plaintiff, BARN LIGHT ELECTRIC COMPANY, LLC
  ALEJANDRO J. FERNANDEZ, ESQUIRE
  JOSEPH R. SOZZANI, ESQUIRE
  FELDMAN GALE
  400 North Tampa Street, Suite 2830
  Tampa, Florida 33602
  813-374-8890
  afernandez@feldmangale.com
  jsozzani@feldmangale.com

Attorney for Defendants, BARNLIGHT ORIGINALS, INC.,
HI-LITE MANUFACTURING COMPANY, INC., and JEFFREY L. OHAI
  MICHAEL J. COLITZ, III, ESQUIRE
  STEPHEN G. ANDERSON, ESQUIRE
  GRAY ROBINSON
  401 East Jackson Street, Suite 2700
  Tampa, Florida 33602
  813-273-5000
  michael.colitz@gray-robinson.com
  stephen.anderson@gray-robinson.com

Attorney for Michael W. Colitz
  ALFRED ROUSH, ESQUIRE
  205 South Hoover Boulevard
  Suite 407
  Tampa, Florida 33609
  813-444-5300

ALSO PRESENT:

Cliff Biram, III
US Legal videographer

### Page 3

INDEX

                                      PAGE

Examination By Mr. Colitz.................7
Examination By Mr. Fernandez.............150

Certificate of Reporter.................214
Certificate of Oath.....................215

EXHIBITS

NO.  DESCRIPTION          PAGE

1  Document titled "Top 24 Report Metadata  15
   Properties" with attachment; 4 pages

2  Document with handwritten title "Assembly &  29
   Installation Instructions" for various
   lamps; 6 pages

3  Document with handwritten title "Drawings";  31
   10 pages

4  Document with handwritten title "Parts"; 4  31
   pages

5  Document with handwritten title "Employee  37
   List"; 4 pages

6  WayBackMachine website printout from Barn  49
   Light Electric for Barn Pendants; 4 pages

7  WayBackMachine website printout from Barn  50
   Light Electric for Barn; 3 pages

8  WayBackMachine website printout from Barn  65
   Light Electric for Barn; 3 pages

### Page 4

EXHIBITS (continued)

EXHIBIT NO.    DESCRIPTION       PAGE

9  Document with handwritten title "Emails"; 5  72
   pages

10  E-mail from John LaCorte to Bryan Scott and  76
   Mike Schultz, dated 12/7/11; 1 page

11  E-mail from Mike Schultz dated 12/19/11,  87
   Subject: Fw: Top 24 Products Report(Sorted
   by Product Revenue); 4 pages

12  WayBackMachine website printout for Top 10  99
   Goosenecks; 16 pages

13  Photographs of lamps; 12 pages      102

14  Printout from TheLIGHTChoice for Barn  110
   Lights; 1 page

15  E-mail Chain; 6 pages        118

16  Blank form for Sky Chief lamp; 1 page  120

17  E-mail from Mike Schultz dated 1/18/12 Re:  121
   New Product Meeting; 3 pages

18  Document with handwritten title "Shades for  122
   Sale"; 4 pages

19  Document titled "Top24report.xlsx"; 7 pages  123

20  Barn Light Electric Company, LLC Agreement;  127
   2 pages

21  Barn Light Electric Termination Letter for  127
   Michael Schultz; 1 page

22  Barn Light Electric Memorandum; 2 pages  127

23  Document with two handwritten arrows titled  147
   "Hi-Lite Retail Website Owner Jeff Ohai" 3
   pages

**13**

1    conversation?
2        A    He told me that they had a manufacturing
3    division that they were trying to ramp up.
4        Q    Uh-huh.
5        A    They were currently manufacturing eight or ten
6    lights.
7        Q    Uh-huh.
8        A    And they wanted to design and build, you know,
9    a couple hundred new lights.
10       Q    Uh-huh.  And how soon after that conversation
11   were you hired?
12       A    The next day.
13       Q    Okay.  And what do you believe Brian Scott
14   hired you to do?
15           MR. FERNANDEZ:  Object to form.
16   BY MR. COLITZ:
17       Q    What did Brian Scott hire you to do?
18       A    To start their -- well, to increase their
19   manufacturing ability.
20       Q    Okay.  Did he tell you which -- at that time,
21   which eight lights they currently manufactured?
22       A    I have drawings of the original lights that --
23   that they were making at that point in time.
24       Q    Okay.  And where were they actually physically
25   manufacturing those lights?

**14**

1        A    Correct.
2        Q    Where?  What -- what location?
3        A    "Lighting Industrial South" is what the
4    building was originally called.
5        Q    Uh-huh.
6        A    When I was hired, they had three facilities.
7        Q    Uh-huh.
8        A    One was their main office and then they had
9    Lighting Industrial South and Lighting Industrial North.
10       Q    Okay.
11       A    So they had a building with a powder coat
12   division.
13       Q    Uh-huh.
14       A    And they were having metal lamp shades made
15   somewhere else and they were bringing them in and
16   painting them and putting them together and selling
17   them.
18       Q    But it was a physical -- physically a
19   different building than their showroom?
20       A    Correct.
21       Q    And they had two of those buildings?
22       A    Correct.
23       Q    And so you believe, in November of 2011, they
24   were making eight different types of lights?
25       A    Correct.

**15**

1        Q    And did Brian ever discuss with you how many
2    more types of lights he wanted to start manufacturing?
3        A    He gave me a list of 24 lights that he wanted
4    to start manufacturing and reverse engineer --
5        Q    Uh-huh.
6        A    -- and he based a bonus -- part of my salary
7    on those 24 lights.
8        Q    Okay.  I'm going to hand you now what -- a
9    document you brought with you today that I would like
10   marked as Exhibit 1.
11           (Defendants' Exhibit 1 was marked.)
12           MR. COLITZ:  And I think we used to have a
13   copy for you, Counsel.
14   BY MR. COLITZ:
15       Q    Do you recognize this document?
16       A    Yes.
17           MR. FERNANDEZ:  Counsel, before we proceed, I
18   would like to designate this deposition as "highly
19   confidential."
20           MR. COLITZ:  That's fine, with the caveat that
21   we'll review it and undesignate any portions that we
22   believe are not confidential.
23           MR. FERNANDEZ:  Well, to the extent that these
24   are documents that were taken from Barn Light
25   Electric, that should be in our purview to determine

**16**

1    whether they are not confidential.
2            MR. COLITZ:  Right.  I'm saying the same
3    ground rules we had for the last deposition.  We'll
4    mark it all "highly confidential" and then we'll
5    have a discussion as to what should or what should
6    not be highly confidential.
7            MR. FERNANDEZ:  Agreed.
8    BY MR. COLITZ:
9        Q    So what do you recognize this document to be?
10       A    I was E-mailed this document the first week
11   that I started at Barn Light --
12       Q    Okay.
13       A    -- from Brian Scott and told me that these
14   were the lights that I was supposed to focus on --
15       Q    Okay.
16       A    -- and find a way to manufacture them.
17       Q    And do you know how he came up with this list?
18       A    I'm assuming amount of sales that they were
19   currently selling.  I believe one there's -- one of the
20   columns is the amount of product that they sold.  I
21   don't know why it's blacked out, but I believe it is the
22   third column.
23       Q    Okay.  So, is it your understanding that these
24   24 were some of the best selling lighting fixtures?
25       A    Correct.

17

1    Q    Okay. Do you -- do you recognize some of
2    these products as coming from a company called Hi-Lite
3    Manufacturing?
4        A    Yes. It states on the paperwork where they
5    came from, who the manufacturer is.
6        Q    Where does it state that?
7        A    That is on the second page.
8        Q    Uh-huh.
9        A    There is a column that states the
10    manufacturer.
11        Q    Uh-huh. And what column -- for the record,
12    what column are you pointing to?
13        A    One right there that says "Hi-Lite."
14        Q    Got it.
15        A    It's on the second page.
16        Q    Umm --
17        A    You see it?
18        Q    So what was -- when he gave you this list,
19    what was your understanding that your job was as to the
20    Hi-Lite products?
21        A    He was currently having the metal lamp shades
22    made somewhere else.
23        Q    Uh-huh.
24        A    And he wanted to start a manufacturing
25    division in Titusville where he could actually make his

18

1    own lamp shades.
2        Q    Uh-huh.
3        A    So he hired me to find companies and metal
4    companies and material that he could use to make metal
5    lamp shades.
6        Q    But specifically on this list are products
7    that came from Hi-Lite Manufacturing, correct?
8        A    Correct.
9        Q    What did he want you to do with those
10    products?
11        A    He wanted --
12        MR. FERNANDEZ: Object to form.
13    BY MR. COLITZ:
14        Q    You can answer.
15        A    He wanted me to reverse engineer them so they
16    could start manufacturing them.
17        Q    Did he specifically tell you that?
18        A    Yes.
19        Q    And walk me through that conversation.
20        A    He -- we had a conversation one day where he
21    told me that he had -- was in multiple screaming matches
22    with the owner of Hi-Lite --
23        Q    Uh-huh.
24        A    -- and it got so heated that they weren't even
25    allowed to talk to each other anymore so his wife had to

19

1    talk to them.
2        Q    Uh-huh.
3        A    And he came in multiple times and said, "I
4    want you to get this list done so we don't have to buy
5    from them anymore."
6        Q    Can -- when he said "get this list done," what
7    do you think he meant by that?
8        MR. FERNANDEZ: Object to form.
9    BY MR. COLITZ:
10        Q    You can answer.
11        A    Find a way to reverse engineer them as close
12    as we could.
13        Q    Did he ever indicate to you that he had
14    permission from Hi-Lite to do that?
15        A    No.
16        Q    Do you think he would get permission from
17    Hi-Lite to do that?
18        MR. FERNANDEZ: Object to form.
19    BY MR. COLITZ:
20        Q    Do you think he had permission from Hi-Lite --
21        MR. FERNANDEZ: Object to form.
22        MR. COLITZ: Can you let me finish the
23    question, Alex?
24        MR. FERNANDEZ: Uh-huh.
25        MR. COLITZ: I appreciate that.

20

1    Can you read back the question?
2    (Record read as follows:
3    "Q  Do you think he got permission from
4    Hi-Lite --")
5    BY MR. COLITZ:
6        Q    Do you think Brian Scott had permission from
7    Hi-Lite Manufacturing to reverse engineer these
8    products?
9        MR. FERNANDEZ: Object to form.
10    BY MR. COLITZ:
11        Q    You can answer.
12        A    No.
13        Q    Okay. Did he ever direct you to be secretive
14    about this?
15        MR. FERNANDEZ: Object to form.
16        THE WITNESS: He did not direct me to be
17    secretive about it --
18    BY MR. COLITZ:
19        Q    Uh-huh.
20        A    -- but he set up the two other facilities --
21        Q    Uh-huh.
22        A    -- so that Hi-Lite would not know that they
23    had those facilities.
24        Q    So do you believe Brian Scott was trying to
25    hide this fact from Hi-Lite?

21

A Yes.
MR. FERNANDEZ: Object to form.
MR. COLITZ: Mr. Fernandez, I understand that you are going to have objections but the court reporter can't transcribe two people at one time.
MR. FERNANDEZ: I understand but there is no pause between your questions and his answers so I need an opportunity to object.
MR. COLITZ: Okay.
BY MR. COLITZ:
**Q So Mr. Schultz, just a pause before -- before you answer.**
MR. COLITZ: Madam Court Reporter, can you read back that question?
(Record read as follows:
"Q Do you believe that Brian Scott was trying to hide this fact from Hi-Lite?")
MR. COLITZ: Mr. Fernandez, you would like to interpose an objection?
MR. FERNANDEZ: Object to form.
BY MR. COLITZ:
**Q Okay. You can answer.**
A Yes.
**Q Okay. And once you had this list, was it then**

22

**your job to figure out how to reverse engineer these parts?**
A Part of my job and then the other gentleman, John LaCorte, that was their consultant.
**Q Okay. And what was done to reverse engineer the parts?**
A John hired a engineering firm --
**Q Uh-huh.**
A -- from Tampa to come in and do drawings, 3-D drawings of these products.
**Q Uh-huh.**
A And we designed molds and bought equipment to actually manufacture that product.
**Q Just let me back up. Who is John LaCorte?**
A John LaCorte was the consultant, the gentleman I worked with at Sunovia.
**Q Uh-huh. And he was hired by Barn Light Electric?**
A Correct.
**Q And he was a contract employee?**
A Correct.
**Q And he was a contract employee prior to your employment at Barn Light Electric?**
A Correct. He is the one that introduced me to Barn Light.

23

**Q Okay. And what was Mr. LaCorte hired to do?**
A He was hired to actually start the manufacturing division, actually do what my job was. But he was working for another company full-time and could not commit to that so he went on to consulting -- part-time consulting basis and then they hired me.
**Q So was it Mr. LaCorte who originally approached you about the opportunity at Barn Light Electric?**
A Yes.
**Q And, at that time, what did he tell you the job would be?**
A He just told me that they were ramping up manufacturing and they needed some help.
**Q Okay. Did -- was Mr. LaCorte familiar with this list of 24 products that's indicated in Exhibit 1?**
MR. FERNANDEZ: Object to form.
THE WITNESS: I don't know.
BY MR. COLITZ:
**Q Okay. So were these products, this list of 24 products, the Hi-Lite products, did you actually get samples from Hi-Lite?**
A Yes, I was given samples of those lights.
**Q And is it your understanding that those actually came from Hi-Lite?**

24

A Yes.
**Q And then what did you do with those -- with those samples?**
A Eventually, ended up giving them to the engineering firm and they drew them up in 3-D so we could make molds and reproduce them.
**Q Okay. So when you say you gave them to the engineering firm, is that this Bay Area Innovations?**
A Correct.
**Q How did you actually get the products to Bay Area Innovations?**
A We had a weekly meeting where they would drive over from Tampa to Titusville and, typically, at the end of the day they would go home with multiple samples of lights and parts and pieces.
**Q Did this occur on more than one occasion?**
A Yes. Weekly.
**Q How many times do you think that happened?**
MR. FERNANDEZ: Object to form.
THE WITNESS: 20 or 30 times.
BY MR. COLITZ:
**Q And so the people from Bay Area Innovations would come over to Titusville?**
A Yes.
**Q And you would provide them with sample**

Page 25

```
1   products?
2       A   Yes.
3       Q   And those would be products from Hi-Lite
4   Manufacturing?
5       A   Yes.
6       Q   And then they would drive them back to Tampa?
7       A   Yes.
8       Q   Do you have any knowledge of what they did to
9   those products back -- once they got them back to Tampa?
10      MR. FERNANDEZ: Object to form.
11      THE WITNESS: They recreated them and drew
12  them in -- in CAD and made different drawings so
13  that we could have them made, either die casting
14  parts or -- or metal molds so we could make lamp
15  shades or whatever the part was, they redesigned
16  that particular part right there.
17      MR. COLITZ: Just for the record, can you get
18  that on video?
19  BY MR. COLITZ:
20      Q   What do you recognize that part to be?
21      A   It is a component to make a -- a lamp. You
22  put it in there. It is adjustable so depending on the
23  size of the lamp, you can move the part up and down --
24      Q   And --
25      A   -- instead of a light bulb.
```

Page 26

```
1       Q   Was that part also provided to Bay Area
2   Innovations?
3       A   Yes.
4       Q   And is it your understanding that Bay Area
5   Innovations then copied that product?
6       A   Correct.
7       Q   What was the work product of Bay Area
8   Innovations as a result of this?  Did they provide
9   engineering drawings?
10      MR. FERNANDEZ: Object to form.
11      THE WITNESS: Yes. They were hired to provide
12  engineering drawings and work instructions on how to
13  put the products together.
14  BY MR. COLITZ:
15      Q   So Bay Area Innovations would give you work
16  product drawings?
17      A   Drawings. Drawings that we could put into the
18  C&C machine or they could actually make a mold. Die
19  cast drawings like this, where we could send it to our
20  die caster and they could manufacture that product.
21      Q   And do you remember receiving those products
22  from them?
23      A   Yes.
24      Q   How many diff -- different sets of drawings
25  did you receive from Bay Area Innovations?
```

Page 27

```
1       A   When I left, there was hundreds of products.
2       Q   And so, lets talk about a particular product.
3   For a particular product, what would Bay Area
4   Innovations provide you?  Would they provide you
5   engineering drawings?
6       MR. FERNANDEZ: Object to form.
7       THE WITNESS: They would provide a top-level
8   drawing of the assembly, how the assembly would go
9   together.
10  BY MR. COLITZ:
11      Q   Uh-huh.
12      A   They would give us a lower-level drawing of a
13  mold so that we could actually create the lamp shade.
14      Q   Uh-huh.
15      A   They would create work instructions on how to
16  actually put that product together if they needed it.
17      Q   Uh-huh.
18      A   And they created installation instructions so
19  we could put it in the box and send it out in the field
20  and the customer could install the light.
21      Q   Let me back up. When you provided Bay Area
22  Innovations these Hi-Lite products, was any of the
23  product literature also provided to them?
24      A   I don't -- I mean, they had it at some point
25  in time, but the product literature was already
```

Page 28

```
1   created --
2       Q   Uh-huh.
3       A   -- from a different draftsman --
4       Q   Uh-huh.
5       A   -- Hal Hinton.  He had already created those
6   prior to me working there.
7       Q   Do you have any knowledge of any of Hi-Lite's
8   instruction sh -- sheets being copied?
9       A   Yes.  You have a copy of them.
10      Q   Okay.  So that would be an instruction
11  sheet -- I'm going to ask you to -- these are the
12  documents you provided, if you could maybe go through
13  there and find an example of an instruction sheet that
14  you were referring to.
15      MR. FERNANDEZ: Counsel, would you agree to
16  produce those documents?
17      MR. COLITZ: Yeah.
18  BY MR. COLITZ:
19      Q   Okay.
20      A   That's not it.
21      Q   Oh, that's not it?
22      A   No.  It looks similar to that but it's not.
23  Correct.
24      MR. COLITZ: Mr. Fernandez.
25      MR. FERNANDEZ: Thank you.
```

7  (Pages 25 to 28)

29

1    BY MR. COLITZ:
2        Q    So, handing you now what we are marking as
3    Exhibit Number 2 and ask if you can identify that
4    document?
5        A    Identify it how?
6        Q    Can you mark that as Exhibit Number 2?
7        (Defendants' Exhibit 2 was marked.)
8    BY MR. COLITZ:
9        Q    I'm handing you now what has been marked for
10   identification as Exhibit Number 2 and what do you
11   recognize this document to be?
12       A    It is an installation instruction for a
13   gooseneck light.
14       Q    Okay.
15       A    There is actually multiple installation
16   instructions for different types of lights, stem light,
17   chord light, wall mounted light.
18       Q    And who generated this installation
19   instruction?
20       A    Hal Hinton.
21       Q    Okay.
22       A    And it's dated on the bottom.  It has his name
23   on there, they were approved by Brian Scott --
24       Q    And --
25       A    -- October 11th.

30

1        Q    And is Hal Hinton an employee at Barn Light
2    Electric?
3        A    He was.  I terminated him while I was there.
4        Q    Okay.  How did Mr. -- to the best of your
5    knowledge, how did Mr. Hinton come up with this drawing?
6        A    He was given Hi-Lite's instructions and I
7    would guess copied it word for word.
8        Q    Okay.  And are you aware any of other drawings
9    of Hi-Lite's that were copied?
10       MR. FERNANDEZ:  Object to form.
11   BY MR. COLITZ:
12       Q    Are there any other documents that you brought
13   with you today that had been copied from Hi-Lite?
14       MR. FERNANDEZ:  Object to form.
15       THE WITNESS:  There are documents of
16   components.
17   BY MR. COLITZ:
18       Q    Okay.  Go ahead and set them out.  When you
19   find one, set it out.
20       A    There are the original drawings of the lights
21   that they were creating prior to me working there.
22       Q    Okay.
23       MR. FERNANDEZ:  Mr. Colitz, did you receive
24   these documents prior to this deposition?
25       MR. COLITZ:  I did not.

31

1        MR. FERNANDEZ:  Okay.
2        MR. COLITZ:  Which is why it's taking me a
3    little time.
4        Madam Court Reporter, can we mark this as
5    Exhibit Number 3 and Exhibit Number 4?
6        (Defendants' Exhibit 3 was marked.)
7        (Defendants' Exhibit 4 was marked.)
8        MR. COLITZ:  Counsel, that is going to be
9    Exhibit Number 3 and Exhibit Number 4.
10   BY MR. COLITZ:
11       Q    Do you recognize -- can you identify Exhibit
12   Number 3?
13       A    Yes.  These are drawings of lamp shades that
14   Barn Light was having manufactured.
15       Q    Okay.  And who -- who generated this drawing?
16       A    Hal Hinton.
17       Q    Okay.
18       A    His name is on the bottom again and it's dated
19   and signed off by Brian.
20       Q    Is it your understanding that Mr. Hinton
21   copied this drawing from a Hi-Lite drawing?
22       MR. FERNANDEZ:  Object to form.
23       THE WITNESS:  Either from a drawing or from an
24   actual product.
25   BY MR. COLITZ:

32

1        Q    Okay.  And, likewise, can you identify Exhibit
2    Number 4?
3        A    Yes, these are -- it's a few components used
4    to make a light.
5        Q    And, again, it was generated by Mr. Hal
6    Hinton?
7        A    Correct.
8        Q    And you believe Mr. Hinton copied a Hi-Lite
9    drawing for this?
10       MR. FERNANDEZ:  Object to form.
11       THE WITNESS:  A drawing or something out of
12   the catalog.
13   BY MR. COLITZ:
14       Q    Okay.
15       A    Or a real product.
16       Q    Other then these examples that we have here in
17   Exhibits 2, 3 and 4, are you aware of any other drawings
18   of Hi-Lites that were copied?
19       MR. FERNANDEZ:  Object to form.
20       THE WITNESS:  No.
21   BY MR. COLITZ:
22       Q    Okay.  Do you believe that Brian Scott knew
23   that these drawings were being copied?
24       MR. FERNANDEZ:  Object to form.
25       THE WITNESS:  Yes, you know, he signed off on

Page 33

1     them --
2     BY MR. COLITZ:
3     **Q**   Okay.
4     A   -- that he reviewed them.
5     **Q**   **All right. Given your understanding of**
6   **Mr. Scott's management style, would it have been**
7   **uncommon for something -- for a drawing like this to**
8   **have been copied and Mr. Scott not be aware of that?**
9     MR. FERNANDEZ: Object to form.
10    THE WITNESS: No.
11   BY MR. COLITZ:
12    **Q**   **How were you paid at Barn Light Electric?**
13    A   I was paid a salary and promised a bonus.
14    **Q**   **Okay. And how much was your salary?**
15    A   It started at 100,000.
16    **Q**   **Uh-huh. And did you periodically get bonuses?**
17    A   I was supposed to get one lump-sum bonus when
18  I helped remanufacture that top 24 list.
19    **Q**   **Uh-huh.**
20    A   And then, during my employment, I was promoted
21  and given a $25,000 raise.
22    **Q**   **So is it fair to say that your bonus was tied**
23  **to your ability to recreate the products that are listed**
24  **on Exhibit 1?**
25    MR. FERNANDEZ: Object to form.

Page 34

1     THE WITNESS: Directly correlated to that.
2   BY MR. COLITZ:
3    **Q**   **Okay. Did -- who communicated that to you?**
4    A   Brian Scott.
5    **Q**   **And what did he say?**
6    A   He said, "Here is a list of products that we
7  need to re -- reverse engineer and if -- if you do that,
8  I'll give you $25,000."
9    **Q**   **Okay. Who was -- was Brian Scott your direct**
10  **supervisor at Barn Light Electric?**
11    A   For most of my employment.
12    **Q**   **Uh-huh.**
13    A   His wife stepped in towards the end of my
14  employment.
15    **Q**   **Did -- did Donna Scott have knowledge of this**
16  **list of 24 products that is in Exhibit Number 1?**
17    A   Yes.
18    MR. FERNANDEZ: Object to form.
19    MR. COLITZ: Can you re -- can you rephrase --
20  can you repeat the question, please, Madam Court
21  Reporter?
22    (Record read as follows:
23    "Q Did Donna Scott have knowledge of
24    this list of 24 products that is in
25    Exhibit Number 1?")

Page 35

1     MR. FERNANDEZ: Object to form.
2     THE WITNESS: Yes.
3   BY MR. COLITZ:
4    **Q**   **Was Donna Scott aware that Hi-Lite products**
5  **were being copied?**
6    MR. FERNANDEZ: Object to form.
7    THE WITNESS: Yes. She was the one ordering
8  the products for us to get -- ordering the samples.
9   BY MR. COLITZ:
10    **Q**   **Okay. So Donna Scott was the one that**
11  **actually ordered the products from Hi-Lite?**
12    MR. FERNANDEZ: Object to form.
13    THE WITNESS: Correct.
14    MR. FERNANDEZ: We're going to talk over each
15  other all day if he doesn't give a pause so I would
16  appreciate it if he pauses.
17    THE WITNESS: I'm sorry.
18    MR. COLITZ: Try to give a pause.
19    Can you read -- read back that question?
20    (Record read as follows:
21    "Q So Donna Scott was the one that
22    actually ordered the products from
23    Hi-Lite?")
24    MR. FERNANDEZ: Object to form.
25    THE WITNESS: Yes.

Page 36

1   BY MR. COLITZ:
2    **Q**   **Did she order them one at a time?**
3    MR. FERNANDEZ: Object to form.
4    THE WITNESS: She strategically ordered them
5  throughout the year so they wouldn't question Barn
6  Light actually ordering lights for themselves and
7  actually had them sent to a couple different
8  friends.
9   BY MR. COLITZ:
10    **Q**   **So when you say "strategically," was she**
11  **trying to hide those orders from Hi-Lite?**
12    MR. FERNANDEZ: Object to form.
13    THE WITNESS: Yes.
14   BY MR. COLITZ:
15    **Q**   **And walk me through what steps she took to**
16  **hide -- hide that.**
17    MR. FERNANDEZ: Object to form.
18    THE WITNESS: She would order one light that
19  we needed to redesign and mix it in with a couple
20  other orders.
21   BY MR. COLITZ:
22    **Q**   **Uh-huh.**
23    A   Or she would order a light and have it sent to
24  one of her friend's house --
25    **Q**   **Uh-huh.**

9 (Pages 33 to 36)

37

1    A  -- placing the order under their name.
2    Q    Okay.  Do you happen to know who that person
3    is, who the friend was?
4    A    I would assume it was a couple different
5    employees that worked at Barn Light.
6    Q    Okay.  Can you give me some -- some names?
7        MR. FERNANDEZ:  Object to form.
8        THE WITNESS:  Mark Leathlean.
9    BY MR. COLITZ:
10   Q    Okay.  Can you spell his name?
11   A    No.
12   Q    Okay.
13   A    It's on -- I do have a document where it's
14   spelled though.
15   Q    Sure.
16   A    His last name is L-e-a-t-h-l-e-a-n.
17   Q    Okay.  Well, why don't you pull out that
18   document for me.
19   A    Sure.
20       MR. COLITZ:  Let's mark this as Exhibit
21   Number 5.  Hand that to the court reporter, if you
22   don't mind.
23       (Defendants' Exhibit 5 was marked.)
24   BY MR. COLITZ:
25   Q    And if you could, identify what has been

38

1    handed to you as Exhibit Number 5?
2    A    It is a list of employees.
3    Q    Okay.
4    A    The first part is kind of a summary of what
5    their roles were and then the second part is a -- list
6    that I was given of current employees that were working
7    there --
8    Q    Okay.  And why -- why were you -- who -- who
9    gave this list to you?
10   A    I created the first list and the second list
11   was given to me from HR.
12   Q    Okay.  And I see here that it came from
13   something -- a website called "Dropbox static."  Do you
14   know what that is?
15   A    I had this -- I actually created this top
16   document for Alfred.
17   Q    Okay.
18   A    It's just explaining the people that were
19   involved and it was in my Dropbox.
20   Q    Okay.  So going to the last page of this
21   document -- or the second to last page, you identified
22   Mark Leathlean; is that correct?
23   A    Yes.
24   Q    And you believe that products were shipped to
25   his home address?

39

1    A    Yes.
2    Q    Okay.  How many times do you think that
3    occurred?
4        MR. FERNANDEZ:  Object to form.
5        THE WITNESS:  I -- I don't know.
6    BY MR. COLITZ:
7    Q    Okay.  I'm going to turn back to one of these
8    exhibits.  I believe it is Exhibit Number -- Number 2.
9    A    Okay.
10   Q    Scratch that.  Exhibit Number 4.
11       I'm going to ask you to take a look at the
12   second page of that exhibit.
13   A    Okay.
14   Q    What is -- what is depicted there?
15   A    It is a wall mounting plate.
16   Q    Okay.  Is it your understanding that
17   Barn Light Electric manufactured that wall moun --
18   mounting plate itself?
19   A    Yes.
20   Q    Okay.  And did they do so at one of these two
21   facilities you referred to earlier?
22   A    No.  They had to -- that was a die cast part.
23   They hired an outside firm to make that.
24   Q    Okay.  And what firm was that?
25   A    The original firm was -- I don't remember

40

1    their name.  They are in Oakland, Florida.  It was
2    actually a sand casting facility.  And then they --
3    since they were selling so many of these, they ramped up
4    and had it made in a die cast version and they were
5    having that made it China by Kuen Lee.
6    Q    Kuen Lee?
7    A    Yup.  K-u-e-n, then L-e --
8    Q    K-u-e-n, L-e-e?
9    A    Yeah, two words.
10   Q    And does the name Millennium Manufacturing
11   ring a bell?
12   A    Yes.
13   Q    Is Kuen Lee the same as Millennium or are
14   those two different entities?
15   A    No.  No.  They are a die casting house.  John
16   LaCorte introduced them.  They ended up making -- they
17   made that part there --
18   Q    Okay.
19   A    -- and probably 20 other casting parts.
20   Q    How long did Kuen Lee work with Barn Light
21   Electric?
22   A    I think John brought them in around January or
23   February of 2012.
24   Q    And did you -- do you have knowledge of things
25   being sent to the Kuen Lee, engineering drawing or

10  (Pages 37 to 40)

53

1  minimal change to the dimension of the light.
2  Q   Uh-huh. Are you -- were you aware, during
3  your time at Barn Light Electric, of there being any
4  agreement in place between Barn Light Electric and
5  Hi-Lite concerning the sale of Hi-Lite products?
6  A   I was told that they had an exclusive
7  agreement and they had special pricing.
8  Q   Okay. What -- what -- what do you believe the
9  exclusive agreement was?
10  A   I don't know the details of that.
11  Q   Okay. Do you know what the special pricing
12  was?
13  A   No.
14  Q   But by "exclusive agreement," was it your
15  understanding that Barn Light Electric was not supposed
16  to be selling competitive -- competitive products --
17  products that were competitive to Hi-Lite?
18  MR. FERNANDEZ: Object to form.
19  THE WITNESS: Yes.
20  BY MR. COLITZ:
21  Q   Who told you about the agreement?
22  A   Brian.
23  Q   And what -- what did he say?
24  A   He just told me that they had an agreement
25  with Hi-Lite where they were supposed to sell their

54

1  lights and they were going to be able to sell them at --
2  you know, or -- or buy them at a discounted price. We
3  placed orders based on that discount. It was a volume
4  discount.
5  Q   Uh-huh.
6  A   So they would hold an order for, you know, at
7  the end of the month to move it to the next month if
8  they had already hit their volume discount for that
9  month.
10  Q   Uh-huh. And what is an example of something,
11  pursuant to the agreement, that they should have not
12  been selling?
13  A   I know they were selling products from
14  Baselite --
15  Q   Uh-huh.
16  A   -- Millennium. I actually met with Baselite
17  at one time and -- and I know they were buying some
18  components and lights and -- but I don't -- I don't know
19  the extent of that. Again, that was in a different
20  department or a different building.
21  Q   Was it your understanding that Barn Light
22  Electric purchasing from either Baselite or Millennium
23  was a violation of the agreement?
24  MR. FERNANDEZ: Object to form.
25  THE WITNESS: Yes.

55

1  BY MR. COLITZ:
2  Q   Did Brian Scott or Donna Scott ever
3  acknowledge to you that they were violating this
4  agreement?
5  MR. FERNANDEZ: Object to form.
6  THE WITNESS: Yes.
7  BY MR. COLITZ:
8  Q   What -- what was said?
9  A   It was after a meeting with -- between Brian
10  and Jeff and he came back and said some explicit words
11  and said, "I don't care what they say, I'm going to do
12  what I want."
13  Q   And who did he say that to?
14  A   Me and a bunch of the managers.
15  Q   And when you say "he," who is he?
16  A   Brian Scott.
17  Q   So he came back and said, "I don't care
18  what" --
19  A   What Hi-Lite wants. "I'm going to do what I
20  want."
21  Q   And the meeting that he came out of, who had
22  he been talking to at Hi-Lite?
23  A   Jeff.
24  Q   Okay. What was your reaction to that comment?
25  A   It was pretty typical for him. That was kind

56

1  of his attitude, rule with an iron fist and it was his
2  way or the highway.
3  Q   What was the -- the extent of the sales that
4  Barn Light Electric made through Millennium or Baselite?
5  MR. FERNANDEZ: Object to form.
6  THE WITNESS: I wasn't privy to that
7  information.
8  BY MR. COLITZ:
9  Q   And during what time period -- let's start
10  with Millennium. What time period did -- did they sell
11  the Millennium product?
12  A   I believe they were selling it the whole time
13  that I was there. It was on -- it was listed on -- it
14  was listed on their website.
15  Q   Okay. Did they list it on their website as a
16  Millennium product?
17  A   I believe so.
18  Q   And did they list Baselite products on their
19  website?
20  A   Yes.
21  Q   Are you ever aware of any instances where an H
22  numbered product was listed on the website but instead
23  of selling a Hi-Lite product, they would sell a
24  Millennium product?
25  A   Not a Millennium product. They would sell a

14 (Pages 53 to 56)

57

1 Barn Light created product.
2    Q Is it your understanding that it would have
3 also been a violation of the agreement for Barn Light
4 Electric to sell its products that it manufactured
5 itself?
6      MR. FERNANDEZ: Object to form.
7      THE WITNESS: Yes. There was an instance or
8 an exception for that, that I was told. They
9 actually had -- they manufactured porcelain lights
10 or a version painted in porcelain.
11 BY MR. COLITZ:
12    Q Uh-huh.
13    A And I was told that it was okay if they made
14 porcelain lights because they gave Hi-Lite the
15 opportunity to provide those and Hi-Lite said no.
16    Q Okay. So other than porcelain lights, under
17 the agreement, was Barn Light Electric supposed to be
18 manufacturing any other light fixtures?
19      MR. FERNANDEZ: Object to form.
20      THE WITNESS: They weren't supposed to be
21 manufacturing light fixtures at all.
22 BY MR. COLITZ:
23    Q So the porcelain exception to the agreement,
24 for lack of a better term, was not that they were
25 manufacturing those porcelain products but they were

58

1 just putting porcelain on them?
2    A It's a whole different type of process and
3 different look of light and Hi-Lite didn't want to be in
4 that business. It's a pretty expensive start-up cost to
5 get into that type of business.
6    Q But what I'm getting at is, were they actually
7 manufacturing those porcelain lights or just coating
8 them with porcelain?
9      MR. FERNANDEZ: Object to form.
10      THE WITNESS: They were having the lamp shade
11 manufactured and then they were sending it to
12 another company to have the porcelain coating put on
13 them.
14 BY MR. COLITZ:
15    Q And it was your understanding that that was
16 all okay under the agreement?
17    A Yes.
18    Q Okay. But it's also your testimony that -- or
19 is it your testimony that they were doing manufacturing
20 beyond that?
21    A Yes.
22    Q Were they doing manufacturing beyond the
23 porcelain products when you arrived back in 2011?
24    A Yes. They were making all the products in
25 Exhibit 3.

59

1    Q They were making all the products in Exhibit
2 Number 3?
3    A Yes.
4    Q I think you testified earlier that there were
5 eight products that they were manufacturing when you
6 arrived in 2011?
7    A Well, I have eight drawings. They have been
8 making more but that's only -- the drawings that I have.
9    Q But the eight drawings that you provided are
10 the eight components that they were manufacturing when
11 you arrived in 2011?
12    A Yes.
13    Q And those products are embodied in Exhibits 4,
14 2 and 3?
15    A Correct.
16    Q Okay. Are those eight products listed on your
17 spreadsheet of 24?
18    A No, they were already making these, so.
19    Q Okay. And by the time you left, how many
20 products on the list of 24 were they then manufacturing?
21    A All but one or two.
22    Q Okay. So is it fair to say you were pretty
23 successful in your job?
24    A Yes.
25    Q Okay. Were you aware of any other agreements

60

1 between the -- the Barn Light Electric and -- and
2 Hi-Lite, other than this agreement you have been -- that
3 you have testified to?
4    A No.
5    Q Let's get back to this sale that you discussed
6 earlier about Hi-Lite purchasing one of its own
7 products. Are you aware that that occurred at some
8 point?
9    A Yes.
10    Q And when do you think that happened?
11    A May of 2012.
12    Q Okay. If I told you it happened in January,
13 would that -- January of 2012, would that -- how do you
14 know -- how do you know it was in May of 2012?
15      MR. FERNANDEZ: Object to form.
16      THE WITNESS: We had a management meeting in
17 May of 2012 --
18 BY MR. COLITZ:
19    Q Okay.
20    A -- where Brian came directly from a meeting
21 with Jeff and told us that had happened --
22    Q Okay.
23    A -- and asked us to come up with a plan to
24 basically get rid of manufacturing.
25    Q What's your understanding of what precipitated

61

1    that meeting, of what -- of what Hi-Lite did?

2    A   Brian told us that Hi-Lite bought a -- a light

3    off of Barn Light Electric or had someone else buy it --

4    Q   Uh-huh.

5    A   -- so they didn't know it was Hi-Lite buying

6    it.

7    Q   Uh-huh.

8    A   And when they were delivered the part, it was

9    a Barn Light light.

10    Q   Is it your understanding that the person who

11    made that order, on behalf of Hi-Lite, thought that they

12    were going to get a Hi-Lite product?

13    A   Yes.

14    Q   And instead, they got a product that was made

15    by Barn Light Electric?

16    A   Correct.

17    Q   And what was -- what was Brian Scott's

18    reaction to that?

19    A   He called an emergency meeting and blew up

20    and, you know, told us what was going on and told us

21    that we needed to come up with a plan to try and fix the

22    situation or, you know, get rid of all the people he

23    just hired.

24    Q   But did he acknowledge or did he say anything

25    to the effect of We got caught?

62

1    A   Yes.

2    Q   What did he say?

3    A   He -- he told me the exact story of what had

4    happened. Barn Light -- or Hi-Lite hire -- or bought a

5    light --

6    Q   Uh-huh.

7    A   -- and received one of theirs and called them

8    up and threatened to stop selling lights to Barn Light.

9    Q   And when you say "Barn Light," do you mean

10    Barn Light Electric?

11    A   Yes.

12    Q   Okay. Did he -- was he angry?

13    A   He was more like he had been caught and had

14    his tail between his legs.

15    Q   Okay. Do you think he knew that that sale was

16    a violation of the agreement?

17    MR. FERNANDEZ: Object to form.

18    THE WITNESS: Yes.

19    BY MR. COLITZ:

20    Q   And so this emergency meeting in May of 2012,

21    who -- who is in the meeting?

22    A   Myself and all of the managers.

23    Q   Okay. How many -- at that time, how many

24    people worked at Barn Light Electric?

25    A   Total, 55, 60.

63

1    Q   And how many of those people were managers?

2    A   I would say there was probably 10 or 11 people

3    in the room --

4    Q   Okay.

5    A   -- whether they were direct managers or worked

6    underneath.

7    Q   Did you ever have any conversations with any

8    of those people, outside of the presence of Brian or

9    Donna Scott, regarding that purchase that Hi-Lite made?

10    A   I didn't -- I didn't know that that is what

11    they were doing before that so I -- I didn't know that

12    they were swapping out --

13    Q   Uh-huh.

14    A   -- Hi-Lite lights with Barn lights.

15    Q   So that came as a surprise to you?

16    A   Yes.

17    Q   Do you think that that was underhanded or

18    unfair?

19    MR. FERNANDEZ: Object to form.

20    THE WITNESS: Yes.

21    BY MR. COLITZ:

22    Q   Okay. And so, at the meeting, Brian Scott,

23    did he indicate what you guys were going to do as a

24    result of that?

25    A   He wanted us to come up with a plan to figure

64

1    out what to do next.

2    Q   And why -- why was there a need for a plan?

3    A   Because, at that point in time, Hi-Lite

4    represented about 80 percent of their revenue. They

5    were selling about 7 to $9 million worth of Hi-Lite

6    product a year.

7    Q   Uh-huh.

8    A   And if that disappeared then, you know,

9    their -- their revenue would shrink by 80 percent.

10    Q   And so what -- what -- did you guys actually

11    come up with a plan at that time?

12    A   We came up with a plan to start selling more

13    porcelain lights --

14    Q   Uh-huh.

15    A   -- and not sell powder coated die cast or

16    powder coated lights that were similar to Hi-Lite's.

17    Q   Okay. And was that plan successful?

18    A   Yes. We had a 4th of July sale where we sold

19    a bunch of porcelain lights --

20    Q   Uh-huh.

21    A   -- so we started focusing on -- on making more

22    of those lights.

23    Q   Okay. Did you -- did you ramp up with any

24    other manufacturers?

25    A   We ramped up with multiple manufacturers while

109

1  by side with a Barn Light Electric manufacturer
2  equivalent, you would probably be able to tell the
3  difference?
4      A   Yeah. I would assume that space is somewhere
5  else.
6      Q   Okay. Looking at Page 4, what about that cage
7  there, the written cage?
8      A   That's actually -- it is called a "cast guard
9  light." This is actually two pieces, it's a light and a
10  lamp shade.
11      Q   Uh-huh.
12      A   So Hi-Lite would not sell Barn Light just that
13  light by itself so they were in -- in the process of
14  making that light and have it die casted in China.
15      Q   But what features, if you put this side by
16  side with a Barn Light Electric manufacturer equivalent,
17  would there be features that were similar or features
18  that were different?
19      A   There were different features that they were
20  designing into it, like I said, I never saw the final
21  products. They added some features that they found on a
22  different light that they liked better.
23      Q   Uh-huh.
24      A   And I think the cage itself, maybe it had an
25  extra ring --

110

1      Q   Uh-huh.
2      A   -- or it was shaped a little bit differently.
3      Q   I think you testified earlier that -- that
4  there was a lawyer involved at some point giving advice
5  to Barn Light Electric; is that correct?
6      A   Correct.
7      Q   Do you know the name of that lawyer?
8      A   No, I don't. They talked to him prior to me
9  working there.
10      Q   Okay. Did you ever talk to him directly?
11      A   No.
12      Q   Umm, let me give you what I am marking as
13  Exhibit Number 14.
14          (Defendants' Exhibit 14 was marked.)
15  BY MR. COLITZ:
16      Q   Do you recognize that document?
17      A   Yes.
18      Q   And what do you recognize it to be?
19      A   It is a page off of my website.
20      Q   Okay. And your website again was called --
21      A   The Light Choice.
22      Q   Okay. And what does it say at the top of that
23  page right underneath "home"?
24      A   Barn lights.
25      Q   Do you think the term "barn light" is a

111

1  descriptive term for a type of lighting?
2          MR. FERNANDEZ: Object to form.
3          THE WITNESS: It's a pretty generic term.
4  BY MR. COLITZ:
5      Q   Okay.
6      A   These lights have multiple -- depending on
7  what part of the country you are from --
8      Q   Uh-huh.
9      A   -- it is more of a slang word than a specific
10  type of light.
11      Q   But you don't think the term "barn light"
12  is -- is owned by anybody, do you?
13          MR. FERNANDEZ: Object to form.
14          THE WITNESS: No. I know Brian was trying to
15  buy it at one point in time and had filed for it but
16  he said they were getting a lot of kickback on it.
17  BY MR. COLITZ:
18      Q   Do you think he actually filed a trademark
19  application for it?
20      A   Yes.
21      Q   Okay. Has he ever sent you a cease and desist
22  letter to say stop using the term "barn light"?
23      A   No.
24      Q   And I think that was exhibit number -- did I
25  mark that?

112

1      A   14.
2      Q   14.
3          Are you likewise familiar with Barn Light
4  Electric's claim that the term Original -- "The
5  Original" is a trademark?
6      A   No.
7      Q   Are you familiar with a product that they
8  called "The Original"?
9      A   No. When I was working there, they had a
10  marketing person making up names for all of the stuff.
11  So I don't -- I really wasn't involved in -- on what the
12  names were. I just knew the part numbers.
13      Q   Okay. Going back to your Exhibit Number 1, I
14  believe.
15      A   Okay.
16      Q   At Line 1, can you read the first line there?
17      A   "Barn Light, The Original, 12-inch to
18          16-inch warehouse shade."
19      Q   Does that refresh your recollection as to
20  whether or not they were using it -- the term?
21      A   I know they -- they were using it --
22      Q   Okay.
23      A   -- but I don't know what light that is.
24      Q   Okay. So that's what I want to talk about
25  their use of The Original.

28 (Pages 109 to 112)

## 145

1    MR. FERNANDEZ: Objection to form.
2  BY MR. COLITZ:
3    Q   You can answer.
4    A   Yes.
5    MR. COLITZ: Go off the record for a second.
6    THE VIDEOGRAPHER: Going off video record at
7  2:18.
8    (Recess taken from 2:18 p.m. to 2:30 p.m.)
9    THE VIDEOGRAPHER: We're back on the video
10  record. The time is 2:30.
11  BY MR. COLITZ:
12    Q   Thank you, Mr. Schultz. I will remind you
13  that you are still under oath.
14    You were previously testifying what it was
15  like to work at Barn Light Electric. Were there ever
16  any violent confrontations --
17    MR. FERNANDEZ: Objection.
18  BY MR. COLITZ:
19    Q   -- when you worked there?
20    MR. FERNANDEZ: Objection to form.
21    THE WITNESS: The violence really started when
22  the sons started working there. We had an instance
23  where one of -- one of the sons tried to start a
24  fight with the assembler on -- on the line and had
25  to get -- it was a young kid. We had to get his --

## 146

1  his dad to come down and he got involved in a big
2  confrontation with Brian and almost quit that day.
3  BY MR. COLITZ:
4    Q   Uh-huh.
5    A   Brian really didn't do anything about it.
6    And then there was another day, there was an
7  electrician working and he was up on a ladder and one of
8  the kids came up behind the electrician and kicked the
9  ladder out of the way while the electrician was on there
10  and knocked him off because he didn't like the guy.
11    Q   What are the names of the sons?
12    A   Ryan and Michael.
13    Q   I want to go back to -- for a moment when
14  you -- when we were talking about the backing plates,
15  remember the backing plates?
16    A   Yeah.
17    Q   And that -- I think you testified that the
18  Hi-Lite product would be shipped directly to Barn Light
19  Electric?
20    A   Correct.
21    Q   And that the box would be opened and a backing
22  plate would be swapped out?
23    A   Right.
24    Q   Do you know whether or not after that box was
25  sealed back up whether the Hi-Lite shipping label

## 147

1  remained or did they put a Barn Light Electric shipping
2  label over it?
3    MR. FERNANDEZ: Objection to form.
4    THE WITNESS: Hi-Lite doesn't have labels on
5  their boxes. Because they sell to so many different
6  people --
7  BY MR. COLITZ:
8    Q   Uh-huh.
9    A   -- they don't put logos on it. The only label
10  that is on there is the FedEx invoice. So they would
11  replace the invoice with a Barn Light invoice.
12    Q   Okay. But, so, would a ship -- would a --
13  would a shipping label be applied to the box?
14    A   Yes.
15    Q   And would it be a Barn Light Electric shipping
16  label?
17    A   Correct. It would be a new label with a new
18  Barn Light invoice.
19    Q   Okay.
20    MR. COLITZ: Let me mark -- Exhibit Number 21.
21  I believe we're on 21.
22    THE REPORTER: 23.
23    MR. COLITZ: 23. Sorry. Wow.
24    (Defendants' Exhibit 23 was marked.)
25  BY MR. COLITZ:

## 148

1    Q   So we have been talking today about Barn Light
2  Electric. Are you familiar with a different company
3  called "Barnlight Originals"?
4    A   Yes.
5    Q   And how do you know Barnlight Originals?
6    A   That is Hi-Lite's competitor website to
7  Barn Light.
8    Q   Okay. And have you ever had a discussion with
9  either Brian or Donna Scott about Barnlight Originals?
10    A   No, we really didn't talk about that. We did
11  talk about kind of the naming convention, where
12  Barn Light came from and Hi-Lite. I know they ended up
13  getting the word Barn Light from Hi-Lite's catalog.
14    Q   Uh-huh.
15    A   You asked earlier about -- you know, if that
16  is a regular word. Like I said, it is really a slang
17  word. The same -- same lights are called RLMs,
18  reflective light manufacturers and warehouse lighting,
19  so.
20    Q   You think it is a descriptive term?
21    A   Barn light itself?
22    Q   Yeah.
23    A   No. It's more of a slang word for a light.
24    Q   And you believe that Brian or Donna Scott got
25  the term "barn light" from a Hi-Lite catalog?

149

1    A    Correct.
2         MR. FERNANDEZ:  Objection to form.
3         MR. COLITZ:  Can you repeat the question?
4         (Record read as follows:
5         "Q  And you believe that Brian or Donna
6    Scott got the term from -- term 'barn
7    light' from a Hi-Lite catalog?")
8         MR. FERNANDEZ:  Objection to form.
9         THE WITNESS:  Yes.
10   BY MR. COLITZ:
11        Q    And how do you know that?
12        A    I -- they would give me the catalogs to look
13   through and we talked about it.
14        Q    What was -- what did you say?  What was said?
15        A    We were actually talking to Bay Area
16   Innovations.  He had a different website and we were
17   talking a little bit about marketing strategies and how
18   they came up with their name.  They actually sold some
19   video game controllers and Brian and -- and Shawn were
20   talking about marketing strategies and the website
21   and -- and we were talking about different names and how
22   they came up with that name.
23        Q    And so was it decided that Barn Light would be
24   a good name?
25        A    That is what they ended up going with.

150

1         Q    The document that I have given you as Exhibit
2    Number 23, have you seen that document before, just the
3    first page?
4         A    I have seen the website before.
5         Q    But have you seen that particular message with
6    Hi-Lite retail website owner Jeffrey Ohai?
7         A    No.  I have seen on Hi-Lite's regular website
8    it says they have -- you know, they sell barn lights.
9         MR. COLITZ:  All right.  That is all I have.
10        MR. FERNANDEZ:  Okay.  Cross.
11             EXAMINATION
12   BY MR. FERNANDEZ:
13        Q    Good afternoon, Mr. Schultz.
14        A    Hi.
15        Q    I'm going to ask you some questions now.  I
16   want to remind you that you are still under oath and the
17   same ground rules that Mr. Colitz mentioned at the
18   beginning of this deposition apply to -- to this latter
19   part of the deposition.  Okay?
20        A    Okay.
21        Q    What is your current home address?
22        A    335 13th Avenue Northeast, St. Pete, Florida.
23        Q    And how long have you lived there?
24        A    Since January.
25        Q    Before then, where did you live?

151

1         A    I lived in Treasure Island.
2         Q    Where in Treasure Island?
3         A    428 Sandy Hook Road.
4         Q    How long did you live there?
5         A    About a year and a half.
6         Q    By yourself there?
7         A    No, I had a roommate.
8         Q    Who was your roommate?
9         A    Martha Moon.
10        Q    Okay.  Are you presently employed?
11        A    Yes.
12        Q    Where?
13        A    Skyway Realty Group.
14             THE REPORTER:  I'm sorry?
15             THE WITNESS:  Skyway Realty Group.
16   BY MR. FERNANDEZ:
17        Q    And what do you do there?
18        A    I'm the owner and the broker -- real estate
19   broker.
20        Q    How long have you been working there?
21        A    Year and a half.
22        Q    Where else do you work?
23        A    That's it.
24        Q    Are you affiliated in -- well, before I get
25   into that, how did you prepare for this deposition?

152

1         A    I was given some paperwork where you guys had
2    asked for some documents so I collected some documents
3    and gave them to Alfred.
4         Q    And you said you were given some paperwork,
5    who was that paperwork from?
6         A    I believe it was a subpoena.
7         Q    Okay.  In --
8         A    Separate lawsuit.
9         Q    In this lawsuit?
10        A    No, a separate lawsuit.
11        Q    Okay.  How did you prepare for this
12   deposition?
13        A    Just showed up.
14        Q    Okay.  Did you review any documents
15   beforehand?
16        A    No.
17        Q    Did you print out any documents?
18        A    Yes.
19        Q    Okay.  What documents did you print out?
20        A    The ones that I provided today.
21        Q    When did you print those out?
22        A    Yesterday.
23        Q    Okay.  And where were those documents stored?
24        A    They're on a Dropbox account that I created
25   for Alfred for my other lawsuit.

38 (Pages 149 to 152)

1

UNITED STATES DISTRICT COUURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 8:14-CV-01955-MSS-AEP

BARN LIGHT ELECTRIC COMPANY,
LLC, a Florida limited liability company,

          Plaintiff,

vs.

BARNLIGHT ORIGINALS, INC.,
a Nevada corporation; HI-LITE
MANUFACTURING COMPANY, INC., a
California corporation; and JEFFREY L.
OHAI, an individual California Resident,

          Defendants.
_____/
          "HIGHLY CONFIDENTIAL"

     DEPOSITION OF WALTER SOLMS
   Volume 1 of 2, Pages 1 through 90

     Thursday, October 8, 2015
     10:00 a.m. - 5:15 p.m.
          Gray-Robinson, P.A.
          301 East Pine Street
               Suite 1400
          Orlando, Florida  32808


     Stenographically Reported By:
          RICHARD CASTILLO
     Certified LiveNote Reporter
     Notary Public, State of Florida

---

2

          APPEARANCES
ON BEHALF OF THE PLAINTIFF
   FELDMAN GALE
     400 North Tampa Street
     Suite 2830
     Tampa, Florida  33602
     Phone: (813)374-8890
       Email:  Afernandez@feldmangale.com
   BY:  ALEJANDOR FERNANDEZ, ESQUIRE
ON BEHALF OF THE DEFENDANT
   GRAY ROBINSON, P.A.
     301 East Pine Street
     Suite 1400
     Orlando, Florida  32802
     Phone: (407)843-8880
     Email: michael.colitz@gray-robinson.com
   BY:  MICHAEL COLITZ, ESQUIRE
        STEPHEN ANDERSON, ESQUIRE

---

3

INDEX OF PROCEEDINGS

Deposition of WALTER SOLMS          Page

   Direct Examination by Mr. Colitz       6
Certificate of Oath               87
Court Reporter's Certificate      88
          - - - - -
NOTE 1:  Ellipses (...) used to reflect pauses
between words.

NOTE 2:  "(Nods)" can mean either yes or no.

---

4

DEFENDANT'S EXHIBITS

Number          Description          Page
   1     Subpoena Duces Tecum            8
   2     Purchase Order            25
   3     Sales Receipt             26
   4     Photographs               26
   5     Internet Archive              33
   6     E-mail                    54
   7     Document                  62
   8     E-mail                    72

U.S. LEGAL SUPPORT, INC.
813-876-4722

## 21

website?

A   Yes.  But  ... we would get over that because a lot of the products would be imported or they would be different, so we always tried to tread lightly on selling anything that was similar to Hi-Lite's products.

Q   And why do you think you were treading lightly?

A   'cause we didn't want to lose Hi-Lite.  You know, it's pretty simple.

Q   Was there ever a time when Hi-Lite said, "Hey, you got to take off -- this manufacturer off your website" and -- and Barn Light Electric complied?

A   Yes, I believe Hi-Lite did ask us a few times to take different things off, and then we talked through it and we would take it off, or we would come to an agreement with Hi-Lite, and so on.

Q   And ... do you remember any -- any of those manufacturers were?

A   Primarily Millenium Lighting.  They're out of Georgia.  And -- but they sell an import fixture that's similar to our lights.  And then Canarm, they're a Canadian lighting and they just sold something that was different and -- and cheaper.  It

## 22

was more cost effective.  We could sell those lights for half the cost 'cause they were half the cost of Hi-Lite Manufacturing products, but they were not as well made.  The quality wasn't there.

MR. FERNANDEZ:  Can I interject and just include our typical stipulation from the last several days, where the testimony here is going to be considered  ... or actually, you already entered a stipulation about the documents, right?

MR. COLITZ:  Yeah.

MR. FERNANDEZ:  Okay.  So sorry for the interruption.

MR. COLITZ:  No, I mean -- yeah, okay.  Correct.  We will designate this as highly confidential pending any designations within 30 days.

And the other stipulation is that highly confidential documents can be shown to third parties provided that the third party is a recipient of that highly confidential document.

MR. FERNANDEZ:  Yeah, but I don't want to designate this  ... well, as long as the party who's being referenced  ... because the information that he's talking about is

## 23

confidential to Barn Light Electric, so I want it to remain accessible to Barn Light Electric but not to Hi-Lite, so that's -- that would be the stipulation.  It would be highly confidential as to Hi-Lite.

MR. COLITZ:  I think we can agree to that.

MR. FERNANDEZ:  Okay.  Good.

MR. COLITZ:  As long as it's clear that he's testifying about his time at Barn Light Electric.

MR. FERNANDEZ:  Yes.

THE COURT REPORTER:  Canarm, how do you spell it, or whatever it was?

THE WITNESS:  C-A-N and then arm, A-R --

THE COURT REPORTER:  A-R-M?  If you know.

THE WITNESS:  Yeah, I believe that's what it is.

THE COURT REPORTER:  Thank you.

Q   (By Mr. Colitz) Okay.  Do you recall in 2012, this probably would have been in January to May timeframe of 2012, where Hi-Lite arranged to have one of its own products purchased just to see what it would receive?

A   Yes, sir, I do remember that.

Q   What do you remember about that?

## 24

A   I see every PO that comes across, and I was the one to initial it off, and I do remember seeing one that was questionable on where it was going.  But I showed it to Donna.  She said it was fine, and so we sent the -- and my inclination was right.  It was Hi-Lite or Jeff ordering it to see what would happen, what would come of it, and  ... Barn light got bit on it, you know, so.

Q   Was it the case that the product that was being ordered was a Hi-Lite product but the product that was being sent was something other than a Hi-Lite product?

A   Yes, sir.

Q   And do you know the product that was actually sent, who manufactured that?

A   Yes, sir.  It was Barn Light Electric.  It was  ... we had a metal spinner and you make your own stuff.

Q   Do you remember seeing the -- the purchase order for that order?

A   Um-hum.

Q   Got a copy of it.  Marking this as Exhibit No. 2.

(Discussion held off the record.)

(Exhibit No. 2 marked for identification.)

25

Q    (By Mr. Colitz) Does that appear to be
information about the order for -- for a product
from Barn Light Electric?
        (Pause.)
    A    Yup.  Yes, sir.
    Q    Do you see where it says code H15116G and
H15116?
    A    Yes, sir.
    Q    Do you recognize those as part numbers of
Hi-Lite Manufacturing?
    A    Oh, yes.  That's the 16-inch warehouse
shade.  Yes, sir.
    Q    Okay.  So, if someone went to the Barn
Light Electric website and placed an order for
H15116 or an H15116G, would it be reasonable to
assume the person would think they're getting a
Hi-Lite product?
        MR. FERNANDEZ:  Object to form.
    A    Be more than reasonable.  I mean, it's
exactly what the part number is for Hi-Lite.  That's
the only part number there is.
        MR. COLITZ:  Exhibit No. 3.
        (Exhibit No. 3 marked for identification).
    Q    (By Mr. Colitz) Is that -- what I've
handed you as Exhibit No. 3, does that appear to be

26

a sales receipt?
    A    Yes, sir.
    Q    And do you think it's a sales receipt for
the order in Exhibit No. 2?
        (Pause.)
    A    Yes, sir.
    Q    Under the description where it says HL-A,
do you recognize that as a -- as a Hi-Lite part
number?
    A    Yes, sir.  That's another gooseneck arms,
so ...
    Q    And were you aware of what was actually
sent out as a result of this order?
    A    Yes, because when you do a purchase order,
the -- the manufacturer on the actual purchase order
would be either Hi-Lite or Base Light or one of our
manufacturers.  It was us, though.  It was Barn
Light Electric.
    Q    Show you what is being marked as Exhibit
No. 4.
        (Exhibit No. 4 marked for identification.)
    Q    (By Mr. Colitz) And I'll just give you a
moment to review those photographs.
        (Pause.)
    Q    And does that appear to be a Barn Light

27

Electric manufactured light fixture?
    A    Yes.
    Q    And  ... and if the order that we've
referenced in Exhibit 2 or 3 was fulfilled by
supplying that product, would you be surprised?
        MR. FERNANDEZ:  Object to form.
    A    Surprised in what way?
    Q    (By Mr. Colitz) If the order that you've
been talking about in Exhibit 2, and the sales
receipt in Exhibit 3, is it your understanding that
that was fulfilled with something other than a
Hi-Lite product?
    A    Yes.
        MR. FERNANDEZ:  Object to form.
    Q    (By Mr. Colitz) And is it your
understanding that that order was fulfilled instead
by a Barn Light Electric product?
    A    Oh, yes, sir.
    Q    And the picture in Exhibit No. 4 ,does
that appear to be a Barn Light Electric product?
    A    Yes, sir.
    Q    Do you know why that would have happened
where --
        MR. FERNANDEZ:  Object to form.
    Q    (By Mr. Colitz) Do you have an

28

understanding of why Barn Light Electric would have
processed this order by supplying a Barn Light
Electric product?
    A    Yes, sir.  I mean, we were ramping up our
own manufacturing efforts to supply our own lights.
That was kind of a business plan that we were
driving off of, and while I didn't necessarily agree
with it, I had a job there and went along with it so
...
    Q    Understood.  Are you aware of other
instances where this occurred?
    A    Definitely.  It was probably half the
orders we pushed to Hi-Lite and half we would do on
our own.  Whatever we could make on our own, we
would do on our own.  What we couldn't, say the
bigger shades, the different gooseneck arms, just
the different finishes that we couldn't produce, we
could do your basic black, white, galvanized, things
like that.  Anything else we had to push to Hi-Lite
... because we were always having internal conflict
with them taking too long to push orders out ,so
this is kind of why  ... they did what they did, so
...
    Q    Okay.  You said you disagreed with the
procedure.  Why did you disagree with it?

29

1    A   Well, on a moral grounds, I believed that
2  we build a company from ... nothing to over
3  $10 million in sales, with Hi-Lite Manufacturing,
4  and I always thought we could work with them and --
5  and -- and we owed that to them.  So I believed we
6  did.  And I didn't mind us branching out and making
7  our own different things but ... but I  ...  I always
8  felt a little to -- both my job, but also the people
9  that made it happen without -- we came from nothing
10  so -- and Hi-Lite's the one that helped us build our
11  company, and I thought we owed them  ... the
12  business, you know, so -- so that's -- and I  ...
13  I'm always a person that could talk through things
14  and manage the situation.
15         I always thought we could work with
16  Hi-Lite to manage the timeframes and manage things
17  to make it better.  I didn't understand why we
18  needed to build the same thing that was being built
19  for us, when we built our company off of the back of
20  Hi-Lite, so  ...
21    Q   And ... you have any sense for the
22  frequency for this?  Was it, you know, 50 percent of
23  the orders for Hi-Lite products?  Was it --
24    A   It started off probably five to ten
25  percent, and it quickly went to fifty percent.  I --

30

1  I would agree on that, so  ...
2    Q   So 50 percent of the orders for Hi-Lite
3  products were being fulfilled with something else?
4    A   Correct.  With our own products, yes, sir.
5    Q   And were customers ever informed as to
6  what was going on?
7    A   No, sir.
8    Q   Were you aware of any policy where Barn
9  Light Electric said, "Well, someone placed an order
10  for a Hi-Lite product but we can't fulfill it so
11  we're going to have contact them and offer
12  alternatives?"
13    A   Not necessarily.  The only instance that
14  would happen would be, say a customer previously
15  ordered a year or two before that.  Mostly
16  architects would order, you know, what we were
17  selling as Hi-Lite, and would get Hi-Lite and then
18  we would sell them -- they'd get this and be like,
19  this is not the same thing.  We had -- so we'd have
20  to take it back and actually do a Hi-Lite order,
21  so -- for them.  And part of my job was to see that,
22  okay, especially with the larger firms, to go, okay,
23  this is what they ordered two years ago.  We got to
24  give them exactly what they ordered last time, so
25  ...

31

1    Q   But if it was a new order --
2    A   Yeah, it was -- I'm sorry.  I didn't mean
3  to interrupt.  I'm sorry.
4    Q   If it was a new order, the customer
5  wouldn't have been informed?
6    A   No, sir.
7    Q   Were you aware of any instances of
8  complaints where people ordered a Hi-Lite product
9  and said, "Hey, wait a minute, I didn't -- I got
10  something other than a Hi-Lite product?"
11    A   Not necessarily.  It would be the
12  customers that previously had ordered something and
13  wanted exactly what they ordered before.  And if
14  they didn't get that, then we'd have to correct it
15  and actually give them a Hi-Lite manufactured
16  product.
17    Q   Okay.  So it sounds like -- don't let me
18  mischaracterize your testimony.  But it sounds to me
19  like customers may have complained if they had
20  ordered the same product in the past and they got
21  something different?
22    A   Exactly.
23         MR. FERNANDEZ:  Object to form.
24    Q   (By Mr. Colitz) Okay.
25    A   Yeah.  That's exactly what happened, so,

32

1  yeah, like I said -- mostly commercial projects
2  would want the same thing that they ordered a year
3  or two before that, so, and if they didn't get it,
4  then ...
5    Q   And I think you said that this occurring
6  at one point with 50 percent of the orders for
7  Hi-Lite products?
8    A   Um-hum.  Yes, sir.
9    Q   What's the time period that this occurred?
10    A   Probably ... over a year and a half, two
11  years.
12    Q   So from 2008?
13    A   No, it was later on in the game.  I mean,
14  we didn't start doing this until 2010, so  ...
15    Q   And when do you think you stopped?
16    A   We never stopped with the --
17    Q   It was still going on when you left?
18    A   Oh, yeah.  It was -- it was ramping up
19  even further.  I mean, it was.  It was game on, so
20  ...
21    Q   I want to turn back now to this -- this
22  particular instance which is reflected in Exhibits 2
23  and 3.
24         And do you know the -- in Exhibits 2
25  and 3, can you tell the date of when that order took

---

37

1   A   Not necessarily.  It was kind of Brian and
2   Donna, you know, discussing it and -- and  ... that
3   was about the course of the meeting, so  ...
4   Q   Now, the products that -- the products
5   that Barn Light Electric was manufacturing itself,
6   was it more than just the type of lighting fixture
7   that is reflected on this order in Exhibits 2 and 3?
8   A   Yes, sir.  We were working on porcelain
9   enamel, a different way of making a light fixtures'
10  finish.  And just different ideas, so  ...
11  Q   But in terms of the -- in terms of the
12  products that Barn Light Electric was manufacturing
13  and using to fulfill for Hi-Lite orders, how many
14  different products are we talking about?
15  A   Initially -- initially around 20.  So
16  anything that was the most popular thing that we
17  sold that Hi-Lite, we would make, and so we could
18  build capital off that to be able to fund things we
19  wanted to build after that, so  ...
20  Q   So of the 20 products  ... that you're
21  talking about, for each of those, were those being
22  supplied to customers who had ordered a Hi-Lite
23  product?
24  A   Yes, sir.
25  Q   So I want to understand about how -- sort

---

38

1   of how the ordering process worked.
2       First of all, were -- during your
3   time there, were the majority of the orders that
4   Barn Light Electric received via the website?
5   A   Yes, sir.  Yeah, probably about 75 percent
6   were through the website and 25 percent through
7   calling us and ordering it through the phone.
8   Q   So, someone would make an order?
9   A   Yes, sir.
10  Q   Online?
11  A   Um-hum.
12  Q   And then that information would somehow
13  get conveyed to the order entry department?
14  A   Right.  It -- basically a customer orders
15  through the website through the Cart program, so you
16  can order the fixture.  Credit card processes.  You
17  get an invoice.  The invoice goes to a sales
18  receipt.  The sales receipt is sent to them with the
19  purchase order, and that's how the order goes.
20  Shipping.
21  Q   But so if someone makes an order on-line,
22  --
23  A   Um-hum.
24  Q   -- that information gets communicated to
25  somebody in the order entry department?

---

39

1   A   Yes, sir.
2   Q   And does that person see the product code
3   or the code that the person orders, do they know --
4   A   The order entry person?
5   Q   Yeah.
6   A   Yes.  They see the product code, and
7   basically after that, we had a conversion table that
8   would say, okay, an H11516 is the BLE -- I forgot
9   the code that we used then, but  ... we just became
10  very aware of the table and everything that said --
11  and taught the order entry person how to do it.
12  Q   Okay.  So I guess my question is that if
13  this was happening 50 percent of the time where you
14  would fulfill the order with a non Hi-Lite product,
15  who was making that determination whether you were
16  going to fulfill it with an actual Hi-Lite product
17  or --
18  A   It was Donna or myself, so we'd look at
19  things such as  ... if the person was on the West
20  Coast, 'cause Hi-Lite was on the West Coast.
21  Anywhere in that sector fire, we kind of -- do
22  Hi-Lite, you know, 'cause we knew it would ship
23  faster.  It would get there quicker.  We would -- we
24  wouldn't get the call from Hi-Lite, so  ...
25  Q   Did you also think it was less likely you

---

40

1   would get caught if you --
2   A   Oh, exactly.  That's exactly why.
3   Q   And what other factors like that would you
4   use to determine how you'd fulfill the order?
5   A   Just depends.  We kind of were working on
6   a ratio, so Hi-Lite wouldn't necessarily worry about
7   our sales 'cause I would always look at our sales
8   and split it in half so it would look like we were
9   growing to an extent, but we were still -- we were
10  going like this.  And -- so it would look as though
11  we were doing what we did last year, you know, so.
12  Q   So, you were  ... maybe limiting it just
13  to 50 percent of the orders so you didn't tip off
14  Hi-Lite?
15  A   Yes, sir.  That was the  ... the main
16  goal.
17  Q   And so other than sort of a geographic
18  consideration, West Coast, and not wanting to do it
19  all the time, what other things were taken into
20  account?
21  A   Well, the products, we couldn't make, so
22  say -- I mean, Hi-Lite's got over 200 products.  We
23  had 20, so -- that we could actually push out.  So
24  anything else we couldn't do, we definitely could
25  give to -- give to Hi-Lite because they could do it.

41

(Pause.)

Q   Was one of the considerations whether the customer had ordered with you before and maybe what they received before?

A   So, yes, that was definitely a consideration, especially with our larger commercial projects and things like that.  You have to -- whatever spec, you have to -- you have to push out, so we -- we'd have to do it then as well, so ...

Q   And ... was it the case that either you or Donna was actually in there with the order entry person, or did you get a sheet of what the day's orders were and then you would decide how you were going to fulfill it?

A   Well, every purchase order that came through Barn Light Electric, I had to review, so I would sit at my desk and review, say, 30, 35 a day.  I would review each one of them and -- and anyone that I had a question on, I would -- I would talk to Donna about it or do it myself and we would just push it which way we thought we should, so ..

Q   And whose decision within the company was it to start fulfilling the Hi-Lite orders with Barn Light Electric products?

A   Brian and Donna Scott's.

42

Q   Okay.  And was there a time that they came to you and said, "Okay, this is our plan?"  I mean, did they --

A   Yeah.

Q   Was there a day where they said, "Okay, now we're going to start doing this?"

A   Well, I don't remember the exact date.  We were building up for quite a while to actually be able to fulfill it.  We had a spinner up in Ohio, I believe, that spun the shades for us and -- and ... so I don't know exact dates of when we kicked it off, but we were building up for quite a while before we could even do what we did, so ...

Q   But I guess my -- I don't know necessarily care about exact dates, but you remember a time when either Brian or Donna came you to and said, "This is what we're going to start doing?"

A   Yeah, it was pretty clear we were going to spin shades and make our own stuff and -- 'cause we about growing and it was always ... we didn't like necessarily the timeframe that Hi-Lite would send products out sometimes.  So it was that, it was -- we could build it for half of what it cost us.  I mean, different factors like that, so ...

Q   And ... were you aware of any efforts to

43

sort of -- scratch that.

Was Hi-Lite aware that Barn Light Electric was -- was manufacturing?

A   No.

Q   Was there any effort to sort of hide that from Hi-Lite?

A   Yes.

Q   Okay.  Explain that to me.

A   Well, you -- you have a manufacturer in California that makes all your stuff and you've built your company based off.  You don't want them to actually know you're building the same things that they're building, so I think that's a pretty simple answer, I think, but ..

Q   I know there was a company called Lighting Industrial?

A   Yup -- well, that was our manufacturing facility.  For Barn Light Electric.

Q   And was that at a different location?

A   Yes, sir.

Q   Was that done purposely to hide the manufacturing?

MR. FERNANDEZ:  Object to form.

A   I don't know if it was necessarily -- we didn't market that at all.  So it was a building in

44

South Titusville so, I mean ... I don't ... I don't think that was necessarily built to hide what we're doing.  It was just -- we didn't market, we didn't -- you know, we didn't push it out there, so ...

Q   (By Mr. Colitz) Okay.  So you just didn't volunteer the information?

A   Right.

Q   Are you aware of any steps that you took to actively hide the manufacturing facility?

A   Not necessarily.

(Pause.)

Q   Did you ever have a discussion with Brian or Donna about whether what you were doing was legal?

MR. FERNANDEZ:  Object to form.

A   Not necessarily.  We ... no, no.

Q   (By Mr. Colitz) Do you think ... do you think -- did you have an understanding of whether Brian or Donna Scott knew it was wrong?

A   Yeah, we knew -- we knew what we were doing was on edge, you know, so we would -- and we especially knew that later in the game, and so we started -- I mean, it was a lot of our ideas, "Hey, we need to configured these lights a little bit

Bay Area Innovations?

A   No, sir -- oh, actually, yes.  My apologies.

Q   You know a guy by the name of Shawn Best?

A   Yes, sir.

Q   And how do you know of that company?

A   They were doing a lot of  ... CAD work and things like that, I believe, to build our new product line.

Sorry.  That was a long time ago.  Forgot the name.

Q   I understand.  I understand.

Do you know whose decision it was to hire Bay Area Innovations?

A   Brian and Donna's, so, they made the decisions to do that.

Q   And  ... what would Bay Area Innovations generate for you?

A   I wasn't so in tune with that, but we did look at -- me and Donna together looked at what they were building, and they did different CAD and -- and  ... computer-related pictures and things like that of the products that we were going to use.  And they did such a good job that it almost looked like the actual photo of a light, is what I remember, and so

we could use those pictures on our site, so  ..

Q   Okay.  And  ... are you aware of any instance where a  ... Hi-Lite manufactured fixture would be provided to Bay Area Innovations?

A   Sure, yes.

Q   Why was that done?

A   So we could --

MR. FERNANDEZ:  Object to form.

Q   (By Mr. Colitz) Do you know why that was done?

A   Yes.  So we could copy it or get as close to it as we could, so  ...

Q   I'm going to give you what we're marking as Exhibit No. 6.

(Exhibit No. 6 marked for identification.)

Q   (By Mr. Colitz) Give you a moment to review that document.

(Pause.)

Q   So  ... does this appear to be an e-mail from Jesse Lee Stringer to  ... to a -- some people at Barn Light Electric?

A   Yes, sir.

Q   Does it appear that you were copied on that?

A   Yes, sir.

Q   And it's referring to a -- a top 24 report?

A   Yes, sir.

Q   Are you familiar with this top 24 report?

A   Yes, sir.

Q   Okay.  And what do you recognize it to be?

A   We had -- we had Jesse do some research on what our top 24 products that we sold on the website was, and our initial plan was to  ... recreate those top 24 products within Barn Light Electric's manufacturing.

Q   Okay.  And do you think that's what Bay Area Innovations was hired to do?

A   Yes, sir.

Q   Okay.  And looking at  ... it's difficult because the spreadsheet that's attached, does it identify who the -- who the manufacturer is?

A   Yes, it does.

Q   And who is the manufacturer, at least in most instances?

A   There were instances of two -- or three, I see.  Hi-Lite Manufacturing.

Q   Okay.  And when you look at the attachment with the photos ... when you look at those, can you identify those as Hi-Lite manufactured products?

A   First page, yes.  Second page, everything except the fan -- well, the light fixture on the fan is Hi-Lite but ... everything on that page.

(Pause.)

A   Yes, sir.

Q   Okay.  And  ... do you -- do you know whether  ... these products, the Hi-Lite manufactured products identified in Exhibit 6, were actually turned over to Bay Area Innovations?

A   Yes, sir.

Q   Okay.  And do you think all of the Hi-Lite products listed in this list were eventually turned over to Bay Area Innovations?

A   Yes, sir -- well, not the fan necessarily but --

Q   Everything other than the fan?

A   Yeah, everything else would be, yes.

Q   And who was the person  ... how were those actual light fixtures given over to Bay Area Innovations?

A   I wasn't part of that process.  I'm certain that either they came over to us and/or we went over to them, so  ...

Q   Do you  ... are you familiar with an individual by the name of Michael Schultz?

part number on Google.

Q   Okay.  I got you.  So in that case, was the -- when the BLE part number -- and let's just take -- do you know the BLE equivalent to the H15116?

A   I -- it's been quite a while, so  ...

Q   But -- so there would be a BLE part number on the website?

A   Right.

Q   And someone would order that part number?

A   We only did it on a couple of fixtures, especially the Outback, which was one of our predominant fixtures that people could find for a better cost somewhere else.  We did it on that one.  That's the one I definitely remember doing it on just -- just  ... so a customer couldn't look up that number and find it somewhere else.

Q   And so when someone used that BLE number corresponding to the Outback, --

A   Yeah.

Q   -- what would that order be fulfilled with?

A   It just depended.  It depended on if it was that commercial project that we spoke about earlier, we would let Hi-Lite do it or we would use

our own, so  ...

Q   Was it the same sort of analysis as to whether or not you fulfilled that order with a Hi-Lite product or a Barn Light Electric manufactured product?

A   Yes, same.

Q   So someone would see the Outback on the website?

A   (Nods.)

Q   They would see the BLE part number?

A   Right.

Q   They would order it?

A   (Nods.)

Q   And some customers would get a Hi-Lite product and sometimes people would get a Barn Light Electric product; is that correct?

A   Yes, sir.

Q   Are you aware of approximately when you started using the BLE number for the Outback?

A   Probably late 2011, early 2012.

Q   About the same time?

A   About the same timeframe.

Q   And  ... can you think of any other products where that was done other than the Outback?

A   I can't think of anything more specific

than that, where we did it that way.

(Pause.)

A   I would think we would have done it on to The Original, but honestly I can't remember.

Q   And then  ... on the  ... the product that was known as The Original, are you familiar with that product?

A   Oh, yeah.

Q   And  ... when people would order  ... an Original, is it fair to say that sometimes they got a Hi-Lite product and sometimes they got a Barn Light Electric product?

A   Very fair.

Q   Would they ever get another manufacturer's product if they ordered The Original?

A   No, not -- not to my knowledge.

Q   Okay.  When you were -- when you were using the BLE part numbers in -- and to start with, was the customer always getting a Hi-Lite manufactured product and then it changed over to be either Hi-Lite or Barn Light Electric?

A   Yeah.

Q   I guess what I'm getting at is, is it possible that the Barn Light Electric part numbers were used?  Did you have a hard time keeping up with

your own manufacturing of your own products?

A   Not necessarily.  I mean, we -- we had a bunch of the most predominant ones, the 16-inch shades and the 15-inch shades, so that was the  ...  The Original and the -- the 15-inch.  We had -- we mass produced a bunch of those.  So we had a lot of stock on those, so those are the ones that we predominantly shipped from Barn Light Electric instead of Hi-Lite.

Q   Okay.  Going back to The Original, do you know when they first started -- Barn Light Electric first started selling a product called The Original?

A   It was our first product.  It was --

Q   Back to 2008?

A   Yeah, back to 2008.

Q   And so when you first started selling The Original back in 2008, was it at that point always a Hi-Lite product?

A   Yes, sir.

Q   And then at some point, you developed your own manufacturing?

A   Right.

Q   And after you developed your own manufacturing, sometimes the customer got Hi-Lite, sometimes they got Barn Light Electric?

103

1    A   Yes.
2    Q   Were you aware at your time at
3 Barn Light Electric, of them setting up other
4 companies?  I think you testified about
5 Lighting Industrial.  Are you aware of whether or
6 not that was a separate company?
7        MR. FERNANDEZ:  Object to form.
8    A   I wasn't aware technically that it was.  I
9 knew we had set up Barn Light Real Estate for
10 purposes of the buildings.
11   Q   (By Mr. Colitz) Um-hum.
12   A   It wasn't until after Lighting Industrial
13 was built that I understood that it was a  ...
14 separate entity, so  ...
15   Q   Were you aware of a separate entity that
16 was set up to do the -- the commercial side of the
17 business?
18   A   No, I do not believe that was set up while
19 I was there.
20   Q   Okay.
21   A   I know it now.
22       MR. COLITZ:  I'm going to mark another
23 exhibit.  We're up to Exhibit No. 9.
24       (Exhibit No. 9 marked for identification.)
25   Q   (By Mr. Colitz) And do you recognize that?

104

1    A   Yes, sir.
2    Q   What do you recognize it to be?
3    A   My company.
4    Q   Is it a printout from your --
5    A   Our website, yup, yes, sir -- or one of
6 the pages from the website.
7    Q   When I use the term Barn Light to you,
8 does that suggest to you a type of lighting fixture?
9    A   Yes, sir.
10   Q   Do you recognize that as -- strike that.
11       Do you understand what a trademark
12 is?
13   A   Yes, sir.
14   Q   Do you think Barn Light is a trademark?
15   A   No, sir.
16   Q   And so here on your website when you use
17 barn lighting, are you using that to describe sort
18 of a category of lighting?
19   A   Yes, sir.
20   Q   And tell me about your  ... your -- were
21 you terminated from Barn Light Electric?
22   A   No, I -- I resigned or quit.
23   Q   Okay.  And when did you -- when did you
24 resign or quit?
25   A   I believe it was May or June of 2012.

105

1    Q   And why did you resign?
2    A   Well, I had always been opposed to the
3 fact that leaving Hi-Lite Manufacturing as a whole.
4 Business-wise, it didn't make sense to me.  I could
5 see kind of what we're doing now down the road.  And
6 ... I stuck around just -- it was -- it was my job,
7 you know, and  ... while looking for another
8 opportunity.  And the opportunity came to own my own
9 company so I decided to do that, like most people do
10 in their career path.
11   Q   And when you say you could see what was
12 coming down the road, do you mean litigation?
13   A   Yeah, litigation.  Just the fact that
14 we're  ... we're recreating Hi-Lite Manufacturing's
15 products.  I didn't think it was right.
16 Business-wise, the numbers didn't add up.  I would
17 look at our costs per cost of, you know, us buying
18 Hi-Lite Manufacturing products, it was really close.
19 So just besides having control over the whole deal,
20 it didn't make sense to me.  It seemed like more of
21 a risk than a reward, so  ...
22   Q   So is it fair to say based on what you saw
23 was going on, --
24   A   Right.
25   Q   -- you thought maybe it was good idea to

106

1 get out of there?
2    A   Yes.  Definitely.
3    Q   All right.  Would you be surprised if  ...
4 if anybody at Barn Light Electric said that you were
5 terminated?
6        MR. FERNANDEZ:  Object to form.
7    A   Yeah, I'd be surprised.
8    Q   (By Mr. Colitz) Did they ever send you a
9 letter or something that says you're -- you're fired
10 or you're terminated?
11   A   No, sir.
12   Q   And  ... did you give them two weeks
13 notice?
14   A   Yes, sir.
15   Q   And did you leave at the end of that two
16 weeks?
17   A   I left a few days early because of the
18 unprofessionalism of Donna Scott.  That was about
19 it.
20   Q   Did they ever ask you to sign a
21 non-compete agreement?
22   A   No.
23   Q   Never?
24   A   Never.
25   Q   Did you ever sign a non-compete agreement

251

1  you have in your records?
2      A   Yes, it's in my records.
3      Q   Do you have a record of that opinion from
4  the handwriting expert?
5      A   Yes, sir.
6      Q   Would that be something that you would be
7  willing to share with us so that he could look at
8  those?
9      A   Sure.
10      (Pause.)
11      Q   I want to talk about Exhibit No. 12 --
12  actually, before I get there, one other question.
13          When you were at Barn Light Electric,
14  who was in charge of their website?
15      A   I'm -- I'm sorry?
16      Q   When you were at Barn Light Electric, who
17  was in charge of running their website, do you
18  remember?
19      A   The website or the IT part of it?
20      Q   Just the website, like the content of the
21  website.
22      A   Well, a lot of us put content on the
23  website.  I mean, sales guys did, we had marketing
24  people putting stuff on.
25      Q   Did -- did Brian and Donna Scott generally

252

1  approve of what was put on and where they go?
2      A   Yup.
3      Q   Did Brian and Donna Scott generally
4  approve of what was -- what was put on and what was
5  taken off the site?
6      A   Yes.
7      Q   Now I'd like to go to Exhibit 12.
8          This Better Business Bureau report
9  reflects that you've had a couple of complaints,
10  does it not?
11      MR. FERNANDEZ:  Object to form.
12      A   Yes, sir.
13      Q   (By Mr. Colitz) And how many complaints
14  does it show that you've got?
15      A   Seven, total.
16      MR. FERNANDEZ:  Object to form.
17      Q   (By Mr. Colitz) And is one of those, in
18  fact, closed?
19      A   Yes, sir.
20      Q   And if it's closed, do you take that to
21  mean that it's been resolved?
22      A   Yes, sir.
23      Q   So is it a fair to say you've got six
24  outstanding complaints?
25      A   Yes, sir.

253

1      Q   How many total orders do you think Classic
2  Light's placed over the years its been in business?
3      A   Close to a thousand, probably.
4      Q   So out of those thousand, looks like you
5  got about six outstanding complaints?
6      A   Yeah.
7      Q   Before this document in Exhibit 12 was
8  presented to you, had you ever seen it before?
9      A   No.
10      Q   And now that you've seen it, are you going
11  to take steps to resolve these things?
12      A   Yes.
13      Q   Do you recall any similar complaints --
14  strike that.
15          I believe Mr. Fernandez made a couple
16  of references in his questioning to you that I think
17  may have been misleading.
18      MR. FERNANDEZ:  Object to form.
19      Q   (By Mr. Colitz) And I want to see -- I
20  want to see what I can do, so  ...
21          With respect to Exhibit 12, and in
22  particular, the complaint that's listed on March
23  31st, 2014, does that ... does that say that the FBI
24  is conducting an investigation on you?
25      A   No, it does not.

254

1      Q   Does that say that you have committed
2  Internet fraud?
3      A   Nope.
4      Q   Has, in fact, the FBI ever investigated
5  you about these things?
6      A   No, sir.
7      Q   To the best of your knowledge, are you
8  under any FBI investigation?
9      A   No, sir.
10      Q   To the best of your knowledge, have you
11  ever been arrested for anything?
12      A   No, sir.
13      Q   To the best of your knowledge, did you
14  ever go AWOL in your service in the military?
15      A   No, sir.
16      Q   To the best of your knowledge, did anybody
17  ever accuse you of an inappropriate relationship
18  with your wife?
19      A   No, sir.
20      Q   Do you think there's any basis for those
21  questions?
22      A   No, sir.
23      MR. COLITZ:  No further questions.
24      MR. FERNANDEZ:  I'm going to re
25  redirect -- or recross.